**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | ) ) ) | Civil Action No. 1:14-cv-00111-PWG |
| Plaintiffs/Counter-Defendants, | ) ) | |
| v. | ) ) | |
| CAPITAL ONE FINANCIAL CORPORATION, *et al.*, | ) ) ) | |
| Defendants/Counter-Plaintiffs. | ) ) ) ) | |

**PLAINTIFFS INTELLECTUAL VENTURES I LLC AND INTELLECTUAL**
**VENTURES II LLC'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION**
**FOR LEAVE TO FILE THIRD AMENDED ANSWER AND COUNTERCLAIMS**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................... 1
     A.  Count 11: Monopolization in Violation of Sherman Act §2.............................. 3
     B.  Count 12: Attempted Monopolization in Violation of Sherman Act §2 ........... 8
     C.  Count 13: Unlawful Asset Acquisition in Violation of Clayton Act § 7 .......... 8

III. ARGUMENT........................................................................................................ 9
     A.  Leave to Amend Should Be Denied Because the Proposed Antitrust Counterclaims Would Be Futile.......................................................................................................... 9
     B.  Capital One's Proposed Antitrust Counterclaims Are Barred by *Res Judicata*................. 9
     C.  Leave to Assert Antitrust Counterclaims Should Be Denied Because They Do Not State "Plausible" Claims for Relief and Are Therefore Futile........................................... 12
     D.  Amended Counterclaim 11 Does Not and Cannot Plausibly State a Claim for Monopolization in Violation of Sherman Act §2. ..................................................... 13
          1.  Capital One Alleges No Plausible Relevant Market..................................... 13
          2.  Capital One Does Not Plausibly Allege that Intellectual Ventures Has Monopoly Power in any Properly Defined Relevant Market. ..................................................... 17
          3.  None of the Conduct Alleged by Capital One Is an Unlawful Act of Monopolization. 18
               a)  Building "a massive patent portfolio that [Intellectual Ventures] alleges reads on existing products in that [financial-services] industry .......................................... 19
               b)  "Combining many invalid, not infringed, and individually weak financial-services patents." ................................................................................................... 19
               c)  "Amplif[ying] its hold-up threat by concealing and obfuscating its patent holdings through a vast network of shell companies." ................................................... 20
               d)  Sham Litigation ................................................................................. 23
                    (1)  Capital One does not plausibly allege facts giving standing to assert, or antitrust injury from, Intellectual Ventures' litigation against other banks. .............................. 24
                    (2)  Intellectual Ventures' Lawsuits Are Not "Shams." ........................... 25
                    (3)  Intellectual Ventures' Lawsuits Are Not Objectively Baseless. ........... 25
                    (4)  Intellectual Ventures' Lawsuits Are Not Subjectively Baseless........... 26
               e)  Targeting Industry Standards..................................................................... 28
          4.  Capital One Lacks Standing to Sue and Has Suffered No Antitrust Injury.................. 30
     E.  Proposed Counterclaim 12 Does Not and Cannot Plausibly State a Claim for Attempted Monopolization in Violation of Sherman Act §2. ...................................................... 31
     F.  Proposed Counterclaim 13 Does Not and Cannot Plausibly State a Claim for Unlawful Acquisition of Assets in Violation of Clayton Act §7........................................... 32

IV.  CONCLUSION.................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Accord, Dang v. San Francisco Forty Niners*,
   964 F.Supp.2d 1097 (N.D. Cal. 2013) ................................................................ 17

*Allen v. McCurry*,
   449 U.S. 90 (1980) .............................................................................................. 9

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988) .............................................................................. 23, 25, 26

*Apple, Inc. v. Psystar Corp.*,
   586 S.Fupp.2d 1190 (N.D. Cal 2008) .......................................................... 16, 17

*Ashcroft v. Iqbal*,
   556 U.S 662 (2009) ........................................................................ 12, 13, 24, 25

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   459 U.S. 328 (1990) ........................................................................................... 24

*Axis, S.p.A. v. Micafil, Inc.*,
   870 F.2d 1105 (6th Cir. 1989) ..................................................................... 30, 31

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
   237 F.3d 394 (4th Cir. 2004) ............................................................................. 26

*Bell Atlantic Corp v. Twombly*,
   550 U.S. 554 (2006) ........................................................................ 12, 13, 24, 25

*Broadcast Music v. Columbia Broadcasting System*,
   441 U.S. 1 (1979) ........................................................................................ 21, 22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) .................................................................................... 24, 31

*California Motor Transport Co. v. Trucking Unlimited*,
   404 U.S. 508 S.Ct. 609, 30 L.Ed.2d 642 (1972) ............................................... 26

*City of Columbia v. Omni Outdoor Advertising Inc.*,
   499 U.S. 365 (1999) ........................................................................................... 27

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ............................................................................. 17

*Eastern R.R.s President's Conf. v. Noerr Motor Freight*,
   365 U.S. 127 (1961) ..................................................................................... passim

*F.T.C. v. Actavis, Inc.*,
    133 S.Ct. L.Ed.2d 343 (2013) ................................................................ 18

*Georgia Pacific Consumer Products, LP v. Von Drehle Corp.*,
    710 F.3d 527 (4th Cir. 2013) ................................................................ 12

*Glass Equip. Dev. Corp. v. Bestin, Inc.*
    174 F.3d 1337 (Fed. Cir. 1999) ............................................................ 26

*Globetrotter Software v. Elan Computer Group*,
    362 F.3d 1367 (Fed. Cir. 2004) ............................................................ 30

*Golan v. Pingel Enterprise, Inc.*,
    310 F.3d 1360 (Fed. Cir. 2002) ...................................................... 14, 24

*Grand River Enterprises Six Nations Ltd. v. King*,
    781 F.Supp.2d 516 (S.D.N.Y. 2011) ..................................................... 24

Green Country Food Market, Inc. v. Bottling Group,
    371 F.3d 1275 (10th Cir.2004) ............................................................. 16

*Hack v. President and Fellows of Yale College*,
    237 F.3d 81 (2d Cir.2000) .................................................................... 16

*Harnett v. Billman*,
    800 F.2d 1308 (4th Cir.1986) ................................................................. 9

*IGT v. Alliance Gaming Corp.*,
    702 F.3d 1338 (Fed. Cir. 2012) ...................................................... 14, 17

*Illinois Tool Works v. Independent Ink, Inc.*,
    547 U.S. 28 (2006) ............................................................................... 17

*In re Varat Enter. Inc.*,
    81 F.3d at 1315 .................................................................................... 11

*Ingle v. Yelton*,
    439 F.3d 191 (4th Cir. 2006) ................................................................ 10

*Intergraph Corp. v. Intel Corp*,
    195 F.3d 1346 (Fed. Cir 1999) ......................................................... 4, 30

*Invitrogen Corp. v. Clonetech Laboratories, Inc.*,
    2007 WL 6856973 (D. Md. April 30, 2007) ......................................... 12

*Jenkins v. Gaylord Entertainment Co.*,
    2011 WL 6755158 (D.Md. Dec. 23, 2011) ............................................. 9

*Laber v. Harvey*,
    438 F.3d 404 (4th Cir 2007) ................................................................ 9

*Lambtek Yogurt Machines v. Dreyer's Grand Ice Cream, Inc.*,
  1997 WL 108718 (N.D.Cal.1997) ........................................................ 16

*Laurel Sand & Gravel, Inc. v. Wilson*,
  519 F.3d 156 (4th Cir 2008) .............................................................. 10

*Linzer Prods. Corp. v. Sekar*,
  499 F. Supp. 2d 540 (S.D.N.Y. 2007) ................................................. 21

*Little Caesar Enterprises, Inc. v. Smith*,
  34 F.Supp.2d 459 (E.D.Mich.1998) .................................................... 16

*Microsoft Corp. v. Motorola, Inc.*,
  963 F. Supp. 2d 1176 (W.D. Wash. 2013) ........................................ 8, 29

*Midwest Machinery Co., Inc. v. Northwest Airlines, Inc.*,
  392 F.3d 265 (8th Cir 2004) .............................................................. 33

*Nobelpharma, AB. v. Implant Innovations, Inc.*,
  141 F.3d 1059 (Fed. Cir. 1998) ..................................................... 23, 28

*Olivares v. NASA*,
  934 F.Supp. 698 (D.Md.1996) ........................................................... 11

*Perkins v. United States*,
  55 F.3d 910 (4th Cir. 1995) .............................................................. 12

*Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.*,
  170 F.3d 1373 (Fed. Cir. 1999) ......................................................... 12

*Pittston Co. v. United States*,
  199 F.3d 694 (4th Cir.1999) ............................................................... 9

*Professional Real Estate Investors v. Columbia Pictures*,
  508 U.S. 49 (1993) ............................................................................ 23

*Queen City Pizza v. Domino's Pizza*,
  124 F.3d 430 (3d Cir. 1997) .............................................................. 14

*Sciele Pharma Inc. v. Lupin Ltd.*,
  684 F.3d 1253 (Fed. Cir. 2012) ......................................................... 26

*Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*,
  827 F.2d 458 (CA9 1987) .................................................................. 27

*Shaw v. Rolex Watch, U.S.A., Inc.*,
  673 F.Supp. 674 (S.D.N.Y.1987) ....................................................... 16

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) .......................................................................... 30

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506S.Ct. 992, 152 L.Ed.2d 1 (2002) ...................................................................... 16

*Tahoe Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*,
   322 F.3d 1064 (9th Cir.2003) ............................................................................................ 9

*U.S. Philips Corp v. ITC*,
   424 F.3d 1179 (Fed. Cir 2005) ................................................................................... 21, 23

*United Mine Workers v. Pennington*,
   281 U.S. 657 (1965)............................................................................................................ 23

*United States v. Grinnel Corp.*,
   384 U.S. 563 (1966)............................................................................................................ 13

*United States v. Paramount Pictures, Inc.*,
   334 U.S. 131 (1962)............................................................................................................ 22

*VAE Nortrak North America, Inc. v. Progress Rail Services Corp.*,
   459 F.Supp.2d 1142 (N.D.Ala 2006)................................................................................ 28

*Washington Gas Light Co. v. Prince George's County Council Sitting as Dist. Council*,
   784 F.Supp.2d 565 (D.Md. 2011) ..................................................................................... 12

*White v. Harris*,
   23 F.Supp.2d 611 (D.Md. 1998) ....................................................................................... 11

## Statutes

15 U.S.C. §15(a) ....................................................................................................................... 23

15 U.S.C. §18 (Id. at ¶74) ......................................................................................................... 32

35 U.S.C. § 271(d) ..................................................................................................................... 35

35 U.S.C. § 282........................................................................................................................... 24

35 U.S.C. §271(d)(3) ........................................................................................................... 28, 35

35 U.S.C. §272(d)(3) .................................................................................................................. 21

## Other

Clayton Act § 7 ....................................................................................................... 5, 10, 32, 33

Sherman Act.................................................................................................................... passim

# I.     INTRODUCTION

Capital One seeks to complicate this already complex patent case by adding the same fanciful antitrust counterclaims that were previously dismissed with prejudice in the Eastern District of Virginia ("EDVA"). Although leave to amend is freely given, leave must be denied here because the proposed antitrust counterclaims are futile. First, they are barred by *res judicata* based on the EDVA judgment dismissing substantially identical counterclaims. Second, even were the proposed counterclaims not barred by *res judicata,* they would still be futile for the same reason that the EDVA dismissed the same counterclaims: they fail to state a claim for relief. As the EDVA held:

> Imbedded in Capital One's theory of liability is that it is impossible to determine, before it commits to technological solutions, which publicly disclosed patents may be infringed by its technological choices. It candidly concedes that, as a practical matter, it has implemented its technological solutions based on the assumption that its potential legal exposure for patent infringement can be ignored, or later managed economically, since an individual patent holder would typically lack the resources or the economic incentive to enforce a single or limited number of patents against a commercial bank. In a sense, Capital One complains that IV's strategy to enforce patents in an economically sensible way has upended its business expectations and business calculus; but the Court knows of no antitrust jurisprudence that would translate that strategy into antitrust liability.

Memorandum Opinion dismissing Capital One's antitrust counterclaims (hereinafter "EDVA Antitrust Opinion"), ECF No. 161, at p. 13, in *Intellectual Ventures I LLC, et al v. Capital One Financial Corporation, et al.*, E.D.V.A (Alexandria Division) Civil Action No. 1:13-cv-00740 (AJT/TJR) (hereinafter the "EDVA Case"). (A true and correct copy of the EDVA Antitrust Opinion is attached to this brief as **Exhibit A**.) As will be seen, Capital One's proposed antitrust claims here are no different.

# II.     STATEMENT OF FACTS

Although dressed up in slightly different (although no less inflammatory) rhetoric than the dismissed EDVA antitrust counterclaims, Capital One's proposed antitrust counterclaims are substantively identical and are proposed to be brought by the same Capital One defendants against

1

the same Intellectual Ventures plaintiffs as in the EDVA Case. A copy of Capital One's dismissed antitrust counterclaims in EDVA, is attached hereto as **Exhibit B**.

Capital One admits, as it must, that it seeks leave to add the same three antitrust counterclaims for monopolization, attempted monopolization and unlawful patent acquisition that were dismissed with prejudice in the EDVA Case.   They even have the identical counterclaim count numbers, namely 11, 12 and 13, respectively, as in the dismissed EDVA antitrust counterclaims.   But Capital One argues in support of its motion for leave to amend, just as it argued and lost in EDVA, that somehow there are new facts which preclude application of *res judicata*:

> Capital One seeks the requested relief [to Amend the Judgment to Specify that Capital One's Antitrust Counterclaims Are Dismissed Without Prejudice, EDVA ECF No. 382] pursuant to Fed.R.Civ.P. 59(e) on the grounds that discovery and events since the Court's Order constitute new evidence that supports its allegations.  As relief, Capital One does not seek leave to amend and pursue its Counterclaim based on that "new evidence,'" but rather seeks only to modify the effect of the Court's Order….  The Court's Order therefore adjudicated the defendants' counterclaims on the "merits" of that claim, as the "merits" of that claim were to be determined at that preliminary pleadings stage.  For that limited reason and in that limited context, the Court's adjudication was not "without prejudice" in that the counterclaims were disposed of for the purposes of this action and for the purposes of appeal.

(Order Denying Motion to Amend Judgment EDVA Case, ECF No.  408, at P. 1-2; a true and correct copy of the Order Denying Motion to Amend is attached as **Exhibit C**.  But *res judicata* attaches to the judgment entered on April 22, 2013 (EDVA Case, ECF No. 376; a true and correct copy of the Judgment is attached as **Exhibit D.**), not to the order granting  Intellectual Ventures' motion to dismiss entered on December 5, 2013 (EDVA Case, ECF No. 151; a true and correct copy of the Order granting Intellectual Ventures' motion to dismiss Judgment is attached as **Exhibit E**.).  Essentially all the "new" facts on which Capital One relies are based on documents produced in the EDVA Case, and thus by definition were available before the EDVA Case judgment and thus are not "new."

### A.      Count 11:  Monopolization in Violation of Sherman Act §2

As the table below shows, Capital One's proposed claim for monopolization in violation of

Section 2 of the Sherman Act, 15 U.S.C. §2, is substantively identical to the dismissed

monopolization claim in the EDVA Case:

| Proposed Maryland Antitrust Counterclaims | Dismissed EDVA Counterclaims |
|---|---|
| References are to paragraph numbers of Capital One's Proposed Third Amended Answer, Defenses, and Counterclaims to Original Complaint in this Action ("PTAC"), a copy of which is attached as **Exhibit B**. | References are to (1) page numbers of the Memorandum Opinion Dismissing Capital One's Antitrust Counterclaims, ECF No. 161 (Exhibit A), cited as ("Opinion at P. ___)" or to (2) Capital One's First Amended Counterclaims, ECF No. 88 (**Exhibit C**), cited as ("FAC at ¶_"), in EDVA (Alexandria Division) Action No. 1:13-cv-00740 (AJT/TRJ). |
|  |  |
| "IV has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the licensing market for the patents in IV's financial-services portfolio, which it claims is essential for bank's operations." (¶155) | "Rather, as best as the Court can discern, Capital One's proposed technology market equates to IV's 'portfolio of 3,500 or more patents that [IV] alleges cover widely used financial and retail banking services' in the United States because IV's patent portfolio presents an 'inescapable threat' to providers of financial services. Answer and First Amend. Counterclaims at 30 ¶72." (Opinion at PP. 8-9) |
| "IV's financial-services portfolio in the United States constitutes a relevant licensing market because IV demands that banks license this portfolio to continue their commercial-banking services (and their redesigned alternatives), threatening and suing those banks that resist. Because Intellectual Ventures sought and obtained such a large portfolio, banks do not have the option to license alternative portfolios, because such an alternative license would not eliminate IV's threat of ceaseless litigation." (¶156) | "Here, Capital One, understandably, does not define the relevant market, as in *SESAC*, *Kodak* and *Qualcomm*, in terms of what is needed to lawfully operate its business.  Indeed, Capital One effectively alleges there is no commercial market for IV's patent portfolio; and Capital One's relevant market reduces to what IV relies upon to justify its allegedly extortionate demands to buy 'patent peace' and avoid the paralyzing costs of 'wave after wave of burdensome and expensive litigation.'  Amend. Answer and Counterclaims at 16; Mem. In Opp. at 3.  The only 'business necessity' alleged is, in essence, the need to avoid future litigation." (Opinion at P. 10) |
| "That is, there are no substitutes for a license to IV's portfolio, because IV removed the original patentees from the market and banks consequently be free from IV's licensing demands and lawsuits, no matter how they | "Likewise, under Capital One's monopolization claims, the actual technologies included within the proposed market, within broad limits, appear nearly irrelevant, since it is not the substantive, commercial usefulness or the |

| | |
|---|---|
| implement the targeted features, products and services, regardless of how great a price IV may charge, and irrespective of any other patentees from which banks might buy licenses. Capital One cannot avoid or negate IV's infringement claims by licensing patents or technologies from alternative sources." (¶156) | merits of the technology that defines the market; but simply the patents in that market used to threaten Capital One, which consist entirely of Intellectual Venture's patent portfolio. Only in that sense are there no 'substitutes' for the patents that Intellectual Ventures controls and uses to threaten and coerce the commercial banks. In short, Capital One's proposed market is not a 'relevant market' under any recognized antitrust jurisprudence." (Opinion at P. 10) |
| "Intellectual Ventures has monopoly power because, by its own admission, banks [cannot avoid] IV's demands that they license its portfolio of 3,500 patents related to the financial-services industry, or the serial baseless litigation with which they are punished if they do not take a license.   IV's portfolio does not contain valuable patents that would enable the banking industry to innovate, introduce new products, lower costs, or enhance the value of existing products.    Instead,    IV's    financial-services portfolio is unavoidable because it is so large and opaque that IV can claim, baselessly, that it reads on [common tools] and threaten the banks' continued operations…. IV's accumulation of patents and associated anticompetitive conduct described below give IV the power to control price in licensing financial-services technology. (¶157) | "In proposing this relevant market, however, Capital One does not allege any of the recognized indicia of a relevant market. It does not allege that the proposed market consists of an 'area of effective competition' between IV and the commercial banks who are the alleged victims of IV's anticompetitive conduct. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999)(defining the relevant product markets as 'the area of effective competition' between the parties). It does not allege that this proposed market contains all, or even any, of the available substitutes for the technologies included within that proposed market, or that the included technologies all pertain to the same aspects of the commercial banking operations, or even to those at issue in this case.    Rather, as best as the Court can discern, Capital One's proposed technology market equates to IV's 'portfolio of 3,500 or more patents that [IV] alleges cover widely used financial and retail banking services' in the United States because IV's patent portfolio presents and 'inescapable threat' to providers of financial services.  Answer and First Amend. Counterclaims at 30 ¶72.  (Opinion at PP. 8-9, footnotes omitted)    Likewise, under Capital One's    monopolization    claims,    the    actual technologies included within the proposed market, within broad limits, appear nearly irrelevant, since it is not the substantive, commercial usefulness or the merits of the technology that defines the market; but simply the patents in that market used to threaten Capital One, which consist entirely of IV's patent portfolio.  Only in that sense are there no 'substitutes' for the patents that IV controls and |

| | |
|---|---|
| | uses to threaten and coerce the commercial banks. In short, Capital One's proposed market is not a 'relevant market' under any recognized antitrust jurisprudence." (Opinion at P. 10) |
| "IV has a 100 percent share of the relevant market because it alone sells a license to what it contends to be an indispensable body of patents, and licenses to patents held by other entities cannot halt IV's activities with respect to its financial-services portfolio." (¶164) | Rather, as best as the Court can discern, Capital One's proposed technology market equates to IV's 'portfolio of 3,500 or more patents that [IV] alleges cover widely used financial and retail banking services' in the United States because IV's patent portfolio presents and 'inescapable threat' to providers of financial services. Answer and First Amend. Counterclaims at 30 ¶72. (Opinion at PP. 8-9) Likewise, under Capital One's monopolization claims, the actual technologies included within the proposed market, within broad limits, appear nearly irrelevant, since it is not the substantive, commercial usefulness or the merits of the technology that defines the market; but simply the patents in that market used to threaten Capital One, which consist entirely of IV's patent portfolio. Only in that sense are there no 'substitutes' for the patents that IV controls and uses to threaten and coerce the commercial banks. In short, Capital One's proposed market is not a 'relevant market' under any recognized antitrust jurisprudence." (Opinion at P. 10) |
| "As explained below, IV has excluded competition in at least three ways. First, it has amassed patents that IV alleges read on existing financial services and products, regardless of how they are designed. (¶171) | However, in the patent context, § 7 addresses only those situations in which the *acquisition* of a patent substantially lessens competition, and not situations in which anticompetitive effects arise at some point after the acquisition… Here, Capital One does not allege that IV's acquisitions, standing alone, have lessened competition as if, for example, IV had acquired all substitutes or competing technologies. Rather, the alleged anticompetitive effects, as Capital One explains, arise from IV's litigation threats, based on the patents it has accumulated, and the settlements that result from those litigation threats. In other words, the complained of anticompetitive effects do not arise from the acquisition of the patents, but from conduct that post-dates the acquisition." (Opinion at PP. 16-17) |
| Second, IV has foreclosed direct licensing between banks and the former patent | "In proposing this relevant market, however, Capital One does not allege … that this proposed |

| | |
|---|---|
| owners or licensors from which IV obtained its patents. Those former owners of financial-services patents competed with one another for licensing opportunities. IV has eliminated that competition entirely with respect to the 3,500 patents in its financial-services portfolio, creating a technology bottleneck over which it has exclusive licensing authority. (¶171) | market contains all, or even any, of the available substitutes for the technologies included within that proposed market, or that the included technologies all pertain to the same aspects of the commercial banking operations, or even to those at issue in this case. (Opinion at P. 8) Likewise, under Capital One's monopolization claims, the actual technologies included within the proposed market, within broad limits, appear nearly irrelevant, since it is not the substantive, commercial usefulness or the merits of the technology that defines the market; but simply the patents in that market used to threaten Capital One, which consist entirely of IV's patent portfolio. Only in that sense are there no 'substitutes' for the patents that IV controls and uses to threaten and coerce the commercial banks. In short, Capital One's proposed market is not a 'relevant market' under any recognized antitrust jurisprudence." (Opinion at P. 10) |
| "Third, Intellectual Ventures excludes competition through obfuscation and concealment. Specifically, IV hid its patent acquisitions through a network of some 2,000 shell companies and, to this day, refuses to disclose the full content of its portfolios." (¶171) | "IV has no commercial purpose other than to engage in '"submarine' hold-up"' of innovators like Capital One that provide goods and services to consumers. *Id.* at 27 ¶63. It accomplishes its anticompetitive business objectives through '[s]ecrecy, misdirection and obfuscation,' including through the use of a 'labyrinthine network of some 2000 shell companies.' *Id.* These shell companies conceal IV's patents…." (Opinion at PP. 2-3, footnote omitted) |
| Capital One alleges five acts of monopolization by Intellectual Ventures: | Capital One alleges five acts of monopolization by Intellectual Ventures: |
| 1. "IV consciously built a massive patent portfolio that it alleges reads, vaguely, on existing products in that [financial-services] industry…." (¶173) | 1. "Acquiring… an enormous quantity of patents… that purport to cover ordinary course financial services industry processes" (FAC ¶74(a)); |
| 2. "By combining many invalid, not infringed, and individually weak financial-services patents into a portfolio, IV achieves monopoly power that would not otherwise exist." (¶176) because with a judicial "error rate" of 1%, there is an 85% chance of an incorrect verdict of infringement and validity if 200 patents are tried. (¶177) | 2. "Asserting vague and ambiguous patents…coupled with licensing demands that increase Intellectual Ventures' power to impose royalty rates that vastly exceed the real economic value, if any, of that patent portfolio" (FAC ¶74(d)) |
| 3. "IV amplifies its hold-up threat by concealing and obfuscating its patent holdings through a | 3. Attempting to force licenses to its patents by preventing banks from evaluating allegations of |

| | |
|---|---|
| vast network of shell companies and by refusing to disclose the full contents of its financial-services portfolio." (¶ 182) | portfolio infringement by "deliberate concealment of the extent of its patent holdings and its threats of continued litigation" (*FAC* ¶74(b)); |
| 4. "Should a victim of this campaign refuse to pay protection money in the form of a license, IV resorts to sham litigation." (¶ 185); | 4. "Initiating sham infringement litigation in bad faith, regardless of the relevance, validity or enforceability of its patents or the likelihood of success on the merits at trial, with the intent of using the federal court process, as opposed to the outcome of that process, as an anticompetitive weapon to increase its pricing power in the relevant market." (FAC ¶74(c)); |
| 5. "IV specifically targeted basic industry standards that all commercial banks must implement, secretly amassed patents that it can baselessly assert against any implementation of those standards, concealed the identity and number of those patents, and then asserted them." (¶190) | 5. Attempting to force licenses to its patents by preventing banks from evaluating allegations of portfolio infringement by "deliberate concealment of the extent of its patent holdings and its threats of continued litigation" (*Id.* at ¶74(b)); |
| Counterclaim 14: Unlawful Acquisition of Patents In Alleged Violation of Clayton § 7. | Counterclaim 13: Unlawful Acquisition of Patents In Alleged Violation of Clayton § 7. |
| Counterclaim 14 alleges that Intellectual Ventures' acquisitions of "some 3,500 financial services patents …has been substantially to lessen competition, and to tend to create a monopoly, in the licensing market for the patents in IV's financial-services patent portfolio." (¶215) | Counterclaim 13 alleges that Intellectual Ventures' acquisitions of the Intellectual Ventures Financial Patents "are likely to lessen substantially, and indeed already have lessened substantially, competition in the [Alleged Financial Technology Market and] in addition are likely to create, and indeed already have created, a monopoly in the relevant market" (FAC¶90) |
| | "However, in the patent context, § 7 addresses only those situations in which the *acquisition* of a patent substantially lessens competition, and not situations in which anticompetitive effects arise at some point after the acquisition… Here, Capital One does not allege that IV's acquisitions, standing alone, have lessened competition as if, for example, IV had acquired all substitutes or competing technologies. Rather, the alleged anticompetitive effects, as Capital One explains, arise from IV's litigation threats, based on the patents it has accumulated, and the settlements that result from those litigation threats.  In other words, the complained of anticompetitive effects do not arise from the |

| | acquisition of the patents, but from conduct that post-dates the acquisition." (Opinion at PP. 16-17) |
|---|---|

Capital One's allegations of Intellectual Ventures' acts of monopolization are as devoid of substance as is its definition of the relevant market, namely:

1.      "Building a "massive patent portfolio that [Intellectual Ventures] alleges reads… on existing products in that [financial services] industry" (PTAC at ¶173);

2.      **"[C]ombining many invalid, not infringed, and** individually **weak financial-services patents into a portfolio [to achieve] monopoly power that would not otherwise exist" (PTAC ¶176);**

3.      "[C]oncealing and obfuscating its patent holdings through a vast network of shell companies" (PTAC ¶182);

4.      Filing sham patent infringement lawsuits (PTAC ¶ 185); **and**

5.      "[S]pecifically target[ing] basic industry standards that all commercial banks must implement, secretly amass[ing] patents that it can baselessly assert against any implementation of those standards[1], conceal[ing] the identity and number of those patents, and then assert[ing]them" (¶190)**.**

B.      **Count 12:  Attempted Monopolization in Violation of Sherman Act §2**

Proposed Counterclaim 12 for attempted monopolization in violation of Sherman Act §2, 15 U.S.C. §2, incorporates, and therefore suffers from, the same defects as the proposed Counterclaim 11 for monopolization, and therefore will not be discussed separately.

C.      **Count 13:  Unlawful Asset Acquisition in Violation of Clayton Act § 7**

Capital One's Thirteenth Counterclaim for "Unlawful Asset Acquisition in Violation of Section 7 of the Clayton Act" asserts that Intellectual Ventures' acquisition of 3,500 financial-services patents, without more, violates Clayton Act § 7.  Clayton Act § 7, 15 U.S.C. §18, prohibits

---

[1] Capital One asserts that there is some antitrust issue arising from Intellectual Ventures' acquisition and assertion of patents that read on standards – so called Standards Essential Patents or "SEPs."  But neither acquiring nor asserting SEPs by Intellectual Ventures raises antitrust issues.   Indeed, FRAND ("Fair Reasonable and Non-Discriminatory) obligations arise from the patentee's representations to standards setting organizations ("SSOs").  *See*, *e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1182 (W.D. Wash. 2013) (discussing patentee's FRAND obligation as arising out of representations to SSO). There is no allegation that Intellectual Ventures made any representation to a standards setting organization that would subject its patents to a FRAND obligation.

the acquisition of assets, where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

## III.     ARGUMENT

### A.     Leave to Amend Should Be Denied Because the Proposed Antitrust Counterclaims Would Be Futile.

"Leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile."  *Laber v. Harvey*, 438 F.3d 404, 426-27 (4th Cir. 2006) (en banc)(citations omitted); *accord Jenkins v. Gaylord Entertainment Co.*, 2011 WL 6755158 (D.Md. Dec. 23, 2011).   Here leave to amend must be denied because the proposed antitrust counterclaims are futile for two independent reasons.  First, they are barred by *res judicata* based on the dismissal with prejudice of those same counterclaims in the EDVA Case.  Second, they fail to state a claim for relief for the same reason that those claims were dismissed with prejudice in the EDVA Case.

### B.     Capital One's Proposed Antitrust Counterclaims Are Barred by *Res Judicata*.

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (emphasis supplied).

> The test for deciding "whether the causes of action are identical for claim preclusion purposes is whether the claim presented in the new litigation 'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment.'" *Pittston Co. v. United States,* 199 F.3d 694, 704 (4th Cir. 1999)(quoting *Harnett v. Billman,* 800 F.2d 1308, 1313 (4th Cir. 1986)). "Newly articulated claims based on the same [transactional] nucleus of facts may still be subject to a res judicata finding if the claims could have been brought in the earlier action." *Tahoe Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency,* 322 F.3d 1064, 1078 (9th Cir. 2003).

*Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 162 (4th Cir. 2008).

Capital One asserts that its proposed antitrust counterclaims here are based on "new facts" that it purportedly discovered after its antitrust counterclaims already had been dismissed in the

9

EDVA Case.  But since the "new facts" are based on documents that Capital One asserts were produced by Intellectual Ventures in the EDVA Case, Capital One could have sought leave to amend its counterclaims prior to entry of judgment in that case.  Although leave to amend was not given in the dismissal order (EDVA Case ECF No. 151)—meaning that it was a dismissal with prejudice—Capital One never sought reconsideration of the dismissal order under Rule 54(b) or leave to amend under Rule 15(a)(2) when these purported "new facts" arose long before the entry of judgment.  Instead, for its own tactical reasons, Capital One never sought leave to amend its antitrust counterclaims but instead sought to modify the judgment dismissing its antitrust counterclaims to be without prejudice.   (EDVA Case ECF No. 408 at p.2 (Order denying motion to modify judgment))  *Res judicata* attached when judgment was entered, not when the motion to dismiss was granted, so facts that Capital One knew or should have know *before entry of judgment in the EDVA Case* are not "new" for purposes of *res judicata*.

When relying on "new evidence" in a motion to amend a judgment, the movant must show that the evidence actually is "new"—that is, it was not available prior to the entry of judgment.  *See Ingle v. Yelton*, 439 F.3d 191, 198 (4th Cir. 2006) (when events "occurred **before** the district court entered summary judgment," the "evidence, to the extent it was evidence, was available at the time the district court ruled" and is not "new evidence" that justifies Rule 59(e) relief) (emphasis in original)).  Since the evidence was not "new" for purposes of a motion to amend a judgment under Rule 59(e), *a fortiorari* the evidence is not "new" for purposes of avoiding the *res judicata* effect of that same judgment.

> But even if new facts and issues have been pleaded, the later suit will be precluded if those facts and issues *might* have been presented in the earlier suit. *See In re Varat Enter. Inc.,* 81 F.3d at 1315; *Olivares v. NASA,* 934 F.Supp. 698, 706 (D.Md.1996), *aff'd,* 114 F.3d 1176 (4th Cir.1997). If the claims are sufficiently related in time, space, origin and motivation; would have formed a convenient trial unit; and their treatment as a unit would conform to the parties' expectations or business understandings or usage, identity for claim preclusion purposes is established. *See* Restatement (Second) of Judgments, § 24(2).

*White v. Harris*, 23 F.Supp.2d 611, 616 (D.Md. 1998). The "new" evidence could have been raised in the EDVA Case, and thus Capital One's proposed antitrust claims here are barred by *res judicata*. *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

Moreover, the "new evidence" would not have changed the outcome in the EDVA Case because the court there ***assumed as true*** Capital One's allegations regarding Intellectual Ventures' conduct and intent (EDVA Antitrust Opinion ECF No. 171 at 2-6).   The EDVA court found that Capital One had failed to allege, *inter alia*, a plausible "relevant market" or the exercise of "monopoly power" within the proposed "relevant market," and therefore had failed to state a claim (EDVA Antitrust Opinion at 8-15).  Capital One's "new evidence" does nothing to cure those fatal deficiencies.  While Intellectual Ventures does not concede that the "new facts" are true, much less "new," or would give rise to the inferences Capital One asks the Court to make, none is material, and neither individually or collectively would not have saved the antitrust counterclaims from dismissal in the EDVA Case, even if these "new facts" are assumed to be true and all reasonable inferences are allowed.

The linchpin of Capital One's antitrust counterclaims in the EDVA case was that ***most of the 3,500*** financial services patents were "irrelevant, invalid, not infringed, and/or unenforceable." That is the same allegation that Capital One makes here:   "By combining many invalid, not infringed, and individually weak financial-services patents into a portfolio, Intellectual Ventures achieves monopoly power that would not otherwise exist."  (PTAC ¶176.)  The EDVA court assumed the truth of Capital One's allegations to that effect (EDVA Antitrust Opinion at p.4 (assuming as true that Intellectual Ventures knew that "many if not most of the 3,500 patents in its financial services patent portfolio are irrelevant, invalid, not infringed, and/or unenforceable")). Thus, the dismissal of the claims under ***only five*** of the ***3,500*** financial services patents is not "new evidence" that would prove that "most of the 3,500" financial services patents are invalid or not

infringed, and would not otherwise have saved the antitrust claims in the EDVA Case from dismissal. This simply is not "new evidence" that would change the outcome or would otherwise warrant Rule 59(e) relief.

Finally, the fact that the judgment in the EDVA Case is on appeal to the Federal Circuit does not deprive that judgment of its res judicata effect. *Georgia Pacific Consumer Products, LP v. Von Drehle Corp.*, 710 F.3d 527, fn. 8 (4th Cir. 2013); *accord*, *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.*, 170 F.3d 1373, 1381 (Fed. Cir. 1999) (applying 4th Circuit law); *Invitrogen Corp. v. Clonetech Laboratories, Inc.*, 2007 WL 6856973 (D. Md. April 30, 2007) at *4 ("The fact that Invitrogen was then appealing Judge Robinson's Order is of no consequence. 'The established rule in the federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal.'")

Capital One's proposed antitrust claims are barred by *res judicata*. Capital One's motion should be denied on the basis alone.

### C.      Leave to Assert Antitrust Counterclaims Should Be Denied Because They Do Not State "Plausible" Claims for Relief and Are Therefore Futile.

"The standard for futility [under Rule 15(a)(2)] is the same as a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995) (amendment is futile if the amended claim would fail to survive motion to dismiss)." *Washington Gas Light Co. v. Prince George's County Council Sitting as Dist. Council*, 784 F.Supp.2d 565, 570 (D.Md. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S 662, 678 (2009), *quoting Bell Atlantic Corp v. Twombly*, 550 U.S. 554, 570 (2006). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 550 U.S. at 678. "[O]nly a complaint that states a ***plausible claim*** for relief survives a motion to dismiss.

Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the review court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (emphasis supplied; citations omitted).

Pleading facts that are as consistent with conduct that does not violate the antitrust laws as with conduct that does will not survive a motion to dismiss, despite the conclusory allegation that they violate the antitrust laws. *Twombly*, 550 U.S. at 557. Even if a plaintiff's complaint is " well-pleaded," conclusory allegations like Twombly's that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry … and ha[d] agreed not to compete with one another" are not entitled to be taken as true. *Ashcroft*, 556 U.S.at 679-80, quoting *Twombly*, 550 U.S. at 555. A court must look to the "nonconclusory factual allegations" to determine whether they give rise to a plausible claim for relief. *Ashcroft*, 556 U.S. at 680, *quoting Twombly*, 550 U.S. at 565-66. When "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the complaint must be dismissed. *Id.* at 558.

### D.   Amended Counterclaim 11 Does Not and Cannot Plausibly State a Claim for Monopolization in Violation of Sherman Act §2.

#### 1.   Capital One Alleges No Plausible Relevant Market.

Intellectual Ventures cannot have committed monopolization (or attempted monopolization) unless (i) Intellectual Ventures has a monopoly (or is likely to acquire a monopoly) in a relevant market and (2) engaged in anticompetitive conduct to acquire or maintain that monopoly. *United States v. Grinnel Corp.*, 384 U.S. 563, 570-71 (1966). "As a threshold issue in any monopolization claim, the court must identify the relevant market. 'The relevant market is the field in which meaningful competition is said to exist.'" *IGT v. Alliance Gaming Corp.*, 702 F.3d 1338, 1344 (Fed. Cir. 2012) (citations omitted). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass

13

all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997).   Defining a relevant market requires "evidence of market share, barriers to entry, or any other commonly accepted evidence showing monopoly power."   *Golan v. Pingel Enterprise, Inc.*, 310 F.3d 1360, 1369 (Fed. Cir. 2002) (citation omitted).

Capital One attempts to allege a relevant market as the "financial services" patents in Intellectual Ventures' financial-services portfolio.   That is, the proposed relevant market is defined to include all, but only, those financial-services patents that are owned by Intellectual Ventures. This is not a market definition cognizable under antitrust law.   Antitrust markets are defined in terms of buyer-side and supplier-side substitutability (whether competing substitutes exist), elasticity of demand (the degree to which a buyer would continue to purchase the product at issue in response to a price increase), whether a supracompetitive price increase would invite entry and return prices back to competitive levels, etc.   Capital One alleges none of these things.   *See*, *e.g.*, U.S. Dept. of Justice and FTC *Antitrust Guidelines for the Licensing of Intellectual Property*, at §3.2.2 (Apr. 6, 1995) (the "*IP Guidelines*") (A technology market is "the intellectual property that is licensed (the 'licensed technology') *and its close substitutes* – that is, the technologies or goods that are close enough substitutes significantly to constrain the exercise of market power with respect to the intellectual property that is licensed.") (emphasis supplied).

In addition, for any two patents (say, Patent A and Patent B) to be in the same relevant market as each other, they must be close enough substitutes for one another that "a small but significant and non-transitory price increase" in the license fee for Patent A would result in enough potential licensees switching from licensing Patent A to licensing Patent B to make the increase in the license fee for Patent A unprofitable.   *IP Guidelines* at §3.2.2; *see* 1992 Department of Justice

14

and FTC *Horizontal Merger Guidelines* ("*Merger Guidelines*") at § 1.11; H. Hovenkamp, M. Janis, M. Lemley and C. Leslie, *IP and Antitrust* (Aspen Publishers 2010) ("*IP & Antitrust*") at 4-81.

Capital One does not allege that there are even two patents that meet the requirements for being in the same relevant market, much less that all ***3,500*** Intellectual Ventures financial-services patents meet the requirement of substitutability necessary for inclusion in the same relevant market.  And Capital One does not, because it cannot, allege that the license fee for each of the 3,500 Intellectual Ventures financial-services patents constrains the license fee for every other one of the 3,500 Intellectual Ventures financial-services patents.  But without such allegations, the 3,500 Intellectual Ventures financial-services patents cannot all be in the same relevant market.  Capital One must, but cannot, allege that Capital One and other banks would consider every one of the 3,500 Intellectual Ventures financial-services patents to be substitutes for each of the others, such that an increase in the license fee of all but one of the 3,500 Intellectual Ventures financial-services patents would cause Capital One and the other banks to license the one patent for which there had been no increase, if only the 3,500 financial-services patents were each owned by a different entity.

Capital One also fails to allege why licenses regarding any other patents, aside from those owned by Intellectual Ventures, would not be substitutes for licenses regarding the Intellectual Ventures patents.  Thus, in addition to failing to explain why licenses for all 3,500 Intellectual Ventures patents somehow belong in the same market, Capital One also fails to allege how it can be that licenses for all other patents, owned by entities other than Intellectual Ventures, should be ***excluded*** from that "relevant market."

The absurdity of Capital One's propose market definition is further confirmed by postulating a financial-services patent that is not owned by Intellectual Ventures on Monday, is

purchased by Intellectual Ventures on Tuesday, and then sold by Intellectual Ventures on Wednesday.   According to Capital One, the postulated financial-services patent is not in the relevant market on or before Monday, or on after Wednesday, but is in the relevant market on Tuesday.  No case has recognized a relevant market with such transient properties, or recognized a relevant market defined by the ownership of assets.

And courts have repeatedly held that alleged relevant markets defined by a single owner's product (or patents) are implausible (to say the least):

> In general, a manufacturer's own products do not themselves comprise a relevant product market.... [A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." *Green Country Food Market, Inc. v. Bottling Group,* 371 F.3d 1275, 1282 (10th Cir.2004). *See also Lambtek Yogurt Machines v. Dreyer's Grand Ice Cream, Inc.,* 1997 WL 108718 at *3 (N.D.Cal.1997) (unpublished). Single-brand markets are, at a minimum, extremely rare. "Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market." *Green Country Food Market,* 371 F.3d at 1282. *See also, e.g., Hack v. President and Fellows of Yale College,* 237 F.3d 81, 86 (2d Cir.2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Spahr v. Leegin Creative Leather Products, Inc.,* 2008 WL 3914461 at *9-10 (E.D.Tenn.2008); *Little Caesar Enterprises, Inc. v. Smith,* 34 F.Supp.2d 459, 477 and n. 30 (E.D.Mich.1998); *Shaw v. Rolex Watch, U.S.A., Inc.,* 673 F.Supp. 674, 678-79 (S.D.N.Y.1987). Antitrust markets consisting of just a single brand, however, are not *per se* prohibited; as stated, markets are defined by the "reasonable interchangeability" of use or the cross-elasticity of demand among products. In theory, it may be possible that, in rare and unforeseen circumstances, a relevant market may consist of only one brand of a product. Psystar's factual contentions therefore must be examined under *Twombly*'s pleading standards to determine if Psystar has pled such a situation. The pleadings, however, fail to allege facts plausibly supporting the counterintuitive claim that Apple's operating system is so unique that it suffers *no* actual or potential competitors.

*Apple, Inc. v. Psystar Corp*., 586 S.Fupp.2d 1190, 1198 (N.D. Cal 2008) (antitrust counterclaims to copyright and trademark complaint dismissed).

> If this order were to accept Psystar's proposed market definition, Apple would no doubt enjoy the protections of a "barrier to entry" into the alleged market far more daunting than the listed technical, financial and logistical barriers: Psystar's own definition of the relevant market. The circular nature of Psystar's market definition becomes unavoidable: Psystar "alleges that given the prevalence of the Mac OS in the Mac OS market, customers need a computer hardware system on which to operate the Mac OS," and that Apple leverages that "prevalence" to dominate the Mac OS compatible computer

16

hardware market (Countercl. ¶ 96).  For the above-stated reasons, this order concludes that
the counterclaim does not plausibly allege that Mac OS is an independent market.
*Id*. at 1200.  *Accord, Dang v. San Francisco Forty Niners*, 964 F.Supp.2d 1097, 1105 (N.D. Cal.

2013) ("Defendants are correct that single–brand markets typically do not constitute legally

cognizable markets for the purposes of an antitrust suit.)

The failure by Capital One to identify a plausible relevant market in which Intellectual

Ventures has or is likely to obtain market power is fatal to its antitrust claims.  *IGT*, 702 F.3d at

1344.    Capital One should not be granted leave to allege proposed Counterclaim 11 for

monopolization because such a counterclaim would be futile.

### 2.    Capital One Does Not Plausibly Allege that Intellectual Ventures Has Monopoly Power in any Properly Defined Relevant Market.

In the Fourth Circuit, a complaint that fails to allege the market power of a Sherman Act §2

defendant must be dismissed under Rule 12(b)(6). *Dickson v. Microsoft Corp.*, 309 F.3d 193, 212-

213 (4th Cir. 2002).  Capital One attempts to get around that requirement by alleging a circularly

defined market in which Intellectual Ventures supposedly has a 100% share.  But by definition,

every patent owner has 100% of a "market" defined by its own patents.  If a plaintiff could avoid

the need to plead market share by alleging a market in which, by definition, the defendant has a

100% share, the requirement that market share be alleged would be rendered a nullity.

A patent is not presumed to confer market power,  *Illinois Tool Works v. Independent Ink,*

*Inc.*, 547 U.S. 28, 42-43 (2006), and Capital One does not allege that even a single Intellectual

Ventures financial-services patent confers market power.  It could hardly do so, since it seeks to

affirmatively allege that all 3,500 Intellectual Ventures financial-services patents are "invalid, not

infringed, and individually weak financial-services patents."  (PTAC ¶ 177.)  An invalid patent

carries no exclusion right, and "even a valid patent confers no right to exclude products or

processes that do not actually infringe."  *F.T.C. v. Actavis, Inc.*, __ U.S. __, 133 S.Ct. 2223, 2231,

186 L.Ed.2d 343 (2013).

To plausibly allege that Intellectual Ventures has monopoly power, Capital One would have to identify specific Capital One products or services that Intellectual Ventures asserts or at least plausibly could assert are infringed by a specific Intellectual Ventures patent or group of patents ("Intellectual Ventures Patent Group 1").  Second, Capital One would have to allege that there is an alternative way for Capital One to provide the identified specific product or service which plausibly would infringe another Intellectual Ventures patent or group of patents ("Intellectual Ventures Patent Group 2"), but which would not plausibly infringe Intellectual Ventures Patent Group 1.[2]  Third, Capital One would have to allege that Capital One cannot provide the identified specific product or service without infringing a patent in Intellectual Ventures Patent Group 1 or Intellectual Ventures Patent Group 2, because otherwise Capital One could simply chose the non-infringing alternative.  *See IP & Antitrust* at 4-78.  Capital One did not and cannot meet this pleading obligation.

### 3.   None of the Conduct Alleged by Capital One Is an Unlawful Act of Monopolization.

Even if Capital One plausibly could allege a relevant antitrust market and Intellectual Ventures' possession of monopoly power in it, the five anticompetitive acts alleged by Capital One, individually and collectively, do not state a plausible claim for monopolization because "where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."  *SCM Corp. v Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981).

---

[2] If there is no way for Capital One to provide a specific product or service which plausibly infringes Intellectual Ventures Patent Group 1 without plausibly infringing Intellectual Ventures Patent Group 2, there could be no anticompetitive effect from their joint ownership.

a)   Building **"a massive patent portfolio that [Intellectual Ventures] alleges reads on existing products in that [financial-services] industry**

Capital One alleges that Intellectual Ventures is monopolizing a market defined by its own portfolio of financial-services patents by acquiring those very patents. (PTAC at ¶174). But no case has ever found it unlawful to acquire even an entire portfolio of patents, and neither of the federal agencies[3] has ever asserted such to be an antitrust violation. *See* Section III (F), *infra*. And it is hard to imagine how the acquisition of any number of patents by a non-practicing entity such as Intellectual Ventures could ever violate the antitrust laws. Presumably if the acquisition of an "enormous quantity" of patents were itself illegal, then the antitrust agencies would have challenged Intellectual Ventures' acquisition of Kodak's portfolio of more than 1,000 digital patents or Apple and Microsoft's acquisition of more than 6,000 Nortel patents. Indeed, since a consortium of direct competitors acquired the Nortel patents, that acquisition presumably would have violated the antitrust laws if ever an acquisition of an "enormous quantity" of patents could. But that acquisition went unchallenged by the antitrust agencies. Thus, the alleged acquisition of an enormous number of issued Intellectual Ventures Financial Patents is not an act of monopolization.

b)   **"Combining many invalid, not infringed, and individually weak financial-services patents."**

Capital One alleges that somehow combining a large number of invalid and not infringed patents achieves monopoly power. But presumably the "value" of an invalid and not infringed patent is zero, and presumably, even when a bank does the math, the collective "value" of any

---

[3] The Antitrust Division of the Department of Justice and the Bureau of Competition of the Federal Trade Commission share responsibility for enforcing the federal antitrust laws. They have on occasion promulgated joint statements of their enforcement policy, including horizontal merger guidelines and guidelines for the licensing of intellectual property.

number of patents each having zero value is still zero.  A "massive patent portfolio" of "invalid, not infringed and individually weak patents" cannot confer monopoly power.

Capital One resorts to a mathematical sleight of hand when it alleges that monopoly power could arise from the fact that even with a judicial "error" rate of only 1%, litigating a sufficiently large number of those patents (200 of them in fact) will produce an 85% chance of at least one "erroneous" verdict finding a patent valid and infringed.  (PTAB at ¶177)  But there are two obvious problems with this probabilistic monopoly theory.  First, if a patent is finally held to be valid and infringed, then it is valid and infringed.   Who is Capital One to say that such a result is error?

But second and more importantly, Capital One's mathematics applies whether the 200 patents are related to one another or not, or even whether the 200 patents are replaced by other non-patent assets like copyrights or home mortgages.  If one presumes a judicial error rate of 1%, then the assertion of any 200 "invalid" claims, whether for patent infringement or dognapping, will mathematically produce at least one "erroneous" verdict 85% of the time.   In Capital One's alternative universe, the acquisition of two hundred "invalid" claims for anything, whether they are all one type of claim (e.g., patent infringement or dognapping), or two hundred different but invalid claims (copyrights and home mortgages), will always produce a monopoly, apparently in a "relevant market" defined as "invalid claims owned by the owner of the invalid claims."  Capital One's absurd theory has no legal, economic or even mathematical basis in reality.

### c) "Amplif[ying] its hold-up threat by concealing and obfuscating its patent holdings through a vast network of shell companies."

Capital One alleges that Intellectual Ventures is attempting to force Capital One and other banks to license its patents by concealing its patent holdings.  (PTAC ¶178) But Intellectual Ventures has no obligation to allow Capital One to tell Capital One what patents it owns.  And

Capital One does not allege that Intellectual Ventures has asserted that Capital One infringes all of its financial-services patents, or even any particular one of them other than the five in suit in the EDVA Case and the five in suit here.   And despite the bluster, there is no allegation that Intellectual Ventures has in fact asserted that Capital One has infringed any other patent.   Offering a license to 3,500 Intellectual Ventures financial-services patents is not the same thing as asserting that all 3,500 are infringed.

Capital One does not allege that it is only being offered a "package" license to the entire 3,500 portfolio of Intellectual Ventures financial-services patents, or that Intellectual Ventures refuses to license just the patents-in-suit or the patents individually.   But even a refusal to license except on a portfolio basis would not plausibly allege monopolization.

In *U.S. Philips Corp v. ITC*, 424 F.3d 1179 (Fed. Cir 2005), the Federal Circuit held that a non-exclusive package license is not anticompetitive.   Appellant Philips only made its patents available as part of a package and charged the same per-disc royalty regardless of how many patents in the package were used by the licensee. *Id.* at 1188-1189.   Although the claim at issue in *Philips* was in the patent misuse context, the Court relied on antitrust principles in its analysis,[4] recognizing unique procompetitive benefits associated with package licensing including "integrating complementary technologies, reducing transaction costs, clearing blocking positions, and avoiding costly infringement litigation"  *Id*. at 1192-3 (citing the *IP Guidelines* at § 5.5).   The Court analogized *Philips*' package license to the package licenses at issue *Broadcast Music v. Columbia Broadcasting System*, 441 U.S. 1 (1979), that were found by the Supreme Court to provide licensees "unplanned, rapid, and indemnified access to any and all of the repertory of

---

[4] *See Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 552 (S.D.N.Y. 2007) ("Misuse is closely intertwined with antitrust law, and most findings of misuse are conditioned on conduct that would also violate the antitrust laws.")

[musical] compositions," saving costs over individual sales transactions, monitoring and enforcement. *Id.* at 1193 (citing *Broadcast Music,* 441 U.S. at 20).

The Federal Circuit agreed with the ITC that Philips' patents were essential and thus in fact gave Philips market power even though they were not presumed to do so under 35 U.S.C. §272(d)(3). *Id.* at 1186. But because a package of non-exclusive patent licenses is only a covenant not to sue on the patents in the package, it does not compel the package licensee to *use* the tied, non-essential licensed patents as opposed to using patents competing with the non-essential patents. *Id.* at 1190. As an economic matter, "the value of any patent package is largely, if not entirely, based on the patents that are essential to the technology in question." *Id.* at 1191. Thus, "[i]t is entirely rational for a patentee who has a patent that is essential to particular technology, as well as other patents that are not essential, to charge what the market will bear for the essential patent and to offer the others for free," which "plainly would not be unlawful." *Id.* at 1190-91. For this reason, a package license cannot be used to obtain power in the market for the non-essential patents, and the "package licensing cannot fairly be characterized as exploitation of power in one market to obtain a competitive advantage in another." *Id.* at 1192. Thus, even if Intellectual Ventures would only license its patents on a portfolio basis, that would be an act of neither monopolization nor patent misuse.

The Federal Circuit distinguished *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1962), which held that Paramount's "block booking" of desirable and undesirable movies was an unlawful tying arrangement. The Federal Circuit held that the *Paramount* tie-in was analogous to a "patent-to-product" tying arrangement because the movie houses actually had to exhibit the undesirable movies in order to exhibit the desirable movies. Thus, competing distributors of undesirable movies were precluded from the market because the exhibitors' movie theaters were already tied up with Paramount's undesirable movies. The Philips' blanket license, on the other

22

hand, was a "patent-to-patent" tie and not illegal *per se* because Philips did not require its licensees to use any of the licensed patents, desirable or undesirable. *Philips* at 1188.

Unlike the patents in the pool at-issue in *Philips*, Capital One fails to allege that any of the patents in Intellectual Ventures financial services portfolio—individually or in the aggregate—create market power to support a claim for monopolization.  Thus, acquisition or ownership of Intellectual Ventures' financial-services patent portfolio could not violate the antitrust laws.

### d)   Sham Litigation

Capital One alleges that "should a victim of this campaign refuse to pay protection money in the form of a license, IV resorts to sham litigation." ( ¶186) The legality of antitrust claims based on obtaining, enforcing or litigating a patent are decided as a matter of Federal Circuit law, not regional circuit law.  *Nobelpharma, AB. v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (en banc as to this issue alone, see fn. 5).  "An intellectual property owner is presumptively entitled to immunity from antitrust liability based on its filing of an infringement lawsuit."  IP & Antitrust at 11-22.  That is because the First Amendment immunizes antitrust defendants from liability for petitioning the government.  *See Eastern R.R.s President's Conf. v. Noerr Motor Freight*, 365 U.S. 127, 144 (1961); *United Mine Workers v. Pennington*, 281 U.S. 657,665 (1965).  Filing a lawsuit is petitioning activity protected by Noerr-Pennington immunity. *Professional Real Estate Investors v. Columbia Pictures*, 508 U.S. 49 (1993) ("*PREI*").

The only exception to *Noerr-Pennington* immunity is if the litigation is a "sham."  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 493 (1988).  To adequately allege facts sufficient to establish the sham exception to *Noerr-Pennington* immunity for assertion of patent infringement, Capital One must allege facts from which a jury could find clear and convincing evidence that Intellectual Ventures had no reasonable basis to believe that Capital One infringed its patents and that its patents are not invalid.  *See Golan v. Pingel Enterprise, Inc.*, 310

F.3d 1360, 1371(Fed. Cir. 2002).  Capital One's allegations that Intellectual Ventures is engaging

in sham litigation should be ignored because they are conclusory:  a court must look only to the

"nonconclusory factual allegations" to determine whether they give rise to a plausible claim for

relief.  *Ashcroft*, 556 U.S. at 680, quoting *Twombly*, 550 U.S. at 565-66.

> (1)     Capital One does not plausibly allege facts giving standing
> to assert, or antitrust injury from, Intellectual Ventures' litigation
> against other banks.

Capital One does not have standing to assert that other banks have been the victims of

sham litigation by Intellectual Ventures because Capital One has not suffered antitrust or any other

injury as a result of suits against other banks.  A competitor does not suffer antitrust injury from

illegal conduct that raises competitors' costs.  *Grand River Enterprises Six Nations Ltd. v. King*,

781 F.Supp.2d 516, 530-31 (S.D.N.Y. 2011) (Canadian cigarette manufacturer and importer lacked

standing and suffered no antitrust injury from tobacco Master Settlement Agreement to which they

were not signatories and which raised rivals' prices).  *See also Atlantic Richfield Co. v. USA*

*Petroleum Co.*, 495 U.S. 328, 345 (1990) ("competitor is not injured by the *anticompetitive* effects

of vertical, maximum price-fixing"); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,

488 (1977) (antitrust plaintiff must suffer "antitrust injury").

Even if Capital One could have suffered antitrust injury from Intellectual Ventures' alleged

sham litigation against rival banks, Capital One is only entitled to "recover threefold the damages

by [it] sustained" as a result of Intellectual Ventures' purported sham litigations against other

banks.  15 U.S.C. §15(a).  Capital One sustained no damages from any alleged sham litigation

against other banks since presumably the other banks are defending themselves rather than being

defended by Capital One, and presumably the other banks are not indemnified against any

judgment by Capital One.  Thus, Capital One cannot assert sham litigations *against other banks* as

a basis for monopolization, since it lacks standing, suffered no antitrust injury and sustained no damages as a result of any sham litigation against any other bank.

(2)     Intellectual Ventures' Lawsuits Are Not "Shams."

Only if a lawsuit meets two distinct tests can it be deemed a "sham" and be stripped of *Noerr-Pennington* immunity.  First, it "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *PRE,* 404 U.S. at 60.  Second, even an objectively baseless lawsuit is not a sham unless it is "an attempt to interfere ***directly*** with the business relationships ***of a competitor*** through the use of governmental process – ***as opposed to the outcome of that process***- as an anticompetitive weapon."  Id. at 60-61 (emphasis in original).  This second test is sometimes referred to as the "subjectively baseless" test.  As will be shown, Capital One does not and cannot plausibly allege facts that would pass either of the two tests.

(3)     Intellectual Ventures' Lawsuits Are Not Objectively Baseless.

"We regard as sham private action that is not genuinely aimed at procuring favorable government action," as opposed to "a valid effort to influence government action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4 (1988).  Capital One cannot show that any of Intellectual Ventures' patents are objectively baseless in that any reasonable patentee would believe they were invalid, unenforceable or not infringed.

Other than conclusory factual allegations which are to be disregarded, *Ashcroft*, 556 U.S. at 680, quoting *Twombly*, 550 U.S. at 565-66, Capital One does not even attempt to show clear and convincing evidence that ***all 3,500*** of the Intellectual Ventures financial-services patents are not infringed, invalid or unenforceable.   And Intellectual Ventures is entitled to rely on the presumption of validity set forth in the Patent Act, 35 U.S.C. § 282.  "The presumption of validity attaches to all issued patents and the clear and convincing evidence burden applies to all issued patents…. The presumption of validity found in §282 is reflected in the standard of proof required

to prove invalidity, clear and convincing evidence." *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012)(citations omitted).  The fact that Capital One prevailed in the EDVA Case does not establish that the case was "objectively baseless," and this case has just begun.

Capital One fails to make a plausible claim that any, let alone all, of Intellectual Ventures' infringement actions are objectively baseless, and Intellectual Ventures is entitled to *Noerr-Pennington* immunity from Capital One's antitrust claims.

> (4)     Intellectual Ventures' Lawsuits Are Not Subjectively Baseless.

Capital One cannot meet the subjectively baseless test either, because it does not and cannot allege that it is a competitor of Intellectual Ventures.  "In the event the challenged litigation is found to be objectively baseless, the lawsuit must further conceal an attempt to interfere directly with the business relationships *of a competitor*." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 399 (4th Cir. 2004) quoting *PREI* at 60-61 (emphasis supplied); *Glass Equip. Dev. Corp. v. Bestin, Inc.* 174 F.3d 1337, 1343 (Fed. Cir. 1999) (quoting *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961).  Because Capital One is not a competitor of Intellectual Ventures, Capital One cannot meet the subjectively baseless test for the sham litigation exception to *Noerr-Pennington* immunity.

But even if Capital One could somehow overcome the fact that the sham exception only applies to lawsuits against competitors, the subjective test still could not be met:

> The "sham" exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.  A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. See *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).  A "sham" situation involves a defendant whose activities are "not genuinely aimed at procuring favorable government action" at all, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 592, 500 n.4, 108 S.Ct. 1931, 1937 n.4, 100 L.Ed.2d 497 (1988), not one "who 'genuinely seeks to achieve his governmental result, but does so *through improper means*,' " *id.*, at 508, n.10, 108 S.Ct. at

1941, n.10 (quoting *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 827 F.2d 458, 465, n.5 (CA9 1987).

*City of Columbia v. Omni Outdoor Advertising Inc.*, 499 U.S. 365, 380 (1999).

Capital One does make the conclusory allegation that Intellectual Ventures initiated the litigation with the intent of using the federal court process, as opposed to the outcome of that process, as an anticompetitive weapon to increase its pricing power in the relevant market, but nowhere explains how that is possible, much less plausible.  And it is flatly contradicted by Capital One's allegations that Intellectual Ventures brings its lawsuits to obtain settlements.  A lawsuit brought to obtain or "coerce" a settlement is not a sham as a matter of law. As the *City of Columbia* court said:

> Neither of the Court of Appeals' theories for application of the "sham" exception to the facts of the present case is sound. The court reasoned, first, that the jury could have concluded that COA's interaction with city officials was " 'actually nothing more than an attempt to interfere directly with the business relations *[sic]* of a competitor.' " 891 F.d2d, at 1139 (quoting Noerr, supra, 365 U.S., at 144, 81 S.Ct. at 533). This analysis relies upon language from *Noerr*, but ignores the import of the critical word "directly." Although COA indisputably set out to disrupt Omni's business relationships, it sought to do so not through the very process of lobbying, or of causing the city council to consider zoning measures, but rather through the ultimate *product* of that lobbying and consideration, viz., the zoning ordinances. The Court of Appeals' second theory was that the jury could have found "that COA's purposes were to delay Omni's entry into the market and even to deny it a meaningful access to the appropriate city administrative and legislative fora."  891 F.2d, at 1139.  But the purpose of delaying a competitor's entry into the market does not render lobbying activity a "sham," unless (as no evidence suggested was true here) the delay is sought to be achieved only by the lobbying process itself, and not by the governmental action that the lobbying seeks.  "If *Noerr* teaches anything it is that an intent to restrain trade as a *result* of the government action sought ... does not foreclose protection."  Sullivan, Developments in the Noerr Doctrine, 56 Antitrust L.J. 361, 262 (1987).

*City of Columbia*, 499 U.S. at 381.

As in *City of Columbia*, Capital One parrots the language from *Noerr* that using litigation to directly interfere with the business of a competitor satisfies the second test, but ignores the word "directly."  The only way that Capital One even claims that Intellectual Ventures is seeking to "use the [litigation] process" is to "obtain the outcome of that process," settlement, which cannot satisfy

the second test for the sham exception to *Noerr-Pennington* immunity.  And all of the alleged infringement claims in each lawsuit, including the hypothetical ones not yet filed, would have to be objectively and subjectively baseless, that is "a sham," in order for that lawsuit to lose *Noerr-Pennington* immunity.  *VAE Nortrak North America, Inc. v. Progress Rail Services Corp.*, 459 F.Supp.2d 1142, (N.D. Ala 2006).  It is impossible, not just implausible, for Intellectual Ventures to *directly* interfere with Capital One's business through the filing of a plethora of patent litigation lawsuits, even if Capital One were a competitor of Intellectual Ventures which Capital One plainly is not.

Even were Capital One to somehow overcome Intellectual Ventures' *Noerr-Pennington* immunity, it "must still prove a substantive antitrust violation.  Proof of a sham merely deprives the plaintiff of immunity' it does not relieve the defendant of the obligation to establish all other elements of his claim." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1072 (Fed. Cir. 1998).  Here Capital One cannot plausibly establish any element, much less all of the elements, of its antitrust claims and they must be dismissed with prejudice.

e)      **Targeting Industry Standards.**

Capital One alleges that Intellectual Ventures is monopolizing because "IV specifically targeted basic industry standards that all commercial banks must implement, secretly amassed patents that it can baselessly assert against any of those standards, concealed the identity and number of those patents, and then asserted them."  (PTAC ¶190.)

As an initial matter, the Payment Card Industry Security Standard ("PCI-DSS") and the NACHA Rules referenced by Capital One as standards have little in common with technology standards developed by standards setting organizations ("SSO").  SSOs work with companies and other entities to formalize a set of technology protocols that will be implemented in a certain type of technology (*i.e.*, essential to the technology), typically for inter-operability purposes.  In contrast

the PCI-DSS is a set of guidelines created to "help organizations ensure the safe handling of cardholder information at every step."[5]  Similarly, NACHA requires participants to comply with its rules to maintain a high security network.[6]  The NACHA rules and PCI-DSS do not require banks to adopt specific technology protocols but rather to use general methods or safeguards to ensure data security.  Accordingly, bank compliance with NACHA rules or PCI-DSS does not have the "hold up" effect associated with "lock-in" to a technology protocol.[7]

Even if patents in Intellectual Ventures' financial services portfolio that correspond to NACHA rules PCI-DSS could be considered to be Standards Essential Patents ("SEPs"), they could only be subject to a Fair Reasonable and Non-Discriminatory ("FRAND") royalty obligation if Intellectual Ventures or its predecessors in interest to the SEPs participated in the standard setting process.[8]  Here, however, there is no allegation that Intellectual Ventures or any of its predecessors participated in any standard setting process, or that even one of Intellectual Ventures' financial-services patents is subject to a FRAND obligation.

Moreover, failure to license FRAND terms is not a *per se* antitrust violation.  Most recently, the court in *Microsoft v. Motorola* evaluated the defendant's failure to honor its FRAND obligation as a breach of contract.  *Microsoft Corp.*, 963 F. Supp. 2d at 1185.  As discussed above, Intellectual Ventures has no such obligation to breach.

---

[5] *See* PCI SSC Data Security Standards Overview (*available at* https://www.pcisecuritystandards.org/security_standards/) (last accessed 10/3/2014).

[6] *See* NACHA's Report a Rule Violation Page (*available at* https://www.nacha.org/rules/report-rules-violation) (last accessed 10/3/2014).

[7] *See Microsoft Corp,* 963 F. Supp. 2d at 1190.

[8] *See* http://www.ftc.gov/sites/default/files/documents/public_statements/ssos-frand-and-antitrust-lessons-economics-incomplete-contracts/130912cpip.pdf.

In addition, to be a monopolistic act, the assertion of SEPs would have to meet the requirements for the sham litigation exception to *Noerr-Pennington* immunity. *Globetrotter Software v. Elan Computer Group*, 362 F.3d 1367, 1376-77 (Fed. Cir. 2004) ("the objectively baseless standard of *Professional Real Estate* applies to state-law claims based on communications alleging patent infringement"). But by definition, Capital One could not establish the objective test for the sham exception since Capital One cannot possibly show by clear and convincing evidence that every reasonable patentee would believe a SEP was invalid, unenforceable or not infringed. Asserting SEPs, especially SEPS not subject to a FRAND obligation, cannot be an act of monopolization.

### 4.     Capital One Lacks Standing to Sue and Has Suffered No Antitrust Injury.

Prohibited monopolization or attempted monopolization "*must be directed toward competitors* and must be intended to injure competition." *Intergraph Corp. v. Intel Corp*, 195 F.3d 1346, 1353 (Fed. Cir 1999) (emphasis supplied) (monopolization and attempted monopolization claims dismissed because Intel and Intergraph were not competitors), *citing Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). The allegedly unlawful "conduct must affect the relevant product market, that is, *the 'area of effective competition between the defendant and the plaintiff.'*" *Intergraph*, 195 F.3d at 1353 (emphasis supplied; citation omitted). Capital One does not and could not allege that it is a competitor of Intellectual Ventures. This absence of a competitive relationship between Capital One and Intellectual Ventures dooms Capital One's antitrust claims, and Capital One should not be granted leave to allege them.

Moreover, Capital One suffered no antitrust injury as a result of any alleged anticompetitive act of Intellectual Ventures because any injury to Capital One was caused by the patents themselves, and not Intellectual Ventures' ownership of them. *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989) ("Thus, the anticompetitive act of purchasing Mechaneer did

not cause the plaintiff's alleged injury. The patents were an impenetrable barrier to the plaintiff's entry before Micafil purchased Mechaneer, and they remained as great a barrier afterwards.")

Finally, although Capital One proposes to allege five separate alleged acts of monopolization or attempted monopolization, fatally absent from Capital One's proposed antitrust counterclaims is any allegation of actual injury, much less antitrust injury. Capital One does not allege that as a result of any alleged antitrust violation, it spent money trying to avoid infringement (it asserts that Intellectual Ventures' concealment of its patents makes that impossible), or that it paid too much for a patent license (it has not taken a license from Intellectual Ventures), or that it sought and was denied a license to any patent, or that it was only offered a license at a price that resulted from monopoly power, or that it asked for a license to only some Intellectual Ventures patents but was only offered a portfolio license.

Capital One's allegation that it spent money defending itself in lawsuits alleging infringement of Intellectual Ventures' financial-services patents does not allege antitrust injury because Capital One would have had to defend itself no matter who asserted the patents-in-suit. *See Axis, S.P.A. v. Micafil,* 870 F.2d at 1107. Thus, Capital One did not suffer antitrust (or any other) injury as a result of the alleged antitrust violations, and thus lacks standing to sue. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 427 U.S. 477, 488 (1977) (injury must result from what made antitrust violation unlawful).

Capital One did not and cannot allege a plausible claim for monopolization. Accordingly, its motion for leave to file proposed counterclaim 11 should be denied.

### E. Proposed Counterclaim 12 Does Not and Cannot Plausibly State a Claim for Attempted Monopolization in Violation of Sherman Act §2.

Capital One's proposed attempted monopolization claim alleges that Intellectual Ventures' alleged acts of monopolization also evidence a specific purpose and intent of obtaining monopoly power in the market for Intellectual Ventures' own financial-services patents. Accordingly, for the

same reasons that Capital One cannot state a plausible claim for monopolization, it also cannot state a plausible claim for attempted monopolization.  Leave to amend should be denied.

> F.     **Proposed Counterclaim 13 Does Not and Cannot Plausibly State a Claim for Unlawful Acquisition of Assets in Violation of Clayton Act §7.**

Capital One's proposed Counterclaim 13 alleges that Intellectual Ventures' acquisitions of the Intellectual Ventures financial-services patents "has been substantially to lessen competition, and to create a monopoly, in the licensing market for the patents in Intellectual Ventures' financial-services patent portfolio" (PTAC ¶215) in violation of Section 7 of the Clayton Act, 15 U.S.C. §18 (*Id*. at ¶213).

For the reasons stated in Section III(D)(1) and III(D)(2), *supra*, Capital One has not alleged a plausible relevant market, and has not alleged (plausibly or otherwise) Intellectual Ventures' share of that market.  For that reason Capital One's counterclaim for unlawful acquisition must fail.

But there are more fundamental problems.  First, the legality of an acquisition of patents under Clayton Act § 7 is measured at the time of acquisition.  *SCM Corp.*, 645 F.2d at 1211-12 ("Where a corporation's acquisition of a patent is not violative of §7, as was the case here, its subsequent holding of the patent cannot later be deemed violative of this section. Where a company has acquired patents lawfully, it must be entitled to hold them free from the threat of antitrust liability for the seventeen years that the patent laws provide. To hold otherwise would unduly trespass upon the policies that underlie the patent law system.")

Capital One alleges that the acquisitions of the patents asserted against it in the EDVA case and in this case violated Clayton Act § 7.  But other than the fact that those patents were asserted against Capital One, Capital One makes no allegation how those acquisitions gave Intellectual Ventures monopoly power, or made it likely that Intellectual Ventures would acquire, monopoly power in any properly defined relevant market.  Since only an acquisition which was likely to

"likely to lessen substantially" competition at the time of acquisition can violate Clayton Act § 7, this omission is fatal to Capital One's Clayton Act § 7 claim.

Moreover, the statute of limitations runs as to each acquisition of patents four years after those assets were purchased. *Midwest Machinery Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265, 270 (8th Cir 2004) ("Once a merger is completed, there is no continuing violation possible under § 7 that would justify extending the statute of limitations beyond four years.").  So only an acquisition of patents acquired less than four years before Capital One filed its counterclaim could even be challenged.  But only two of the ten acquisitions identified by Capital One, the December 18, 2012 acquisition of the '587 patent, and the November 16, 2011 acquisition of the '084 patent (PTAC ¶215), could possibly fall within the statute of limitations.  And it is implausible that the acquisition of two patents within the statute of limitations, or even the acquisition of all ten patents asserted against Capital One, could have created a monopoly.  If there was a monopoly, it must already have existed by virtue of Intellectual Ventures' presumed ownership of the remaining 3,490 financial-services patents.

Perhaps most importantly, it is not the acquisition of any or all of the Intellectual Ventures financial-services patents that could have injured Capital One but only their assertion.  Patents do not assert themselves.  That Intellectual Ventures' acquisition or ownership of its own financial-services patents did not injure Capital One is obvious from its proposed allegation that "Intellectual Ventures…secretly amassed patents that it can baselessly assert against any implementation of those standards, concealed the identity and number of those patents, and then asserted them." (PTAC ¶190)  If patents were concealed such that Capital One does not know about the patents or their ownership, how could Intellectual Ventures' ownership of them have injured Capital One?  It was only their assertion, not their acquisition, which possibly could have injured Capital One.

For all of these reasons, Capital One cannot state a plausible violation of Section 7 of the Clayton Act.

## IV.  CONCLUSION

Because Capital One's proposed antitrust counterclaims are barred by *res judicata*, and because they do not and cannot allege a plausible antitrust counterclaim, Capital One's motion to file antitrust counterclaims 11, 12 and 13 should be denied as futile.

Dated: October 6, 2014

Respectfully submitted,

*/s/Michael E. McCabe, Jr.*
Michael E. McCabe, Jr. (Bar No. 10693)
mmccabe@fblaw.com
Bryan D. Bolton (Bar No. 02112)
bbolton@fblaw.com
FUNK & BOLTON
36 South Charles Street, Twelfth Floor
Baltimore, Maryland 21201-3111
(41) 659-7700 (telephone)
(410) 659-7773 (facsimile)
*Attorneys for Plaintiffs, Intellectual Ventures I and Intellectual Ventures II*

Of Counsel:
Ian N. Feinberg (pro hac vice)
ifeinberg@feinday.com
Margaret Elizabeth Day (pro hac vice)
eday@feinday.com
David L. Alberti (pro hac vice)
dalberti@feinday.com
Clayton Thompson  (pro hac vice)
cthompson@feinday.com
Sal Lim (pro hac vice)
slim@feinday.com
Yakov Zolotorev (pro hac vice)
yzolotorev@feinday.com
Marc Belloli (pro hac vice)
mbelloli@feinday.com
FEINBERG DAY ALBERTI & THOMPSON LLP
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone: 650-618-4360
Facsimile: 650 618-4368

34