**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Greenbelt Division*

| | | |
|---|---|---|
| Intellectual Ventures I LLC, *et al.*, | * | |
| Plaintiffs/Counter-Defendants, | * | |
| v. | * | Civil Action No. 8:14cv111-PWG |
| Capital One Financial Corp., *et al.*, | * | |
| Defendants/Counterclaimants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**CAPITAL ONE DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 101**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

I.   Executive Summary ....................................................................................................1

II.  Background ..................................................................................................................4

III. Legal Standards...........................................................................................................5

     A.   Summary Judgment Standard ..........................................................................5

     B.   Abstract Ideas Are Not Patent Eligible Under 35 U.S.C. § 101 .......................6

IV.  Argument ...................................................................................................................10

     A.   The Asserted Claims of the '409 Patent Are Invalid ......................................10

          1.   Representative Claim 6 of the '409 Patent Is Not Patent Eligible Because
               It Covers an Abstract Idea Without Meaningful Limitations ...............11

          2.   Claims 24, 33, and 36 of the '409 Patent Are Not Patent Eligible Because
               They Also Cover the Same Abstract Idea Without Meaningful Limitations.........18

     B.   The Asserted Claims of the '081 Patent Are Invalid ......................................21

          1.   Representative Claim 21 of the '081 Patent Is Not Patent Eligible Because
               It Covers an Abstract Idea Without Meaningful Limitations ...............21

          2.   Claims 22 and 24 of the '081 Patent Are Not Patent Eligible for the Same
               Reasons .................................................................................................26

     C.   The Asserted Claims of the '002 Patent Are Invalid ......................................27

          1.   Claims 34 and 37 of the '002 Patent Are Invalid Because They Do Not
               Fall Within Any Category of Patent-Eligible Subject Matter................28

          2.   Claims 9, 11, 34 and 37 of the '002 Patent Also Are Not Patent Eligible
               Because They Cover an Abstract Idea Without Meaningful Limitations.............30

     D.   The Asserted Claims of the '084 Patent Are Invalid ......................................34

          1.   Representative Claims 15 and 18 of the '084 Patent Are Not Patent
               Eligible Because They Are Directed to an Abstract Idea Without
               Meaningful Limitations ........................................................................34

      2.      Claims 27 and 32 of the '084 Patent Do Not Have Additional Features that Transform the Abstract Idea into Patent-Eligible Subject Matter ........................40

V.      Conclusion .............................................................................................................................41

# TABLE OF AUTHORITIES

## CASES

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ................................................................................. passim

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ............................................................................................ passim

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*,
  687 F.3d 1266 (Fed. Cir. 2012) .......................................................................... 9, 17, 27

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ................................................................................................ passim

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014) ............................................................................... passim

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
  717 F.3d 1269 (Fed. Cir. 2013) ....................................................................................... 6

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
  768 F. Supp. 2d 221 (D.D.C. 2011) ................................................................................ 6

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  --- F.3d ----, No. 2013-1588,
  2014 WL 7272219 (Fed. Cir. Dec. 23, 2014) .......................................................... passim

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
  558 F. App'x 988 (Fed. Cir. 2014) ................................................................ 22, 23, 25, 32

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ............................................................................... passim

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  --- F.3d ----, No. 2013-1505,
  2014 WL 6845152 (Fed. Cir. Dec. 5, 2014) ............................................................ passim

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) ..................................................................................... 27

*Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014) ............................................................................... passim

*Fed. Home Loan Mortg. Corp. v. Graff/Ross Holdings LLP (Freddie Mac)*,
   893 F. Supp. 2d 28 (D.D.C. 2012) ........................................................................... 20, 33

*Funk Bros. Seed Co. v. Kalo Inoculant Co.*,
   333 U.S. 127 (1948) ..................................................................................................... 7

*Glory Licensing LLC v. Toys "R" Us, Inc.*,
   No. 2:09-cv-4252, 2011 WL 1870591 (D.N.J. May 16, 2011) ................................. 20, 33

*Gottschalk v. Benson*,
   409 U.S. 63 (1972) .............................................................................................. passim

*Graff/Ross Holdings LLP v. Fed. Home Loan Mortg. Corp.*,
   892 F. Supp. 2d 190 (D.D.C. 2012) ............................................................................. 33

*Harris v. District of Columbia*,
   561 F. Supp. 2d 63 (D.D.C. 2008) ................................................................................. 5

*In re Kollar*,
   286 F.3d 1326 (Fed. Cir. 2002) ................................................................................... 28

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1301 (2012) ........................................................................................ passim

*Microsoft Corp. v. i4i Limited Partnership*,
   131 S. Ct. 2238 (2011) ................................................................................................. 6

*Parker v. Flook*,
   437 U.S. 584 (1978) ............................................................................................ passim

*Planet Bingo, LLC v. VKGS LLC*,
   576 F. App'x 1005 (Fed. Cir. 2014) ................................................................. 20, 25, 33

*SmartGene, Inc. v. Advanced Biological Labs, SA*,
   555 F. App'x 950 (Fed. Cir. 2014) ................................................................................. 7

*Ultramercial, Inc. v. Hulu, Ltd.*,
   772 F.3d 709 (Fed. Cir. 2014) ............................................................................. passim

*Walker Digital, LLC v. Google, Inc.*,
   --- F. Supp. 2d ----, No. 2011-318,
   2014 WL 4365245 (D. Del. Sept. 3, 2014) ................................................................. 25

**STATUTES**

35 U.S.C. § 100(b) ............................................................................................................. 28

35 U.S.C. § 101..................................................................................................................... passim

35 U.S.C. § 112....................................................................................................................... 11

## OTHER AUTHORITIES

The Leahy-Smith America Invents Act (AIA), Pub. L. No. 112-29 ....................................... 11

## RULES

Fed. R. Civ. P. 12(b)(6).............................................................................................................. 5

Fed. R. Civ. P. 56(a) .................................................................................................................. 4

## I.    EXECUTIVE SUMMARY

Capital One moves for summary judgment that all asserted patent claims in this case are invalid under 35 U.S.C. § 101.  The Supreme Court has repeatedly instructed that, as a matter of law, "abstract ideas" are not patent eligible under § 101.  *See*, *e.g.*, *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014); *Bilski v. Kappos*, 561 U.S. 593 (2010).  Such fundamental concepts are "'part of the storehouse of knowledge . . . free to all . . . and reserved exclusively to none.'"  *Bilski*, 561 U.S. at 602 (citation omitted); *see Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1301 (2012).  For example, a party cannot patent the concept of "intermediated settlement," *i.e.*, using a third-party to permit only those transactions for which there are sufficient funds (*Alice*, 134 S. Ct. at 2356-57), or the concept of "verifying the validity of credit card transactions over the Internet" (*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011)).  This principle cannot be circumvented merely by expressing the idea as a series of routine steps, implementing the idea using general-purpose or well-known components, or embellishing the idea with other inconsequential features or field of use limitations.  *Alice*, 134 S. Ct. at 2355-59; *Bilski*, 561 U.S. at 609-11.

In *Mayo* and *Alice*, the Supreme Court established a two-step test for determining whether claims that may be directed to one of the four subject matter categories listed in § 101 nevertheless claim unpatentable abstract ideas.  First, courts must identify and define the idea intended to be covered by the claims.  *Alice*, 134 S. Ct. at 2355; *Ultramercial, Inc. v. Hulu, Ltd.*, 772 F.3d 709 (Fed. Cir. 2014); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013).  Second, for any patent claim directed to an abstract idea, courts must determine whether other recited elements transform the claim into a patent-eligible application of that abstract idea.  *Alice*, 134 S. Ct. at 2355, 2357.  A patent-eligible application of an abstract idea must contain "an inventive concept,"

described as "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 2355, 2357 (quoting *Mayo*, 132 S. Ct. at 1294). Taking an abstract idea and adding "'well-understood, routine, conventional activit[ies]' previously known to the industry," such as well-known computer components, contributes nothing inventive. *Id.* at 2357-59 (quoting *Mayo*, 132 S. Ct. at 1294); *see also Bilski*, 561 U.S. at 611-12; *Parker v. Flook*, 437 U.S. 584, 590, 594 (1978); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, --- F.3d ----, No. 2013-1588, 2014 WL 7272219, at *3 (Fed. Cir. Dec. 23, 2014); *Ultramercial*, 772 F.3d at 715-16; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014).

All of the asserted patent claims fail this two-part test:

*'409 patent*. Step one of the *Alice* analysis shows that the asserted '409 patent claims are directed to an abstract idea: protecting and distributing data such that each and every access to an unprotected form of the protected data is limited in accordance with unspecified rules. This idea is a fundamental practice that can be carried out with a pen and paper and thus cannot be patentable. Moreover, the idea encompasses both known and unknown ways of protecting data and of limiting access to the unprotected form of that data, as well as known and unknown rules for accessing data. It is at least as abstract as the ideas found to be unpatentable in *Bilski*, *Alice*, and *Ultramercial*. Step two confirms that the claims are unpatentable because the remaining limitations add only generic computer and software components (*e.g.*, "access mechanism"), which the courts universally have held are insufficient for patentability.

*'081 patent*. Step one of the *Alice* analysis shows that the asserted '081 patent claims are directed to an abstract idea: organizing and modifying data relating to documents. Like the ideas

covered by claims held invalid in *Alice*, *Content Extraction*, and a panoply of other Federal Circuit cases, this idea is abstract because it is directed to mere data manipulation.  The asserted '081 patent claims also fail step two: the claims simply add generic computer components (*e.g.*, "processor," "component" and "user interface") that do not add an inventive concept.

   *'002 patent*.   Two of the asserted '002 patent claims fail without even reaching the *Alice* analysis: claims 34 and 37 do not fall into any of the four categories of patentable subject matter set forth in § 101 because they claim an intangible "mobile interface" with pointers.  *Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1348 (Fed. Cir. 2014).   In any event, applying *Alice* to all of the asserted claims, step one shows that all are directed to an abstract idea: retrieving user-specific information using pointers.  This idea is abstract, both because it is a fundamental practice (*e.g.*, a card catalog or index in a library) and because it is directed to mere data gathering and organization. Either characterization dooms the claims.  The asserted '002 patent claims also fail step two because they simply add to the abstract idea only generic computer components, computer-related steps, and field-of-use limitations (*e.g.*, "pointers," "displaying the mobile interface on the local device," and "via a cellular network"), none of which supplies an inventive concept.

   *'084 patent*.  *Alice* step one shows that the asserted '084 patent claims are directed to an abstract idea: analyzing data from multiple sources in some unspecified way to detect an anomaly and using some unspecified pattern correlations to determine targets likely to be affected by the anomaly.  This idea is abstract, both because it is directed to mere data gathering and manipulation and because it covers both known and unknown ways of analyzing data to detect anomalies and using pattern correlation to determine targets anticipated to be affected.  The claims also fail step two because they

add to the abstract idea only post-solution activity (*e.g.*, "alerting the device that is anticipated to be affected by the anomaly") and generic components (*e.g.*, "firewall," "device").

Accordingly, this Court should grant summary judgment that the asserted patent claims are invalid as a matter of law under § 101.

## II.     BACKGROUND

On January 15, 2014, IV filed the present case against Capital One alleging infringement of five patents.  (Dkt. No. 1.)  IV's largely-generic infringement allegations relate to mobile banking, back-end database, server, and security technologies.  *See*, *e.g.*, Complaint (Dkt. No. 1) at ¶¶ 23, 25, 28, 31, 47, 52, 63; Ex. 1, IV's Preliminary Identification of Accused Products and/or Processes (May 22, 2014) [RECORD 0001-0016].  The parties subsequently filed a joint stipulation to dismiss all claims and counterclaims relating to one of these patents, which this Court granted on April 2, 2014.  (Dkt. No. 81.) The remaining four patents are U.S. Patent Nos. 6,314,409 (the '409 patent); 7,984,081 (the '081 patent); 6,546,002 (the '002 patent); and 6,715,084 (the '084 patent) (collectively, the "Asserted Patents").  As discussed below, each of the asserted claims of the Asserted Patents is invalid under § 101.[1]

---

[1] This would not be the first time that a court has granted summary judgment that claims in a patent asserted by Intellectual Ventures are invalid under § 101.  IV first sued Capital One on June 19, 2013, in the U.S. District Court for the Eastern District of Virginia for alleged infringement of five patents. Complaint (Dkt. No. 1), Case No. 1:13cv740-AJT-TRJ.  In that case, IV withdrew one patent based on invalidity, stipulated to noninfringement of another patent based on the claim construction, and voluntary withdrew a third patent.  (*See* Dkt. Nos. 1, 183, 199, 200, 371, and 372.)  The court held that the remaining two patents were invalid as a matter of law under § 101 for lack of patent-eligible subject matter.  Memorandum Op. at 1-7, 13 (Dkt. No. 371), *appeal pending* Nos. 2014-1506, -1515 (Fed. Cir.).

## III.     LEGAL STANDARDS

### A.     Summary Judgment Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the issue is an issue of law (as it is here), summary judgment is "particularly appropriate." *See Harris v. District of Columbia*, 561 F. Supp. 2d 63, 66 (D.D.C. 2008).

Whether the asserted patent claims recite patent-eligible subject matter is a threshold question of law suitable for summary judgment. *See Alice*, 134 S. Ct. at 2353-54 (affirming summary judgment of invalidity under § 101); *Bilski*, 561 U.S. at 594 ("The § 101 eligibility inquiry is only a threshold test."). "From a practical perspective, addressing section 101 at the outset of the litigation will have a number of salutary effects.  First, it will conserve scarce judicial resources.  Failure to recite statutory subject matter is the sort of basic deficiency that can, and should, be exposed at the point of minimum expenditure of time and money by the parties and the court. … Finally, and most importantly, turning to section 101 at the outset protects the public."  *Ultramercial*, 772 F.3d at 718-19 (Mayer, J., concurring) (quotations omitted).

The district court need not construe the claims before conducting a § 101 analysis.  *Ultramercial*, 772 F.3d at 711-12, 714-15 (affirming Fed. R. Civ. P. 12(b)(6) dismissal, finding the claims invalid under § 101 "[w]ithout purporting to construe the claims, as the district court did not"); *Content Extraction*, 2014 WL 7272219, at *5 (district court properly held claims patent-ineligible "at the pleading stage without first construing the claims or allowing the parties to conduct fact discovery").  The court may, as Capital One does here, assume constructions favorable to the patentee and determine whether the claims are invalid under § 101 in view of those constructions.  *See Content Extraction*, 2014

WL 7272219, at *5 ("even when construed in a manner most favorable to [the patentee], none of [its] claims" survive § 101); *see also Alice*, 132 S. Ct. at 2360, *aff'g, CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269 (Fed. Cir. 2013), *aff'g, CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 768 F. Supp. 2d 221, 236 n.6 (D.D.C. 2011) ("To have the Court consider CLS's § 101 defense before conducting a possible *Markman* hearing, CLS agreed to assume a construction of claims favorable to Alice.") (internal citation omitted).

Unlike other types of invalidity, there should be no presumption of eligibility that applies to the § 101 analysis. *Ultramercial*, 772 F.3d at 720-21 (Mayer, J., concurring). The Supreme Court, for example, has taken up four § 101 cases in the last four years and never mentioned or applied any presumption of eligibility. *Id.* As Justice Breyer explained in a non-§ 101 case, *Microsoft Corp. v. i4i Limited Partnership*, "[w]here the ultimate question of patent validity turns on the correct answer to legal questions—what these subsidiary legal standards mean or how they apply to the facts as given— [the clear and convincing evidence standard] has no application." 131 S. Ct. 2238, 2253 (2011) (Breyer, J., concurring) (joined by Justices Scalia and Alito). In any event, any such "presumption" would not save the patent claims in this case.

### B.    Abstract Ideas Are Not Patent Eligible Under 35 U.S.C. § 101

The four categories of patent-eligible subject matter set forth in 35 U.S.C. § 101 are processes, machines, manufactures, and compositions of matter:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

As a threshold matter, patent claims that do not fall within one of these statutory categories are invalid. *Bilski*, 561 U.S. at 601.

But even when patent claims are drafted to implicate these categories, they must not claim "laws of nature, physical phenomena, and abstract ideas," which are *per se* not patentable. *Id.* Subject matter within any of these three exceptions cannot be patented "[r]egardless of what statutory category … a claim's language is crafted to literally invoke." *CyberSource*, 654 F.3d at 1374 (analyzing the "underlying invention for patent-eligibility purposes"); *see also Alice*, 134 S. Ct. at 2360. Abstract ideas—and the other exceptions to patent subject matter eligibility—cannot be patented because they are "part of the storehouse of knowledge of all men … free to all men and reserved exclusively to none." *Bilski*, 561 U.S. at 602 (omission in original) (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). "In defining the excluded categories, the [Supreme] Court has ruled that the exclusion applies if a claim involves a natural law or phenomenon or abstract idea, even if the particular natural law or phenomenon or abstract idea at issue is narrow." *buySAFE,* 765 F.3d at 1353 (citing *Mayo*, 132 S. Ct. at 1303). Furthermore, abstract ideas are not patentable even if they, or the claims embodying them, are novel and non-obvious. *Flook*, 437 U.S. at 588, 590 ("assum[ing] that [the claimed] formula is novel and useful and that [the patent applicant] discovered it" but nevertheless finding the claim abstract and unpatentable); *Ultramercial*, 772 F.3d at 715 ("We do not agree with Ultramercial that the addition of merely novel or non-routine components to the claimed idea necessarily turns an abstraction into something concrete"); *buySAFE*, 765 F.3d at 1352 (holding that abstract ideas are not patentable "no matter how 'groundbreaking, innovative, or even brilliant'"); *SmartGene, Inc. v. Advanced Biological Labs, SA*, 555 F. App'x 950, 952 (Fed. Cir. 2014) (holding claims invalid under § 101 even though, in prior reexamination, "[t]he PTO ultimately concluded that all of the patents' claims were patentable over the prior art presented during the reexaminations").

Courts have enforced these exceptions stringently, holding that claims directed to the following concepts, for example, impermissibly claim unpatentable abstract ideas:

(1) fundamental practices such as hedging (*Bilski*, 561 U.S. at 611-12) and intermediated settlement (*Alice*, 134 S. Ct. at 2352, 2356-57, 2359-60);

(2) mathematical algorithms (*Flook*, 437 U.S. at 589-90);

(3) computer algorithms (*Gottschalk v. Benson*, 409 U.S. 63, 72 (1972));

(4) data manipulation, such as "a process of organizing information through mathematical correlations" (*Digitech*, 758 F.3d at 1350-51) and "data collection, recognition, and storage" (*Content Extraction*, 2014 WL 7272219, at *3);

(5) processes that can be "performed in the human mind, or by a human using a pen and paper" (*CyberSource*, 654 F.3d at 1371-72); and

(6) processes "so abstract and sweeping as to cover both [the] known and unknown" (*Benson*, 409 U.S. at 68).

In *Mayo* and *Alice*, the Supreme Court established a two-part framework for evaluating whether a claim that falls within a category of patent-eligible subject matter is nonetheless drawn to an unpatentable law of nature or abstract idea. *See Mayo,* 132 S. Ct. at 1296-97 (law of nature); *Alice*, 134 S. Ct. at 2355 (abstract idea). First, courts determine whether the asserted patent claims are directed to an abstract idea. *Alice*, 134 S. Ct. at 2355. To identify the "abstract idea," courts identify and define the idea intended to be covered by the claims. *Ultramercial*, 772 F.3d at 714 ("We first examine the claims because claims are the definition of what a patent is intended to cover."); *Accenture*, 728 F.3d at 1341 ("identify and define whatever fundamental concept appears wrapped up in the claim").

Second, for any patent claim directed to an abstract idea, courts determine whether any other recited elements transform the claim into a patent-eligible application of that abstract idea. *Alice*, 134 S. Ct. at 2355, 2357. A patent-eligible application of an abstract idea must contain "an inventive concept," described as "an element or combination of elements that is 'sufficient to ensure that the patent in

practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Id.* at 2355, 2357 (quoting *Mayo*, 132 S. Ct. at 1294).   Taking an abstract idea and adding "'well-understood, routine, conventional activit[ies]' previously known to the industry" contributes nothing inventive.  *Id.* at 2359 (quoting *Mayo*, 132 S. Ct. at 1294); *see also Flook*, 437 U.S. at 590.   For example, simply implementing an abstract idea using well-known computer components, limiting the idea to a particular field of use or technological environment, or adding token post-solution activity is insufficient.  *Alice*, 134 S. Ct. at 2357-59; *Bilski*, 561 U.S. at 611-12; *Flook*, 437 U.S. at 594; *Ultramercial*, 772 F.3d at 716; *buySAFE*, 765 F.3d at 1354-55.   These corollaries date back at least to *Flook*, in which the Supreme Court cautioned that a contrary rule would "exalt[] form over substance."  437 U.S. at 590, 593.   Stated another way, the prohibition on patenting abstract ideas cannot be circumvented through mere "draftsman's art" or by trying to dress up an abstract idea with inconsequential steps or features.  *See*, *e.g.*, *Alice*, 134 S. Ct. at 2359 (quoting *Flook*, 437 U.S. at 593).

Courts have often used the "machine or transformation test," which "can provide a 'useful clue' in the second step of the *Alice* framework."  *Ultramercial*, 772 F.3d at 716 (citing *Bilski*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)).   The machine or transformation test, which asks whether the claim is "tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing," can help evaluate whether claims are unpatentable under § 101.  *See*, *e.g.*, *Bilski*, 561 U.S. at 602, 604; *Benson*, 409 U.S. at 65.   If a claim fails to satisfy both prongs of this test, it suggests the claim is patent-ineligible.  *Ultramercial*, 772 F.3d at 716-17.   To date, neither the Supreme Court nor the Federal Circuit has ever determined that a claim failing the machine or transformation test is valid.

## IV.    ARGUMENT

It is common to analyze claims in groups using a *representative claim* when the asserted claims are the same or very similar for purposes of patent eligibility under § 101.  In *Alice*, for example, the Supreme Court collectively considered and rejected 208 computer method, media, and system claims in four patents based on two representative claims.  134 S. Ct. at 2359-60.  And, in *Content Extraction*, the Federal Circuit found that the district court correctly held 242 computer-implemented claims in four patents patent-ineligible based on two representative claims because "addressing each claim of the asserted patents was unnecessary."  2014 WL 7272219, at *1, *4.  Moreover, the analysis is the same whether the claims are drafted as methods, systems, or otherwise.  *See*, *e.g.*, *Alice*, 134 S. Ct. at 2360 (holding that the system claims "fail for substantially the same reasons" as the method claims); *Accenture*, 728 F.3d at 1341 ("system claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together"); *CyberSource*, 654 F.3d at 1374 (regardless whether the claim is a process or machine, "we look to the underlying invention for patent-eligibility purposes.").  Below, a representative claim for each patent is identified and analyzed, and then applied to the remaining asserted claims.

### A.    The Asserted Claims of the '409 Patent Are Invalid

IV accuses Capital One of infringing claims 6, 24, 33, and 36 of the '409 patent, each of which is invalid under § 101.  As an initial matter, the Patent Office recently instituted a covered business method patent review of these and other claims of the '409 patent.  *See* Ex. 2, PTO Institution Decision, CBM2014-00157 (Jan. 14, 2015) [RECORD 0017-0045].  The basis for institution, according to the Patent Office, is that "Petitioner has demonstrated that it is more likely than not that [claims 1-21, 24-27, 29, 30, 32, 33, and 36-39] are directed to non-statutory subject matter and, therefore, unpatentable under

35 U.S.C. § 101." Ex. 2, PTO Institution Decision at 2 [RECORD 0019]. Although the Patent Office is not expected to make a final determination for about one year, this Court need not wait so long to confirm the Patent Office's initial assessment. All asserted claims of the '409 patent are invalid under § 101.

     **1.      Representative Claim 6 of the '409 Patent Is Not Patent Eligible Because It Covers an Abstract Idea Without Meaningful Limitations**

Dependent claim 6 of the '409 patent is representative of the four asserted claims of the '409 patent for assessing patent subject matter eligibility. Dependent claims "contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference [*i.e.*, include] all the limitations of the claim to which it refers." 35 U.S.C. § 112 ¶ 4.[2] Claim 6 depends from claim 1.

> **1.** A method of distributing data, the method comprising:
>
> protecting portions of the data; and
>
> openly distributing the protected portions of the data, whereby
>
> each and every access to an unprotected form of the protected portions of the data is limited in accordance with rules defining access rights to the data as enforced by an access mechanism, so that unauthorized access to the protected portions of the data is not to the unprotected form of the protected portions of the data.
>
> **6.** A method as in claim **1**, wherein the rules indicate which users are allowed to access the protected portions of the data, the method further comprising

---

[2]    The Leahy-Smith America Invents Act (AIA), Pub. L. No. 112-29, took effect on March 18, 2013. Because each application for the Asserted Patents was filed before that date, this motion refers to the pre-AIA version of 35 U.S.C. § 112, which included paragraphs that were not enumerated. Regardless, pre-AIA paragraph 4 is identical in relevant part to current subsection (d) of § 112.

> allowing the user access to the unprotected form of a protected portion
> of the data only if the rules indicate that the user is allowed to
> access that portion of the data.

'409 patent col.35 ll.33-43, col.35 ll.61-67.  IV proposes the following constructions for terms in claim

6, which Capital One assumes as correct for purposes of this motion:

| Claim Term or Phrase | IV's Proposed Construction |
|---|---|
| openly distributing | transmitting data over an openly accessible communications channel |
| rules defining access rights | rules governing access to the data |
| access mechanism | hardware and/or software for controlling access to data |
| unauthorized access | access that is not in accordance with applicable rules |

*See* Ex. 3, Plaintiffs' Amended Infringement Contentions at Ex. E (Sept. 25, 2014) (Patent Local Rule

805(1)(b) Disclosure for '409 Patent) [RECORD 0046-0097 at 0050-0072].

Claim 6 covers the abstract idea of protecting and distributing data such that each and every

access to an unprotected form of the protected data is limited in accordance with unspecified rules.  It

does nothing more than recite the basic, routine, and conventional sequence of steps performed to

securely distribute data: (1) protecting portions of data, (2) distributing the protected data, and (3)

limiting access to the unprotected form of the protected data in accordance with unspecified rules.  Like

the claims rejected in *Alice* and *Bilski*, claim 6 is directed to a basic concept.  *See Alice*, 134 S. Ct. at

2351-52, 2355-57, 2359-60 (analyzing claims on "the concept of intermediated settlement"); *Bilski*, 561

U.S. at 611-12 (analyzing claims based on the "basic concept" of "hedging").  Indeed, the Patent Office

determined on the record before it that claim 1 of the '409 patent is more likely than not directed to a

"fundamental concept" that, "similar to the 'fundamental economic practice' at issue in *Alice*, is an

abstract idea under § 101."  Ex. 2, PTO Institution Decision at 23 [RECORD 0040].  The Patent Office

concluded that the remaining claims—including claim 6—"also are more likely than not directed to a patent-ineligible abstract idea." *Id.*

People have been protecting forms of distributed data in accordance with rules for thousands of years simply by using codes or encryption. *See* Ex. 4, Fred Cohen, *Introductory Information Protection: Software Engineering Edition* 13-20 (1987) [RECORD 0098-0115 at 0108-0115]. For example, the Spartans protected messages communicated over public roads using the scytale transportation cipher. *Id.* at 14 [RECORD 0109]. Similarly, the Germans protected data distributed over public media in accordance with rules during World War II using the Enigma machine. *Id.* at 20 [RECORD 0115]. And people have long discussed the idea of protecting data in such a way that each and every access to the unprotected form of the protected data is limited in accordance with rules. *See* Ex. 5, G. Scott Graham & Peter J. Denning, *Protection—Principles and Practice*, 40 Joint Computer Conf. 417, 418 (1972) [RECORD 0116-0129 at 0118] (discussing a protection scheme utilizing "rules which govern the accessing of objects by subjects," noting that these "rules are the heart of the protection system" and that "[a]n important property of our model is: each and every attempted access by a subject to an object is validated").

The concept of distributing and controlling access to protected data in claim 6 is at least as abstract as the concept of hedging risk that the Supreme Court found unpatentable in *Bilski*. For example, the concept in claim 6 does not describe how the data is protected or how the access is controlled in accordance with the unspecified rules, whereas the *Bilski* claim recited three specific steps purporting to explain "how buyers and sellers of commodities in the energy market can protect, or hedge, against the risk of price changes." *Bilski*, 561 U.S. at 599. Claim 6 thus covers both known and unknown methods of protecting and distributing data, such that each and every access to an unprotected

form of the protected data is limited in accordance with rules known now or conceived in the future. This is a key indication that the claim is an abstract idea and unpatentable under § 101. *See Benson*, 409 U.S. at 68 (holding that a process claim covers unpatentable subject matter where the claim was "so abstract and sweeping as to cover both known and unknown uses").

The concept of distributing and controlling access to data in claim 6 also is more abstract than the rejected concept of intermediated settlement in *Alice*. The Supreme Court determined that the claims in *Alice* were directed to the unpatentable abstract idea of "intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk" even though the claims recited the computer-implemented steps of (1) creating a shadow record and a shadow debit record for each stakeholder to be held independently by a supervisory institution, (2) obtaining a start-of-day balance for each shadow record, (3) adjusting each party's shadow record based only on transactions that would not cause the value of a shadow debit record to be less than the value of the shadow credit record, and (4) instructing one of the exchange institutions to exchange credits or debits in accordance with the adjustments. *See Alice*, 134 S. Ct. at 2352, 2355-56 & n.2, 2359. Indeed, the claimed idea here (protecting and distributing data such that each and every access to an unprotected form of the protected data is limited in accordance with unspecified rules) is similar to certain steps of the abstract formulations in *Alice* (checking the available funds to permit a transaction), but is even more abstract:  the claims in *Alice* limited adjustments based on a claimed rule that the value of a shadow debit record cannot fall below the value of a shadow credit record, whereas claim 6 of the '409 patent limits access to data based on unspecified rules. *See* Ex. 2, PTO Institution Decision at 23 [RECORD 0040] (determining that the fundamental concept at issue in claims of the '409 patent is, similar to *Alice*, an abstract idea).

14

The concept of protecting and controlling access in claim 6 also is very similar to, yet more abstract than, "[t]he process of receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad" that was held to be an unpatentable abstract idea in *Ultramercial*, 772 F.3d at 715.  Like the '409 patent, the *Ultramercial* patent also relates to the idea of protecting the distribution of copyrighted media.  *Compare id.* at 714-15 *with* '409 patent col.34 ll.29-57.  In fact, the claims in *Ultramercial* are not only analogous to the basic steps of claim 6 but are far more specific and provide many additional steps:

| Steps in Claim 6 of the '409 Patent | Steps in Claims of *Ultramercial* |
|---|---|
| protecting portions of data | restricting public access to the [copyrighted] media |
| distributing the protected data | offering the media for sale on the Internet and offering the media to the consumer . . . |
| allowing access to the data based on unspecified rules | facilitating the display of the ad, allowing the consumer to access the media and allowing the consumer to access the media if the ad is interactive |

*Ultramercial*, 772 F.3d at 714-15.  Thus, this recent Federal Circuit decision is precisely on point—claims covering the abstract idea of protecting and distributing data, and limiting the data in accordance with unspecified rules, are unpatentable.  *Id.*  Indeed, the idea was unpatentable in *Ultramercial* even though it *did* specify a particular rule ("if the ad is interactive").  *Id.*  As a result, the concept of claim 6 of the '409 patent is an unpatentable abstract idea.

The fact that the concept in claim 6 can be carried out by a human with a pen and paper, such as with an encrypted letter containing a protocol for destruction of the decrypted contents, further confirms

15

that it is an unpatentable abstract idea.  *See CyberSource*, 654 F.3d at 1371-73.  Indeed, militaries have used that basic concept for centuries.  That not only shows that claim 6 is not solving a potentially patent-eligible "Internet-centric" problem—and thus fundamentally different from the handful of claims found eligible in *DDR Holdings, LLC v. Hotels.com, L.P.*, --- F.3d ----, No. 2013-1505, 2014 WL 6845152, at *12 (Fed. Cir. Dec. 5, 2014)—it also is why the Federal Circuit has previously rejected similar formulations as unpatentably abstract.  *See Accenture*, 728 F.3d at 1344 ("generating tasks [based on] rules … to be completed upon the occurrence of an event").  The fact that the idea is merely a form of data manipulation also confirms that it is abstract.  *Content Extraction*, 2014 WL 7272219, at *3 (holding that "data collection, recognition, and storage" was an "undisputedly well-known" abstract idea that "humans have always performed"); *Digitech*, 758 F.3d at 1350-51 (holding that "a process of organizing information through mathematical correlations" was an abstract idea); *CyberSource*, 654 F.3d at 1370 (concluding that "the mere collection and organization of data regarding credit card numbers and Internet addresses is insufficient" to make a claim patent eligible).  The concept of claim 6 (protecting and distributing data such that each and every access to an unprotected form of the protected data is limited in accordance with unspecified rules) is an abstract idea.

Turning to the second step of the analysis, claim 6 does not meaningfully limit, through an "inventive concept," how data is protected, distributed, or accessed, as *Alice* and *Mayo* require.  Claim 6 states only that the unspecified rules are "enforced" by an "access mechanism" that the claims identify only in functional terms and which the specification describes as including only the following generic components included in nearly every computer: "a processing unit 154, read-only memory (ROM), volatile memory (RAM), I/O controller and some form of energy source."  '409 patent col.15 ll.41-45.  This is not an "inventive concept" that "'transform[s] the nature of the claim' into a patent-eligible

application." *See Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294, 1298).  The Patent Office too rejected an argument by IV that the claimed access mechanism is "a non-generic hardware and/or software component," explaining instead that the access mechanism is simply "comprised of … conventional, well-known components."  Ex. 2, PTO Institution Decision at 25 [RECORD 0042].  In doing so, the Patent Office properly noted that the challenged claims of the '409 patent do not contain an "inventive concept."  *See id.* at 24-26 [RECORD 0041-0043].

This is the only reasonable conclusion in light of *Alice*, which held that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  134 S. Ct. at 2358.  Such claims that do not "purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field" are not patent eligible.  *Id.* at 2359-60 (citations omitted).  Specifically, the *Alice* Court stated "what petitioner characterizes as specific hardware—a 'data processing system' with a 'communications controller' and 'data storage unit,' for example . . .—is purely functional and generic.  Nearly every computer will include a 'communications controller' and 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims."  *Id.* at 2360.  And, in *Ultramercial*, the court held that the computer-implemented steps of "restricting public access to [copyrighted] media" and "allowing the consumer access to the media" only if certain conditions are met are merely "routine additional steps" that "do[] not transform an otherwise abstract idea into patent-eligible subject matter."  772 F.3d at 715-16.  The same is true here of the generic computer functions recited in the claims, all of which are "the most basic functions of a computer."  *Alice*, 134 S. Ct. at 2359; *Bancorp*, 687 F.3d at 1278.  Additionally, claim 6 relies solely on unspecified rules without stating how interactions with a

generic computer or the Internet are manipulated to yield a desired result. *Cf. DDR Holdings*, 2014 WL 6845152, at *12.

Claim 6 also fails the machine-or-transformation test. *Bilski*, 561 U.S. at 604. This test asks whether the claim is "tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *Id.* at 602. Claim 6 is not tied to any particular machine or apparatus, does not recite any particular article, and thus similarly does not transform any particular article into a different state or thing. *Ultramercial*, 772 F.3d at 716-17. As a result, claim 6 of the '409 patent is invalid under § 101.

### 2. Claims 24, 33, and 36 of the '409 Patent Are Not Patent Eligible Because They Also Cover the Same Abstract Idea Without Meaningful Limitations

The abstract idea in claim 6 of the '409 patent is representative of the abstract idea in claims 24, 33, and 36. Claim 24 is nearly identical to claim 6, which recites three basic steps: (1) protecting portions of data, (2) distributing data, and (3) limiting access to data in accordance with unspecified rules. Claim 24 combines the first two steps and reorients the claim to a different perspective—"obtaining" distributed data rather than "distributing" data. Claim 24 requires (1) obtaining distributed data that has protected portions and (2) limiting access to data in accordance with unspecified rules. Despite these minor differences, claim 24 of the '409 patent is invalid because it covers, without any meaningful limitation, the same abstract idea of protecting and distributing data such that each and every access to an unprotected form of the protected data is limited in accordance with unspecified rules. IV's proposed claim constructions for claim 24 are substantively identical to the constructions that IV

proposed for claim 6,[3] and thus claim 24 is similarly not patent eligible even assuming for purposes of this motion that IV's claim construction positions are correct.

Claims 33 and 36 are also drawn to the same abstract idea of protecting data such that each and every access to an unprotected form of the protected data is limited in accordance with unspecified rules, despite nominally taking the form of a "device" or "system" rather than a "method" like claim 6. *See*, *e.g.*, *Alice*, 134 S. Ct. at 2360 (analyzing system and method claims the same way and holding that the system claims "fail for substantially the same reasons" as the method claims); *CyberSource*, 654 F.3d at 1374 (regardless whether the claim is a process or machine, "we look to the underlying invention for patent-eligibility purposes.").

Claims 33 and 36 also fail the second *Alice* step, because they simply add generic components for storing rules and generating an output signal from accessed data, even assuming for purposes of this motion that IV's constructions are correct.[4]   As the Supreme Court explained in *Alice*, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."   *Alice*, 134 S. Ct. at 2358.   Indeed, the specific hardware in the *Alice* claims ("data

---

[3]   The only difference in IV's proposed claim constructions between claim 6 and claim 24 is "openly distributed data" (claim 24) as opposed to "openly distributing … data" (claim 6). But IV's proposed construction for these terms only changes the verb tense, and presents no meaningful difference to the § 101 analysis.   *See* Ex. 3, Plaintiffs' Amended Infringement Contentions at Ex. E (Sept. 25, 2014) (Patent Local Rule 805(1)(b) Disclosure for '409 Patent) [RECORD 0046-0097 at 0050-0072] (construing "openly distributed data" as "*data transmitted* over an openly accessible communications channel" rather than "*transmitting data* over an openly accessible communications channel") (emphasis added).

[4] Claims 33 and 36 of the '409 patent both require a "means for storing the rules," which IV proposed construing as the structure of "computer storage" for performing the function of "storing the rules."   *See* Ex. 3, Plaintiffs' Amended Infringement Contentions at Ex. E (Sept. 25, 2014) (Patent Local Rule 805(1)(b) Disclosure for '409 Patent) [RECORD 0046-0097 at 0050-0072].   Claim 33 also includes the term "means for generating," which IV proposed construing as the structure of "one or more devices inputting signals into the I/O controller and the I/O controller" for performing the function of "generating the output signal from the accessed data."   *See id.*

processing system" with a "communications controller" and "data storage unit") is even more specific than the hardware in claims 33 and 36 of the '409 patent ("means for storing," "access mechanism" and "means for generating the output signal"), even taking into account IV's proposed constructions. *Compare* '409 patent claims 33 and 36 *with Alice*, 134 S. Ct. at 2358. As in *Alice*, the claims do not "purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field." 134 S. Ct. at 2359. And, as in *Alice*, it does not matter whether the claims are method or system claims because they all fail for the same reason. *See id.* at 2360. Individually or collectively, the computer-implementation limitations do not save the claims.

The Federal Circuit, for example, has already invalidated claims specifically reciting a "database for storing rules" (analogous to the "means for storing") and "basic … outputs" (analogous to the "means for generating an output signal"). *See Accenture*, 728 F.3d at 1338-39, 1343-44 (invalidating a claim reciting "database for storing rules"); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1005-09 (Fed. Cir. 2014) (nonprecedential) (invalidating claims that "allow[] for basic inputs and outputs" and "storing," including "an input and output terminal," "a printer," "a memory," and other similar generic components); *see also Glory Licensing LLC v. Toys "R" Us, Inc.*, No. 2:09-cv-4252, 2011 WL 1870591, at *2-3 (D.N.J. May 16, 2011) (invalidating claims reciting a "computer display"); *Fed. Home Loan Mortg. Corp. v. Graff/Ross Holdings LLP (Freddie Mac)*, 893 F. Supp. 2d 28, 41 (D.D.C. 2012) (invalidating claims that recite "display … on a monitor"). Tacking on these generic storage and output components is a classic example of impermissibly using the "draftsman's art" to dress up an abstract idea with conventional, inconsequential features.

20

Claims 33 and 36 also do not satisfy the machine-or-transformation test because they are not tied to any *particular* machine or apparatus and do not transform any *particular* article into a different state or thing. *Ultramercial*, 772 F.3d at 716-17.

Accordingly, all asserted claims of the '409 patent—*i.e.*, claims 6, 24, 33, and 36—are invalid under § 101. Without any meaningful limitations, these claims are drawn to the patent-ineligible abstract idea of protecting and distributing data such that each and every access to an unprotected form of the protected data is limited in accordance with unspecified rules. The Patent Office has already determined that these claims are "more likely than not" unpatentable under § 101. This Court should confirm the Patent Office's determination by holding that all of the asserted claims are invalid under § 101.

**B.     The Asserted Claims of the '081 Patent Are Invalid**

IV accuses Capital One of infringing claims 21, 22, and 24 of the '081 patent—all of which are invalid under § 101.

**1.     Representative Claim 21 of the '081 Patent Is Not Patent Eligible Because It Covers an Abstract Idea Without Meaningful Limitations**

Claim 21 is representative of all the asserted claims. Claim 21 recites:

**21.** An apparatus for manipulating XML documents, comprising:

a processor;

a component that *organizes* data components of one or more XML documents into data objects;

a component that *identifies* a plurality of primary record types for the XML documents;

a component that *maps* the data components of each data object to one of the plurality of primary record types;

> a component that *organizes* instances of the plurality of primary record types into a hierarchy to form a management record type;
>
> a component that *defines* a dynamic document for display of an instance of a management record type through a user interface;
>
> and a component that *detects modification* of the data in the dynamic document via the user interface, and in response thereto *modifies* a data component in an XML document.

'081 patent col.20 ll.43-61 (emphasis added).  IV does not contend that any claim term or phrase in this or any other asserted claim of the '081 patent has a special or uncommon meaning, or otherwise requires construction by the Court.  *See* Ex. 3, Plaintiffs' Amended Infringement Contentions at Ex. G (Sept. 25, 2014) (Patent Local Rule 805(1)(b) Disclosure for '081 Patent) [RECORD 0046-0097 at 0083-0089].

Claim 21 includes the following fundamental computing steps: (1) organize data components; (2) identify primary record types; (3) map data components to primary record types; (4) organize primary record types; (5) define a dynamic document; (6) detect modifications to data in the dynamic document; and (7) modify data components.  *See* '081 patent col.2 ll.4-11.

As these steps show, claim 21 is drawn to the abstract idea of organizing and modifying data relating to documents, which is merely a well-known type of data manipulation.  *See*, *e.g.*, *Alice*, 134 S. Ct. at 2356-57, 2359 (giving the examples of electronic recordkeeping and the use of a computer to obtain data, adjust account balances, and issue automated instructions); *CyberSource*, 654 F.3d at 1370 (explaining that "[t]he mere collection and organization of data regarding credit card numbers and Internet addresses" is not patentable subject matter"); *Digitech*, 758 F.3d at 1350-51 (holding "a process of organizing information through mathematical correlations" was not patentable subject matter).  Indeed, the Federal Circuit addressed analogous claims in *Content Extraction*, 2014 WL 7272219, at *3, and in *Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*, 558 F. App'x 988 (Fed. Cir. 2014)

(nonprecedential), and found them directed to unpatentable abstract ideas for precisely this reason.  In *Content Extraction*, the claims provided a computer-implemented method for scanning hard copy documents, "recognizing portions of said hard copy documents corresponding to a first data field," and "storing information from said portions" in the memory location of the data field.  2014 WL 7272219, at *1.  Affirming the district court's grant of judgment on the pleadings of invalidity under § 101, the court held that the claims are drawn to the "undisputedly well-known" "abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." *Id.* at *3.  In *Cyberfone*, the patent claimed a method and system for "capturing and storing data."  558 F. App'x at 990.   The steps involved (1) "obtaining data transaction information entered on a telephone"; (2) "forming a plurality of different exploded data transactions"—which the patent explained required "separating [the data] into component parts"; and (3) "sending those parts to different destinations."  *Id.* at 990-91.  The Federal Circuit affirmed summary judgment of invalidity on the basis that "the well-known concept of categorical data storage, *i.e.*, the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible."  *Id.* at 992.  The same principle applies to the '081 patent: claim 21's idea of organizing and modifying data is at least as abstract an idea as categorical data storage in *Content Extraction* and *Cyberfone*.

Step two in the *Alice* framework confirms that claim 21 is unpatentable.  Nothing in claim 21 adds an "inventive concept" to the underlying abstract idea to convert the claim from unpatentable subject matter to patentable subject matter.  *See Alice*, 134 S. Ct. at 2355 (requiring an inventive concept for a patent-eligible application of an abstract idea).   Claim 21 adds only "a processor," generic

unspecified "component[s]"[5] and "a user interface."  In fact, claim 21 recites a "processor" without even requiring that the processor perform any specific functions.  Mere recitation of generic computer components performing generic computer functions to implement an abstract concept "cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  *Alice*, 134 S. Ct. at 2358, 2360 (holding that recitation of a "data processing system" with a "communications controller" and "data storage unit" insufficient to make the claim patentable subject matter).

In *Content Extraction*, the court held that the claims' use of basic "scanning and processing technology to recognize and store data from specific data fields such as amounts, addresses, and dates" does not amount to an inventive concept—such computer functions are "well-understood, routine, and conventional activities commonly used in industry."  2014 WL 7272219, at *4.  And, in *Accenture*, the court found that the limitations of the claim were "essentially a database of tasks, a means to allow a client to access those tasks, and a set of rules that are applied to that task on a given event," and "[a]lthough the specification . . . contains very detailed software implementation guidelines, the system claims themselves only contain generalized software components arranged to implement an abstract concept on a computer."  728 F.3d at 1344-46.  As in those cases, claim 21's use of generalized software components to organize data, locate data, map one data to another data, display data and to modify and store data based on user input are all well-understood, routine, conventional activities previously known in the industry—the "most basic functions of a computer" (*Alice*, 134 S. Ct. at 2357-59)—that do not

---

[5] Whether the "component" is hardware or software does not affect the patent subject matter eligibility of the claim.  To the extent that "component" is hardware as opposed to software, it is nothing more than a generic hardware component that cannot convert the claim into a patentable subject matter.  *Alice*, 134 S. Ct. at 2358, 2360.  If "component" is software, the claimed components are only generalized software components that also cannot transform the claims into patentable subject matter.  *Accenture*, 728 F.3d at 1344-46.

provide an "inventive concept" to render the claims patent eligible. *See also Cyberfone*, 558 F. App'x at 992-93.

Similarly, the "processor," generic unspecified "component[s]" and "user interface" of claim 21 are generic computer components that do not provide the necessary "inventive concept" to convert the claim into patentable subject matter. *See Alice*, 134 S. Ct. at 2357-59; *Planet Bingo*, 576 F. App'x at 1008 (nonprecedential) (finding "central processing unit" and "video screen" conventional components); *Walker Digital, LLC v. Google, Inc.*, --- F. Supp. 2d ----, No. 2011-318, 2014 WL 4365245, at *6 (D. Del. Sept. 3, 2014) (finding "processor" and "memory" generic computer components). Therefore, individually or collectively, the computer implementation limitations do not save the claims.

In addition, Claim 21 is not patent eligible merely because it confines the basic data-manipulation idea to "XML documents." That is a classic field of use limitation that does not meaningfully limit the claims, just as it was not enough to limit the abstract hedging principle in *Bilski* to the energy markets (561 U.S. at 611-12), or limit the abstract transaction-guarantee idea in *buySAFE* to the online environment or to specific types of transactions (765 F.3d at 1354-55), or limit the abstract data "collection and organization" concept in *CyberSource* to "data regarding credit card numbers and Internet addresses" (654 F.3d at 1370). At most, the references to XML documents limit the abstract idea to a "particular technological environment" (*Content Extraction*, 2014 WL 7272219, at *4)—which is not enough.[6]

---

[6] For similar reasons, *DDR Holdings* is inapposite. In sharp contrast to the limited number of claims found eligible in *DDR Holdings*, claim 21 broadly and generically claims the use of standard computer components to implement the abstract idea of organizing and modifying data relating to documents (without providing adequate specificity). 2014 WL 6845152, at *12.

Lastly, claim 21 does not pass the machine-or-transformation test.  This claim is not tied to any particular machine or apparatus and does not transform any particular article into a different state or thing.  *See Ultramercial*, 772 F.3d at 717 ("Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis"); *CyberSource,* 654 F.3d at 1375 ("The mere manipulation or reorganization of data, however, does not satisfy the transformation prong.").  Accordingly, claim 21 of the '081 patent is not patent eligible and, therefore, is invalid.

### 2.      Claims 22 and 24 of the '081 Patent Are Not Patent Eligible for the Same Reasons

The other asserted claims of the '081 patent (*i.e.*, claims 22 and 24) cover the same abstract idea as claim 21 without any additional meaningful limitations, and thus these claims also are invalid under § 101.  These claims—including unasserted claim 23 from which asserted claim 24 depends—recite:

> **22.** The apparatus of claim **21**,
>
> wherein an instance of one of the primary record types includes or points to a relational database table of that primary record type; and
>
> wherein the instance of the management record type points to instances of the primary record types.
>
> **23.** The apparatus of claim **21**, wherein the management record type defines business objects and the instances of the management record type comprises the business objects.
>
> **24.** The apparatus of claim **23**, wherein the business objects comprise invoices, bills of material, purchase orders, price books, forecasts, or fund transactions.

'081 patent col.20 l.62 - col.21 l.6.  All of these claims simply describe the type and organization of information stored in the primary and management record types recited in claim 21.  These additional claim elements do not meaningfully limit (or "amount[] to significantly more than") the underlying

abstract idea of organizing and modifying data related to documents. *See Alice*, 134 S. Ct. at 2355. Instead, these elements amount to mere field of use limitations, which cannot transform the underlying abstract idea into patent-eligible subject matter. *See Alice*, 134 S. Ct. at 2357-59; *Bilski*, 561 U.S. at 611-12 (limiting the concept of hedging to the energy markets did not make it patentable); *Flook*, 437 U.S. at 594 (finding that applying a mathematical formula, even if the solution is for specific purpose, did not make the claims patentable); *buySAFE*, 765 F.3d at 1354-55 (limiting the claims to the online environment was "an 'attempt[ ] to limit the use' of the abstract guarantee idea 'to a particular technological environment,' which has long been held insufficient to save a claim in this context.") (citations omitted); *Bancorp*, 687 F.3d at 1277-80 (limiting the claims to the life insurance market did not render the claims patent eligible); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333-34 (Fed. Cir. 2012) (limiting the claims to the field of auto loans did not provide the requisite meaningful limitation). Thus, individually or collectively, the additional limitations of claims 22 and 24 do not save the claims.

Accordingly, all asserted claims of the '081 patent—*i.e.*, claims 21, 22, and 24—are invalid under § 101 because these claims are drawn to the abstract idea of organizing and modifying data relating to documents without any additional limitations that amount to significantly more than the abstract idea itself.

### C.    The Asserted Claims of the '002 Patent Are Invalid

IV accuses Capital One of infringing claims 9, 11, 34, and 37 of the '002 patent—all of which are invalid under § 101.  First, even without reliance on *Alice*, the "mobile interface" of claims 34 and 37 are invalid under § 101 because they fail the threshold requirement that claims must fall within one of the four statutory categories of patent-eligible subject matter.  Second, all of the asserted claims of the

'002 patent are ineligible under *Alice*'s two-step test because they claim the abstract idea of retrieving user-specific information using pointers and add nothing inventive.

> **1.    Claims 34 and 37 of the '002 Patent Are Invalid Because They Do Not Fall Within Any Category of Patent-Eligible Subject Matter**

Claims 34 and 37 are drawn to a "mobile interface" with a "plurality of pointers":

> **34.** A *mobile interface used for retrieving* user specific resources and information stored either on a local device or a network server, the mobile interface being adapted to move from one local device to another and adapted to be displayed on the local device, the mobile interface comprising:
>
> > a *plurality of pointers* that correspond to the user specific resources and information, wherein upon initiating a pointer, a user specific resource or information from either the local device or the network server is retrieved.
>
> **37.** A *mobile interface* according to claim **34**, wherein the *plurality of pointers* access the user specific resources and information stored on the network server via a cellular network.

'002 patent col.19 ll.19-28, col.19, ll.36-39 (emphasis added).   But, a "mobile interface" with a "plurality of pointers"—even one that is "adapted to be displayed on [a] local device," as claim 34 states—is not a "process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."   *See* 35 U.S.C. § 101; *Digitech*, 758 F.3d at 1349.   As discussed below, a "mobile interface" with a "plurality of pointers" is not a "process" and it certainly is not a tangible thing as is required to qualify as a "machine, manufacture, or composition of matter."

A "process" is a "series of acts or steps" and typically appears in patent claims as a method or procedure.   *See*, *e.g.*, *In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002); *see also* 35 U.S.C. § 100(b); Manual of Patent Examining Procedure § 2106, at 2100-13 (9th ed. 2014), *available at* http://www.uspto.gov/web/offices/pac/mpep/mpep-2100.pdf.   Thus the claimed mobile interface is not a

"process."  "For all categories except process claims, the eligible subject matter must exist in some physical or tangible form."  *Digitech*, 758 F.3d at 1348.  The claimed mobile interface, however, does not exist in a physical or tangible form and thus is not a machine, manufacture, or composition of matter.  Instead, the "mobile interface" in claims 34 and 37 is merely an interface that includes a "plurality of pointers."  *See* '002 patent col.3 ll.8-9, col.4 l.28, col.4 ll.44-54, claims 25-39, figs. 1A, 1B.  The '002 patent describes a pointer as "a link/shortcut to an item such as a file" and again as "a reference to a type of menu item that can be accessible on the computer, PDA or server."  *Id.* at col.1 ll.36-38, col.10 ll.8-10.  Pointer data, the patent explains, "is similar to bookmarks used in web browsers."  *Id.* at col.8 ll.32-36.  The '002 patent never describes the mobile interface as a physical or tangible thing; nor is it.

In these respects, the '002 patent claims directed to a "mobile interface" have the same defect as a group of asserted claims directed to a "device profile" that the Federal Circuit found invalid in *Digitech*.[7]  758 F.3d at 1349.  The "device profile" consisted of two data sets describing color and spatial properties of a device within a digital image processing system.  *Id.* at 1347, 1349-50.  The Federal Circuit concluded that "the device profile described in the … patent is not a tangible or physical thing and thus does not fall within any of the categories of eligible subject matter."  *Id.* at 1349.  Thus without even engaging in the two-part framework of *Mayo* and *Alice*, the court concluded that those claims are invalid under § 101.

---

[7] As with the '002 patent, *Digitech* addressed some claims directed to non-statutory categories (*e.g.*, "a device profile…") and some claims directed to statutory categories (*e.g.*, "a method for generating a device profile…").  *Digitech*'s holding that the claims directed to statutory categories were invalid under § 101 for claiming an abstract idea is discussed in Part IV.C.2, *infra*.

The term "mobile interface" is the only term in the asserted '002 patent claims that IV identified as requiring construction by the Court.  IV proposed construing this term to mean "an agent that provides a user interface on different computing devices and is capable of dynamically accessing user specific data stored on a network server and local device."  *See* Ex. 3, Plaintiffs' Amended Infringement Contentions at Ex. H (Sept. 25, 2014) (Patent Local Rule 805(1)(a) Disclosure for '002 Patent) [RECORD 0046-0097 at 0090-0097].  Even under IV's proposed construction, however, the mobile interface is merely a collection of information.  The mobile interface may be stored or even adapted for display on a computing device, but the interface itself is not a physical or tangible thing.  *Digitech*, 758 F.3d at 1349.  Thus, without even engaging in *Alice*'s two-part framework, claims 34 and 37 are invalid under § 101, just as the claims in *Digitech* were, because they fail to even nominally fall within any of the four categories of patent-eligible subject matter.

### 2. Claims 9, 11, 34 and 37 of the '002 Patent Also Are Not Patent Eligible Because They Cover an Abstract Idea Without Meaningful Limitations

In any event, all of the asserted '002 patent claims fail under the *Alice* framework.  Claim 9 is representative of asserted claims 11, 34, and 37 of the '002 patent for these purposes because all of these claims are directed at the same underlying invention.  *Accenture*, 728 F.3d at 1341 ("system claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together"); *CyberSource*, 654 F.3d at 1374 ("Regardless of what statutory category ('process, machine, manufacture, or composition of matter,' 35 U.S.C. § 101) a claim's language is crafted to literally invoke, we look to the underlying invention for patent-eligibility purposes.").  Claim 9 (which depends from claim 1 and is strikingly similar to claim 11) recites:

> **1.** A method for retrieving user specific resources and information stored either on a local device or a network server, the method comprising the steps of:

> retrieving a mobile interface from the network server to the local server;
>
> displaying the mobile interface on the local device, the mobile interface including a plurality of pointers corresponding to the user specific resources and information;
>
> retrieving the user specific resources and information using the plurality of pointers displayed on the mobile interface.
>
> **9.** A method according to claim 1, wherein the step of retrieving the mobile interface from the network server comprises the step of retrieving the mobile interface via a cellular network.

'002 patent col.17 ll.10-21, col.17 ll.46-49.  Claim 9 thus covers the idea of retrieving user-specific information using pointers, and whether or not that is accomplished across a cellular network (claim 9) has no bearing on patentability.  This idea is both fundamental and abstract.  Indeed, libraries have been using indexes or card catalogs to direct users to particular resources or information for hundreds of years.  *See* Ex. 6, Joseph Smalley, *The French Cataloging Code of 1791: A Translation*, 61 The Library Q. 1, 2 (1991) [RECORD 0130-0144 at 0132].  There can be no dispute that a human can "retrieve" an index, "display" an index and "retrieve" user specific information using the index, just as recited in the asserted claims of the '002 patent.

Claim 9 is at least as fundamental and abstract as the claims covering the concepts of hedging risks in the energy markets found patent-ineligible in *Bilski* and intermediated settlement found invalid in *Alice*.  The steps of claim 9 are directed to mere data gathering and organization, which is a patent-ineligible, abstract idea, just like the abstract data manipulation ideas discussed above.  *See, e.g.*, *supra* Part IV.A.1.  For example, in *Digitech*, the Federal Circuit held patent-ineligible a claim reciting "a process of taking two data sets and combining them into a single data set, the device profile" wherein "[t]he two data sets are generated by taking existing information … and organizing this information into

31

a new form." *Id.* at 1351.   The court found that the claims were directed to the abstract idea of "organizing information through mathematical correlations." *Id.* at 1350-51.   Likewise ineligible were claims directed to the abstract ideas of "data collection, recognition, and storage" (*Content Extraction*, 2014 WL 7272219, at *3), "collection and organization of data regarding credit card numbers and Internet addresses" (*CyberSource*, 654 F.3d at 1370), and "collecting information in classified form, then separating and transmitting that information according to its classification" (*Cyberfone*, 558 F. App'x at 992).   Claim 9 is similarly directed to an abstract data manipulation idea, but even more so because it is directed only to the retrieval of a user's personal information using pointers without specifying what happens to the information after it is retrieved.

The claims also fail step two of the *Alice* analysis.   *Alice*, 134 S. Ct. at 2355, 2357.   The fact that the claims use "pointers" to retrieve the user specific information does not make the claims patentable. At most, "pointers" limit the invention to a particular technological environment (*i.e.*, a generic computer environment), which is not sufficient to transform the claim into patentable subject matter.   *Id.* at 2360 (linking the claim "to a particular technological environment, that is, implementation via computers … add[s] nothing of substance to the underlying abstract idea" (internal quotation marks, alteration and citations omitted)).   The '002 patent admits that "pointers" do not add an "inventive concept" because they already were well-known, routine, and conventional activities: "pointers are commonly used to retrieve/access menu items." '002 patent col.1 l.41.   Similarly, in *Alice*, the Supreme Court held that retrieving, transmitting, and storing data in data fields (such as "shadow records") are the "most basic functions of a computer."   134 S. Ct. at 2359.   And in *Content Extraction*, the Federal Circuit held that "use of … existing scanning and processing technology to recognize and store data from specific data fields" is simply "well-understood, routine, and conventional activities commonly

used in industry"—which were insufficient to make the claims patent eligible.  2014 WL 7272219, at *4.  The same is true here.  Indeed, claim 9's use of pointers to retrieve data from a network server or local device is mere data-gathering.  As the Federal Circuit explained in *CyberSource*, "even if some physical steps are required to obtain information from the database [], such data-gathering steps cannot alone confer patentability."  654 F.3d at 1372.  As a result, the claimed "pointers" do not make these claims patentable; not only do the pointers consist of mere data, they simply carry out conventional functions and data gathering, which are insufficient for patent eligibility under § 101.  '002 patent col.8 ll.26, col.8 ll.32-36.

The "displaying the mobile interface on the local device" limitation is also insufficient to make the claims patentable.  Displaying data on an interface is the most generic of computer functions, and the Supreme Court has already held that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  *Alice*, 134 S. Ct. at 2358.  Courts have already invalidated patent claims reciting steps of "displaying said file on a computer display" in *Glory Licensing* and "display … on a monitor" in *Freddie Mac*.  *See Glory Licensing*, 2011 WL 1870591, at *3; *Freddie Mac*, 893 F. Supp. 2d at 41; *see also Graff/Ross Holdings LLP v. Fed. Home Loan Mortg. Corp.*, 892 F. Supp. 2d 190, 193, 195 (D.D.C. 2012) ("output means").  The Federal Circuit has also invalidated claims involving "display capabilities."  *Planet Bingo*, 576 F. App'x at 1006.

Likewise, the "via a cellular network" limitation fails to transform claim 9 into a patentable application of the abstract idea.  At most, it is merely a field-of-use limitation or limitation to a particular technical environment, which cannot transform the unpatentable abstract idea to patentable subject matter.  *Alice*, 134 S. Ct. at 2360 ("linking the use of the method to a particular technological environment, that is, implementation via computers . . . add[s] nothing of substance to the underlying

abstract idea" (internal quotation marks, alteration, and citations omitted)); *buySAFE*, 765 F.3d at 1355. And, in any event, cellular networks were well-known long before the alleged invention claimed in the '002 patent.  Ex. 7, Zachary C. Fluhr & Eric Nussbaum, *Switching Plan for a Cellular Mobile Telephone System*, Com-21 IEEE Transactions on Comm. 1281 (1973) [RECORD 0145-0151]; Ex. 8, Markku Kojo, *et al.*, *Connecting Mobile Workstations to the Internet over a Digital Cellular Telephone Network* at 1-3, 7-14, Report C-1994-39 (Univ. of Helsinki, Dep't of Computer Science) (Sept. 1994) [RECORD 0152-0172 at 0156-0158, 0162-0169].  Considered collectively, the computer limitations of claim 9 also add nothing that is not already present when the steps are considered separately.  *See Alice*, 134 S. Ct. at 2359.  Therefore, individually or collectively, the computer implementation limitations do not save the claims.

Without belaboring the point, claim 9 also fails the machine-or-transformation test for the above reasons because it is not tied to any particular machine or apparatus and does not transform any particular article into a different state or thing.  *Ultramercial*, 772 F.3d at 716-17.

Accordingly, all asserted claims of the '002 patent—*i.e.*, claims 9, 11, 34, and 37—are invalid under § 101 because they recite an unpatentable abstract idea without an "inventive concept."

### D.     The Asserted Claims of the '084 Patent Are Invalid

IV accuses Capital One of infringing claims 15, 18, 27, and 32 of the '084 patent—all of which are invalid under § 101 because they recite an unpatentable abstract idea.

#### 1.     Representative Claims 15 and 18 of the '084 Patent Are Not Patent Eligible Because They Are Directed to an Abstract Idea Without Meaningful Limitations

Claims 15 and 18 both depend from claim 9 and are representative for evaluating patent subject matter eligibility:

**9.** A method of alerting a device in a networked computer system comprising a plurality of devices to an anomaly, comprising:

> detecting an anomaly at a first device in the computer system using network-based intrusion detection technicques [sic] comprising analyzing data entering into a plurality of hosts, servers, and computer sites in the networked computer system;

> determining a device that is anticipated to be affected by the anomaly by using pattern correlations across the plurality of hosts, servers, and computer sites;

> and alerting the device that is anticipated to be affected by the anomaly.

**15.** The method of claim **9**, wherein alerting the device comprises alerting a firewall associated with the device that the anomaly has been detected.

**18.** The method of claim **9**, further comprising adjusting anomaly detection sensitivity and alarm thresholds based on the detected anomaly.

'084 patent col.12 l.57 - col.13 l.2; col.13 ll.22-24; col. 13 ll.31-33.  Claim 15 adds only that "alerting the device comprises alerting a firewall associated with the device that the anomaly has been detected." Claim 18 adds the generic step of "adjusting anomaly detection sensitivity and alarm thresholds based on the detected anomaly."  IV does not contend that any claim term or phrase in these or any other asserted claims of the '084 patent has a special or uncommon meaning, or otherwise requires construction by the Court.  *See* Ex. 3, Plaintiffs' Amended Infringement Contentions at Ex. F (Sept. 25, 2014) (Patent Local Rule 805(1)(b) Disclosure for '084 Patent) [RECORD 0046-0097 at 0073-0082].

Claim 9 is directed to the abstract idea of analyzing data from multiple sources in some unspecified way to detect an anomaly and using some unspecified pattern correlations to determine targets likely to be affected by the anomaly.  These steps are directed to an abstract idea because detecting an anomaly by analyzing data and determining targets anticipated to be affected by the anomaly based on unspecified pattern correlations are merely data gathering and manipulation—which,

as discussed, is undoubtedly an abstract idea as in the cases discussed above. *See, e.g.*, *supra* Part IV.A.1. For example, the idea in these claims is similar to—but far more abstract than—the one in *CyberSource*, 654 F.3d at 1371-72, where the claims were directed to analyzing Internet data to match "pattern[s]" and discern "anomal[ous]" (i.e., fraudulent) credit card transactions. *See also* '084 patent at Abstract, col.5 ll.44-51, col.8 ll.13-18 and ll.46-52, col.12 ll.28–31.

The asserted '084 patent claims are sweeping because they never place limits on how to analyze the data or how to use pattern correlation to achieve the purported invention. Indeed, even the specification describes these claimed requirements expansively, stating only that: "[d]ifferent types of algorithms can be used to look for different types of patterns that would not be recognizable by a conventional intrusion detection system at a single customer site." *Id.* at col.8 l.67 - col.9 l.3. The '084 patent does not provide a single example of how pattern correlations across multiple sources is used to determine targets anticipated to be affected. And it never provides an example of a single algorithm to achieve the purported invention. The claims are not limited to any specific algorithm and are invalid.

Claim 9 is so abstract that it attempts to cover both known and unknown ways of analyzing data to detect anomalies and using pattern correlation to determine targets anticipated to be affected. This is improper. *See Benson*, 409 U.S. at 68 (processes "so abstract and sweeping as to cover both known and unknown uses").

As discussed above, the Supreme Court has repeatedly held that algorithms for analyzing data are not patentable subject matter under § 101 in each of *Alice*, *Benson* and *Flook*. *Alice*, 134 S. Ct. at 2352, 2355-60 (holding claims to a computerized algorithm for analyzing settlement risk unpatentable subject matter); *Benson*, 409 U.S. at 70-72 (holding claim to the algorithm for converting BCD to pure binary numerals unpatentable subject matter); *Flook*, 437 U.S. at 595 (holding that if the claim is

directed essentially to a mathematical formula or algorithm, even if for a specific purpose, the claimed method is nonstatutory subject matter).   And the Federal Circuit has also found a process for pure data manipulation to be unpatentable.  *Digitech*, 758 F.3d at 1350-51.

*Flook* and *Alice* are particularly instructive.   In *Flook*, the relevant claim covered a computerized method for updating alarm limits during a catalytic conversion process.   437 U.S. at 585-86.   When operating conditions exceeded a threshold value, an alarm "signal[ed] the presence of an abnormal condition."  *Id.* at 585.   "[T]he method consist[ed] of three steps: an initial step which merely measures the present value of the process variable (*e.g.*, the temperature); an intermediate step which uses an algorithm to calculate an updated alarm-limit value; and a final step in which the actual alarm limit is adjusted to the updated value."  *Id.*   The Supreme Court held the claim unpatentable, explaining that "if a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory."  *Id.* at 595 (citation omitted).

Here, claim 9 is similarly directed to a method of calculating—analyzing data and pattern correlations.   A side-by-side comparison of the steps in claim 9 and *Flook* is provided below:

| Steps in Claim 9 of '084 Patent | Steps in Claims of *Flook* |
|---|---|
| analyze data entering into a plurality of network devices to detect an anomaly in a first device | measure the present value of a process variable (*e.g.*, temperature) |
| use pattern correlation across multiple computers to determine a device that is anticipated to be affected by the anomaly | use an algorithm to calculate an updated alarm-limit value |
| alert the device anticipated to be affected | update alarm limit |

*Flook*, 437 U.S. at 585.   As this chart reflects, analyzing data to detect the anomaly in claim 9 is analogous to measuring the present value of a process variable in step 1 of *Flook*.   Both steps are mere data gathering and manipulation, an abstract idea in itself.  *See, e.g.*, *supra* Part IV.C.2 (discussing

*Mayo*, 132 S. Ct. at 1298-99; *CyberSource*, 654 F.3d at 1370, 1373-74; *Digitech*, 758 F.3d at 1351).

Using some unspecified "algorithm" to perform pattern correlation in the second step of claim 9 ('084

patent col.8 l.67 - col.9 l.4) is also analogous to the abstract idea of using an algorithm in step 2 of

*Flook*.  And the abstract idea of alerting the device in claim 9 is analogous to updating the alarm limit in

step 3 of *Flook*, as noted above.  *Flook*, 437 U.S. at 590.  Claim 9, like the claims in *Flook*, is directed to

an abstract idea.

Claim 9 is even more abstract than the claims at issue in *Flook* and the claims at issue in the

Supreme Court's *Benson* decision because claim 9 does not even describe—let alone limit itself to—a

specific algorithm to perform the claimed second step.  *See Flook*, 437 U.S. at 596-97 (*See* Appendix -

Claim 1 directed to specific algorithm); *Benson*, 93 409 U.S. at 73-74 (*See* Appendix - Claim 8 directed

to a specific algorithm).  Claim 9 states only that the unspecified "algorithm" will use "pattern

correlations" to detect an anomaly.  This is far more abstract than the claims in *Flook*, which recited a

*specific*, "new and presumably better method for calculating alarm limit values" and, yet, the Supreme

Court still concluded it was not patent eligible.  437 U.S. at 585 n.2, 594-95.  Claim 9 may indeed cover

*any* algorithm for "determining a device that is anticipated to be affected by the anomaly by using

pattern correlations across the plurality of hosts, servers, and computers," including unknown methods

never contemplated by the inventor or anyone else.  *Benson*, 409 U.S. at 68 (unpatentable process claim

was "so abstract and sweeping as to cover both known and unknown uses of the BCD [binary coded

decimal] to pure binary conversion").[8]

---

[8] This lack of a specific technological solution to limit the claims is one reason why the '084 patent
claims are still invalid under *DDR Holdings*.  2014 WL 6845152, at *11-12.  Unlike *DDR Holdings* and
like *Ultramercial*, the asserted claims of the '084 patent are invalid under § 101 because they do not
recite any specific way to detect an anomaly or any specific pattern correlation to determine targets

*Alice* also is analogous.  Claim 9 calls for a computer to (a) receive data from multiple computers (*Alice*—obtaining data from the exchanges), (b) apply some unspecified algorithms to analyze the data to detect an anomaly and to use pattern correlation to determine the devices anticipated to be affected (*Alice*—adjusting the shadow credit and debit records and allowing certain transactions), and (c) alert devices anticipated to be affected (*Alice*—instructing exchange issues to make certain transactions).  *See Alice*, 134 S. Ct. at 2352 (discussing claim 33).

Applying the second prong of the *Alice* test, nothing in claim 9, individually or collectively, transforms this unpatentable abstract idea into a patent-eligible invention.  *See Ultramercial*, 772 F.3d at 717 (holding that the computer and software components in the claims at issue were insufficient to render the claims patentable; observing that "[a]ny transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis"); *CyberSource*, 654 F.3d at 1375 ("[M]erely claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer does not satisfy the machine prong of the machine-or-transformation test.").

The limitations added by dependent claims 15 and 18 do not make those claims patentable. Claim 15 adds only that "alerting the device comprises alerting a firewall associated with the device that the anomaly has been detected."  Claim 18 adds the generic step of "adjusting anomaly detection sensitivity and alarm thresholds based on the detected anomaly."  Both of these steps, like the "adjusting said alarm limit" step in *Flook*, are simply insignificant post-solution activity akin to tacking on "apply it" to the end of the abstract idea.  *See* 437 U.S. at 590, 597.  Claim 9 and dependent claims 15 and 18

---

likely to be affected by the anomaly. The '084 patent claims are also distinguishable from *DDR Holdings* because they (a) involve an abstract idea that long pre-dates computer networks and (b) create no "new composition[] or product[]."  *See id.* at *10-11 & n.5.

also fail the machine-or-transformation test because they are not tied to any *particular* machine and do not transform any *particular* article into a different state or thing. *See*, *e.g.*, *Mayo*, 132 S. Ct. at 1302-03; *Ultramercial*, 772 F.3d at 716-17.

### 2.    Claims 27 and 32 of the '084 Patent Do Not Have Additional Features that Transform the Abstract Idea into Patent-Eligible Subject Matter

The other asserted claims of the '084 patent (*i.e.*, claims 27 and 32) cover the same abstract idea as claim 9 and do not add any limitations that supply an inventive concept. Both claims are dependent on claim 26. Claim 27 depends directly from independent claim 26. Claim 32 depends from claim 31, which depends from claim 26.

Each of claims 26, 27 and 32 is "no different from the method claims in substance" for purposes of assessing patent eligibility. *See Alice*, 134 S. Ct. at 2360; *Accenture*, 728 F.3d at 1341 ("system claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together"); *CyberSource*, 654 F.3d at 1373-75. The scope of claim 26 is basically the first step of claim 9—analyzing data entering into a plurality of sources to detect an anomaly—with the addition of generic computer components, such as "a computer with a firewall" and a "data collection and processing center." None of these components "offers a meaningful limitation beyond generally linking the use of the method to a particular technological environment, that is, implementation via computers." *Alice*, 134 S. Ct. at 2360 (internal quotation marks and alteration omitted).

The '084 patent admits that computers with firewalls were well-known, routine or conventional. '084 patent col.1 ll.33-38, col.1 ll.66-67, fig.1. And the data collection and processing center is purely functional and generic, just like the hardware and software components found insufficient to make the claims patentable in *Alice*. 134 S. Ct. at 2359-60 (finding additional limitations insufficient because a

"data processing system" with a "communications controller" and "data storage unit" are purely functional and generic and transmitting, receiving, and storing data are "the most basic functions of a computer").

Turning to the asserted dependent claims, dependent claim 27 adds the second and third steps of claim 9, which, as discussed *supra*, consist of abstract data manipulation using mathematical algorithms and trivial post-solution activity.  Claim 32 adds detecting an anomaly by "analyzing a plurality of data packets with respect to predetermined patterns" and that "the data packets … have been received by at least two devices that are connected to the network." '084 patent col.14 ll.45-53.  Claim 32's addition of "data packets" as opposed to data, generic "predetermined" patterns, or receipt by two devices, are mere field-of-use limitations or limitations to a particular technical environment—none of which adds an "inventive concept" or is sufficient to make an unpatentable abstract idea patentable.  *See Mayo*, 132 S. Ct. at 1294 (requiring an inventive concept for a patent-eligible application of an abstract idea); *Bilski*, 561 U.S. at 611-12; *Flook*, 437 U.S. at 594; *buySAFE*, 765 F.3d at 1354-55.  None of these limitations changes the fact that the claim is directed to an unspecified algorithm as discussed above.  Accordingly, claims 27 and 32 of the '084 patent are invalid under § 101.

## V.    CONCLUSION

For at least the foregoing reasons, all asserted claims of the '409, '081, '002, and '084 patents are invalid under 35 U.S.C. § 101.  These claims cover patent-ineligible abstract ideas, and at least claims 34 and 37 of the '002 patent do not even fall within any of the four statutory categories of patent-eligible subject matter.  Courts across the country and at all levels are recognizing that granting early dispositive motions for invalidity under § 101 is an effective tool for curbing abusive patent litigation, and this case presents another such opportunity.

Respectfully submitted,

Dated: January 20, 2015

**CAPITAL ONE FINANCIAL
CORPORATION
CAPITAL ONE BANK (USA), N.A.
CAPITAL ONE, N.A.**

/s/ Mary Catherine Zinsner

Robert A. Angle (*pro hac vice*)
robert.angle@troutmansanders.com
Dabney J. Carr, IV (*pro hac vice*)
dabney.carr@troutmansanders.com
Megan C. Rahman (*pro hac vice* to be filed)
megan.rahman@troutmansanders.com
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
T: (804) 697-1246; F: (804) 698-5124

Mary Catherine Zinsner (Bar No. 11763)
mary.zinsner@troutmansanders.com
S. Mohsin Reza (Bar No. 19015)
mohsin.reza@troutmansanders.com
TROUTMAN SANDERS LLP
1850 Towers Crescent Plaza, Suite 500
Tysons Corner, VA 22182
T: (703) 734-4334; F: (703) 734-4340

Paul E. McGowan (*pro hac vice*)
paul.mcgowan@troutmansanders.com
TROUTMAN SANDERS LLP
600 Peachtree St., N.E., Suite 5200
Atlanta, GA 30308
T: (404) 885-3270; F: (404) 962-6842

Matthew J. Moore (*pro hac vice*)
matthew.moore@lw.com
Marguerite M. Sullivan (*pro hac vice*)
marguerite.sullivan@lw.com
Adam M. Greenfield (*pro hac vice*)
adam.greenfield@lw.com
Elizabeth Johnson (*pro hac vice*)
elizabeth.johnson@lw.com
Peter Schmidt (*pro hac vice*)
peter.schmidt@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2200; F: (202) 637-2201

Jeffrey G. Homrig (*pro hac vice*)
jeff.homrig@lw.com
Patricia Young (*pro hac vice*)
patricia.young@lw.com
Ethan Y. Park (*pro hac vice*)
ethan.park@lw.com
Katherine M. Schon (*pro hac vice*)
Katherine.schon@lw.com
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 92025-1008
T: (650) 328-4600; F: (650) 463-2600

Clement J. Naples (*pro hac vice*)
clement.naples@lw.com
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
T: (212) 906-1200; F: (212) 751-4864

Kristopher R. Davis (*pro hac vice*)
kris.davis@lw.com
LATHAM & WATKINS LLP

Alan J. Devlin (*pro hac vice*)
alan.devlin@lw.com
LATHAM & WATKINS LLP

233 North Wabash Avenue, Suite 2800
Chicago, IL  60611
T: (312) 876-7700; F: (312) 993-9767

James P. Ulwick (Bar No. 00536)
julwick@kg-law.com
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, MD  21202
T: (410) 752-6030 ; F: (410) 361-8206

505 Montgomery Street, Suite 2000
San Francisco, CA  94111-6538
T: (415) 391-0600; F: (415) 395-8095

Kenneth R. Adamo *(pro hac vice)*
kenneth.adamo@kirkland.com
David W. Higer *pro hac vice)*
david.higer@kirkland.com
Brent P. Ray *(pro hac vice)*
brent.ray@kirkland.com
Vishesh Narayen *(pro hac vice)*
vishesh.narayen@kirkland.com
Kristina Hendricks *(pro hac vice)*
kristina.hendricks@kirkland.com
Megan M. New *(pro hac vice)*
megan.new@kirkland.com
KIRKLAND &ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
T: (312) 862-2000; F: (312) 862-2200

*Attorneys for Defendants Capital One Financial Corporation,*
*Capital One Bank (USA), N.A. and Capital One, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2015, I filed the foregoing with the Clerk of the Court, which will send a Notice of Electronic Filing to all registered counsel listed below:

Ian N. Feinberg (*pro hac vice*)
ifeinberg@feinday.com
M. Elizabeth Day (*pro hac vice*)
eday@feinday.com
David L. Alberti  (*pro hac vice*)
dalberti@feinday.com
Clayton W. Thompson, II (*pro hac vice*)
cthompson@feinday.com
Sal Lim (*pro hac vice*)
slim@feinday.com
Yakov Zolotorev (*pro hac vice*)
yzolotorev@feinday.com
Marc C. Belloli (*pro hac vice*)
mbelloli@feinday.com
Feinberg Day Alberti & Thompson LLP
1600 El Camino Real, Suite 280
Menlo Park, CA  94025
T: (650) 618-4364
F: (650) 618-4368

Bryan D. Bolton (D. Md. Bar No. 02112)
bbolton@fblaw.com
Michael E. McCabe, Jr. (D. Md. Bar No. 10693)
mmccabe@fblaw.com
Funk & Bolton, P.A.
36 South Charles St., 12th Floor
Baltimore, MD  21201
T: (410) 659-7700
F: (410) 659-7773

*Counsel for Plaintiffs Intellectual Ventures I LLC*
*and Intellectual Ventures II LLC*

/s/ Mary Catherine Zinsner
Mary C. Zinsner (Bar No. 11763)
mary.zinsner@troutmansanders.com
TROUTMAN SANDERS LLP
1850 Towers Crescent Plaza, Ste. 500
Tysons Corner, Virginia 22182
T: (703) 734-4334
F: (703) 734-4340