**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| | * | |
| **INTELLECTUAL VENTURES I LLC,** | | |
| *et al.,* | * | |
| | | |
| **Plaintiffs,** | * | **Case No.: PWG-14-111** |
| | | |
| **v.** | * | |
| | | |
| **CAPITAL ONE FINANCIAL CORP.,** | * | |
| *et al.,* | | |
| | * | |
| **Defendants.** | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiffs/Counter-Defendants Intellectual Ventures I LLC and Intellectual Ventures II LLC (together, "Intellectual Ventures companies" or "IV"), two companies whose "businesses include purchasing important inventions from individual inventors and institutions and then licensing the inventions to those who need them," bring patent infringement claims against Defendants/Counterclaimants Capital One Financial Corp., Capital One Bank (USA), N.A., and Capital One, N.A. (collectively, "Capital One companies").  Compl., ECF No. 1.  Specifically, Plaintiffs claim that the Capital One companies infringed four patents "[i]n connection with the[] online banking services and other [electronic] systems and services" that they provide.  *Id.* ¶¶ 13 & 23.[1]

The Capital One companies filed, and then twice amended, an Answer, Defenses, and Counterclaims, seeking a declaratory judgment of non-infringement or invalidity of each patent,

---

[1] There were claims and counterclaims regarding a fifth patent, but the parties stipulated to the dismissal of those claims.  ECF No. 80.

as well as unenforceability of one patent due to inequitable conduct.  ECF Nos. 28, 72, 103.

They now timely seek to amend their Second Amended Answer, Defenses and Counterclaims to

add three antitrust counterclaims "alleging that IV's creation and abuse of monopoly power to

hold up Capital One and other banks violates Section 2 of the Sherman Act [15 U.S.C. § 2] and

Section 7 of the Clayton Act [15 U.S.C. § 18]."[2]  Countercls.' Mot. to Am. 1, ECF No. 106.

Their new counterclaims are "based on IV's new and continuing conduct, internal documents

that IV produced near the end of its first action against Capital One in Virginia, and from events

occurring during and after IV's first case against Capital One."  *Id.*  Given that Counterclaimants

filed similar counterclaims in the earlier suit between the parties in the Eastern District of

Virginia, I must determine whether res judicata bars the proposed counterclaims and, if not,

whether the proposed counterclaims are plausible.  Because Counterclaimants base the proposed

counterclaims on events that occurred after they filed their counterclaims in the Eastern District

of Virginia, res judicata is not a bar.  Further, Counterclaimants sufficiently state claims in their

proposed counterclaims for purposes of surviving a plausibility challenge and to warrant

proceeding to discovery on the counterclaims.  Therefore, I will grant their Motion to Amend.

## I.      STANDARD OF REVIEW

Whether to grant a motion for leave to amend is within this Court's discretion.  *Foman v.*

*Davis*, 371 U.S. 178, 182 (1962).  When, as here, a party moves to amend for a third time but

---

[2] The parties have briefed the motion fully.  ECF Nos. 106-3, 109, 118, 124 & 125.  A hearing is not necessary.  *See* Loc. R. 105.6.  Counterclaimants also filed Motions to Seal, ECF Nos. 110 & 126, requesting that briefs and exhibits containing confidential business information be sealed. Given that Plaintiffs do not oppose the motions to seal; the briefs and exhibits contain confidential business information; and Counterclaimants filed redacted versions for the public, ECF Nos. 106-3 & 124, the Motions to Seal ARE GRANTED.  Although these briefs and exhibits are sealed, I have determined, after reviewing this Memorandum Opinion, that none of its contents warrants sealing this Memorandum Opinion.

before the deadline established in the Scheduling Order for doing so, Rule 15(a)(2) provides the standard for whether to grant the motion. *See id.*; Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) states that "[t]he court should freely give leave [to amend] when justice so requires." "The Court only should deny leave to amend if amendment 'would prejudice the opposing party, reward bad faith on the part of the moving party, or . . . amount to futility.'" *Rao v. Alaska Airlines*, 22 F. Supp. 3d 529, 540 (D. Md. 2014) (quoting *MTB Servs., Inc. v. Tuckman-Barbee Constr. Co.*, No. RDB-12-2109, 2013 WL 1819944, at *3 (D. Md. Apr. 30, 2013)); *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). Otherwise, "[i]f the underlying facts or circumstances relied upon by a [counterclaimant] may be a proper subject of relief," and the counterclaimant moves to amend, the Court should grant the motion so that the counterclaimant has the "opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182.

Here, Plaintiffs/Counter-Defendants do not oppose Counterclaimants' proposed amendment insofar as they seek to add as counter-defendants new entities related to the existing Counter-Defendants. Therefore, Counterclaimants' Motion to Amend IS GRANTED as to the addition of the new counter-defendants. Nor do the Intellectual Ventures companies contend that amendment would be prejudicial or that the Capital One companies acted in bad faith. Plaintiffs/Counter-Defendants argue only that amendment to include three antitrust claims would be futile.

Determining whether amendment would be futile does not involve "'an evaluation of the underlying merits of the case.'" *MTB Servs.*, 2013 WL 1819944, at *3 (quoting *Next Generation Grp. v. Sylvan Learning Ctrs., LLC.*, No. CCB–11–0986, 2012 WL 37397, at *3 (D. Md. Jan. 5, 2012)). Rather, "the merits of the litigation" are only relevant to the Court's ruling on a motion for leave to amend if "a proposed amendment may clearly be seen to be futile," *Davis v. Piper*

*Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980), such as "if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards," *Katyle v. Penn Nat'l Gaming Inc.*, 637 F.3d 462, 471 (4th Cir. 2011); *see MTB Servs.*, 2013 WL 1819944, at *3. Notably, a claim is subject to dismissal for failure to state a claim "'when the face of the complaint clearly reveals the existence of a meritorious affirmative defense.'" *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Brockington v. Boykins,* 637 F.3d 503, 506 (4th Cir. 2011) (internal quotation marks omitted)).

The affirmative defense of res judicata "'bars a party from suing on a claim that has already been litigated to a final judgment by that party or such party's privies and precludes the assertion by such parties of any legal theory, cause of action, or defense which could have been asserted in that action.'" *Reid v. New Century Mortg. Corp.*, No. AW-12-2083, 2012 WL 6562887, at *3 (D. Md. Dec. 13, 2012) (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009) (citation and internal quotation marks omitted)). When considering this defense, "'a court may take judicial notice of facts from a prior judicial proceeding when the res judicata defense raises no disputed issue of fact.'" *Kalos*, 2012 WL 6210117, at *2 (quoting *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000)). Res judicata provides grounds for dismissal if a defendant or counter-defendant establishes "'(1) a judgment on the merits in a prior suit resolving (2) claims by the same parties or their privies, and (3) a subsequent suit based on the same cause of action.'" *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009) (quoting *Aliff v. Joy Mfg. Co.*, 914 F.2d 39, 42 (4th Cir. 1990)). Even if the claimant's legal theory differed in the earlier dispute, res judicata still may bar the current action, provided that "the second suit 'arises out of the same transaction or series

of transactions as the claim resolved by the prior judgment.'" *Id.* (quoting *Aliff*, 914 F.2d at 42).

Further,

> The preclusive [e]ffect of a prior judgment extends beyond claims or defenses actually presented in previous litigation, for "[n]ot only does res judicata bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F.2d 355, 359 (4th Cir. 1989), quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979) (internal quotation marks deleted).

*Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir. 1991).

## II.    DISCUSSION

Plaintiffs/Counter-Defendants oppose the amendment, arguing that it would be futile because res judicata bars the proposed counterclaims.  Pls.' Opp'n 9–10.  They also contend that the proposed counterclaims do not state plausible claims for relief.  *Id.* at 12.  Counterclaimants reply that res judicata is not a bar because the earlier opinion was limited to the facts as pleaded, and now there are new facts that were not in existence or known during the earlier litigation, and the counterclaims are plausible.  Countercls.' Reply 3, 8.

### A.  Res Judicata

As noted, this is not the parties' first time facing each other in court.  In June, 2013, the Intellectual Ventures companies filed suit against the Capital One companies in the Eastern District of Virginia, and the Capital One companies filed counterclaims in October, 2013 that, as amended, "assert[ed] [three] antitrust claims under Section 2 of the Sherman Antitrust Act and Section 7 of the Clayton Act." *Intellectual Ventures I LLC v. Capital One Financial Corp.*, No. 13-740 (AJT/TRJ), 2013 WL 6682981, at *1 (E.D. Va. Dec. 18, 2013); *see* E.D. Va. First Am. Countercl., Countercls.' Mot. to Am. Ex. 2, ECF No. 106-5; E.D. Va. First Am. Countercl., Pls.'

Opp'n Ex. B, ECF No. 118-2 (same).  There, also, the Intellectual Ventures companies opposed

the counterclaims.  *Intellectual Ventures I LLC*, 2013 WL 6682981, at *1.  The Eastern District

of Virginia granted the Intellectual Ventures companies' motion to dismiss all three

counterclaims in December, 2013.  *Id.*; E.D. Va. Dec. 5, 2013 Order 1, Pls.' Opp'n Ex. E, ECF

No. 118-5.  When, after the court granted summary judgment in the Capital One companies'

favor on the remaining claims in April, 2014, the Capital One companies asked the court to

amend its judgment to make the dismissal of the counterclaims without prejudice, the court

denied the motion in May, 2014. E.D. Va. May 27, 2014 Order 1, Pls.' Opp'n Ex. C, ECF No.

118-3.  The court noted that the Capital One companies sought "the requested relief pursuant to

Fed. R. Civ. P. 59(e) on the grounds that discovery and events since the Court's Order constitute

new evidence that supports its allegations."  *Id.*  The court also observed that "Capital One [did]

not seek leave to amend and pursue its Counterclaim based on that 'new evidence,' but rather

[sought] only to modify the effect of the Court's Order."  *Id.*  It stated, *id.* at 2:

> The Court's Order therefore adjudicated the defendants' counterclaim on the
> "merits" of that claim, as the "merits" of that claim were to be determined at that
> preliminary pleadings stage. For that limited reason and in that limited context,
> the Court's adjudication was not "without prejudice" in that the counterclaims
> were disposed of for the purposes of this action and for the purposes of appeal.

Thus, there was "a judgment on the merits in a prior suit."  *See Ohio Valley Envtl. Coal.*, 556

F.3d at 210; *Jacobs v. Venali*, 596 F. Supp. 2d 906, 914 (D. Md. 2009) ("It is well established

that dismissals with prejudice—including those resulting from settlement agreements or consent

decrees—are treated as final judgments on the merits for purposes of res judicata.").  And, that

judgment resolved claims between the same parties as those appearing before this Court.  *See*

*Ohio Valley Envtl. Coal.*, 556 F.3d at 210.  Further, the Capital One companies' three proposed

antitrust counterclaims in this suit are based on the same causes of action as the three antitrust counterclaims that the Eastern District of Virginia dismissed with prejudice.  *See id.*

Nonetheless, Counterclaimants argue that they should be allowed to bring these counterclaims because, in their view, they offer new factual allegations that they could not have made in the earlier lawsuit.  Countercls.' Mem. 6.  According to Counterclaimants, at the time the Intellectual Ventures companies filed the Eastern District of Virginia action,

> IV had only just begun to wield its monopoly power against Capital One and many details of IV's scheme were unknown or unproven: the Virginia action was IV's first against Capital One, no court had weighed the validity or infringement of IV's financial-services patents, and only IV knew the specifics of its acquisitions, strategy, plans, and intent which, quite naturally, it kept as closely guarded secrets. Capital One thus based its Virginia antitrust counterclaims on its assessment of the patents there in suit, IV's threats, and on public information about IV's conduct.

*Id.* at 4.  But now, Counterclaimants contend, they can support their antitrust counterclaims better, using documents produced in discovery in the earlier case, *id.* at 7, as well as by including allegations that the Intellectual Ventures companies did not succeed on any of their claims in the Eastern District of Virginia, *id.* at 5; that Plaintiffs/Counter-Defendants filed suit in this Court "as part of its overall scheme to monopolize"; that "IV's claims in this case . . . reveal a distinct form of patent aggregation and assertion within that overall scheme"; and that "IV's infringement allegations in this case represent new anticompetitive conduct," *id.* at 6; *see also id.* at 14 ("Capital One's proposed antitrust counterclaims derive from new conduct, including IV's filing this second baseless lawsuit, targeting the standards, acquiring more patents secretly through shell companies, and losing on all of its asserted patent claims.").  Also, noting that "IV admitted that it has no factual basis to allege infringement of [one of the allegedly infringed patents] and dismissed it, because Capital One does not even use the commercial product that IV

alleges infringes," the Counterclaimants assert that this is "evidence that IV . . . knows or should know [that its infringement allegations] are baseless." *Id*. at 7.

As Plaintiffs see it, these "new" events simply are not "new," because they occurred before litigation concluded in the Eastern District of Virginia. Pls.' Opp'n 10. They insist that "[r]es judicata attached when judgment was entered, not when the motion to dismiss was granted, so facts that Capital One knew or should have know[n] before entry of judgment in the EDVA Case are not 'new' for purposes of res judicata." *Id.* Thus, the applicability of res judicata turns on when the events that Counterclaimants allege transpired in relation to the timeline of the earlier action, and when (if ever) in that timeline it became possible, under the doctrine of res judicata, to raise the events in a separate action.

> Claim preclusion analysis may be sorely tested by disputes that arise out of a number of events. . . . [I]t is necessary to determine whether events that have some elements of partial independence give rise to more than one claim or cause of action. The resulting problems can be arrayed along a spectrum from questions presented by events that were completed before the first suit was filed, through events that continued on substantially the same course throughout the period of the first suit, to events that recur or arise after the conclusion of the first suit. . . .

Wright & Miller, *Fed. Prac. & Proc*. § 4409.

Plaintiffs filed this suit on January 15, 2014, and the parties stipulated to the dismissal of the claims based on one of the five patents at issue in this suit on March 31, 2014, before litigation concluded in the Eastern District of Virginia in April, 2014. Therefore, these events alleged in the proposed counterclaims arose after the Eastern District of Virginia dismissed the Capital One companies' counterclaims, but before the court entered summary judgment in favor of the Capital One companies on the remaining claims. But, another significant event is the entry of judgment in Counterclaimants' favor, an event about which Counterclaimants necessarily could not have known before the court entered that judgment. Moreover, it is

undisputed that all of the events that Counterclaimants identified occurred after Counterclaimants filed their counterclaims in the Eastern District of Virginia in October, 2013.

The Fourth Circuit has declined to "decide whether the relevant time period for a newly articulated claim to satisfy the exception to res judicata is the point at which the complaint is filed in the previous case . . . or the entire pendency of that case . . . ." *Clodfelter v. Republic of Sudan*, 720 F.3d 199, 210–11 (4th Cir. 2013) (concluding instead that "res judicata should not apply . . . for three independent reasons"); *see Young-Henderson v. Spartanburg Area Mental Health Ctr.*, 945 F.2d 770 (4th Cir. 1991) ("While we doubt that the [rule that two causes of action are the same if they arise out of the same transaction or series of transactions] was intended to preclude claims that could not have been brought at the time the first complaint was filed, we need not reach that issue . . . .") (footnote omitted).  Yet, the Fourth Circuit has stated that res judicata does not apply when the basis for the later suit occurs "more than a year after [the plaintiff] initiated its [earlier] action," because "a plaintiff need not 'expand its suit in order to add a claim that it could not have asserted at the time suit was commenced.'" *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 554 n.2 (4th Cir. 2013) (quoting *NBN Broad., Inc. v. Sheridan Broad. Networks, Inc.*, 105 F.3d 72, 78 (2d Cir. 1997)).  And, in *Union Carbide Corp. v. Richards*, 721 F.3d 307, 315 (4th Cir. 2013), the Fourth Circuit "conclude[d] that the . . . subsequent claims [in the case before it] ar[o]se from operative facts that [we]re separate and distinct from those underlying Respondents' initial claims, and therefore constitute[d] new causes of action."  It reasoned that while "[i]dentity of the cause of action . . . exists if two claims 'arise out of the same transaction or series of transactions or the same core of operative facts,' . . . a new factual development . . . gives rise to a fresh cause of action . . . ." *Id.*; *see also Meekins v. United Transp. Union*, 946 F.2d 1054, 1058 (4th Cir. 1991) ("'[R]es

judicata has very little applicability to a fact situation involving a continuing series of acts, for generally each act gives rise to new cause of action.'" (quoting *Crowe v. Leeke*, 550 F.2d 184, 187 (4th Cir. 1977))).  Additionally, at least eight other jurisdictions have held that, for purposes of res judicata, "an action need include only the portions of the claim due at the time of commencing that action, frequently observing that the opportunity to file a supplemental complaint is not an obligation." Wright & Miller, *Fed. Prac. & Proc*. § 4409 (citing *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1345 (Fed. Cir. 2012); *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 652 (7th Cir. 2011); *Morgan v. Covington Tp.*, 648 F.3d 172, 177–78 (3d Cir. 2011); *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 919 (2d Cir. 2010); *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1150 (10th Cir. 2006); *Rawe v. Liberty Mut. Fire Ins. Co*., 462 F.3d 521, 530 (6th Cir. 2006); *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1298 (11th Cir. 2001); *Baker Grp. v. Burlington N. Ry.*, 228 F.3d 883, 886 (8th Cir. 2000)).

Here, the events giving rise to the counterclaims occurred after Counterclaimants filed their counterclaims in the Eastern District of Virginia and after the Virginia court dismissed those counterclaims.  Moreover, at least one significant event —the court's judgment in their favor in the Eastern District of Virginia—was one that Counterclaimants could not have known about until that case concluded.  Considering Fourth Circuit precedent and the persuasive authority cited by Wright and Miller, I conclude that res judicata does not bar the proposed counterclaims. *See Bethel*, 706 F.3d at 554 n.2; *Union Carbide Corp.*, 721 F.3d at 315; *Meekins v. United Transp. Union*, 946 F.2d 1058; *Fed. Prac. & Proc*. § 4409.

**B.  Plausible Claims**

The remaining issue is whether Counterclaimants include sufficient factual allegations to state their counterclaims, such that amendment would not be futile.  *See Katyle v. Penn Nat. Gaming Inc.*, 637 F.3d 462, 471 (4th Cir. 2011).

*1.  Monopolization and attempted monopolization under § 2 of the Sherman Act*

To state a claim for monopolization under § 2 of the Sherman Act, Counterclaimants must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. at 451, 481 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).   A cause of action also exists for attempted monopolization under § 2, for which "a claimant must plead: (1) the use of anticompetitive conduct, (2) with specific intent to monopolize, and (3) a dangerous probability of success." *Therapearl, LLC v. Rapid Aid Ltd.*, No. CCB-13-2792, 2014 WL 4794905, at *8 n.10 (D. Md. Sept. 25, 2014) (quoting *E.I. DuPont de Nemours & Co. v. Kolon Indus. Inc.*, 637 F.3d 435, 453 (4th Cir. 2014)); *see Spectrum Sports, Inc. v. McQuilan,* 506 U.S. 447, 456 (1993).   In Plaintiffs/Counter-defendants' view, Counterclaimants fail on both counts because (1) they do not allege a plausible relevant market, Pls.' Opp'n 13; (2) they do not allege sufficiently that Plaintiffs have monopoly power in such a market, *id.* at 17; and (3) none of the purportedly unlawful acts of monopolization that Counterclaimants allege are indeed unlawful, *id.* at 18.   Alternatively, Plaintiffs argue that Counterclaimants lack standing.  *Id.* at 30.

### a.  Relevant market

"[F]ailure to plead a relevant product market" rarely is grounds for dismissal "[b]ecause market definition is a deeply fact-intensive inquiry" for which discovery generally is necessary. *Kolon Indus. Inc.*, 637 F.3d at 443.  "The proper market definition in [some] case[s] can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Co.*, 504 U.S. at 482.  Yet, dismissal is possible if there is a "'glaring deficienc[y],'" such as if a claimant does not plead a relevant market at all.  *Kolon Indus. Inc.*, 637 F.3d at 444 (quoting *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 339 (D. Vt. 2010)).  When dismissal does occur, it typically is for "'(1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.'"  *Id.* at 443 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (footnotes omitted)).  According to Counterclaimants, Plaintiffs' "3,500-patent financial-services portfolio . . . is the market in which it admits to acquiring monopoly power." Countercls.' Mot. to Am. 8. Thus, the issue is whether the market in this case can be limited to the patents in Plaintiffs' portfolio.

"[A] single brand of a product or service" may "be a relevant market under the Sherman Act" if no substitute exists for that brand's products or services.  *Eastman Kodak Co.*, 504 U.S. at 481–82 (citing "prior [Supreme Court] cases support[ing] the proposition that in some instances one brand of a product can constitute a separate market").  In *Eastman Kodak Co.*, Kodak and independent service organizations ("ISOs") both serviced and provided parts for Kodak machines.  *Id.* at 457.  Kodak began to limit the availability of its parts "to make it more difficult for ISO's to sell service for Kodak machines," and, as a result, "many [ISOs] were

forced out of business, while others lost substantial revenue," and customers had no option but to go to Kodak for service. *Id*. at 458. The ISOs brought an antitrust action against Kodak for "mak[ing] it more difficult for [them] to compete with Kodak in servicing Kodak's equipment." *Id*. at 455. The Supreme Court noted that Kodak equipment, specifically its photocopiers and micrographic equipment, "is unique," such that "programs that operate on Kodak machines . . . are not compatible with competitors' machines," and "Kodak parts are not compatible with other manufacturers' equipment, and vice versa." *Id*. at 456–57. Observing that "[t]he relevant market for antitrust purposes [was] determined by the choices available to Kodak equipment owners," the Court concluded that, "[b]ecause service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id.*

Parallels can be drawn between the Capital One companies' interactions with the Intellectual Ventures companies and the Kodak customers' situation in *Eastman Kodak Co*. Like the Kodak customers with no choice but to seek parts and services directly from Kodak (because the parts and services were necessary to run the equipment they already owned, had no equivalent, and were not otherwise available), the banks have no choice but to pay licensing fees to the Intellectual Ventures companies (and/or legal fees to challenge the licenses) because their online services, which already are in use, cannot run without their components, for which the Intellectual Ventures companies purport to hold valid patents. *See Eastman Kodak Co.*, 504 U.S. at 456–58, 482. As Counterclaimants see it,

> [t]he reality facing banks is that IV's financial-services portfolio is a distinct
> market: banks have no choice but to buy a license from IV or to face endless,
> meritless litigation. They cannot buy a substitute license from any other patentee
> or reconfigure their business methods and products to avoid IV's baseless

infringement claims. The law holds that an inescapable IP portfolio constitutes its own antitrust market, and such is the case here.

Countercls.' Mot. to Am. 18 (citing *Meredith v. SESAC LLC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014)).

*Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014), provides an in-depth examination of the licensing of copyrighted music by local television stations, a process that, boiled down, also bears significant similarity to the circumstances facing Counterclaimants. Essentially, three performing rights organizations ("PROs"), on behalf of their members and affiliates, have the right to issue licenses for all of the music that is incorporated into the shows that television stations air in the United States. *Id.* at 185–89. The stations cannot air the shows without the music as they do not control the shows' contents, and they cannot work directly with the musicians or other rights holders. *Id.* Consequently, they have no option but to work with these PROs to obtain performance rights for the music. *Id.* Further, each PRO works with a distinct collection of music and licenses the music collectively, such that the stations cannot choose among the PROs but rather must work with all of them, and must license all of the music from each PRO rather than selecting it à la carte. *Id.* This means that the stations have no choice but to pay a licensing fee to each station. *Id.* Two of the three PROs are regulated by consent decrees with the United States Department of Justice, as a result of antitrust litigation. *Id.* at 185.

In *Meredith Corp.*, 1 F. Supp. 3d 180, antitrust claims were brought against the third PRO, SESAC Corp. The plaintiffs claimed, *inter alia*, monopolization under § 2 of the Sherman Act, and the PRO moved for summary judgment. To establish their prima facie case of monopolization, "plaintiffs claim[ed] that the relevant market [was] the market for television-performance rights to works within SESAC's repertory." 1 F. Supp. 3d at 218. In denying

summary judgment, the court observed that "market definition 'is a highly factual one best allocated to the trier of fact.'" *Id.* at 219 (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992)). The court concluded that "[t]he facts in the summary judgment record offer[ed] strong support for plaintiffs' proposed market definition." *Id.* at 218. The "ample factual basis" included the following facts: "virtually all composers affiliate with only one of the three PROs"; "almost all local stations have licenses from all three PROs" and "[a]s a practical matter, a station must have such licenses, because it is unable to control—or, sometimes, even identify—what music is contained within third-party programs"; and, when SESAC significantly increased its prices, "local stations [did] not respond[] to SESAC's price increases by replacing SESAC licenses with alternative licenses." *Id.*

Here, Counterclaimants have alleged sufficiently that they have no viable option other than to license the patents at issue from Plaintiffs/Counter-Defendants. They claim that the Intellectual Ventures companies have "creat[ed] a single licensing source," thereby "eliminate[ing] all competition between patentees that would otherwise compete with each other for financial-services licensing opportunities." Third Am. Countercl. ¶ 178. This is akin to the circumstances in *Meredith Corp.*, in which local stations could go only to the PROs, not the composers and musicians, and had to go to each PRO, as each amassed a distinct collection of music. *See Meredith Corp.*, 1 F. Supp. 3d at 218. Moreover, like the local stations, Counterclaimants already own products that (unknowingly) incorporate the allegedly patented products, and the patented products cannot be extracted from the online banking systems, just as the music cannot be removed from the television programs. *Id.* at 185–89, 218.

In the Eastern District of Virginia, also, the Capital One companies "liken[ed] its proposed market to the relevant market in *Kodak*, [*Broadcom Corp. v.*] *Qualcomm* [*Inc.*, 501

F.3d 297, 307 (3d Cir. 2007)] and *Meredith Corp. v. SESAC, LLC*, 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011)," and the court observed that the three cases were ones in which "the patents, copyrights or product lines at issue were controlled by a single company and the customers were 'locked in' to those particular patents, copyrights or replacement parts, without the availability of substitutes." *Intellectual Ventures I LLC v. Capital One Financial Corp.*, No. 13-740 (AJT/TRJ), 2013 WL 6682981, at *5 (E.D. Va. Dec. 18, 2013). The court rejected the comparisons, concluding that "Capital One's proposed market [was] not a 'relevant market' under any recognized antitrust jurisprudence."[3] *Id.* The court noted that in the cases that the Capital One companies cited, "the relevant market was defined in terms of what was a business necessity for the complaining businesses' lawful operation." *Id.* The Virginia court opined that, in the case before it, "[t]he only 'business necessity' alleged is, in essence, the business need to avoid future litigation," and that "the actual technologies included within the proposed market . . . appear nearly irrelevant, since it is not the substantive, commercial usefulness or the merits of the technology that defines the market; but simply the patents in that market used to threaten Capital One, which consist entirely of IV's patent portfolio." *Id.*

Yet, unlike in the earlier suit, Counterclaimants now allege:

IV's financial-services portfolio in the United States constitutes a relevant licensing market because IV demands that banks license this portfolio to continue their commercial-banking services (and their redesigned alternatives), threatening and suing those banks that resist. Because IV sought and obtained such a large portfolio, banks do not have the option to license alternative portfolios, because

---

[3] In defining the market in the parties' previous litigation, the Capital One companies claimed that "the relevant market [was] the 'market for technology enabling business processes common throughout the commercial banking industry in the United States, where the relevant geographic market is nationwide.'" *Intellectual Ventures*, 2013 WL 6682981, at *5 (citation to E.D. Va. record omitted). The Eastern District of Virginia concluded that "Capital One's proposed technology market equates to IV's 'portfolio of 3,500 or more patents that [IV] alleges cover widely used financial and retail banking services' in the United States because IV's patent portfolio presents an 'inescapable threat' to providers of financial services." *Id.*

such an alternative license would not eliminate IV's threat of ceaseless litigation. That is, there are no substitutes for a license to IV's portfolio, because IV removed the original patentees from the market and banks consequently cannot be free from IV's licensing demands and lawsuits, no matter how they implement the targeted features, products, and services, regardless of how great a price IV may charge, and irrespective of any other patentees from which banks might buy licenses. Capital One cannot avoid or negate IV's infringement claims by licensing patents or technologies from alternative sources. In short, IV has eliminated banks' access to substitutes for IV's license, both in the form of other patent licenses and banking-product designs, through a carefully orchestrated campaign of patent aggregation, concealment, and sham litigation.

Third Am. Countercl. ¶ 156.  On the factual allegations that Counterclaimants now make, their business necessity is not only to avoid litigation but also to continue to provide the online services they already offer without paying the cost-prohibitive licensing fees to the Intellectual Ventures companies—the only source of such licenses—, and, at this pre-discovery stage in the litigation, Counterclaimants adequately have alleged a plausible relevant market.  Moreover, discovery is necessary to determine whether, in this case, a need to avoid endless litigation is a business necessity.  Therefore, I will not dismiss the § 2 counterclaims on this ground.  *See Eastman Kodak Co.*, 504 U.S. at 482; *Kolon Indus.*, 637 F.3d at 443–44; *Meredith Corp.*, 1 F. Supp. 3d at 218–19.

### b.  Monopoly power

Monopoly power is "'the power to control prices or exclude competition.'" *United States v. Grinnell Corp.,* 384 U.S. 563, 571 (1966) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).  A party may establish monopoly power "either through 'direct evidence of supracompetitive prices and restricted output' or by inference 'from the structure and composition of the relevant market.'" *Intellectual Ventures*, 2013 WL 6682981, at *4 (quoting *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 307 (3d Cir. 2007)). For example, control of seventy percent or more of the relevant market is circumstantial evidence of monopoly power.

*See Kolon Indus.*, 637 F.3d at 450–51.   But, it is not sufficient evidence in and of itself: A plaintiff using market share to establish monopoly power also "must show that new competitors face high market barriers to entry and that current competitors lack the ability to expand their output to challenge a monopolist's high prices." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997).   These "[b]arriers to entry 'must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting.'" *Id.* (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995)).   Patents are "[c]ommon entry barriers." *Id.*   In *Eastman Kodak Co.*, 125 F.3d at 1208, the Ninth Circuit concluded that the ISOs "prove[d] meaningful entry barriers" by demonstrating that "Kodak ha[d] 220 patents and control[led] its designs and tools, brand name power and manufacturing capability," as well as its "original-equipment manufacturers," and that Kodak "consistently maintained a high share of the service market."

Before the Eastern District of Virginia, the Capital One companies "rel[ied] exclusively on . . . 'direct evidence' of market power, namely 'supracompetitive prices and restricted output.'" *Intellectual Ventures I LLC*, 2013 WL 6682981, at *6.   Specifically, they claimed that "Intellectual Ventures reportedly extracted $350 million from Verizon Communications, for instance, $120 million from Intuit Inc., and between $200 million to $400 million from Cisco Systems, Inc.," insisting that "[s]uch amounts bear no commercial or economic relation to the real financial worth of the individual licensed patents, but reflect portfolio monopoly overcharges that Intellectual Ventures can impose due to its targeted aggregation, obfuscation, and related anticompetitive practices." E.D. Va. Countercl. ¶ 70.   They also alleged: "Based on the sheer number of patents Intellectual Ventures has accumulated, its licensing practices, and its other anticompetitive conduct alleged above (but not based on the value of any of its individual

patents), Intellectual Ventures holds monopoly power in the market for technology enabling business processes common throughout the commercial banking industry in the United States." *Id.* ¶ 72.  Based on these factual allegations, the Eastern District of Virginia concluded that, even if the Capital One companies alleged a relevant market, they failed to state a plausible "claim that IV wields unlawful monopoly power within that market" by failing to state the "share of the market" that IV controls, or how much IV receives in licensing fees and royalties and how that amount compares with other businesses.  *Id.* at 10-11.

The Capital One companies now take a different tack, offering also circumstantial evidence of monopoly power.  They allege that "IV has a 100 percent share of the relevant market because it alone sells a license to what it contends to be an indispensable body of patents, and licenses to patents held by other entities cannot halt IV's activities with respect to its financial-services portfolio."  Third Am. Countercl. ¶ 164.  In their view, "[b]y controlling 100 percent of the market, and due to the absence of any supply- or demand-side constraints on its power over price, IV has monopoly power."  *Id.*  Thus, Counterclaimants sufficiently have alleged a significant market share—the entire market.  *See Kolon Indus.*, 637 F.3d at 450–51.

As for "high barriers to entry," the Intellectual Ventures companies allegedly control the market through the volume of patents they have acquired, and patents are "[c]ommon market barriers."  *See Eastman Kodak Co.*, 125 F.3d at 1208.  Moreover, "the essence of a patent grant is the right to exclude others from profiting by the patented invention." *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980).  Because the market that the Intellectual Ventures companies allegedly control consists of patents, each of which Counterclaimants and other banks cannot infringe, and those patents cover critical components of the banks' existing online systems, Counterclaimants adequately have alleged that "current competitors lack the ability to

expand their output to challenge [the Intellectual Ventures companies'] high prices." *See Eastman Kodak Co.*, 125 F.3d at 1208. Additionally, Counterclaimants claim that "banks 'cannot avoid' IV's demands that they license its portfolio of 3,500 patents related to the financial-services industry, or the serial baseless litigation with which they are punished if they do not take a license." Third Am. Countercl. ¶ 157. Based on these allegations, Counterclaimants have alleged sufficiently that the Intellectual Ventures companies have monopoly power. *See Kolon Indus.*, 637 F.3d at 450–51; *Eastman Kodak Co.*, 125 F.3d at 1208.

### c. Unlawful acts of monopolization

To state a claim for monopolization under § 2, a claimant must allege not only the possession of the monopoly power in the relevant market, but also the unlawful use of that power. *See Eastman Kodak Co.*, 504 U.S. at 481–83. This means that the claimant must allege that the opposing party "use[d] [its] monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor,'" or acquired or maintained that power willfully, and not "from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)). The Intellectual Ventures companies argue that "the five anticompetitive acts alleged by Capital One, individually and collectively, do not state a plausible claim for monopolization because 'where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws.'" Pls.' Opp'n 18 (quoting *SCM Corp. v Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981)). Although Plaintiffs correctly state the holding from *SCM Corp.*, that case is not binding precedent. Further, the Supreme Court has observed that "[e]ven constitutionally protected property rights such as patents may not be used

as levers for obtaining objectives proscribed by the antitrust laws." *Ford Motor Co. v. United States*, 405 U.S. 562, 576 n.11 (1972).

In any event, *SCM Corp.* is distinguished readily from the case before me.   In *SCM Corp.*, after Xerox acquired a number of patents related to its own products and refused to license them to SCM, SCM brought an antitrust action, claiming damages for Xerox's refusal to license its patents, which SCM alleged to be a violation of §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act.   645 F.2d at 1197. The district court denied the damages claim, while acknowledging that SCM might be entitled to equitable relief, and the Second Circuit affirmed the damages denial, "based upon [its] determination that none of Xerox's patent-related conduct, the only conduct alleged by SCM to have caused it any harm, contributed to any antitrust violation."  *Id.*

But here, the alleged conduct is not a refusal to license; nor is it narrowly focused on specific patents.   Rather, Counterclaimants allege as wrongful conduct Plaintiffs' intentional acquisition of "a massive patent portfolio," encompassing 3,500 patents, "that [IV] alleges reads, vaguely, on existing products in [the financial-services] industry, regardless of how those products are designed, so that it could hold up banks that have substantially invested in those existing product designs."   Third Am. Countercl. ¶ 173.   According to Counterclaimants, "IV reverses the normal from-patent-to-product process by using the designs of existing products as targets for custom-built patent portfolios – it is a product-to-patent process" that "start[s] from widely adopted and existing technology" – and IV capitalizes on the fact that "companies like Capital One have substantial sunk investments [*sic*] in their existing product designs."  *Id.* ¶ 175. The Capital One companies claim that, "as IV describes it, the 'simple driver' of IV's strategy is

to create a portfolio that its victims 'can not avoid.'"   *Id.*   Counterclaimants differentiate the Intellectual Ventures companies' patent aggregation from sanctioned patent aggregation:

> IV's strategic *ex post* patent aggregation is unlike the patent aggregation that *bona fide* operating companies practice. In many instances, patent aggregation by companies with their own productive commercial operations clears a path through patent portfolios that would otherwise frustrate the commercialization of technology; that is, it protects the acquiring firm's own products or design freedom. The purpose and effect of IV's aggregation are precisely the opposite: its patent accumulation creates portfolios allowing IV to assert repeated claims of infringement to tax productive commercial use of existing technology.

*Id.* ¶ 180.   Counterclaimants further allege that the Intellectual Ventures companies "conceal[] and obfuscate[] [their] patent holdings" such that it is "practically impossible for targets like Capital One to assess the portfolio and take steps to avoid IV's claims of patent infringement." *Id.* ¶ 183.

Moreover, in *SCM Corp.*, the court stated that "analyzing the lawfulness of the acquisition of a patent necessitates [a] primar[]y focus upon the circumstances of the acquiring party and the status of the relevant product and geographic markets at the time of acquisition." 645 F.2d at 1206–07.   It said: "In scrutinizing acquisitions of patents under § 2 of the Sherman Act, the focus should be upon the market power that will be conferred by the patent in relation to the market position *then occupied* by the acquiring party."   *Id.* at 1208 (emphasis added). Significantly, in *SCM Corp.*, the allegedly wrongful patent acquisition preceded "the appearance of the relevant product market and submarket defined by SCM" by at least eight years, such that it only "*eventually* afforded it monopoly power."   *Id.* at 1207–08 (emphasis added).   In contrast, here, Plaintiffs had no role in the market when they began their patent acquisition, and the products already were in place and employed by the banking industry.   Counterclaimants have alleged sufficiently that Plaintiffs willfully acquired their monopoly power.   *See Eastman Kodak Co.*, 504 U.S. at 481–83.   Thus, amendment to include a Sherman Act claim for monopolization

22

would not be futile, *see id.*, and Counterclaimants' Motion to Amend will be granted as to that claim. *See Katyle v. Penn Nat. Gaming Inc.*, 637 F .3d 462, 471 (4th Cir. 2011).

### d. Attempted monopolization under § 2 of the Sherman Act

Plaintiffs contend that Counterclaimants' attempted monopolization claim fails "for the same reasons that Capital One cannot state a plausible claim for monopolization." Pls.' Opp'n 31–32. Based on this argument, given that Plaintiffs have not shown that amendment to include a monopolization claim under § 2 of the Sherman Act would be futile, they also have not shown that the inclusion of an attempted monopolization claim would be futile. Therefore, Counterclaimants' Motion to Amend will be granted as to the attempted monopolization claim as well. *See Katyle v. Penn Nat. Gaming Inc.*, 637 F .3d 462, 471 (4th Cir. 2011).

### e. Standing

Plaintiffs insist that Counterclaimants cannot assert their proposed antitrust Sherman Act counterclaims because the parties are not competitors. Pls.' Opp'n 30. It is true that in *Intergraph Corp. v. Intel Corp.*, which Plaintiffs cite, the Federal Circuit stated that "[t]he prohibited conduct must be directed toward competitors and must be intended to injure competition." 195 F.3d 1346, 1353 (Fed. Cir. 1999) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993), in which the Supreme Court stated that § 2 "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself"). Yet, this is a limitation imposed on *conduct* in defining what is actionable; it is not a bar to suit by an entity that is not a competitor. *See id.*

Rather, the Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers," or "immunize the outlawed acts because they are done by any of

these." *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948); *see also Jefferson Cnty. Pharma. Ass'n v. Abbott Labs.*, 460 U.S. 150, 157 (1983) ("On numerous occasions, this Court has affirmed the comprehensive coverage of the antitrust laws and has recognized that these laws represent 'a carefully studied attempt to bring within [them] every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states.'" (quoting *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 553 (1944); citing *Mandeville Island Farms, Inc.*)); *BNLfood Investments Ltd. SARL v. Martek Biosciences Corp.*, No. WDQ-11-446, 2011 WL 6439451, at *3 (D .Md. Dec. 14, 2011) ("The antitrust laws protect not only consumers and competitors, but all victims of prohibited practices." (citing *Mandeville Island Farms, Inc.*)).  Indeed, "[t]he Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms*, 334 U.S. at 236.  Consequently, Counterclaimants are correct that they are not foreclosed from bringing this action because they have pleaded that "Capital One and IV operate in the same market as buyer and seller," rather than competitors.  *See* Countercls.' Reply 23 (citing Third Am. Countercl. ¶¶ 199–200).

Plaintiffs argue that Counterclaimants lack standing nonetheless because they did not suffer any actual injury or any "antitrust injury as a result of any alleged anticompetitive act of Intellectual Ventures because any injury to Capital One was caused by the patents themselves, and not Intellectual Ventures' ownership of them."  Pls.' Opp'n 30–31.  Counterclaimants respond that it was not simply the patents that caused their injury; in their view, the patents that the Intellectual Ventures companies acquired would not "have commanded the same market power when dispersed in separate hands as when aggregated together into a single portfolio." Countercls.' Reply 23–24.  According to Counterclaimants,

> [w]hen the patents were in separate hands, banks could negotiate licenses more consistent with the far-lower prices that *IV* paid for the patents, and/or trust that disaggregation would discourage anticompetitive enforcement of invalid patents. Now that IV has amassed those patents into a single portfolio, banks have no way to avoid its exorbitant demands or serial litigation threat.

Countercls.' Reply 24 (citation omitted to Third Am. Countercl. ¶¶ 160, 175, 178–79). Additionally, they contend that they have alleged actual injury in their allegations that "IV has foreclosed Capital One's access to competitively priced commercial banking services technology, and put Capital One to an anticompetitive choice between paying a monopoly price, exiting the banking industry, and paying millions of dollars in litigation costs" and that "IV has forced Capital One to operate in the shadow of IV's licensing monopoly, suppressing its efficient investment incentives, and cutting off potential re-engineering avenues otherwise available to Capital One and other banks."  Countercls.' Reply 24 (citing Third Am. Countercl. ¶¶ 198, 200).

An antitrust claimant must allege both "'antitrust injury,'" which is "required for standing to bring an antitrust action," and "actual injury," which is "required for standing to bring any federal action under Article III of the Constitution."  *BNLfood Investments Ltd.*, 2011 WL 6439451, at *3.  To determine whether a plaintiff has alleged antitrust injury, courts consider "'(1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; [and] (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws.'"  *Id.* (quoting *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311, 315 (4th Cir. 2007)).

Through the Sherman Act, Congress sought "to protect the freedom to compete by curtailing the destruction of competition through anticompetitive practices." *Novell, Inc.*, 505 F.3d at 315.  As previously discussed, Counterclaimants have alleged that Plaintiffs intentionally engaged in "anticompetitive practices."  *See id.*  Moreover, Counterclaimants have alleged that

those practices harmed them directly by preventing them from "access[ing] . . . competitively priced commercial banking services technology" and forcing them to choose between paying costly litigation expenses or excessive licensing fees. *See* Third Am. Countercl. ¶¶ 198, 200. And, based on the allegations Counterclaimants identify, they have pleaded sufficiently that Plaintiffs' alleged antitrust violations, and not the patents themselves, caused the injury. *See* Countercls.' Reply 24 (citing Third Am. Countercl. ¶¶ 160, 175, 178–79). Therefore, Counterclaimants adequately have alleged antitrust injury. *See BNLfood Investments Ltd.*, 2011 WL 6439451, at *3.

To plead actual injury sufficiently, a claimant must allege "'an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *BNLfood Investments Ltd.*, 2011 WL 6439451, at *5 (quoting *Lux v. Judd*, 651 F.3d 396, 400 (4th Cir. 2011)). Because "'[t]he concept of antitrust standing is narrower than constitutional standing,'" *id.* (quoting *Novell*, 505 F.3d at 311 n.16), "'[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact,'" *id.* (quoting *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). As noted, Counterclaimants sufficiently alleged antitrust injury. Therefore, they also have alleged actual injury sufficiently. *See id.*

Courts consider three additional factors that "focus on the directness or remoteness of the plaintiff's alleged anti-trust injury" to determine whether a claimant has antitrust standing: (1) "the directness of the alleged injury"; (2) "the existence of more direct victims of the alleged antitrust injury"; and (3) "problems of identifying damages and apportioning them among those directly and indirectly harmed." *Novell, Inc.*, 505 F.3d at 311. The purpose of this analysis is to permit only suits by "the most direct victims of defendants' anticompetitive conduct and [to]

deny[] standing to more remote victims on the theory that the direct victims have the greatest motivation to act as 'private attorney[s] general' and 'to vindicate the public interest in antitrust enforcement.'" *Id.* at 317–18 (quoting *Associated Gen. Contractors of Calif., Inc.*, 459 U.S. at 542). Here, the counterclaims assert direct injury—Plaintiffs amassed an extensive patent portfolio, and by demanding large licensing fees to avoid exposure to possible serial patent litigation, a few patents at a time, hindered Counterclaimants' business—and these factors support Counterclaimants' standing to bring an antitrust action. *See id.* Consequently, given that they adequately alleged antitrust injury and actual injury, Counterclaimants have standing. *See BNLfood Investments Ltd.*, 2011 WL 6439451, at *3–5.

### 2. *Unlawful asset acquisition under § 7 of the Clayton Act*

Section 7 of the Clayton Act proscribes the acquisition of "the assets of one or more persons engaged in commerce" if "the effect of such acquisition of . . . assets . . . may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Plaintiffs argue that Counterclaimants fail to state a claim because they do not "allege[] a plausible relevant market" or "Intellectual Ventures' share of that market." Pls.' Opp'n 2. As discussed above, these arguments are unpersuasive. It is undisputed that Plaintiffs acquired assets, namely, 3,500 financial-services patents. Additionally, Counterclaimants have alleged sufficiently that the extent of their acquisitions was such that their financial-services patent portfolio became its own market, and the effect is that Plaintiffs have a monopoly in that market, as they own 100% of the market.

Alternatively, relying on *SCM Corp.*, 645 F.2d 1195, Plaintiffs argue that the claim fails because "the legality of an acquisition of patents under Clayton Act § 7 is measured at the time of acquisition." Pls.' Opp'n 32. It is true that the Second Circuit held that "the patent laws

circumscribe [§ 7's] scope," which may be broader in other contexts. *SCM Corp.*, 645 F.2d at

1211.  The court reasoned, *id.* at 1211–12:

> Where a corporation's acquisition of a patent is not violative of § 7, as was the
> case here, its subsequent holding of the patent cannot later be deemed violative of
> this section. Where a company has acquired patents lawfully, it must be entitled to
> hold them free from the threat of antitrust liability for the seventeen years that the
> patent laws provide. To hold otherwise would unduly trespass upon the policies
> that underlie the patent law system.

Under this reasoning, which, as noted, is not binding on this Court, it may be that Plaintiffs' first

10, or 100, or 1,000 patent acquisitions did not violate § 7.  But, at some point, the acquisitions,

as alleged, created a monopoly and crossed the line to actionable under § 7.  *See* 15 U.S.C. § 18.

Moreover, in *Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962), the Supreme

Court observed that Congress enacted § 7 to "arrest[] mergers at a time when the trend to a

lessening of competition in a line of commerce was still in its incipiency."  And, "'[i]ncipiency'

in this context denotes not the time the stock was acquired, but any time when the acquisition

threatens to ripen into a prohibited effect."  *United States v. E. I. du Pont de Nemours & Co.*, 353

U.S. 586, 597 (1957).  Thus, the legality of each individual patent acquisition at the time of

acquisition is immaterial; "the effect of such acquisition," 15 U.S.C. § 18, is not its immediate

effect but rather the cumulative effect it has at a later point when it "ripen[s] into a prohibited

effect."  *See E. I. du Pont de Nemours & Co.*, 353 U.S. at 597.  Counterclaimants have stated a

claim under § 7 of the Clayton Act, *see Brown Shoe Co.*, 370 U.S. at 317; *E. I. du Pont de

Nemours & Co.*, 353 U.S. at 597, at least insofar as they base their allegations on patent

acquisitions other than Plaintiffs' initial financial-services patent acquisitions.  *See SCM Corp.*,

645 F.2d at 1211–12.  Therefore, their amendment is not futile with regard to the Clayton Act

claim, and their Motion to Amend to include this claim will be granted.  *See Katyle v. Penn Nat.

Gaming Inc.*, 637 F .3d 462, 471 (4th Cir. 2011).

**III.      CONCLUSION**

In sum, Counterclaimants' Motion to Amend, ECF No. 106, will be granted, and Counterclaimants' Motions to Seal, ECF Nos. 110 and 126, will be granted.  A separate order will issue.


Dated: <u>March 2, 2015</u>                          <u>        /S/                </u>
                                                            Paul W. Grimm
                                                            United States District Judge

lyb