1                          VOLUME II

2              IN THE UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF MARYLAND

4                      AFTERNOON SESSION

5    INTELLECTUAL VENTURES 1 LLC,

6    et al.,

7              Plaintiffs          CIVIL ACTION NO:

8    vs.                          8:14-CV-00111-PWG

9    CAPITAL ONE FINANCIAL

10   CORPORATION, et al.,

11             Defendants

12   _____/

13

14             The Trial in the above-captioned matter

15   was held on Thursday, April 16, 2015, commencing at

16   2:05 p.m., at the United States District Court of Maryland,

17   6500 Cherrywood Lane, Greenbelt, Maryland 20770,

18   before Judge Paul W. Grimm and Raphael V. Lupo, Special

19   Master.

20

21   REPORTED BY: R. Dwayne Harrison

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 172

```
 1   APPEARANCES:
 2
 3       ON BEHALF OF PLAINTIFF
 4       MARC BELLOLI, ESQUIRE
 5       DAVID ALBERTI, ESQUIRE
 6       YAKOV "Jake" ZOLOTOREV, ESQUIRE
 7       CLAYTON THOMPSON, ESQUIRE
 8           FEINBERG DAY ALBERTI & THOMPSON LLP
 9           1600 El Camino Real
10           Suite 280
11           Menlo Park, California 94025
12           Telephone:  650-704-1613
13           Email: mbelloli@feinday.com
14           Email: dalberti@feinday.com
15           Email: yzolotorev@feinday.com
16           Email: cthompson@feinday.com
17
18
19
20
21   APPEARANCES:   (Continued on Next Page)
```

Page 173

```
 1   APPEARANCES CONTINUED:
 2       ON BEHALF OF PLAINTIFF
 3       MICHAEL E. MCCABE, JR., ESQUIRE
 4           Funk & Bolton, P.A., 12th Floor
 5           36 South Charles Street
 6           Baltimore, Maryland  21201-3111
 7           Telephone:  410.659.7700
 8           Facsimile:  410.659.7773
 9           Email:  mmccabe@fblaw.com
10
11       ON BEHALF OF DEFENDANT:
12       MATTHEW J. MOORE, ESQUIRE
13       ADAM M. GREENFIELD, ESQUIRE
14           Latham & Watkins LLP
15           555 Eleventh Street NW
16           Suite 1000
17           Washington, D.C., 20004-1304
18           Telephone:  202-637-2200
19           Facsimile:  202-637-2201
20           Email:  matt.moore@lw.com
21           Email: adam.greenfield@lw.com
```

Page 174

```
 1   APPEARANCES CONTINUED:
 2
 3       ON BEHALF OF THE DEFENDANT:
 4       JEFFREY G. HOMRIG, ESQUIRE
 5       MICHELLE P. WOODHOUSE, ESQUIRE
 6           Latham & Watkins LLP
 7           140 Scott Drive
 8           Menlo Park, California 94025-1008
 9           Telephone:  650-328-4600
10           Facsimile:  650-463-2600
11           Email:  jeff.homrig@lw.com
12           Email: michelle.woodhouse@lw.com
13
14
15
16
17
18
19
20
21   APPEARANCES (Continued on Next Page)
```

Page 175

```
 1       ON BEHALF OF THE DEFENDANT:
 2       ROBERT A. ANGLE, ESQUIRE
 3       MARY C. ZINSNER, ESQUIRE
 4       PAUL E. MCGOWAN, ESQUIRE
 5           Troutman Sanders LLP
 6           Troutman Sanders Building
 7           1001 Haxall Point PO Box 1122
 8           Richmond, Virginia 23218-1122
 9           Telephone:  804-697-1246
10           Facsimile:  804-698-5124
11           Email:  robert.angle@troutmansanders.com
12           Email: mary.zinsner@troutmansanders.com
13           Email: paul.mcgowan@troutmansanders.com
14
15
16
17
18
19
20
21   APPEARANCES (Continued on Next Page)
```

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 176

1    APPEARANCES CONTINUED:
2
3    ON BEHALF OF THE DEFENDANT:
4  DAVID W. HIGER, ESQUIRE
5  KENNETH R. ADAMO, ESQUIRE
6    Kirkland & Ellis LLP
7    300 North LaSalle
8    Chicago, Illinois 60654
9    Telephone:  312-862-7029
10   Facsimile:  312-862-2200
11   Email:  david.higer@kirkland.com
12   Email:  kradamo@kirkland.com
13
14
15   ALSO PRESENT: EULONDA G. SKYLES
16   ROBSON BASSETT
17   ANTHONY WHITLEDGE, J.D.
18   MICHAEL RUTLEDGE
19   DAVID BACHINSKI
20
21

Page 177

1    PROCEEDINGS
2    MR. LUPO: All right.  Capital One?
3  Identify on the record again when you speak, please.
4    MR. HOMRIG: Thank you, Special Master.
5  Thank you, Your Honor.  Jeff Homrig for Capital One.
6    May we approach with handouts?
7    MR. LUPO: Please, and could you pull the
8  microphone up just a little bit?  Thank you.
9    MR. HOMRIG: Can you hear me better now?
10   MR. LUPO: Yes.
11   MR. HOMRIG: So one of the fundamental
12  disputes between the parties which we saw in evidence
13  this morning in the way that tutorials were
14  presented -- and we'll see it again and we'll see it in
15  the briefing is whether the focus on the specification,
16  what's described there, or whether to focus on the
17  claims and what's actually claimed in the patent suit.
18   I'd like to start with the legal framework
19  that we were applying which, of course, does, like most
20  of the patent law, focus on the claims.  That framework
21  is very clear as set forth in Alice by the Supreme

Page 178

1  Court for evaluating 101 and it was, as you know, set
2  forth after a dispute or -- dispute is probably too
3  strong, but certainly different views were expressed by
4  different courts and how to deal with it and the
5  Supreme Court stepped in and set forth this two-part
6  test, first in Mayo and then confirmed in Alice that
7  the two-part test applies to abstract ideas as well as
8  laws of nature and applies to computerized inventions
9  or alleged inventions, in any event, and that two-part
10  test first involves looking at the claims,
11  specification or the claims and determining whether
12  they involve an abstract idea and, if they do, then
13  looking at those same claims to determine whether the
14  balance of the claims adds anything inventive.
15   That's the language that's used in Benson
16  but, as is explained, what that part of the test is
17  really getting at is whether the balance of the claims
18  add anything substantial to the idea such that it's
19  patentable, such that it is a meaningful application of
20  the idea and that's the inquiry.
21   To really understand how that should be

Page 179

1  applied, though, it's useful to look at how the Supreme
2  Court applied that test in Alice.  So here we see on
3  slide 5 the abstract from the patent that Alice or the
4  Supreme Court considered in Alice and, as that abstract
5  says, that patent was directed at methods and apparatus
6  which deal with a management of risk relating to
7  specified yet unknown future events.  That's how the
8  specification framed the idea.
9    The claims were more specific than that.
10  Here we see claim 33.  This is on slide 6 of the 479
11  patent.  It was one of the claims that was found to be
12  ineligible by the Supreme Court and, as you can see,
13  the idea is set forth in pretty good detail.  It's
14  broken down into composite steps.  There's a lot of
15  language in the claim about what steps should be taken
16  to implement that idea and the arguments were made that
17  the claim was very specific.  It was a specific
18  implementation.  It required programming.  There were
19  all those types of arguments, the same kind of
20  arguments that are made by Intellectual Ventures in
21  this case.

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 180

1   What the Supreme Court did, though, is look
2  not to the individual pieces of words and we'll see
3  this more carefully in a minute, but to look at the
4  gist of the claim, the goal, the object of the
5  invention to determine what it was and what it
6  determined is all of these steps set forth in claim 33
7  were drawn to the abstract idea of intermediated
8  settlement.  That was the goal.
9   And so the court found that -- it also
10 found when looking at the balance of the claims that
11 the balance really just required generic computer
12 implementation so that the components, the things that
13 were referenced in this claim and the other claims that
14 are looked at were not meaningfully limiting because
15 they use the computer in a way that computers are
16 always used.  So they amounted to, in total, simply
17 saying just apply this idea in a computerized context
18 and that wasn't enough.  Let's see how the court got
19 there.
20  So what the court did is it looked at parts
21 of the claim.  Some of those are shown here on slide

Page 181

1  number 7 and, because the argument was made that
2  while -- the claim, as I said, is specific and it
3  requires things like a shadow credit record.  There's
4  programming involved to create these data structures
5  and these files and these things that have to managed
6  and that's way too specific to be an abstract idea in
7  total.  The court looked at those.  It commented on the
8  shadow accounts.  It looked to the computer to obtain
9  data.  We see that in the second limitation of claim 33
10 and it looked at the computerized function of adjusting
11 account balances and it looked at the issuance of
12 automated instruction.
13  What it ultimately determined was that all
14 of these computer functions are well known and routine.
15 Although they were -- the kind of data that they were
16 working on might have been related to this idea, the
17 way the computer was using that data, it was simply
18 storing it and transmitting it and using it in the
19 normal way.
20  So what it ultimately found, as we said, is
21 that this claim was abstract because the generic

Page 182

1  computer functions and the generic computer structures
2  that we'll see in a moment weren't enough to be
3  meaningfully limited.
4   MR. LUPO: Do you think this was because of
5  a failure on their part to be more specific and the
6  descriptions for the steps that are set forth in the
7  claims such as creating, obtaining, adjusting and
8  instructing, if they had more specifically shown in the
9  specification so that, when the claims were read in
10 terms of the specification, it would have been more in
11 the direction that it would not have been an abstract
12 idea?
13  MR. HOMRIG: I think in this case, no.  And
14 the reason I say no in terms of Alice -- by this case,
15 I mean Alice.  No, because ultimately what the object
16 was, what they were trying to do was to take
17 intermediated settlement and break it down and they
18 hadn't really come up with an idea that was anything
19 other than apply it.
20  So what I mean by that is that had they
21 come up with something, a new system to perform

Page 183

1  intermediated settlement in a way that changed the way
2  or used computer functions that didn't exist before or
3  that changed the way the overall system operated in a
4  way that wasn't just storing different data in the
5  usual way or transmitting different data in the usual
6  way, then, possibly.  But that's -- it's not really
7  addressed in the specification and it certainly wasn't
8  claimed.
9   So at some level it's hard to say whether
10 there was something in the minds of the inventors, that
11 they could have written down it was patentable.  But if
12 they were directed in this general vein, I don't think
13 that tweaking the language or using draftsman's art
14 would have saved these particular claims, no.
15  MR. LUPO: How do you see that as
16 coinciding if at all with the DDR decision in the
17 Federal Circuit?  I'm not sure if it's on the appeal
18 with the Supreme Court or not.  There was actually a
19 finding by the court that it was inventive steps even
20 though it was abstract?
21  MR. HOMRIG: That's right.  Actually, Adam,

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 184

1 can we skip ahead to -- I believe this is 76.  We have
2 some graphics on that to help illustrate what DDR was
3 addressing.
4     MR. LUPO: We can wait and get to it, if
5 you have it later.  That's all right.  If you would
6 rather talk about DDR later --
7     MR. HOMRIG: I actually think it would be
8 helpful.  In light of your question, I think it would
9 be helpful to address now.  So let me do that briefly.
10     Here we go.  So DDR -- what I would say is
11 the basic difference between what the patent was
12 seeking to accomplish in DDR versus what the patent in
13 Alice and the patents in this case were seeking to
14 accomplish is that it was directed at a technological
15 problem and a technological solution, one that had no
16 analogous situation in real life and that is a key
17 reference point.  There was no analogous situation to
18 the situation that DDR was trying to address and the
19 problem here on slide 79 that we see is the way the
20 normal Internet works.
21     So on the left we see a host website and

Page 185

1 that website has a link.  There, it's www.amazon.com.
2 When somebody is using the Internet in a normal way, he
3 clicks on that link.  They're directed to Amazon and
4 that's where they go and that's always how it works.
5 The link is designed to take you to the site that the
6 link points to.  It's just a pointer at the end of the
7 day, points to another server.  There you go.
8     That was problematic in the context in
9 which the DDR patent came about because what was
10 happening is if someone was shopping on your website
11 and they clicked on a link for an ad or something
12 else -- we all get these pop-up adds when we're on the
13 Internet, if you click on that, what happens is you're
14 transported into someone else's store, basically, and
15 if it's your website that they were looking at, you
16 don't want that to happen.
17     So what they were trying to do and what
18 they ultimately claimed is to say, well, we're going to
19 break that system.  We're going to create something
20 that doesn't exist to address a totally different --
21 present a totally different experience on the Internet.

Page 186

1 We're going to fundamentally change the way it works
2 because when somebody clicks on that link, instead of
3 being transported to the site, which is the way it
4 normally works, they're going to get a page that's a
5 little of what was on the website that it pointed to
6 and a little of the website that they were looking at
7 to make it look as though those products were being
8 shown on the website they originally viewed and that is
9 beneficial to the website.  It meant they could shop
10 for these products but stay on the website that,
11 originally, they were visiting.  So they didn't lose
12 that customer.
13     That was important to the Court as it said
14 in the call-out from 773 at 1257 which is shown there
15 on slide 81 because, in real life, you never have a
16 situation in which somebody is shopping at Sports
17 Authority and suddenly is transported physically to
18 Target.  It just doesn't happen.  It's not a problem
19 that ever existed in the real word.
20     So there is no way you can look at it and
21 say, oh, well, this is kind of like an idea that people

Page 187

1 used before, but maybe here is why we have to tweak it
2 a little bit and use it differently for the Internet
3 the way some of the cases that have failed like
4 Ultramercial had dealt with.  So this was a
5 fundamentally different problem and the solution was a
6 fundamentally new thing.
7     MR. LUPO: So it was a problem that arose
8 in the computer age, not before the computer age that
9 was being solved in DDR?
10     MR. HOMRIG: That's exactly right.  So
11 there was no real world analogue either to the problem
12 or to the solution.  So it just makes it a wholly
13 different kind of invention that what the people in
14 Alice or what Intellectual Ventures here with their
15 patents are seeking a claim where there are real world
16 analogues.
17     So one can look at the 409 patent as we
18 will in just a moment, and look and see that, well, the
19 problem of protecting secrets has been around since
20 there were secrets.  It's a problem dealt with by
21 sophisticated computer companies and it's a problem

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 188

1 dealt with by people like my third grade daughter, how
2 to keep people from sharing the information that you
3 don't want shared.
4     So one can look to all of the scenarios and
5 just say, well, all right, here is a goal that we have.
6 Now, let's look at this technological environment or
7 let's look at this particular kind of system and just
8 seek that goal in that environment and, as Alice tells
9 us, that's not going to be enough unless you change the
10 environment.
11     MR. LUPO: Does there have to be a no real
12 world analogue to make it a non-abstract?
13     MR. HOMRIG: No, I don't think so. I
14 think, you know, this is work. We're talking about
15 DDR, which is why I've been addressing that issue. But
16 it arises in situations where either because something
17 was -- ultimately, somebody never had more than the
18 idea and we'll see that with a couple of the patents in
19 this case where there's no implementation. It's left
20 to everybody else to implement. So it's not clear that
21 the inventors ever got beyond the idea.

Page 189

1     In that kind of scenario, obviously. But
2 what we see is there isn't -- the Supreme Court hasn't
3 laid out a fundamental or a check-box test to say,
4 well, it has to be -- first, step one, it has to be a
5 fundamental idea or it has to be an age old idea.
6     What's happened, though, is that there
7 isn't a check-box test to say, well, it has to fit into
8 one of these categories. But what you see when you
9 look through the different cases is that the ideas that
10 are not patentable or that start out as potentially not
11 patentable, otherwise as abstract, they tend to have
12 common characteristics and often they have more than
13 one characteristic. So sometimes it's a longstanding
14 idea. Sometimes it's something for which there's no --
15 they're dealing with a conventional system and just
16 attempting to use that with a new kind of information
17 or they're taking commercial practice in trying to put
18 it on the Internet. So those often overlap, but
19 there's no fundamental requirement to be abstract. It
20 has to fit into one of those categories.
21     MR. LUPO: I'm not sure if there is an

Page 190

1 answer to the following question but I'll ask it
2 anyway.
3     I get confused by the KSR decision, for
4 example, that is one of a long line of decisions that
5 says almost every invention is a combination of old
6 things that have existed, but yet it can be an
7 invention because it's new -- somehow they assessed
8 another section of the law, I understand, section
9 102 and 103. But with that kind of thought in mind and
10 that long line of case law, what makes it an abstract
11 idea?
12     Does it make it an abstract idea just
13 simply because it uses old and understood computer
14 systems, yet it's saying -- using all of those things
15 in another way? Does that make it abstract?
16     What makes it abstract? How do you define
17 an abstract idea, I guess is the question.
18     MR. HOMRIG: I think the Supreme Court has
19 declined to define it and put precise boundaries around
20 it. So it's a bit difficult to define it in a precise
21 way. But I think, at the fundamental level, what it

Page 191

1 means is it's not directed -- that the overall goal of
2 the claim is not directed at something that is specific
3 and -- tangible is the wrong word because it's not
4 tangible, but it's something that's focused on --
5 something that is not focused on a specific solution
6 that deals with technology. I think it's ultimately
7 sort of where we're headed, right, which -- and it can
8 fail to deal with technology in a specific way in a lot
9 of different ways.
10     So sometimes it's because it's just an
11 economic practice, it's not a technological issue.
12 Sometimes it's because it never gets beyond the general
13 idea stage and it's just -- it never gets to the place
14 where it's so specific that it deals directly with
15 technology. It comes up, as I said, in different ways
16 and I think, at this point, it would make sense to turn
17 back to Alice and sort of see how they walked through.
18 So I'd like to return -- I think I was probably on
19 slide 7.
20     MR. LUPO: What are you returning to, what
21 page?

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 192

1    MR. HOMRIG: I believe it's slide 7.
2  Actually, I got a little ahead.  I wasn't -- there we
3  go.  So the argument that was made by the patency in
4  Alice was that, well, even if the method claims were
5  unpatentable, that certainly the system claim was
6  because the system claim set forth very specific
7  components that required matched hardware with
8  computerized programming to implement the steps and,
9  therefore, that was going to be enough to make it
10  specific and technological enough to not be abstract.
11    But the court looked at those claims and
12  they walked through the components and noted that, for
13  example, the data processing system as shown on slide 8
14  and the communications controller and the data storage
15  unit and ultimately even the computer, all of them have
16  two characteristics in this case, two problems.  One is
17  that they're generic.  So they're not specific.
18  They're not a specific machine, they're just
19  generalized components and, secondly, their claim is
20  purely functional form.  So, really, in some ways,
21  given that the context is a computer, it almost could

Page 193

1  have been claimed as a widget.  It's not a specific
2  kind of storage, it's just storage.  It's not a
3  specific way or technological way of communicating,
4  it's just a control and, as long as it can perform the
5  function, it will satisfy the requirements of the claim
6  and that was problematic.  This is very important
7  because what it meant was, again, it's at the end of
8  the day, it was just applying this generalized idea in
9  a computer context because the specifics of the
10  computer didn't matter.
11    So, with that, unless you have further
12  questions about the general framework, I think it makes
13  sense to take a look at the 409 patent and walk through
14  what that patent shows.
15    So that patent, in general, is related to
16  the field of computer security as we've heard this
17  morning and the abstract tells us -- it walks us
18  through sort of a series of steps.  Portions of the
19  data are protected and rules concerning access rights
20  to the data are determined.  We see this on slide 10.
21    Access to the protected portions of the

Page 194

1  data is prevented except in a non-usable form.  So if
2  it's distributed openly, for example, someone can
3  access -- not everybody can just access the data in a
4  way that's usable even though they might get their
5  hands in mid air.
6    And then, finally, users are provided
7  access to the data only in accordance with the rules as
8  enforced by a mechanism and that's how the abstract
9  sets it forth.
10    We see claim 6 and claim 6 is an
11  independent claim.  So we also included claim 1 so we
12  can see all the limitations put together and consider
13  all of those and how they interrelate.
14    What we saw in Alice was when Alice looked
15  at the claim -- and this is important.  This is a
16  criticism that IV has made and it's one, frankly,
17  that's part of the patent playbook for these kinds of
18  motions as to say, well, you're just stealing the
19  claims, abstracting.  You're pulling out pieces and not
20  looking at the whole thing.
21    It's important to remember that when we

Page 195

1  looked at how Alice dealt with those issues, how the
2  Supreme Court dealt with that Alice patent, what it did
3  was it looked at the specific components and it looked
4  at what those components did.  It focused on things
5  like the data storage and it focused on the
6  communications of the controller.  It didn't have to
7  look as far as every single word.  It didn't do that
8  for the abstract idea as we saw and it didn't do it for
9  step two.  So we're going to follow the framework that
10  Alice shows the Supreme Court uses and that it uses in
11  all of its recent cases.
12    So in looking at claim 6, what we see is
13  that it's directed to the abstract idea of protecting
14  and distributing data such that each and every access
15  to an unprotected form of the protected data is limited
16  in accordance with unspecified rules.
17    Now, you can see I've highlighted almost
18  the entire claim and that's because almost the entire
19  claim relates to that idea.  That's the balance of the
20  limitations.  In the first limitation, it's protecting
21  portions of the data.  Then there are openly -- that

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 196

1 data is openly distributed as protected portions are
2 whereby each and every access, through an unprotected
3 form or protected portions of the data, was limited and
4 it goes on.  You see a spot that's grayed out there.
5 We'll get to that.  That's one piece that's not
6 directly related to the idea itself.
7    Then it picks back up with unauthorized
8 access and preventing that and then in claim 6 allowing
9 a user to access the unprotected form of the protected
10 portions of the data.  So encryptions were used then
11 depending on the unencrypted form of that data only in
12 accordance with the rules.
13    Now, that idea is one that's been around a
14 long time.  As I said, it's an issue that's always been
15 an issue since there have been secrets to keep.  As
16 noted in the briefing as Bartons used encryption, a
17 form of encryption thousands of years ago to try to
18 prevent people who shouldn't see their secrets from
19 seeing them.  So the scytale cipher is an example.  But
20 there's also much more recent, but still relative to
21 today examples of people trying to use actually the

Page 197

1 very same idea that we have in claim 6.
2    So on slide 13 we see a conference paper
3 from 1972, so well before the 409 patent was filed.  In
4 that paper, there's a discussion about a system that
5 deals with the accessing of objects by subjects.  So in
6 this case subjects refers to people.  And we see in the
7 highlighted portion on slide 13 that there are rules
8 that govern the accessing of objects by subjects and
9 below an important property of their model is that each
10 and every attempted access by a subject to an object is
11 validated.  It's just another example.  They wanted to
12 make sure that if someone wanted to look at the
13 protected data, the object, that every time somebody
14 would look at it they were validated to make sure they
15 were authorized to see it in light of the rules.
16    This is a longstanding example and the '409
17 patent acknowledges that too.  There's a reference to
18 the '409 patent in column 5, lines 33 to 46 here on
19 slide 13 and there it discusses uncopyable media.
20 That's directed at the same problem, the same idea
21 which is to say we're going to give out media that

Page 198

1 people can use, but we know they might distribute it
2 somewhere, so we're going to make it uncopyable so that
3 they can't just copy it and give it to their friends
4 and their friends' friends and all of that.  It's the
5 same concept and this is from the background of the
6 '409 patent.
7    Now, the Federal Circuit looked at a very
8 similar -- at least similar in some respects patent in
9 the Ultramercial case.  I say similar in some respects
10 because although, as we'll see, some of the steps that
11 the Ultramercial patent claimed were the same -- there
12 were actually a whole bunch of the other steps in the
13 claim.  So the Ultramercial claim is much longer and
14 more detailed.  But when we look at the '409 patent,
15 claim 9 breaks down into basically three essential
16 steps, that's protected portions of the data,
17 distributing the protected data and then allowing
18 access to the data based on rules that the claim
19 doesn't specify.
20    In Ultramercial, they dealt with, again,
21 the same problem which was they wanted to show

Page 199

1 copyrighted material, but they wanted to make it
2 contingent on receiving an ad or, in some cases,
3 interacting with an ad.  So that claim required steps
4 of restricting public access to the copyrighted
5 material, offering the media for sale on the Internet
6 and then offering the media to the customer.  So it was
7 offered on the Internet.  And then the display of the
8 ad was facilitated and, once that happened, allowing
9 the consumer to access the media.  If it was an
10 interactive ad, then allowing access after a query had
11 been issued by the ad and then a response received from
12 the viewer.  Those are the rules for accessing the
13 protected information.  The same kind of steps.
14    Of course, Ultramercial itself has a pretty
15 storied history.  That was the case in which the
16 Federal Circuit issued an opinion finding the claims
17 valid after the claims had been found invalid under a
18 Motion to Dismiss.  And the reason I bring up that
19 history a bit is it's going to be important when we
20 talk about some of IV's arguments in this case about
21 facts and about the role of experts and who has facts

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 200

1 behind them and all of that because it is this
2 Ultramercial case in one of those early opinions in
3 which Judge Raider, who wrote that opinion, said that
4 the one-to-one inquiries were rife with factual
5 questions, factual issues such as conventionality.
6     But it's important to keep in mind that
7 what happened to that is that it went out to the
8 Supreme Court. The Supreme Court vacated it sent it
9 back down to the Federal Circuit. Judge Raider worked
10 on another opinion for the Ultramercial case. That
11 also went up to the Supreme Court and, after Alice,
12 that was vacated and sent back down.
13     Now, Judge Raider had left the bunch by the
14 time Ultramercial was decided applying Alice and the
15 Ultramercial court, the Federal Circuit applying Alice
16 and the guidance of the Supreme Court ultimately found
17 the Ultramercial patent invalid on -- at the Motion to
18 Dismiss stage.
19     So it's important to understand that
20 context because this isn't just any claim. This is a
21 claim where this fight was had back and forth and the

Page 201

1 Supreme Court, as it does, got its way.
2     MR. LUPO: Well, you brought up the subject
3 of experts.
4     Is it Capital One's position that expert
5 testimony should not be looked at all whether the
6 patent claims are abstract or contain an inventive
7 concept?
8     MR. HOMRIG: Yes.
9     MR. LUPO: As distinguished from saying is
10 it Capital One's position here that the expert
11 testimony from experts who were not credible or the
12 testimony was not credible?
13     MR. HOMRIG: I would say there are two
14 issues. So first -- the answer to your first question
15 is yes, that in this context 101 -- this context being
16 101, is a legal issue which the Supreme Court has never
17 looked at expert testimony or dealt with actual issues
18 and which, actually, the Federal Circuit in Bilski, a
19 portion of the opinion that wasn't turned around by the
20 Supreme Court held that 101 is a matter of law. So,
21 yes, this is a matter of law for which expert testimony

Page 202

1 is not needed.
2     Now, beyond that, there are problems, basic
3 rule of evidence problems with the expert testimony
4 that's proffered in this case. So even if it were
5 appropriate in some circumstance to look at particular
6 factual issue, the expert testimony in this case is
7 problematic because, one, it focuses on the
8 specification, not on the claim. So it attempts to
9 bolster its case that way. But then, secondly, it does
10 legal analysis and that's not the purview of an expert.
11 Effectively what happened is the experts effectively
12 regurgitate their legal arguments that are made in the
13 briefing. So it has two of those problems, but...
14     MR. LUPO: Are you aware of any cases where
15 the courts looked at expert testimony in considering
16 the 101 issue?
17     MR. HOMRIG: I'm not aware of -- I would
18 say no, I'm not aware of any case in which, for
19 example, the Federal Circuit cases that involved expert
20 testimony --
21     MR. LUPO: What if the testimony would

Page 203

1 perhaps address or did address the problems facing
2 prior art at the time? If we're not paying attention
3 to expert testimony, are we to ignore also the prior
4 art problems that are subject to the patent and its
5 claims?
6     In other words, the patent is written to
7 improve over problems in prior art. An expert
8 testifies I agree with that. I'm making up words here.
9 I agree with what the patent says. It was overcome,
10 this problem. It's a longstanding problem.
11     If we're not to consider expert testimony,
12 can we at least consider what is said in the patent as
13 to the existence of the problem?
14     MR. HOMRIG: Absolutely. That is what
15 courts look to is intrinsic evidence and, to some
16 extent, the nature of the discussion -- and we saw it,
17 I believe, in Alice where there times where they refer
18 generally to treatises and things. But usually the way
19 they're being used isn't to prove up a specific fact,
20 it's just almost taking judicial notice that, for
21 example, there's a longstanding problem and that's

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 204

1 reflected in some treatise.
2    So, absolutely, the court should be looking
3 into the intrinsic evidence. That is the source. And
4 that's why it's -- that's part of why it's a legal
5 test, right? That's -- it's very -- in that sense,
6 when the courts are looking into intrinsic evidence and
7 trying to understand the meaning of that document and
8 how it matches up with the 101, that's classic legal
9 exercise. Just as it remains after Teva in the claim
10 construction context.
11    Actually, on that point, it's probably
12 worth noting as several people did today which is so
13 we're clear, because Capital One agreed for the
14 purposes of this motion to adopt Intellectual Ventures'
15 claim instruction conditions, any factual issues
16 conceivably that could come up in a claim construction
17 context aren't relevant to today.
18    MR. LUPO: I'm sorry, did you say are
19 relevant or not?
20    MR. HOMRIG: Are not because there is no
21 claim construction dispute that would impact this

Page 205

1 motion in any way because we agreed to proceed because
2 it was for a claim construction, agreed to proceed
3 under their construction --
4    MR. LUPO: Particularly for section 101
5 consideration, you agreed with their claim
6 construction?
7    MR. HOMRIG: Correct.
8    MR. LUPO: But not in any other way later
9 if there is a later?
10    MR. HOMRIG: That's right. So even in the
11 claim construction context, there isn't one in this --
12 as to this motion. So there is just no role for
13 experts in this case with respect to section 101.
14    MR. LUPO: Let me ask another question. In
15 your reply brief on page 1 regarding the '409 patent,
16 you said that the invention was akin to the age old
17 concept of government's distribution of classified data
18 and closely controlling who has clearance to access it.
19    Where is the analogue in that example for
20 access mechanism? What is it?
21    MR. HOMRIG: Well, the access mechanism

Page 206

1 would be the various -- I guess, in that context, would
2 be the tools that the government would use to enforce.
3 So we hear about burn boxes.
4    I actually worked on a case for a company
5 that makes devices, storage units that have a button on
6 them. So they put them on Humvees out in the desert
7 and, if they get overrun, they can press the button and
8 it just wipes everything out.
9    So there are all kinds of mechanisms that
10 the government uses to try to protect those secrets.
11 Some of them are extremely complex.
12    So turning to step 2 for the '409 patent,
13 we looked first at -- we saw the basic idea, but there
14 is some remaining and that's this access mechanism that
15 you just asked about and that is claimed in generic
16 terms and functional terms. And there's no dispute on
17 that. IV's position as we saw on claim construction is
18 that an access mechanism can be hardware or software or
19 both.
20    Again, just like in the Alice case, it
21 might as well be a widget because as long as it

Page 207

1 performs the function of enforcing the rules, it's an
2 access mechanism and, like the communications
3 controller in the data storage unit in the computer in
4 Alice, it don't, therefore, meaningfully limit the
5 claims.
6    MR. LUPO: For the record, you're referring
7 to slide 18, right?
8    MR. HOMRIG: Yes, sir.
9    MR. LUPO: Comparison of when (Inaudible.)
10 came from Alice to claim one of the '409?
11    MR. HOMRIG: That's correct. Thank you for
12 putting that on the record. So the access mechanism
13 just doesn't -- it performs the function in the claim,
14 but it doesn't seek and work to limit that idea through
15 a specific application just like the functional generic
16 components in Alice didn't for that matter. And we see
17 here on slide 19 some of Alice's discussion of that. I
18 won't belabor. We've already talked through it, but
19 it's relevant to the access mechanism.
20    Now, the next part that we should get to is
21 the machine-or-transformation test. That's important

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 208

1 because that was the test for a while. But now that is
2 treated as part of step 2. Ultramercial, the Federal
3 Circuit, pointed out that it is -- it remains useful
4 according to the Supreme Court and the place that it
5 fits in under Alice according to the Federal Circuit is
6 into step 2.
7    Really, what that test does is it looks at
8 whether the claim as a whole -- not bits and pieces but
9 is the claim as a whole tied to a particular machine or
10 apparatus? The answer for claim 6 and all the asserted
11 claims in the '409 patent is clearly no, it's not
12 because this access mechanism could be any of them
13 according to IV. So it fails that part.
14    It also fails step 2 because the claim, as
15 a whole, doesn't transform a particular article into a
16 different state or thing. So these claims fail. And
17 we see Alice's analysis on slide 21 and the piece that
18 I think is interesting to focus on is actually the
19 second piece there where it starts "any transformation
20 from the use of computers or the transfer of content
21 between computers is merely what computers do and does

Page 209

1 not change the analysis. That's from Ultramercial
2 applying the Alice framework and applying the
3 machine-or-transformation test and what it's commenting
4 on is the sense that -- well, is the access mechanism,
5 by working with the other steps of the claim in
6 computerized scenarios, that's somehow a transformation
7 because we know data is moved around and data is stored
8 and these sorts of things.
9    What Ultramercial says is no, that's not,
10 at least for that claim and that claim as we saw is
11 quite similar to these.
12    So, in the briefing, we identified claim 6
13 as representative of the other claims. IV challenged
14 that in their briefing. But in response to your
15 questions, they have now challenged that anything is
16 representative. I hate to spend the time on this, but
17 I will just to illustrate that there is not a
18 meaningful difference.
19    So for claim 21, we see again the same
20 basic abstract idea which is shown on slide 23.
21 There's the obtaining opening distributed data having

Page 210

1 protected data portions --
2    JUDGE GRIM: You said 21. You mean 24?
3    MR. HOMRIG: I apologize if I did. I made
4 a mistake. It is claim 24.
5    So in claim 24 we see the obtaining openly
6 distributed data, having protected data portions and
7 rules defining access rights to the protected data
8 portions and then we see the limitation about limiting
9 each and every access through an unprotected form of
10 the protected data portions. We see the same access
11 mechanism that we saw in claim 6 and we see the same
12 object so that unauthorized access ultimately is
13 prevented.
14    So it's the same idea, just from an
15 obtaining standpoint instead of a distribution
16 standpoint. The access mechanism is the same access
17 mechanism that we just talked about which can be
18 anything. So it fails to limit the claim in the same
19 way that it did for claim 6.
20    On slide 25, we see claim 33. This one is
21 a little different, at least in the way that it's

Page 211

1 written. It's written in a means-plus-function format
2 for at least -- well, for two of the limitations. But
3 you see the same -- and we'll talk about those in a
4 moment. You see the same basic abstract idea where the
5 claim refers to accessing the digital data only in
6 accordance with the rules and, whereby, the user
7 accesses the unprotected form of the protected data
8 portions is permitted only if the rules indicate that
9 that's allowed, for that person.
10    The balance of the claim, as I mentioned,
11 consists of two means-plus-function terms and an access
12 mechanism. The parties agree that as a means for
13 storing, that the structure is computer storage and
14 we've accepted for the purposes of this motion that the
15 structure for the means for generating is one or more
16 devices inputting signals into the I/O controller --
17 and the I/O controller. But there's no specific about
18 any of that structure, it's just basic computer
19 components.
20    And the access mechanism which is where all
21 the action is according to IV too, it's all in the

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 212

1 access mechanism. That access mechanism, again, can be
2 anything according to IV, hardware, software or both.
3    So that -- those limitations failed to
4 limit the idea in the same way that those
5 limitations -- those types of limitations failed to
6 limit the idea in the Alice claim.
7    Claim 36, again, is the same basic abstract
8 idea, the accessing, the unprotected form of the
9 protected data portions only in accordance with the
10 rules and it continues on in the same fashion as that
11 we've seen. This is shown on slide 29. That claim has
12 a means for storing and an access mechanism again means
13 for storing is -- the structure there is computer
14 storage, that's by agreement, and the access mechanism
15 is anything.
16    So there a lot of arguments in the briefing
17 and I'll try to move through this quickly in part
18 because we've touched on some of these issues already.
19    I'm not going to try to respond to every
20 characterization of our position or every statement in
21 IV's briefing. Frankly, I think our positions in the

Page 213

1 case speak for themselves. But I do think these
2 arguments are illustrative of many of the differences,
3 actually, in the way that the parties approach the
4 one-on-one inquiry and help to illustrate why IV's
5 approach is wrong.
6    So let's start with Hughes. So Hughes is a
7 district court case from the Central District of
8 California and I call it --
9    MR. LUPO: After Alice or before Alice?
10    MR. HOMRIG: It is after Alice and I call
11 it out because IV said in its briefing that the patent,
12 the '409 patent, is analogous to another patent found
13 patent eligible in the Hughes case. And so I think
14 it's useful to look at what the judge in that case did
15 and what that patent actually looks like.
16    So I've shown on slide 33 here a call-out
17 of claim 1 of the '032 patent which is one of the
18 patents at issue in the Hughes case. That patent is
19 not eligible and the Court's analysis -- and the reason
20 I call that out is the Court said that the purpose of
21 the claims in coding and decoding data for error

Page 214

1 correction is abstract.
2    That's important in this context because
3 even IV's case that they're relying on and saying that
4 this is essentially analogous to or actually analogous
5 to the '409 patent looks at a claim that is as detailed
6 and specific as claim 1 of the '032 patent as shown on
7 slide 33. And what the judge said is even though the
8 patent claims specific methods, what the court has to
9 look at, which is what the Supreme Court said in Alice,
10 is you look at the general purpose of the claims just
11 as the Supreme Court did.
12    So what she did is to look to this very
13 specific formula and on the other limitations and
14 ultimately see what the object is, exactly like the
15 Supreme Court and exactly like Capital One in this
16 case.
17    The next thing the Court did is she looked
18 at the elements of the claim, the balance of the claim
19 to determine whether it limited the abstract idea.
20    What she found, like the Supreme Court, is
21 that conventional steps in the computing context were

Page 215

1 not enough to meaningfully limit the claim. They don't
2 add that inventive concept. This is shown on slide 34.
3    So she said all the action is in the
4 formula and, as it turns out, because the formula that
5 was used in that claim she found was -- involved the
6 use of prior Peribit information and regular repetition
7 of message bits in a way that changed the way that
8 encoding and decoding system fundamentally worked took
9 a different approach to this computer specific issue of
10 implementing in that context and it took that and
11 changed it. She found that that was enough to limit
12 the claim.
13    Now, we don't know if the judge is right.
14 This is a District Court case that hasn't been up to
15 the Federal Circuit. But what this does, I think, is
16 show a couple of things.
17    First of all, if we look at slide 36, we
18 see on the left claim 6 of the '409 patent. We see on
19 the right the '032 patent from Hughes. These claims
20 are not analogous. These are very different claims.
21    The Hughes claim is very specific. It

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 216

1 tells one skilled in the art exactly what is claimed.
2     The claim on the left, claim 6 for the '409
3 patent like all the asserted claims in the '409 patent
4 doesn't. The key element can be anything as long as it
5 performs the function and the rest is just an idea.
6     The other thing it does it addresses one
7 of the arguments that IV makes, that, well, if these
8 patents in this case are found invalid, we have to
9 overturn the Supreme Court law software patenting won't
10 exist. All software patenting will be gone.
11     Well, slide 36 shows that's not right. We
12 don't know whether the patent will ultimately be
13 upheld, but it's not going to live or die based on
14 whether claim 6 of the '409 patent survives. It's much
15 more specific. So that argument doesn't work for IV.
16     Another argument they make focuses on
17 specification and what is shown here on slide 38 is an
18 example of one of the ways that IV seeks and it does
19 this in its expert reports. It does it in its briefing
20 to try to build up what the invention is. We saw it
21 here this morning talking about the spec and we see it

Page 217

1 discusses the invention. All of these reference the
2 specification. But what ultimately matters, as we saw
3 from the test from the Supreme Court is what do the
4 claims say. This on slide 39 is a quote from the
5 Accenture case for the Federal Circuit in response to
6 this very argument said you need to look at the claims
7 or, quote, the important inquiry for a 101 analysis is
8 to look at the claims. So the Federal Circuit rejected
9 this very argument.
10     So that argument doesn't work. The next
11 argument is the claims, in this case, the '409 required
12 programming. So that if someone wanted to take this
13 idea and what is set forth, they'd to specifically
14 program a computer and, therefore, that would be
15 patentable and we see that quote here on slide 41 where
16 they refer to the Alappat case and the idea that, by
17 programming, to implement the claimed idea, that that
18 would make the computer system a new machine.
19     That argument has been made. Again, this
20 is another move straight out of the usual playbook.
21 But, like the others, it's been rejected. The Supreme

Page 218

1 Court considered that kind of argument in the Alice
2 case where it's shown on slide 42 the petitioner, the
3 hopeful patentee, emphasized that those claims cite
4 specific hardware and figure to perform specific
5 computerized function. It had to be programmed, but
6 the Supreme Court rejected that. We see, for example,
7 a claim from CyberSource. This is on slide 43. For
8 the Federal Circuit considered claims that were drafted
9 in a Beauregard format in which it's a computer
10 readable medium containing program instructions for and
11 then setting forth the idea, part of it, wherein
12 execution of the program instructions by one or more
13 processers of the computer system causes the one or
14 more processers to carry on the steps of and then it
15 set forth the individual steps that collectively
16 performed the idea which we've truncated at the bottom
17 because there were so many.
18     The Federal Circuit considered this type of
19 claim, which actually claimed that sort of specific
20 program and that was rejected too. So that argument
21 doesn't work.

Page 219

1     Another argument that's being made and it's
2 made in various forms usually under presumption or,
3 excuse me, preemption is an argument that's made quite
4 frequently and here we see that from the cross motion
5 at 12. This is slide 45.
6     So what IV's approach here is to say, well,
7 there have been attempts to invalidate the '409 patent.
8 The patent office originally found that the claims were
9 patented prior art and then found that the prior art
10 didn't show enough in its view to institute an IPR.
11 So, therefore, there's no preemption risk and,
12 therefore, there's not a one-on-one problem. But
13 there's a host of problems with that argument.
14     First and foremost, if that were true,
15 there would never be a 101 problem because every patent
16 is issued over prior art at the end of the day. So it
17 proves too much.
18     Another problem with it is that this is --
19 as you pointed out and as the Supreme Court has pointed
20 out, 102 and 103, the whole novelty issue is completely
21 separate from Section 101. Section 101 gets to a

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 220

1 different motivating factor.

2     And the final piece is that, although
3 preemption may be the motivational factor for applying
4 Section 101, preemption is not the test that the
5 Supreme Court set forth in Alice.  To address its
6 concerns about the risk of preemption, it set forth the
7 two-part test.

8     Does it have an abstract idea?  If it does,
9 does the balance of the claim convert that into an
10 inventive concept?  That's the test.  Not preemption,
11 not novelty.

12     The Federal Circuit chimed in saying that
13 no matter how groundbreaking, innovative or even
14 brilliant the idea is, that doesn't matter, not under
15 101.  So that argument doesn't work.

16     The last point I'll note, we've already
17 talked about expert testimony, but I think it bears
18 mention just so our point of view is clear, as I noted,
19 there is no claim instruction in the case with respect
20 101 because of the way the motion is framed.

21     There's also -- and this is addressed in

Page 221

1 the briefing.  The Supreme Court has never mentioned
2 the presumption of validity with respect to Section 101
3 and we explained in the briefing why the presumption
4 shouldn't apply.  This is not a scenario where --

5     MR. LUPO: It's statutory, though, isn't
6 it?  It says that was a 283, section 283 that every
7 patent is presumed valid?

8     MR. HOMRIG: It does say that, that's
9 correct.  But the nature of this inquiry is, as we've
10 seen, different and so we submit that in light of the
11 way this Supreme Court approaches it, the presumption
12 of validity does not apply.  But -- it's an important
13 but -- even if it does, we know from eye for eye that's
14 the Supreme Court.  What that means, it means that on
15 evidentiary questions, that the proof has to be by
16 clear and convincing evidence.

17     Now, we've seen that this is a legal issue.
18 There are not very many evidentiary questions.
19 Basically, there's the intrinsic evidence and whether
20 by clear and convincing evidence whether that's the
21 standard or not, the intrinsic evidence in this case

Page 222

1 shows that every claim of every one of these patents
2 that's asserted is invalid under Section 101.  So I
3 raise it to make clear that's -- we submitted our
4 position, you understand it, but we're also -- whether
5 or not these claims are invalid under Section 101 does
6 not hinge on whether there's a presumption of validity
7 or whether there's a clear and convincing evidence
8 standard.

9     The resounding answer from the intrinsic
10 evidence is they are absolutely invalid under Section
11 101.

12     So, with that, I will take my seat so he
13 can respond, but I will certainly address any questions
14 that you have.

15     MR. LUPO: No, that's fine and thank you
16 for that.  And we will give IV the appropriate amount
17 the time to respond to that.

18     I will note -- and this is not meant for
19 any pressure on IV or Intellectual Ventures, that if
20 we're going at the pace of two hours to present each
21 patent, we did volunteer to be here as late as you

Page 223

1 want, but I just want to you to know that that's going to
2 go quite a ways and I'm not sure how our court reporter
3 will feel after 5:30 or 6:00.

4     Anyway, you can have as much time as you
5 need to respond.  That was an hour and if you need an
6 hour, take it.

7     MR. BELLOLI: May I approach to give you
8 our --

9     MR. LUPO: Would you identify yourself for
10 the record, please?

11     MR. BELLOLI: Yes, this is Mark Belloli
12 from Feinberg Day for Intellectual Ventures.

13     MR. LUPO: And when your presentation is
14 finished, we'll take a break again for the court
15 reporter and our benefit.

16     MR. BELLOLI: I'll begin exactly where the
17 Special Master left off with the burden on clear and
18 convincing evidence.

19     There are cases that have held, post Alice,
20 that the clear and convincing standard does apply and
21 it makes sense that it does apply even more so than in

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 224

1  the context of Section 102 and 103 because in 102 and
2  103 you might not have had art that was before the
3  Court.  But 101 was necessarily looked at by the
4  examiner in each case just as one 112 is and it's in
5  our briefing.  I want belabor the case cites, but it
6  absolutely applies and the reason Capital One wants to
7  eschew it is because this is a heavily factual matter.
8  There are facts that need to be determined.  Whether
9  something is conventional is a fact that needs to be
10  determined in this context.  Whether there's a problem
11  in the art, in the technology that needed to be
12  overcome, that's a factual issue and we'll get to that
13  in a second answering Your Honor's or Special Master's
14  question regarding evidence and the use of experts in
15  the specification.
16      What I will go with first is a couple of
17  questions that the Special Master asked because they
18  were extremely apt questions.
19      The first one, the most apt question of
20  them all there could possibly be in this is what is
21  abstract and I feel like Capital One kind of eschewed

Page 225

1  that position and it's been made clear by the Supreme
2  Court what, in fact, is abstract.
3      So to find something that's abstract, you
4  have to be looking for a building block or a
5  fundamental, long prevalent practice in our system of
6  commerce of principal and original cause or a motive
7  and you're going to see that there's none of that in
8  this case.
9      MR. LUPO: And you're referring to page 9,
10  for the record?
11      MR. BELLOLI: Yes, yes.  Page 9 of the
12  slides.  Even looking at the whether the claims fit
13  into one of these abstract ideas that Alice enumerates
14  on slide 9, there was evidence.  I mean, in Alice they
15  looked to a text from a long time ago that showed that
16  intermediated settlement was something there.
17      Now, this Spartan -- going to the '409
18  patent, the Spartan analogy is not an actual one.  Just
19  because there was encryption before, doesn't mean you
20  cannot have later inventions, that buildup of
21  encryption or advance the art of encryption.  So they

Page 226

1  didn't show that there was an access mechanism built on
2  top after encryption.  It was the second layer that
3  prevents the secondary distribution of data.
4      So there's not those same facts as there
5  was in Alice or a lot of the cases we're going to look
6  at.
7      So, again, answering the first question
8  Special Master asked, what is an abstract idea, it's
9  these on slide 9 and it's not just what they want to
10  say, which is all, oh, it has conventional components,
11  throw up our hands, it's abstract.  You're going to
12  hear that on each and every patent from Capital One.
13      Now, the next thing that Capital One wants
14  to eschew because, again, it doesn't have any experts,
15  it doesn't have the facts to support these are abstract
16  ideas and all it wants to do is point to the claims and
17  say, oh, these are generic parts.  What is the role of
18  experts and what is the role of specification?
19      IV is not using the specification to read
20  in elements to the claims.  The claims stand by
21  themselves and they all are directed to inventive

Page 227

1  concepts and not directed to abstract ideas that
2  contain inventive concepts.  But what the specification
3  does and what the role of the specification does and
4  what Capital One wants to steadfastly ignore at every
5  juncture is that specification is telling -- what it's
6  telling you is what is the technological problem and
7  what is the technological solution that's in the claim?
8  Those are necessary facts you need -- this panel needs
9  to decide these issues.
10      Now, in a lot of the cases --
11      MR. LUPO: Does the problem have to be
12  connected to a computer environment then?
13      In other words, must it be solving a
14  problem of computer technology?
15      MR. BELLOLI: I would say in the context of
16  computer patents, yes.  In the context of patents as a
17  whole, no.  But they have to be resolving problems.  I
18  mean, that's definitely something that comes up because
19  a lot of the cases that we'll see and a lot of ones
20  that they want to rely on, the problem is not with
21  what's in the claims themselves, the components.  It's

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 228

1 the fact that there wasn't a problem that was overcome.
2 It was take this that's known and do it on a computer
3 and that's not what we have here.
4     MR. LUPO: Until the computer age such as a
5 DDR decision?
6     MR. BELLOLI: Exactly. And they kind of
7 gloss over DDR. And that was a very apt by the Special
8 Master as well and they gloss over to say, oh, this was
9 fundamentally different. But if they were arguing the
10 DDR claim, they would just say, oh, that's taking a
11 different route, right? Or they would say that's just
12 presenting the same information differently.
13     So instead of going to the other cite and
14 seeing the articles of commerce, you still see those
15 articles of commerce with a different look and feel,
16 right? So it's just presenting it differently. That's
17 what they would say if they were on the other side of
18 that case. But what you've got to look at is what was
19 the problem and what was the solution and, in this
20 case -- and Capital One has not rebutted this for any
21 of these patents. What the problem, what's the

Page 229

1 solution and I think your question was embedded with
2 DDRs this is what our briefing focused on was going
3 through the patents methodically showing what the
4 state-of-the-art was as set forth in the patent, what
5 the problem was and how these inventors overcame those
6 problems. These patents came from a variety of
7 different companies, how these companies working on
8 these problems, what the problem was and what it
9 overcame.
10     There is one other question I wanted to --
11 before we delve into a couple of other things that I
12 wanted to answer.
13     Yes, the role of experts. So Section 101
14 has factual underpinnings just as claim construction
15 does. Claim instruction inventor testimony is
16 permitted. Expert testimony is permitted because you
17 need to know what things mean in the art. It can't be
18 any different for Section 101 because you need someone
19 to tell you is this conventional or not.
20     Was there really a problem like this? Is
21 this true? Is this accurate? What was the extent of

Page 230

1 the problem or is this really reporting it onto a
2 computer? And it's telling that Capital One doesn't
3 come back with experts and really doesn't take issue
4 with their testimony and really doesn't take issue with
5 what it said in the specification in terms of what the
6 problems were and how they were overcome. And those
7 are all the facts that go into IV's favor and make all
8 of these patents valid under Diehr, DDR and patent 101
9 decisions all the way back to the 1800s that we'll go
10 to in one quick second.
11     So, again, this is a heavily factual
12 determination. They have a clear and convincing burden
13 and as we'll see in all four patents -- we'll talk
14 about '409 first, they're not rebutting the facts that
15 we put forward. They're just -- they're going to
16 claims and they're saying generic, generic, generic,
17 generic, done, we've met our burden and that's not the
18 way this works because, as we'll see right now -- we
19 can go to slide -- and the Special Master hit on
20 this -- back to the 1800s the Supreme Court was
21 recognizing this and even today.

Page 231

1     All claims are made up of known components,
2 pretty much. So just going to the claim and saying
3 this is known, that's known, that's known, that's
4 known, it doesn't meet the burden and it's actually not
5 even the test.
6     In making those arguments, Capital One is
7 completely eschewing the test of what is the claim
8 really directed to and is there an inventive concept
9 and we would submit, again, since they have no expert
10 testimony, don't take issue with what is said in the
11 specification regarding the problem or solution, all of
12 those factual determinations have to be resolved in
13 IV's favor because they've essentially been unrebutted
14 the entire time.
15     Now, getting back to this generic, generic,
16 generic argument that Capital One likes to espouse,
17 here we have the claim in DDR. There are two physical
18 components. There is a computer store --
19     MR. LUPO: For the record, it's page 16.
20     MR. BELLOLI: Sorry, Special Master. Yes,
21 this is slide 16 of IV's presentation and this is the

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 232

1 claim from DDR. And there are two physical components
2 that they would have to say are generic based on what
3 they're saying is generic here.
4     So you have a computer store containing
5 data and a computer server and, after that, it's just
6 functional claiming of how it works. I say "just" in
7 tongue-in-cheek because there's an invention here just
8 like there's an invention in ours.
9     So, again, this generic, generic, generic
10 argument that, really, the fundamental root of what
11 Capital One's arguing all the time, it doesn't hold
12 water and it's contrary to that slide 15, that Parks
13 case, it's contrary to DDR and must there be any doubt,
14 because they're going to cast DDR in a negative light,
15 it's the same in Diehr. The Supreme Court, 1981. You
16 have -- this method is carried out by a computer and
17 all that's in there is a digit computer, a database and
18 a timer on the computer and then you run some
19 calculations.
20     So the generic argument just doesn't hold
21 water. You have to look at what's in the specification

Page 233

1 and was there a problem and was it being overcome.
2     What 101 is really trying to get rid of is
3 patenting bare principles like relativity or something
4 that truly was known before like risk hedging and, say,
5 put it on a computer. But when you're doing something
6 different and new with a computer as set forth in the
7 specification, it's valid and that's been true since
8 the 1800s. It was true in Diehr in 1981. It was true
9 with Alice last year and it was true with DDR most
10 recently.
11     Now, to go to -- we're jumping around to
12 save a little time. We were talking about what is an
13 abstract idea on slide 9 before. Now, we're up to
14 slide 10. Alice also tells us what is not abstract.
15 And it's no different than what DDR told us or any of
16 these have. Is there an inventive concept? Is there
17 an improvement of existing technology and is there a
18 problem that's being solved in conventional industry
19 practice? We will see again that that's the case for
20 all four patents and, again, that's really unrebutted
21 because the experts weren't rebutted, the averements in

Page 234

1 the specification were not rebutted and the best they
2 could come up with with the '409 patent is the dawn of
3 encryption or encryptions in the log.
4     MR. LUPO: Are you aware of any cases where
5 expert testimony was used in consideration a one-on-one
6 issue in a computer context?
7     MR. BELLOLI: Am I aware of any? No, and I
8 think you're going to start to see it a lot more,
9 though, because of the factual underpinnings of this
10 and how Alice brought to light the fact that those
11 factual underpinnings are extremely important.
12     And again, it's no different than claim
13 construction. If you have -- if you're going to take
14 expert testimony on the meaning of terms in the
15 specification, the state of the art, what those terms
16 mean, you know, go back and look at the prosecution
17 history and all of this, it couldn't be any different
18 for 101 when you're trying to determine
19 conventionality -- conventionality? I don't even know
20 what the word is. But whether it's conventional or not
21 and what the state-of-the-art was and what the problem

Page 235

1 was and what's the leap in the technology.
2     MR. LUPO: But even under that analogy that
3 you made for claim construction, the rules require
4 first that you look at the claims and the spec for the
5 meaning if you need to and then a dictionary if that's
6 confusing. It may be helpful to hear expert testimony.
7     MR. BELLOLI: Well, right. That's exactly
8 right. So you would go to the claims first. But
9 claims claim, specifications teach. So where are you
10 going to go to learn if there was a problem in the art
11 that was overcome? You could really only find that out
12 from the specification. That can't be in the claims
13 themselves because you're claiming something and you're
14 teaching about it in the specification.
15     So that aspect which, again, in slide 10
16 with Alice, is the bedrock of determining what's not
17 abstract. You can't find out if there was a
18 conventional industry practice or some problem that was
19 overcome by looking at the claims themselves. I mean,
20 you start with the claim. No dispute there. But you
21 have to go look for the specifications. So to say

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

1 looking at the specifications is completely wrong and
2 putting a red line through it as Capital One has done,
3 it's not true.  It's simply not true.
4     Okay.  So I thought it was interesting to
5 look at something graphically -- one last thing
6 graphically before we go into the '409 patent
7 specifically.
8     Now, here on slide 11 we have claims that
9 have been or patents that were cleared and eligible and
10 they went and looked to see what the idea behind it
11 was.
12     Now, Ultramercial was one that Capital One
13 liked to rely on for the '409 patent, but you really
14 need to look at what's under the cover and
15 Ultramercial, the patent itself talked about how
16 showing an advertisement and then seeing a show was
17 known and then you get to the claims and, basically,
18 all that's there is the same thing but it's
19 computerized.
20     So in the specification there wasn't this
21 problem/solution, technological problem, technological

1 solution.  The Ultramercial claim goes down after Alice
2 has decided on that basis and they say, on slide 11,
3 showing an advertisement before delivering free
4 content.  That concept is not patentable and how do we
5 know they're trying to patent that concept?  Because
6 they even acknowledge themselves that it was available
7 before.
8     So, again, you can't just say -- look at
9 the claim and say, oh, generic computing components, I
10 don't know if this is new or not.  It's invalid because
11 you're trying to claim an idea.  You do necessarily
12 have to go on a hunt for facts as to whether there's a
13 technological problem, a technological solution.  Alice
14 has made this clear.  DDR has made this clear.  Even
15 Diehr made this clear.  I don't think there's a Supreme
16 Court or Federal Circuit case that could even possibly
17 come close to contradicting that.
18     So, again, looking at the kinds of claims
19 have gone down on slide 11 here, they're all usually a
20 couple words that can be distilled down to you and
21 that's when you read those patents in light of the

1 specifications to see if there was a problem that was
2 overcome.
3     Now, when you get to, on slide 12, the
4 kinds of patents that have been upheld, you can't
5 describe what's claimed, the idea behind those claims
6 in a short, quick way because they're not some idea
7 that's being claimed.  They're using in pretty much all
8 of these -- actually, all of these cases because
9 computer technology seems to be the hotspot for 101
10 these days.  They're all computer patents on slide 12
11 of IV's presentation and they are all doing more than
12 just taking an idea that was before put and putting it
13 on a computer.  They did the computer in a different
14 way.  They programmed the computer in a different way.
15 They had a mechanism in the computer that did something
16 different than was going on before.  DDR is a great
17 example as are the rest of these cases including a
18 couple of cases where IV patents have been held up on
19 this exact same basis.
20     Going to slide 13, now we go to what's
21 really going on with these patents in this case and you

1 can see that what's really claimed is not some easy
2 idea of watch a show or watch a commercial, see a show.
3 There's much more than that going on and, as we'll see
4 with the '409 patent, it really is about overcoming the
5 secondary distribution problem and how they did it,
6 much like the claims in DDR or the claims in Diehr.
7     So let's go to the '409 patent.  So what
8 was the problem?  The '409 patent and our expert who
9 laid this out for the court, Capital One doesn't
10 necessarily dispute it -- at least it wasn't in their
11 briefing or their presentation of the last hour that we
12 were up here.  It's right here in the patent.  The
13 prior art, access was all or nothing.  So you have --
14     MR. LUPO: Are you looking at --
15     MR. BELLOLI: Slide 22.  Thank you.
16     So access is all or nothing.  Once it was
17 granted, once you decrypt it, you cannot decontrol --
18 it couldn't be controlled in other ways.  So you
19 couldn't control copying and secondary distribution in
20 whatever way you wanted to.
21     Now, Capital One likes analogies.  But the

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 240

1  problem with analogies is that at some level all
2  computers, all machines can be analogized to human
3  behavior.  They just can be.  If those analogies were
4  apt, you couldn't have a machine.  You couldn't have
5  the cotton Gin because you would just analogize it to
6  someone pulling cotton apart from a plant.  So
7  abstracting at that level using analogies just shows
8  that there's no "there" there for Capital One and, in a
9  way, using those apt analogies goes to another question
10  Special Master asked which was does there need to be a
11  real world analogue.  There can be or there cannot be.
12  There doesn't have to be because you saw real world
13  problems with machines for one.  But the fact that they
14  have to go to these kinds of analogies shows that there
15  really isn't a real world analogue because they have to
16  take these analogies to such extremities.
17      For instance, this morning we had the
18  analogy of being in the schoolyard and giving kind of a
19  decrypted message about something to a friend and they
20  decrypt it.
21      Well, that's not even apt because that goes

Page 241

1  against the problem we were trying -- the patents he
2  was trying to solve here with the '409 patent.  You had
3  the secondary distribution problem and how are you
4  going to stop it?
5      So you know your encrypted data that you
6  went to send, you want it to get there and you want it
7  to get to someone, but you don't necessarily want them
8  to un-encrypt it and then be able to do whatever they
9  want with it.  So you want different rules for
10  different people and different ways to do this and the
11  '409 was quite clear that this was the problem, that
12  access was all or nothing.  So what are we -- and,
13  moreover, the problem was a failure -- not the failure
14  of mechanisms because, again, usually things are known,
15  all elements are known.  But the architectural design
16  of distributing data this way, there was an omission
17  there.  There was the problem of copying by an
18  authorized user that wasn't addressed.  So the '409
19  patentee got down and he started working on this and he
20  came up with the invention and we'll skip ahead for
21  time's sake.

Page 242

1      Slide 27 here which you saw from the
2  tutorial this morning.  So you're going to have that
3  access mechanism that takes the encrypted material and
4  when it unencrypts it, it's only going to do it in
5  response and this is each and every time in response to
6  these access rules.
7      Now, there was a question about -- again,
8  but how -- does this needs to be absolute?  No, the
9  claim is quite clear that it's accessing the data
10  that's what's limited by the rules.  It doesn't have --
11  in accordance with the rules.  It doesn't have to be
12  absolutely limited so that it can never be distributed
13  secondarily, but we're trying to combat the secondary
14  distribution problem by putting different rules on
15  different people each and every time the unencrypted
16  form of the protected work is used.  So, again, we have
17  a problem and we have a solution.
18      Now, Capital One says novelty is
19  irrelevant.  I don't know how they can say that when
20  they're saying that generic, generic, generic claims
21  are invalid.  There has to be some aspect of novelty to

Page 243

1  this.  There has to be, else you would never know
2  whether something is conventional or not, whether
3  something solves a problem or not, whether something is
4  an application versus an unbounded idea and what it
5  preempts.
6      Counsel made a very interesting statement,
7  that preemption, while it's in Alice, is basically
8  irrelevant to the test.  That cannot be true.  The
9  justices were clear.  That's what undergirds the entire
10  test.  So preemption is a piece of both the first prong
11  of Alice and the second prong of Alice.
12      So if a claim is not preempting an entire
13  field or too great a boundary of an idea, it's more
14  likely to be not directed to an abstract idea.  The
15  same way that if a claim overcomes four ITRs with all
16  of this encryption art coming after it, it can't be
17  unnecessarily holding up the field of encryption or the
18  field of data distribution.
19      So novelty -- I think it's more properly
20  cast as preemption because preemption and novelty go
21  hand in hand what you preempt or not and what's novel

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 244

1  or not. It is absolutely a piece of this. The
2  preemption, it undergirds it, it's a part of both tests
3  and it needs to be looked at and Capital One does not
4  address preemption really at all in their brief and
5  that's quite notable for a lot of us because these
6  patents don't unnecessarily tie it.
7      The '409 patent took encryption technology
8  and it moved it forward. It took the distribution of
9  protected files and it moved it forward because you
10 have this architectural design omission, this problem
11 with secondary distribution and you needed to figure
12 out what to do about it and that's what the '409 patent
13 did.
14     Okay. So here it is from our letter to the
15 Special Master and we were actually very glad that the
16 Special Master focused it in this way because, when it
17 really comes down to it, you can't describe these
18 claims in two or three words. There was this problem
19 and it was overcome and it's not risk hedging. It's
20 not Ultramercial which is their principal case that
21 they used against this patent. It's not something that

Page 245

1  was already admittedly known in the specification of
2  watch an advertisement to see a show. It's something
3  completely different. It's an access mechanism and
4  there is no prior art access mechanism that does
5  something like this which is taking an access mechanism
6  and rules within their consent of the work, defining
7  access rights to data to control each and every access
8  to that encrypted file so that, once you encrypt it, it
9  can't be further distributed or viewed by an
10 unauthorized recipient in accord with those rules.
11     That's the crux of the invention. The
12 claim is not directed to an abstract idea because
13 that's the idea that's claimed. Not all of encryption
14 or all of file distribution, it's this is exactly
15 what's claimed and, moreover, it's -- what the claim is
16 directed to is also the inventive concept. That's the
17 inventive concept. You have this extra security layer
18 on top that is going to enforce those rules and solve
19 the problem of secondary distribution, at least insofar
20 as the rules prevent. And again, bringing up the
21 expert testimony here, they're not opining on legal

Page 246

1  principles. They're giving you facts like here on
2  slide 32 where the expert says I'm told, you know,
3  preemption is a problem. Well, the '409 patent -- and
4  this is someone who they haven't challenged under a
5  Daubert or anything like that, it's just an expert in
6  encryption and computer systems.
7      This doesn't preempt always of limiting
8  access to digital data. It doesn't prevent all ways of
9  encryption or decryption. It just takes -- it's just
10 this next layer of security that's been added on to
11 solve the problem of secondary distribution in the
12 protected works and Capital One pulled the claims apart
13 and says, again, this is not new, that's not new, this
14 is all conventional. But what we have here on slide 33
15 is we have what the claim is directed to at -- what we
16 claim, claim 6, and at the bottom, what the claim is
17 directed to and what the inventive concept is and
18 that's all in the claim. You have the access
19 mechanism. You have the rules defining the access
20 rights to control each and every access to the
21 encrypted file so that it won't be further distributed

Page 247

1  in a way that's not authorized or not -- that the
2  authorized recipient, you can't further distribute it
3  to someone else.
4      So what the claim is directed to in the
5  inventive concept is in the claims. Capital One said
6  we're trying to eschew the claims. No. They
7  fundamentally misapprehend this. What the inventive
8  concept is, it's right in those claims and we'll see
9  this on this slide and in the next few slides. The
10 only reason we're going to go into the specification --
11     MR. LUPO: Before you go on, can you tell
12 me the red text at the bottom of page 33 that's in
13 quotes?
14     MR. BELLOLI: Oh, very good. That should
15 have been explained. That is from the letter brief
16 that we sent on Friday when you asked what is the
17 inventive concept and what is the claim directed to and
18 that would be the case for the next few slides as well.
19     So what we're trying to illustrate on these
20 slides is we've laid out in our briefing and hope with
21 our presentations the same why the claims are not

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 248

1 directed to an abstract idea and they contain an
2 inventive concept, we identified that for the panel and
3 then we put that on the slide because Capital One has
4 so steadfastly said that we're reading things into the
5 claims in order to find them eligible.  We're not
6 reading anything into the claims.  We're saying this is
7 what the claim is directed to and it's all right there.
8     MR. LUPO: Thank you.
9     MR. BELLOLI: And I won't belabor it, but
10 it is the same -- the claims are all directed at least
11 to this concept and have the same inventive concept.
12 We're on slide 34 now, but the Special Master asked
13 about why the claims are different and can't really be
14 considered as one in terms of rising or falling
15 altogether.  At least for the '409 patent, I can claim
16 33 as an example.  Claim 33 has those means plus
17 function elements to them.  We have identified
18 structures for them, but this just goes further to
19 show -- the machine or transformation test, I'm not
20 going to harp on it, but these means elements show that
21 this is really a system running a program that does all

Page 249

1 of these things and it's not just some unencumbered
2 idea.  But, again, I'm not going to harp on the machine
3 or transformation test.  We think both prongs of Alice
4 are passed with flying colors with these claims.  But,
5 again, the machine or transformation test remains a
6 useful tool in this and there's no question that all
7 four of these patents are rooted in computer
8 technology.  Capital One really hasn't disputed that.
9 So if you're programming a new machine, it should like
10 these patentees were.  It should pass the old machine
11 or transformation test.
12     So on slide 37 here -- we have three more
13 slides and then I'll give everyone a much wanted break
14 unless the panel has any questions.  What we did before
15 we were talking about the introduction was I set forth
16 all of these cases, as many as I could fit on the
17 slide, that Capital One has been citing that have gone
18 down on similar grounds and there was another slide
19 about how patents that have been upheld and when you
20 compare what the '409 patent claims were directed to,
21 which is at the bottom of slide 37 and was in our

Page 250

1 letter brief and what the inventive concept is, you
2 compare that to the ideas that were claimed in these
3 other cases, there's really no comparison.  This is not
4 hedging.  This is not intermediate settlement.  This is
5 not -- and especially with Ultramercial again, which is
6 Capital One's favorite case of this patent, this is not
7 showing an advertisement and then delivering free
8 content.  This is something completely different.  This
9 is a problem that was overcome.
10     This is slide 38.  Outside of 38, we had
11 the same slide we showed before except, again, putting
12 the -- what the claims of the '409 patent are directed
13 to with some patents that have been upheld and kind of
14 showing the parallels between patents that have been
15 upheld and especially the ones that are in blue that
16 contain similar or even truncated concepts and ideas to
17 a '409 patent.
18     So, in conclusion, are the claims directed
19 to an abstract idea?  No, not at all.  They are not
20 what the Spartans were doing.  They are adding an extra
21 layer of security that overcame a problem in the art

Page 251

1 and is there an inventive concept?  We don't even need
2 to get there because the claims aren't directed to an
3 abstract idea.  But if we did, the inventive concept is
4 clear.  It was fully laid out in the specification,
5 claimed in the claims and the experts corroborated as
6 well and there really can't be any factual disputes on
7 that because Capital One, other than their article
8 about the Spartans, offered nothing to contradict
9 what's in the specification, nothing to contradict what
10 the experts said.  So this patent passes the 101 test.
11 Thank you.
12     MR. LUPO: Thank you.  Would you like five
13 minutes to respond?
14     MR. HOMRIG: Yes, please.  Thank you,
15 Special Master.
16     So this was the slide -- sorry.  Actually,
17 probably the most effective way to do it is just to
18 point you to slide 12.
19     MR. LUPO: Slide 12?
20     MR. HOMRIG: Slide 12, Intellectual
21 Ventures' presentation.  It was one we just looked at.

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 252

1 This is a listing of cases of what has been found to be
2 eligible. That stood out to me for several reasons.
3 One is there's only Federal Circuit case in there.
4 There's no Supreme Court case. There's only one
5 Federal Circuit case and that Federal Circuit case is
6 DDR which, contrary to -- I think the comment was,
7 well, every computerized invention has some sort of
8 human analogue. Not DDR. It sure doesn't. People
9 aren't magically transported from Target to Sears. It
10 doesn't happen.
11    So that's the only one that's binding
12 authority. Every other is a District Court case and I
13 call your attention in particular to IV vs. M&T Trust
14 Company down there at the bottom. What they don't tell
15 you on that slide is that very same patent was asserted
16 against Capital One in Virginia and Judge Trenka
17 (phonetic) found it invalid under 101.
18    So, in that case, District Court judges had
19 different points of view. That's up at the federal
20 circuit. We'll find out who's right. But that's why
21 you need, really, to look at the Supreme Court and the

Page 253

1 Federal Circuit and, frankly, given the history at the
2 Supreme Court pretty carefully to make sure that the
3 decisions are in line with what that standard should
4 be.
5    As to patents on the '409, actually counsel
6 summed it up very well. Claim 33, like all the claims,
7 is directed at a system, running a program that does
8 all of these things. That's what he said. And you
9 know what? That's what the claim says and that system
10 can be anything. It can be a software, it can be
11 hardware. It could be both. As such, it's an idea
12 with a widget in it and that's just not patentable
13 applying the standard that the Supreme Court actually
14 set forth in Alice.
15    So, with that, I think I'll take my seat.
16 We spent a lot of time on this patent and I think
17 it's...
18    MR. BELLOLI: I may have 30 seconds.
19    MR. LUPO: He had five minutes, he took
20 three. I'll give you three and you get one.
21    (Laughter.)

Page 254

1    MR. BELLOLI: Okay, perfect. If we can get
2 it up there, slide 12, if he wants Supreme Court cases,
3 I'm give him two. Diehr, which we showed at the
4 beginning which overcame a problem and it only had a
5 computer and a database. It was recited. And then
6 that case from the 1800s that says known elements
7 aren't a problem. All patents are made up of known
8 elements. So that is the test and not the proper way
9 to do an analysis as Capital One has done. Thank you.
10    MR. LUPO: Okay. Let's take a ten-minute
11 break and, when we come back, how does it look for
12 going forward, each side, in terms of the time you
13 need? Just give me a rough estimate for the whole
14 total.
15    MR. BELLOLI: I think it's going to be
16 faster.
17    (There was a recess taken at 3:34 and the
18 trial resumed at 3:48 p.m.)
19    MR. LUPO: Is everyone ready?
20    MR. HOMRIG: Thank you. So next we'll
21 address the '081 patent.

Page 255

1    MR. LUPO: Which one? I'm sorry.
2    MR. HOMRIG: This is the '081. This
3 patent, as we heard, it's directed at XML extensible
4 markup language generally in that field, the field of
5 computing.
6    So here we have on slide 56, claim 21 from
7 the '081 patent which as we noted briefly which is
8 representative of the asserted claims.
9    And what claim 21 and the other claims show
10 is that essentially the '081 patent is directed at the
11 abstract idea of organizing and modifying data relating
12 to documents. And as we'll see, it's given a field of
13 use, which is XML, and we'll see that it has some other
14 limitations in it that we'll explore. But that is the
15 object of the claim, is to organize and modify data to
16 documents.
17    Now, on slide 56 I've also included a
18 call-out from the Digitech case. This is a Federal
19 Circuit case and what it found was the '415 patent,
20 which is what it was looking at in that case, was
21 directed in an abstract idea because it was focused on

Page 256

1 organizing information through mathematical
2 correlations and if we look at the claim from -- oops,
3 I went too far.  I think -- there we go.  Since I
4 referenced it, we'll look at the claim that was issued
5 in Digitech and what you'll see is what they were doing
6 in that patent was generating one set of data,
7 generating another set of data and combining them
8 together to create a new dataset.
9     What the court said was that this
10 organizing information into a new form and generating
11 it is an ineligible abstract process.  That's
12 ultimately what they did, the Federal Circuit did.
13 That wasn't the only case, of course, to look at a
14 patent that it was directed at organizing and modifying
15 data and data gathering generally.
16     In Cyberfone, the Federal Circuit looked at
17 another case that was directed -- that it found was
18 directed to an abstract idea.  There, there was
19 organization and storage and transmission of
20 information.  As it noted, those were all well
21 established concepts.

Page 257

1     The claim there, though, wasn't
2 superficial.  It actually walked into some very
3 explicit discussions in the claims and this is shown in
4 slide 60.  Claim 1 in the patent of the Cyberfone case
5 talks about things like exploded data transactions and
6 how -- it actually walks through the steps of taking a
7 single transaction, breaking it into its component
8 parts, figuring out which data goes with which and then
9 ultimately transmitting it and storing it.
10     So this is -- I guess the suggestion that's
11 been made certainly in the briefing, although they
12 didn't come right out and say it, is, well, a patent
13 that deals with organizing, modifying data and every
14 patent does that in some way can't be invalid.  That's
15 true.  Every patent does it in some way.  But patents
16 that are directed to that issue and only that issue,
17 those consistently have been found to not satisfy
18 Section 101 as this Cyberfone phone patent was found
19 not to.
20     Content extraction, is yet another case in
21 which the concept of collecting data, organizing and

Page 258

1 storing it was also found not to be patentable.  It was
2 an abstract idea and in that case the claimants didn't
3 meaningfully limit it even though it was in a system
4 that was scanning documents and storing it.  Here is
5 that claim on slide 62.
6     So we received an output of data that
7 was -- data representative of hard copy documents based
8 on scanning.  It recognized portions of the data.  So
9 when you think about what computer kind of
10 implementation would have been required to actually do
11 that, to take an input of data from a bunch of
12 different documents to be able to then look at those
13 documents, break the data up into its component parts,
14 determine which of those parts go together and then, in
15 step C, store the information into folders that
16 correspond to those data types.  That's not a
17 generalized concept as expressed there.  Those are
18 specific limitations, but ultimately that claim was
19 directed at storing, collecting, modifying data and,
20 because it doesn't have something else to it to
21 actually apply that concept in a patentable way, that

Page 259

1 claim was found to be unpatentable and, really, when we
2 look at the '081 patent claims, claim 21 and the other
3 assorted claims, it's the same idea.
4     MR. LUPO: It is your position, then, that
5 the patent was directed to data manipulation, no matter
6 how complex that manipulation is, it is always
7 abstract?
8     MR. HOMRIG: I think that a patent that is
9 directed only to the idea of data manipulation, that
10 doesn't have some other effect that one could measure.
11     So, for example, it's conceivable that one
12 could manipulate data in a way, for example, as the
13 patent in the Hughes case did.  The patent manipulated
14 data in some way, but it was to change that system, at
15 least as that district judge found.  We'll see if that
16 gets held up.  But it's conceivable that you could have
17 an invention that involved a very substantial one,
18 maybe, organizing and modifying data.  But that's not
19 the patent I have here.  This is only focused on those
20 issues, right?
21     So when we look at the claims here, there

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 260

1 really weren't other issues. This is about -- solely
2 about organizing and modifying the data in the field
3 use of XML. That's it. So I have highlighted here in
4 slide 64 the basic idea.
5      One of the concepts that has come up a
6 couple times is, well, you know, again, on this
7 preemption point, we were just discussing the context
8 of novelty. The argument is being made, well, of
9 course preemption is the test. Well, it can't be the
10 test. How could preemption be the test if, according
11 to the Supreme Court, applying the idea in a field of
12 use or applying the idea in a -- or limiting the idea
13 to a technological environment which is what we see in
14 Ultramercial which also ultimately comes from the
15 field, those are not meaningful in terms of
16 patentability.
17      So preemption, at least the way they say
18 it, couldn't possibly be the test and, of course, we
19 know it's not. The two-part test is intended to do
20 that.
21      So here when we see these limitations, XML,

Page 261

1 at most, those are a technological environment, a type
2 of data that's being dealt with. The remaining
3 limitation of claim 21 are generic computer limitations
4 and I've included here on slide 67, a system claim from
5 the Bancorp case. That was another Federal Circuit
6 case in which the Court considered limitations that
7 were written in functional terms and the reason I did
8 that there is to illustrate just how detailed that
9 claim is, what kind of programming that it required.
10 It wasn't just a generalized storage unit. It required
11 a policy generator to carry out a very long function.
12      So the argument and the suggestion in the
13 briefing was, well, these are components but they're
14 carrying out very intricate steps, those components are
15 generalized components carrying out steps related to
16 categorizing information. That, in and of itself,
17 isn't patentable under 101 according to the Federal
18 Circuit.
19      Looking at the machine or transformation
20 test, there's nothing in claim 21 that ties this to a
21 particular machine. Claim 21 just doesn't include a

Page 262

1 limitation. It doesn't tie into a specific machine and
2 transit transforming data. CyberSource here
3 included -- it illustrates a second point. We talked a
4 little bit of it in the Alice case, but CyberSource
5 dealt with the same issue again, well, look, you have a
6 data structures and you're moving data around quite a
7 bit. Isn't that transforming the data in some way? I
8 mean, after all, you changed the organization.
9      CyberSource says no. That's -- collecting
10 and organizing data? No. That's insufficient to meet
11 the transformation call. It's not a transformation in
12 the meaning of that test. So that's not enough.
13      Again, I hate to do it in light of the
14 time, but to make the record and to illustrate that the
15 other claims have the same problems, on 69 I've
16 included claim 22. So this is a dependent claim from
17 claim 21 and the other limitations that are shown from
18 this claim just talk about the primary record types and
19 what they include in terms of the organizational
20 structure and the same sort of concept that the other
21 limitations include in terms of organizing and

Page 263

1 modifying the data. This is just more of the basic
2 abstract idea. The same is true of claim 24 which is
3 dependent from claim 23 which itself is dependent from
4 claim 21. And so on slide 70 I've shown that. That
5 simply identifies information that -- the types of
6 information that business objects can comprise.
7      So, again, it's talking about -- well, it
8 can include invoices or it doesn't include invoices or
9 enclosing material or the like. So it's best to find
10 the kind of information to be organized and modified,
11 more of the same basic abstract idea.
12      So the arguments here are similar and
13 intertwined. I'll try not to repeat myself, but I want
14 to make sure we address the full set of arguments that
15 we're hearing. On this one, I called it tangible user
16 interface and here the -- the ultimate concept here is
17 that by allowing the user to interface with these HTL
18 documents, HTL information in this environment, that
19 this somehow makes it tangible in a way that, frankly,
20 harkens back to a test now I'm rejecting. That's not
21 the test. But it's also not been found to be

Page 264

sufficient. So, again, this is an argument that's been made. It's been rejected. So Alice dealt with a very similar argument and in that case the argument was made -- you see it quoted here from the partitioner on slide 73 that -- well, the fact that there's a computer and it necessarily exists in the physical rather than purely conceptual realm, that's enough to sort tie it to -- tie the claim that the software that runs on the computer, to make it happen. And Alice, of course, said, no, it's not. If that were the end of the inquiry -- if every step that were possible to do on a computer were claimed, then 101 wouldn't have a role and, of course, it does.

So the idea here is you can't just say a fine idea in a computer environment or allow a patentee by including generic components like a, quote, component or, as we saw before, an access mechanism. It could be anything.

That just allows a patent order to take an idea that's not patentable and not really add anything substantive to it, not explain how because, ultimately,

Page 265

that's what's required. You have explain how to achieve the idea and that's not -- that wasn't in the Alice patent. That's why it failed. It's not in the '081 or any of the other patents we'll see today. That "how" is always missing.

The argument was also made, this tangibility argument was also made in content extraction. On slide 74, you see on the left-hand side the quote from the brief where they argued to the Federal Circuit that the claims required display and I include that here because there, with the display, that's an interaction with the information that's displayed. It's the same sort of concept that's being argued by IV. So, therefore, there's some tangible application. Nope, not according to the Federal Circuit there wasn't. So that argument is rejected there to.

The software is patentable. That's a theme we hear a lot. Today, it's in the briefs and the argument that Capital One's analysis would overrule every one of the cases is wrong.

Page 266

We talked about DDR. I'll touch on it again. But, first, I want to talk about Diehr because we just heard about Diehr. Oh, I'll give you some Supreme Court cases. Well, here is one and here is what the Supreme Court said about what it decided in Diehr. It wasn't patentable because it involved a computer. It was patentable because it used a mathematical equation. But it used that equation in the process of solving a technological problem, but what was it? It's called out here in slide 78. The invention in Diehr used a thermal couple to report constant temperature measurements inside the rubber mold. That's a technological problem with a technological solution that explained how to achieve that solution.

It just explained it in specification. It claimed it. So it limited -- not only explained it and taught it, it limited the invention to that. That's why the Supreme Court said it was patentable.

DDR, again, we go -- DDR is focused on fundamental change, just breaking it, that's the way it

Page 267

normally works and substituting it with something else. Thereto, it wasn't just that they were addressing a technological problem or that they had a technological solution. They explained in that patent or into Federal Circuit how.

So it taught and limited the claim to how to carry out that solution. Again, you won't see how in the claims, any of the claims that we'll look at today from Intellectual Ventures.

One last point because DDR is going to be used a lot today, I think. So it's useful to keep in mind that one of the things that DDR said was just because these claims in this situation that these limitations addressing this idea with this solution were patentable doesn't mean everything involved in the Internet is patentable.

So even the DDR Court understood just because you involved the Internet and just because you had solved an Internet problem doesn't mean that it's patentable. Of course, these are just the Cyberfone content and extraction, Digitech rulings address the

Page 268

1 situation we actually have here with the '081 patent
2 which is organization modified data.  We discussed
3 those.
4     The specification argument, I want to make
5 sure it's clear what it is we're arguing because it was
6 misstated on the other side.  We're not arguing that
7 the specification can't be looked at for any reason.
8 The point, of course, it teaches and informs somebody
9 about the background.  Of course, it informs somebody
10 about the problem to be addressed.
11     What it cannot be used for, though, and how
12 it's been used here is as a substitute for the claims.
13     So the detailed discussion in the '409
14 patent about to the extent they say it's detailed,
15 which they haven't, those figures and those -- all of
16 those things that relate to an access mechanism, first
17 of all, those, themselves, are generic concepts, but
18 they don't explain what the excess mechanism actually
19 is in the claims which is anything, software, hardware
20 or both.
21     So it would be inappropriate to look at

Page 269

1 that specification and substitute the figures and
2 substitute the discussion for what's actually in the
3 claim and here, because claim construction is not an
4 issue for 101, we're not in the situation where we're
5 trying to look and determine, well, is there enough to
6 actually import that into the claim which is a very
7 high standard.  But we don't even have that situation
8 here at all.
9     So I want to make clear that's what the
10 issue is and that's the law.  So we saw that in
11 Accenture.  Accenture doesn't say you can never look at
12 this classification.  What it says is the claims are
13 what matters whether it's patentable and you can't
14 substitute the specification what's described for the
15 claims.
16     So the argument they're actually -- that's
17 exactly what they do because what happens is the
18 discussion is about what the invention is or we've
19 heard about what this access mechanism can do or, in
20 this context, you know, we'll hear about how the
21 individual components are especially programmed and all

Page 270

1 of that.  But when you look at them, they don't tell
2 you how.  They don't say how must they be programmed to
3 achieve the function.  They simply say go achieve this
4 function.  That's not enough.
5     MR. LUPO: Let me ask a question a second.
6 If you could take IV's Intellectual Ventures booklet
7 for a second and look at page 9, the first one is do
8 you feel that's a fair summary of what is an abstract
9 idea according to Alice?
10     MR. HOMRIG: No, I don't because -- and the
11 difference is subtle, but really important which is
12 these are examples, shown on slide 9, of things that
13 are abstract.  The way this slide is framed is as a
14 list of things said and the Supreme Court has held this
15 is sort of the limit of what is an abstract idea.
16 That's not accurate.  These are all things that have
17 been found.  They're characteristics of things that are
18 abstract, but it's not an exhaustive list.
19     MR. LUPO: So, then, would you say that the
20 manipulation of XML falls within this definition or
21 not?

Page 271

1     MR. HOMRIG: I would say it does.  I would
2 say that it falls within -- certainly within the first
3 and second categories because people have been
4 organizing and modifying data since the beginning of
5 time -- well, since the beginning of people, anyway.
6 It's what we do.  And so, yes, it does.  It is one of
7 the things we use to build our society, the
8 organization of data, and all they've done here is
9 limit this idea for field of use or technological
10 marketing.
11     And I do just want to touch on this.  There
12 was discussion about the expert testimony.  I will be
13 brief.  Several things.  We included in our -- one of
14 our briefs -- I believe it's our reply brief, the
15 citations in the depositions of the experts and the
16 point is we pointed to some of their testimony and they
17 called it out to your attention because we do think
18 that it's consistent with our position.  We don't think
19 you should rely on it.  We don't think it's appropriate
20 to rely on it.  But let's be clear, their testimony,
21 when considered as a whole, doesn't ultimately support

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 272

1 the position that they're advocating in the case.
2    The second thing I would say is the
3 declarations -- and here I've shown the Kelly
4 declaration on slide 88, they do exactly what the
5 briefing does.  So the progression, when you read the
6 whole declaration, will be that there's a long
7 discussion of what the invention is with citations that
8 discuss limitation.
9    As we see from paragraph 16 of the Kelly
10 declaration on slide 88, then there's discussion about
11 the invention, the claimed invention which relies on
12 the discussion of the specification in substance for
13 the opinions that are offered and then there are
14 conclusions about things like -- whether or not things
15 are preempted and conclusion about whether or not
16 something adds to the balance, whether there's
17 inventive concept, those types of legal issues.
18    So these declarations, it's true of each
19 one -- I'll probably do it more briefly this time, but
20 I just wanted to show you one because we got pressed
21 for time.  Unless you have any questions, I'll take my

Page 273

1 seat.
2    MR. LUPO: Thank you.
3    MR. BELLOLI: I'll start with the last
4 point as my first point.  Who better to inform a court
5 or a panel or anyone about what an inventive concept is
6 and what it contains than someone of ordinary skill in
7 the art looking at the specification and who better to
8 tell you what it preempts in the field than an expert
9 in the field?
10    It's certainly not myself or Mr. Homrig
11 that should be telling anyone that.  It should be an
12 expert that tells someone what's inventive or the
13 specification itself which is a true intrinsic record.
14    We'll start with your question about slide
15 9.  If you read Alice, this is what Alice delineates as
16 abstract ideas.  I mean, could there technically be
17 others?  I guess there could.  But this is what they
18 point to.  It doesn't fall into any of these.  I mean,
19 Capital One says it falls in the first two.  I don't
20 see how you can say it's a building block of human
21 ingenuity.

Page 274

1    The arguments that are being made with
2 respect to the '081 patent are so generic and so far
3 reaching that you couldn't have a database about it.
4 It's just manipulating data.  That's all it is.  You
5 could make an argument for anything and this leads back
6 into the preemption issue -- go to slide 6 -- which he
7 keeps wanting to take you away from this, but they were
8 very clear.  This is before you even get to the
9 two-step test.  The concern that drives the
10 exclusionary principle, i.e., the abstract idea
11 exception to patent eligibility is one of preemption.
12 It undergirds it.  It is relevant throughout because
13 you don't want to take up a big abstract idea.  You
14 only want applications because, as the Supreme Court
15 has told us -- at some level, slide 7, and this is page
16 2254 from Alice.  All inventions rest upon -- well,
17 laws of nature and natural phenomenon or what's
18 applicable here, abstract ideas.
19    So Capital One is completely overreaching
20 and trying to say what the abstract ideas -- oh, it's
21 mere data manipulation.  You can say that about any

Page 275

1 computer patent, any database patent, anything that
2 involves computers at all.  It's just not sufficient.
3 You actually have to look at what the claim is directed
4 to.
5    So let's look at two things with the '081
6 patent before we launch into the slides real quick.
7 What argument did they didn't address?  They didn't
8 address whether there was a technological problem that
9 was overcome with a technological solution.  We'll show
10 in a minute that it was.  They again didn't address
11 preemption.  Preemption is a big deal here.  You're not
12 preempting, always manipulating data or manipulating
13 documents.  You're manipulating them in one very
14 specific way in response to a problem that necessarily
15 arises in the field of XML documents.  We'll get to
16 that in a minute.
17    So what were the two arguments Capital One
18 did make for this pattern?  They said -- they trotted
19 out the conventionality argument again.  It's not
20 relevant and we'll go why again and they came into this
21 new "the claim doesn't tell you how."  That's not in

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 276

1 the case law.  It's flat out not in the case law and it
2 fundamentally conflates the difference between the
3 claims and the specification.  Claim is claim.
4 Specification teaches.  But, nevertheless, even putting
5 that aside, the patent definitely tells you how.
6 Figure 18 does as well as there are 17 columns as to
7 how and then if we go to the actual claim, if they say
8 it's data manipulation --
9     MR. LUPO: What page is that?
10     MR. BELLOLI: This will be page 50 and then
11 we'll go back to the beginning of the presentation on
12 this one.  But it tells you exactly how to manipulate
13 it and what you're manipulating it with and these
14 concepts of dynamic documents, primary record, record
15 types and management record types and it tells you
16 exactly how.
17     Then you go to specification for any
18 further details as to how.  You only need to claim what
19 your invention is, how it comes in the specification.
20 But even setting that aside, the spec tells you and the
21 claim tells you how.  I mean, you have to go look at

Page 277

1 how each of these things are further implemented, but,
2 you know, Capital One is almost arguing for a rule here
3 with this "how" argument, that you need to import the
4 entire specification into the claims and the claims
5 would be pages long if you're buying Capital One's
6 argument.  But you don't have to claim how.
7 Nevertheless, they did and they have a bunch of figures
8 and an entire specification that tells you as to how.
9     Again, was 101 considered by the patent
10 office?  It was.  If this claim was really directed
11 to -- that's the first prong.  Is it directed to an
12 abstract idea?  If it was directed as Capital One says
13 in its letter to the Special Master, this is just
14 organizing and modifying data related documents, there
15 is no way in the world that that patent would have been
16 allowed under 101, 102, 103, 112 and probably a bunch
17 of other parts of the patent act that I don't deal on
18 an everyday basis as those.  So, you know, they're
19 completely overreaching on it.
20     So let's go to what the problem was because
21 they didn't address this and they didn't address

Page 278

1 preemption.  Again, you have massive XML documents,
2 massive, and they're changing and you want everything
3 to be in line.
4     Now, we'll go back to is there a real world
5 analogue to this.  There is not.  Instead, they have to
6 come up with an inapt analogy which we saw this morning
7 and the analogy to the real world here was two people
8 in different places saying let's reconcile some
9 purchase orders over the phone.  That's exactly the
10 problem that this patent was trying to solve because
11 before this patent was around, you had these XML
12 documents and you did have to reconcile each one of
13 them.
14     So you needed to come up with a way so that
15 you could ensure that they were all reconciled properly
16 and that if one piece of the dynamic document changed
17 for the user -- these aren't programmers, right?  We
18 want to be able for real world people like myself and
19 my colleagues to be able to play with these documents
20 and make sure that it's okay throughout all the XML
21 documents.  That's what this overcomes.  It's not two

Page 279

1 people on the phone debating purchase orders or the
2 analogy they used -- Capital One used in its briefing
3 was a human translator.  It's not this at all.
4     The fact that they have to go to those
5 analogies just shows there's no real world analogue.
6 XML documents are their own creation and you have all
7 of those data files or all those data structures, all
8 those fields that you're filling in and you populate
9 them and you have documents that interrelate.  You need
10 to make sure that those are all fine.
11     Capital One, this bank, isn't going to go
12 back to reconciling XML documents with two people over
13 the phone who are a human translator.  They couldn't
14 reconcile all their transactions.  So you could have
15 problems where all of these XML documents aren't
16 reconciled because you're not using this invention.
17     So that was the problem as discussed here.
18 They're very difficult for non-business people,
19 non-technical users to operate because you have to
20 program them to keep all the data reconciled and you
21 have to program them on an individual basis.

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 280

1    So, again, the problem slide 44 here is
2 from the patent as well. You need a system that both
3 allows the users to view and update XML documents in
4 different formats. In other words, all the XML
5 documents are consistent, populated consistently. And
6 it allows them to manipulate the data and perform the
7 functions without programming skills. So you want to
8 eliminate all of that. Again, no real world analogue
9 here at all.
10    All right. So what are we going to do? As
11 my colleagues described this morning, you have these
12 XML documents. You're going to arrange them into
13 primary record types which is really the raw date.
14 Then you have all of these management record types that
15 could be your personal information, your transactional
16 information, your asset info and then you're going to
17 have this dynamic document that the users can see
18 certain parts of depending how the dynamic documents
19 are set up and what we're going to ensure is that when
20 these fields are changed or put in, it's going to
21 populate back through all the MRTs and the XML

Page 281

1 documents so that the information stays the same.
2    This was a real world problem after XML
3 documents came in to be. So you have XML documents and
4 the technology takes off and then there's all these
5 documents. How are you going to keep them all
6 consistent? That's what the '081 patent solved. And
7 to find that it's mere data manipulation is really to
8 eviscerate all the interbase patents. It's to
9 eviscerate all computer -- you can't just come into
10 court and say this is mere data manipulation. That's
11 not what the spec says. That's not what any expert
12 says. Capital One didn't bring in an expert to say
13 this is mere data manipulation. They could have if it
14 really was and they had a chance to offer testimony and
15 revoke. And they took the depositions. They wouldn't
16 have taken the depositions if it wasn't completely
17 irrelevant.
18    So going back to the letter the Special
19 Master and Capital One did to really focus the
20 issues -- this is slide 48. Capital One recitation
21 which is, again, "organizing and modifying data

Page 282

1 relating to documents." That's what they say this is
2 directed to and then there's no inventive concept.
3 That's all it's related to.
4    Nonsense. You're using dynamic documents,
5 a new creation here in the context of XML documents
6 based on management record types and primary tests and
7 you're doing that so that you can ensure that all of
8 this data remains consistent. And, again, this is a
9 new problem that arose after XML documents came in to
10 be and started to proliferate through different
11 organizations.
12    Getting back to preemption again. I don't
13 see -- we have an expert declaration on this -- how
14 there could be undergirding issue with preemption here.
15 This is not always to modify documents. It's not even
16 always to modify XML documents. It's a specific way to
17 handle -- granted, XML has become ubiquitous. But it's
18 not all documents. It's not a Word document. It's not
19 Excel documents. It's not PowerPoints that we're
20 showing you right now. It's XML documents. It's one
21 kind of document and it's a very specific way to modify

Page 283

1 XML documents to show that it's consistent throughout.
2    MR. LUPO: Are you referring to page 49?
3    MR. BELLOLI: I was, yes. That's the extra
4 declaration of John Capelli.
5    Now, going to slide 50, the single
6 independent claim. There's one independent claim and
7 two dependent claims with this patent and, again, what
8 they said before, they didn't say it this time. It's
9 all throughout their briefing is they were trying to
10 read things into the specification of the patent. No.
11 Everything that we say the claim is directed to and is
12 the inventive concept is directly in that claim and
13 they can't dispute it. Using dynamic documents,
14 they're created based on management record types and
15 primary record types. That's what the claim is related
16 to, that's the inventive concept. It's indisputably in
17 the claim.
18    One argument -- sorry, bear with me for one
19 second. All right. Getting back to preemption, I
20 don't know how you could say this preempts the entire
21 field or unnecessarily ties up the field of modifying

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 284

1 documents or even modifying XML documents because,
2 again, you have seven elements that are telling you --
3 that are narrowing the way in which you modify XML
4 documents and you're doing it, in the last component,
5 through a user interface. The idea that this is just
6 manipulating data untied to a machine, no. There's a
7 new user interface to this. This is a different kind
8 of user interface, the dynamic document that's, again,
9 unique to this problem in the XML space.
10     The cases they rely on, Cyberfone.
11 Cyberfone was cataloging phone numbers. That's what
12 the abstract idea was. Nothing like that here. And
13 Cyberfone, no technological problem, no technological
14 solution like we have here. Thanks for pre-Alice again
15 which kind of shades the analysis because they weren't
16 doing the two-step prong approach there as in Alice.
17 But, again, no technological problem, no technological
18 solution.
19     Same thing with content extraction.
20 Content extraction they took -- like, basically like a
21 picture of something, took the content out and then

Page 285

1 stored it. But there was a real world analogue to
2 that, taking a picture and then taking information and
3 putting into something. Again, there was nothing in
4 the content extraction patent that said we have this
5 problem that we're trying to solve and we've solved it
6 by taking a picture of data and extracting the data
7 from it and storing. So, again, the principal cases
8 they're relying on are inapt. Let me see if I have
9 anything else.
10     Just to summarize again, the two
11 fundamental pieces to determining whether certain
12 computerized technology is patentable, whether it's a
13 technological problem, technological solution, they
14 don't address it. Preemption, don't address it. And
15 then their two principal arguments are if it doesn't
16 say how, not an argument in the case law. There were
17 no "hows" to pop up there. You need to say how in
18 order to pass 101 and, regardless, the claim tells you
19 how as well as the specification and then their
20 principal argument that will pervade all four
21 patents -- this is all just conventional stuff, but

Page 286

1 it's not. There's nothing in the specification.
2 There's no expert that's come in and said, oh, yeah,
3 all of this is purely conventional and it's been known
4 forever because they can't say that. This is something
5 that necessarily happened within -- I mean, XML
6 documents didn't come along until less than a decade
7 before this patent was filed, not a decade.
8     So we're not talking about some
9 longstanding principal in our system of commerce, an
10 original motive for anything that Alice was
11 contemplating when it was talking about the bounds of
12 law. So unless the panel has any questions, I'll take
13 my seat.
14     MR. LUPO: Thank you. You want two or
15 three minutes?
16     MR. HOMRIG: Thank you, Special Master.
17     To address a couple of things and, Adam,
18 actually, while I do that, if you would, please show
19 slide 56. Thank you.
20     While he does that, because it was raised,
21 again, the issue of section 101, 102 and 103. So

Page 287

1 sections 102 and 103 are separate. You can satisfy 102
2 and 103 and still fail 101. That's a fluke. That's
3 what happened. They assumed that 102 and 103 were
4 satisfied, but it still failed. So that's a separate
5 inquiry.
6     On the point about "how," if you look at
7 what the Supreme Court has done and what the Federal
8 Circuit has done in locating claims, if we go to, for
9 example, the content extraction claim -- actually, let
10 me just do this.
11     So if we look at claim 21, what we do see
12 is sort of how is it that the documents should be
13 organized? How should the data look when you're done?
14     What you don't see is how do you have a
15 technological way to actually get that done? And
16 that's when the Supreme Court is focused on generic
17 computer components. It's talked about not being able
18 to apply or not applying the idea in a specific way
19 that's claimed. That's really what it's getting at.
20 So here we see that there's a component, for example,
21 that maps the data components of each data object to

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 288

1 one of the plurality of primary record types. That has
2 to be implemented to actually work. All you have is a
3 processor and a goal and a generic component that does
4 that. It's not a technological solution. It's not a
5 specific solution. It's a goal. And the claim fails
6 because it never claims how to do it. That's one way
7 of saying exactly what the Supreme Court has found
8 consistent needs to be insufficient.
9     The other thing we should do -- and would
10 you advance to slide 90? So the other thing I'll say
11 is that step one and step two are separate tests and
12 they evaluate different things. So step one is
13 evaluating the claim as a whole looking to see whether
14 it's abstract and issues like conventionality and
15 novelty that have been raised, even issues like
16 conventionality or generic computer components, those
17 types of issues aren't really in step one. That's
18 really about step two to see, all right, you have the
19 idea. How does the claim actually try to apply it, if
20 it does.
21     So conflating the two together and

Page 289

1 ultimately looking at the claim as a whole as is done
2 in the briefs and as is done in argument to say, oh,
3 this isn't conventional or this is novel, these things.
4 It's mixing the tests and applying it inconsistently
5 with the way the Supreme Court does it.
6     So with that, we can turn to the 002...
7     MR. LUPO: Okay. Before you turn to the
8 002, I'm talking to our court reporter also, I'd like
9 to target 6:00, if we can, to finish. That would mean,
10 to be safe, about 20 minutes a side for each patent.
11 There's a little bit of leeway in there, it could be 25
12 but, if that's possible. On the other hand, if you
13 want to be fair to the parties to do more than that,
14 let me know and we'll do it.
15     MR. HOMRIG: I'll do my best. Thank you.
16     With respect to the 002 patent, here we
17 have a system we heard about this morning that deals
18 with gathering information and when we look at claims
19 34 and 37, we see -- one of the issues that we'll talk
20 about that are sort of a two-part Alice test, but we
21 see what I might call step zero which is that, as shown

Page 290

1 on slide 92, claims 34 and 37 are directed not to a
2 machine or to one of the other statutory works, but to
3 a mobile interface. And as the Federal Circuit has
4 held in Digitech, unless it's a process claim, you have
5 to have claim to target a tangible or physical form to
6 satisfy one or the other categories, be it a machine or
7 a manufacturer, for example. And the case -- Digitech
8 dealt with a claim that was directed to a device
9 profile and had some information that went on about
10 what the nature of the device profile was. But as the
11 Court held, data in its material form, just the data
12 without tied to a specific machine, doesn't even fall
13 within the statute. So it's not even -- you don't even
14 get to the Alice analysis and as the Digitech work
15 held, some of the claims in that case failed step zero.
16 Some of them satisfied it, but then failed a step,
17 ultimately the application of step one and two. And
18 like the claim Digitech, claims 34 and 37 are not
19 directed at tangible subject matter. They are directed
20 at data. So those claims failed that basic test.
21     Now, when we turn to claim 9, which is

Page 291

1 representative of the claim in the Federal Circuit and
2 claim 9 is dependent on claim 1, we see in the last
3 limitation of claim 1 really where the idea is. That
4 basic idea that's addressed in the claim 9 is
5 retrieving specific information with a pointer. This
6 is something that runs afoul to an idea that is
7 abstract for the same reasons as the patents in the
8 Digitech case. They were organizing information
9 through mathematical correlations. We saw that before.
10 We saw, with respect to Cyberfone, the same problem.
11 We talked about that case before and we also saw that
12 in content extraction.
13     And, again, this is -- this is dealing with
14 the same kind of issue. How do you organize
15 information with pointers that we'll see in the claims
16 that we'll look at a moment? Those just pointed to
17 information and where to get it and that -- I mentioned
18 early on that claims that fail often have several of
19 the hallmarks of abstract ideas. This one has the data
20 organization and gathering and all of that. That's
21 certainly true. It's also a long held idea.

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 292

1  So people have been indexing books at the
2  library for as long as there's been a library. That's
3  how people found them. And this is no different. It's
4  the same object. It's a different environment, but for
5  somebody to go through the card catalog, that's an
6  index and that points to where information is and that
7  is the same object at the end of the day that the 002
8  patent was directed to.
9      So looking at claim 9, then we identify
10 where the basic idea is and what relates directly to
11 it. I mentioned the pointers and you can view these in
12 a number of different ways.
13     MR. LUPO: You're on 104?
14     MR. HOMRIG: Yes. One of the ways to look
15 at them is as a technical limitation, a technical
16 environment or field abuse limitation. We saw that
17 that's not enough. We saw that thinking of them as
18 generic, which they are at this point, it doesn't say a
19 specific kind. It doesn't have that kind of a
20 requirement. It's really whatever points and, as the
21 002 patent acknowledges and as IV has acknowledged in

Page 293

1  its briefing, pointers aren't new.
2      So it's not that -- and I say they're not,
3  but it's also that -- it's not just that they're not
4  new, it's that there's nothing about them that is
5  specific and that is anything other than generic
6  because of the claimed pointers generally. So it's not
7  as though there's some specific way of carrying out,
8  for example, the pointing of someone to the information
9  that they're going to retrieve whether that's a
10 bookmark or a phone number.
11     They are very much like, in some ways, the
12 shadow accounts that we saw in Alice because they
13 basically deal with storing and locating information
14 and they are much like the claims there and then
15 they're just claimed at a generic level.
16     The mobile interface, which is where IV
17 puts most of the argument is -- the construction shown
18 on slide 109 and that, as you can see, isn't specific,
19 that is, a user interface successful on different
20 computer devices and capable of dynamically accessing
21 user specific data stored on a network server or a

Page 294

1  local device.
2      So if one really carried out the function,
3  that's set forth in these claims, retrieving and
4  pointers, whatever kind of pointers you wanted to use,
5  it's hard to see how there's anything limiting in this
6  claim at all because it's all generic and it's all
7  conception.
8      This is an aspiration, this patent is. So
9  are the others, in terms of way they were claimed. And
10 that's not enough according to the Supreme Court.
11     The machine or transformation test, there's
12 nothing in the mobile interface or the set of pointers
13 or the balance of the limitations, whether you consider
14 them individually or collectively that ties this to a
15 machine, specific machine. There's nothing that
16 transforms an article in the sense of the machine or
17 transformation test. And there's no case I'm aware
18 of -- I don't think there is one -- in which a patent
19 that has failed the machine or transformation test has
20 been upheld.
21     So here we have just a basic problem. It's

Page 295

1  not time. So skipping ahead to some of the other
2  claims, they have the same basic problems. I think
3  this is clear from our briefing. I'll just skip
4  through quickly to point out that, again, in claim 11,
5  ultimately, all the actions in the mobile interface,
6  that's the same construction. There's nothing else in
7  that claim that adds structure or specificity or the
8  "how" that I mentioned that would be sufficient to make
9  this an application as opposed to an idea.
10     The same is true of claim 34 where you have
11 the basic idea, the same kinds of field abuse that are
12 generic limitations and then you have the display.
13 Again, we've see before from the cases that
14 interactivity argument that has been made in several
15 contexts. That's not enough.
16     There's just nothing in claim 34 that ties
17 this to a machine or to a transformation that's
18 sufficient or passes the second test of -- the second
19 step of the Alice test in any other way.
20     So, at the end of day, this fails step one
21 and it fails step two. That's true of all of these

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 296

1 sorted claims in the 002 patent.
2     MR. LUPO: Do you disagree with
3 Intellectual Ventures that the mobile interface is
4 something you can touch?
5     MR. HOMRIG: I don't think there is enough
6 in the claim to say. To physically touch? Well, I
7 think the mobile interface itself, I would say no.
8 Right? It's display. It's interactive with at some
9 level, right, but it does a mobile interface. So I
10 guess the question is under that construction does a
11 monitor include or a screen include -- is that
12 included? It might be.
13     I mean, the problem I have isn't, I guess,
14 that -- the problem I have is that the construction is
15 so general and so functional, I guess at some level I
16 don't see why it would part of it. But I also don't
17 think it's required.
18     So at some level I think you can have a
19 user interface that or a mobile interface in this case
20 under that construction that is pure data or I think it
21 could be data displayed on a screen.

Page 297

1     So whether that's a no or yes, I apologize.
2 I'm trying to give you the substantive answer, but I
3 don't think it's an easy question to answer yes or no
4 because it sort of depends on how you chose to apply
5 it. That's part of the problem. There is no
6 meaningful limitation there.
7     So with respect to novelty, I think we've
8 covered that ground. 101 is separate and different
9 from 102 and 103.
10     On the requires programming point, let me
11 skip ahead to that because that's argument made -- and
12 again, this is sort of made in a lot of different ways
13 here. On slide 126 we see it framed as the inventive
14 concept couldn't be performed on a conventional generic
15 computer.
16     So, in other words, you can't just go buy a
17 computer off the shelf, plug it in and it will already
18 perform this. That's not the test. And similar
19 arguments were rejected by the Supreme Court and by
20 CyberSource and by other cases at the Federal Circuit.
21 So that's not going to be enough.

Page 298

1     On the expert testimony, please, one issue
2 that's come up -- you may hear it again. So I'd like
3 to address it. At the risk of breaking the system
4 here, let me try the document camera again. The notion
5 that I'd like to address is culled from -- this is
6 Intellectual Ventures Reply Brief and I'm showing part
7 of page 5 and the piece that is interesting is it's the
8 source -- according to IV, this idea that things are
9 rife with factual issues and the way that IV frames
10 this to the Court is really a lesson. So they
11 acknowledge, as they must, that the language comes from
12 Ultramercial. Not the Ultramercial case that we've
13 seen that's good law, but the Ultramercial case that
14 was vacated by the Supreme Court and is not good law.
15     MR. LUPO: The first Ultramercial?
16     MR. HOMRIG: Right, both were vacated. But
17 this comes from -- this comes from that. That's what
18 they're pointing to and the problem here is that -- the
19 problem here is that, of course, isn't the law. That
20 view of 101 was rejected by the Supreme Court
21 ultimately in Alice as the way that Ultramercial turned

Page 299

1 out at the end of the day when Alice was applied and by
2 the Supreme Court's decision to vacant it and send it
3 back out.
4     But the second piece that's illustrative is
5 there's no citation to other material there and the
6 reason why is because that's not how the Federal
7 Circuit in the cases that are good law applies the
8 rule.
9     So that's the source of this notion that
10 there are so many factual issues that we have to
11 resolve with experts and otherwise. This is a legal
12 question. So I discussed that the expert reports don't
13 address it. At this point, I'll take my seat unless
14 you have any questions.
15     MR. LUPO: No, that's fine. Thank you.
16     MR. BELLOLI: I'll start where Capital One
17 left off. I really can't believe they're arguing to
18 the three of you that there are no factual issues here.
19     Then why in both Bilski and Alice, two
20 Supreme Court cases, to find that there was an abstract
21 idea, they looked to text that was more than 100 years

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 300

1 old?  All legal issues have to have some factual
2 underpinnings.  They have to.  It's a ridiculous
3 statement to say that they don't.  But you could never
4 make any conclusions of law without any facts and I
5 know Special Master practices in the ITC a lot.  We
6 have findings of fact and conclusions of law.  You're
7 not making conclusions of law without findings of fact.
8 This argument just falls dead.
9      So let's talk about their first argument,
10 that two of the claims are not even directed to
11 statutory subject matter.  They don't fall into one of
12 the four categories.  Well, they do.  They fall into
13 both machine and manufacture.
14      What does tangible mean?  Tangible means
15 capable of being perceived.  Certainly you can perceive
16 the mobile interface visually and there's also a
17 touchscreen embodiment.  This is a column 6, lines 36
18 to 50.  I actually don't have the text because I was
19 looking at the patent at the table while that argument
20 was being made.
21      So it is tangible.  It can be either

Page 301

1 tactile, visual.  I mean, you could have a mobile
2 interface that beeps too.  So now we've hit on
3 everything, every perception I think other than smell
4 or taste.  You can perceive this mobile interface in
5 multiple ways and it is capable of being perceived as
6 tangible.
7      Capital one is definitely right about one
8 thing, Digitech is on point, but they don't quote the
9 part of Digitech that's the most salient.  Digitech
10 actually holds that software is tangible and that's the
11 bedrock of whether something is a machine or a
12 manufacturer, right?  A machine, is a concrete thing
13 consisting of parts?  A manufacture is a tangible
14 article that has form and qualities to it.
15      MR. LUPO: Could you read your citation?
16      MR. BELLOLI: Yes, this is page 1349 of
17 Digitech and it says -- so, first, what they say is,
18 look, they just patented info and info can exist in
19 one's mind or anywhere and what they said was
20 Digitech's position is not supported by the claim
21 language which does not describe the device

Page 302

1 profile, i.e., the information that was claimed as a
2 tag or as an embodiment of hardware or software.
3      So what's the natural implication of that
4 since it wasn't claimed as hardware or software?
5 Hardware and software are both tangible things and, if
6 they're tangible, that puts you squarely within
7 patentable subject matter.  Digitech is on all fours
8 and connects 34 and 37.  I think there was a reason
9 that they moved this argument from the front of their
10 arguments to the back in beginning the rely.  It just
11 doesn't -- it holds no water.  Software is tangible.
12 And when you see software executed, you can see it,
13 hear it and, in some cases, interact with it in a
14 tactile fashion.
15      Now, let's go to the one-on-one inquiry in
16 terms of -- the exceptions to the one-on-one.  One
17 thing we haven't talked about is the abstract idea is
18 an exception to all of those categories.  Other than
19 these two claims, there is not a challenge that they
20 don't fall into statutory subject matter as a matter of
21 first chorus.  It's whether there's an exception that

Page 303

1 it's so broad and abstract that it preempts all kinds
2 of things which we have shown for a few patents that it
3 hasn't and we'll show them for two more that they don't
4 fall into the category of the abstract idea.
5      So let's talk first about the arguments
6 Capital One didn't make and then we'll talk about the
7 ones they did make.  Again, they don't go into whether
8 there was a technological problem and a technological
9 solution.  Don't do it.
10      So that's uncontested -- I mean, IV's
11 positions on that are essentially un-rebutted and
12 uncontested.  The positions of its experts on the same
13 point are un-rebutted or uncontested.  They don't --
14 slide 9, they don't try to build it into any of these
15 abstract idea categories from Alice, nor could they.
16 This is a mobile interface.  It's necessarily part of
17 the computer system and it's distinguished from prior
18 interfaces where it was device dependent.  Now, you
19 have that same one stop shop for all your information,
20 be it remote or local, in one spot and it's independent
21 of operating system.  It's independent of the device

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 304

1  and that's the ingenuity and that's the ingenuity of
2  this invention.
3     So they don't put into one of these
4  categories of Alice.  They don't argue no technological
5  problem, no technological solution and they don't even
6  address preemption.  It's not all interfaces.  It's not
7  even all mobile interfaces.  Again, preemption,
8  completely disregard it.
9     So what are the two things that Alice
10  really points you to in determining whether something
11  is abstract or has an inventive concept?  Again, it's
12  does it fit into one of these categories on slide 9?
13  They don't address it.  Preemption, they don't address
14  it and, as Alice told us, you know, something that's
15  not abstract is, again, something that solves a
16  technological problem, a conventional industry
17  practice.
18     My partner, Dave Alberti, this morning, he
19  went through what that problem was.  He showed you in
20  the spec where that problem was described and how they
21  overcame it.

Page 305

1     So, in a way, Capital One is completely
2  eschewing Alice.  So we don't want to talk about
3  preemption, we don't want to talk about technological
4  solutions.  We don't want to talk about whether it fits
5  in one of the abstract ideas that Alice talks about.
6  So what are we going to talk about?  What were the
7  arguments that were just made?  Again, generic.
8     When we go back and look at this
9  transcript, when the 002 patent was mentioned, that
10  generic word had to come out of Capital One's counsel
11  mouth at least 15 times and not more.  I lost track of
12  them.  I had little hashmarks, but I got to thinking
13  about other things.
14     The next thing they say is, oh, it's just
15  cataloging and indexing.  Well, it's not just
16  cataloging and indexing.  If that's what it was, the
17  patent wouldn't have come through the patent office.
18  It's aspirational.  No, it's not.  There's figures that
19  show the mobile interface and then tons of columns that
20  explain it and explain all of the embodiments of it.
21  It's not aspirational.  It was something that was

Page 306

2     And again, generic aspirational and its own
3  mirrored catalog and indexing, these aren't things that
4  we're pulling out of Alice.  The preemption is.
5  Technological problems and solutions is.  Preemption
6  is.  And, finally, they say machine -- doesn't pass the
7  machine or transformation test.
8     This can only arise in the realm of
9  computer networks.  This is not -- this is a mobile
10  interface that moves from place to place and I guess
11  that feeds back into the fact that they don't have a
12  real world analogue, so they come up with this
13  cataloging and indexing thing.  Catalogs in a library
14  don't pick themselves up and go to the next library.
15  You know, this is one -- this only arises in computers.
16  There was this problem of getting all your data and all
17  your devices and they solved it with this.
18     And again, just to highlight this real
19  quick, the patent is clear about what the problems were
20  and what the invention relates to.  It talks about the
21  field of invention and what the invention is at slide

Page 307

1  57.  The patent at column 1, lines 5 to 16.  Again, it
2  talks about the problem was, users having information,
3  documents, programs, links in all of these places and
4  you have all of these multiple devices and how are we
5  going to synch all of those?
6     So, again, the solutions, slide 59, and the
7  patent -- this is actually multiple places, but for the
8  sake of brevity, we put one example here.  It's at
9  column 4, lines 42 to 58 when it talks about what the
10  solution is.  We haven't had common mobile interface
11  with any access, information display seamlessly and
12  make this all -- any changes that are dynamic.  So
13  everything is synced and you can go to one place and
14  have all of your information.
15     Again, slide 60 was -- is the embodiment
16  that was shown this morning and the solution to the
17  problem.  61 shows it on the phone.  As to 62, how does
18  it work in real life and, again, here is the interface
19  agent which is the mobile interface.  We'll get to that
20  one in claim construction.  But, again, this is the
21  guts behind it and these aspects are in the claim.  The

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

1 pointers are in there, the interface is in there.
2 Inputting and outputting is all within the realm of the
3 claim.
4     So, finally, getting to the letter we
5 submitted to the Special Master, what are these claims
6 directed to?  You take pointer data and you use it to
7 access files and data through that mobile interface and
8 not on the lunar face which is a term defined by the
9 patent.  It's not something that has its own meaning
10 separate and apart from the patent.
11    Mobile interface is accessible from any
12 location device no matter what platform.  That's the
13 inventive concept and exactly what it's directed to
14 and, again -- I'll just say this real quick -- in slide
15 66 there is no preemption issue and there's expert
16 testimony on that.
17    Getting back to the inventive concept or
18 the claim is directed to on slide 67, we have what the
19 claim is directed to and the concept at the bottom of
20 the slide, then claim 9 which is dependent on claim 1
21 and, again, Capital One's briefing says, oh, this -- IV

1 is importing from the spec and what, basically, the
2 concept is and what the claim is directed to is not in
3 the claim it is.  Every aspect of it is and that's true
4 for all the claims in this patent and these are slides
5 67, 68 and 69, not to belabor it, given the 6:00
6 hopeful stop time.
7     So on slide 70, again, we put on the bottom
8 what the claims are directed to, what the novel concept
9 is, the inventive concept is and it's nothing like all
10 of these claims that Capitol One relies upon in other
11 cases too.  But these are the ones they principally
12 rely on for a lot of these patents.  And then, again,
13 it looks, on slide 71, a lot like patents that have
14 been upheld.
15    There's, like, the trading technologies
16 case.  There's mobile or it was interface technology,
17 graphically user interface technology and you've
18 overcome a problem in the realm of computer networks
19 and made that computer function better, it's eligible.
20    Unless there are any questions --
21    MR. LUPO: I do have one question.

1     MR. BELLOLI: Yes?
2     MR. LUPO: With respect to the 003 patent,
3 claims 34 and 37, what's Intellectual Ventures' reply
4 to Capital One's challenge that those two claims do not
5 recite any of the four categories of invention required
6 by section 102?
7     MR. BELLOLI: It's straight out of
8 Digitech.  Digitech said that you patent information by
9 itself, ineligible.  But if it's what's claimed as
10 embodiment of hardware or software, it falls into one
11 of those categories.  And again, that's the Digitech
12 case at 1349 where it says when distinguishing what
13 Digitech was claiming from hardware and software and
14 computer technology, Digitech was only claiming the
15 information, just information without it being tied to
16 hardware or software and the mobile interface
17 necessarily is.
18    It says Digitech's position is not
19 supported by the claim language which does not describe
20 the device profile as a tag or any embodiment of
21 hardware or software.

1     Well, the mobile interface here is software
2 and it's run on hardware.  So it falls straight into
3 Digitech, what Digitech would find falls into those
4 categories.
5     MR. LUPO: Look on page 69 in your
6 presentation, just looking at claim 34, the preamble
7 recites the first six lines and then the embodiment
8 claims of plurality appointments and corresponds to the
9 user's specific resources and information wherein upon
10 initiating a pointer.  A user specific resource of
11 information from either the local device or the network
12 server as retrieved.
13    Is it your response that you need preempt
14 to interpret this claim or do you interpret it just on
15 the body of the claim and does Digitech support you
16 either way?
17    MR. BELLOLI: I don't think Digitech dealt
18 with preambles versus the body of the claim in that
19 regard because there was nothing in the software or
20 hardware realm.  But, again, they've adopted all of our
21 constructions for this and our construction is a

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 312

1  user -- mobile interface is a user interface accessible
2  on different computing devices and capable of
3  dynamically accessing user specific data stored on a
4  network server and local device.
5      So it's directly tied -- it is a software
6  creation and it's tied directly to hardware.  It only
7  appears on hardware and it is executed by software is
8  what creates it.
9      So the mobile interface is software and if
10  it's software that's run on hardware and displayed to
11  users on hardware necessarily falls into at least two
12  of the four patent eligible categories.
13      MR. LUPO: Which one of the ones of
14  plurality of the four categories?
15      MR. BELLOLI: Machine and manufacture
16  because machine is -- well, both of them.  If it's
17  something that's tangible, it passes and Digitech is
18  saying that hardware and software are tangible in that
19  part that I described to Special Master, thus it falls
20  right in both of those categories.
21      MR. LUPO: Thank you.  You want two minutes

Page 313

1  and 30 seconds?
2      MR. HOMRIG: Yes, please.  I'll try to keep
3  it very short.
4      So with respect to the scope of the claims
5  since we are talking about Digitech, first of all,
6  Digitech didn't say what you just said it says.  So the
7  quote he read with the implication that that means, oh,
8  software is tangible, that's not what Digitech said.
9  So Digitech is criticizing those particular claims.
10      Secondly, I think I just heard him say that
11  in IV's position, the mobile interface is completely
12  software.  So, in that context, you know, the thing I
13  would leave you with is you have to look -- and in
14  answer to your question earlier, you have to look at
15  what the claim covers versus what it is limited to.
16  There's a big difference saying that something is
17  covered like there were references to the specification
18  implementation and all of that.  That may be covered,
19  but it's not limited to those things.
20      Here what we have is a claim directed to
21  mobile interface and we have something that they're now

Page 314

1  saying is pure software.  That just don't have -- that
2  really isn't -- it's not tangible in any way that what
3  was considered Digitech wasn't tangible.  So we submit
4  that there's no difference in it and it doesn't satisfy
5  for the basic reasons we've already discussed.
6      Another point I wanted to address is that
7  the point has been raised about claim instruction, oh,
8  well, actually, I apologize.  So the point about how
9  could a legal issue be decided, it's decided on facts.
10  Well, a claim instruction is the natural situation
11  where in all but rare cases, according the Supreme
12  Court in Teva, it's decided on intrinsic evidence, but
13  yet it's still a legal exercise.  It's the rare case
14  when it's decided by -- as a factual question where
15  there are underlining facts.
16      And the last thing I would say is there was
17  the suggestion that somehow we've acknowledged and are
18  not challenging that there's a technical problem and a
19  technical solution.  That is, yes, we're absolutely
20  challenging that.  That's what -- that's the whole
21  inquiry into what kind of idea is it and/or is it

Page 315

1  directed to an underlying idea and here it is.  It's
2  gathering, organizing information.  It's a long held
3  idea.  That is a direct challenge to the notion that
4  has been offered on the other side.  This is directed
5  to what is only a technical problem.  So that's where
6  we stand on that.
7      Unless there are questions, I'll turn to --
8      MR. LUPO: No, I think we're fine.
9      MR. BELLOLI: Could I have 30 seconds?
10      MR. LUPO: 34.
11      MR. BELLOLI: I'll just stay here.  I can
12  talk into the microphone here.
13      I think I largely, but not fully answered
14  your question before about the mobile interface and
15  just to say, our position is that the preamble of this
16  claim is limiting.  I don't know whether Capital One
17  takes issue with that because this is where you learn
18  about -- the mobile interface is the invention, the
19  mobile interface comprising.  So the preamble certainly
20  breathes life, meaning, vitality, all of that, into the
21  claim.  So it is limiting.

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 316

1    Then just to call out one aspect to this
2 right here, that mobile interface has adapted
3 (Inaudible) the local device. I mean, it is a thing.
4 It's something that you see and interact with. It's
5 something, again, tangible.
6    Finally, the last point, I guess we're
7 still going back and forth about whether there's
8 factual underpinnings, but Teva -- that recent Teva
9 case on a claim construction in the Supreme Court and
10 there they said factual determination, i.e., actual
11 factual matters that are disputed and need to be
12 resolved, which I guess we have some factual matters on
13 whether there's a tech problem or a tech solution that
14 need to be resolved, are -- in the claim construction
15 context, are entitled to deference. So when you have
16 competing factual issues here with 101, why wouldn't
17 there need to be findings and then presumably deference
18 given to the District Court when those findings are
19 made. There's no -- again, we might be fighting this
20 one to the end. I don't see how you can ever say
21 there's no factual underpinnings to this.

Page 317

1    MR. LUPO: Thank you.
2    MR. HOMRIG: Thank you. The '084 patent
3 is, direct as we heard earlier, generally in the field
4 of intrusion detection and the claims, claims 15 and
5 18, we said in our briefing, they both depend on claim
6 9. So we've got all three of them called out here.
7    Those are directed to the abstract idea of
8 analyzing data from multiple sources in some
9 unspecified way to detect an anomaly and using
10 someone's specified relations to determine targets
11 likely to be affected by the anomaly.
12    So on slide 137, it set forth both claims
13 and also some pieces of information that were very
14 useful to look at, one from the '084 patent on the
15 bottom and one of the things the '084 patent tells us
16 is that different types of algorithms can be used to
17 look for different types of patents that would not be
18 recognizable by a conventional intrusion detection
19 system at a single customer site.
20    What it's saying there is when one looks to
21 claim 9 and looks at patent correlation there,

Page 318

1 what's -- the claim, as the spec, is open. The patent
2 as a whole doesn't say what pattern correlations to
3 use. It simply says use pattern correlations
4 generally. It covers both as to that element and,
5 overall, both known and unknown uses. And that's
6 something that was called out in Benson, another one of
7 the hallmarks, an idea that's abstract because it's not
8 being applied by the claim in a meaningful way.
9    So whether it's network based intrusion
10 catching techniques which are left open both by the
11 claim and patent, analyzing data entering the plurality
12 of most servers and computer sites, how that's done,
13 that's left open. Using patent correlations across the
14 plurality of host service computer sites, that's also
15 left open. It doesn't limit this claim to a specific
16 way of doing.
17    Now, here, too, we have the same issue of
18 analysis and organization and open data. Here, the
19 claim is really focused on analysis and, frankly, when
20 I saw this claim, the thing that struck me most of all
21 was its similarly to the proof claim and the steps

Page 319

1 there. So in claim 9, we reduce that basically to
2 three steps, analyzing the data, entering into a
3 plurality of network devices, detecting an anomaly in
4 the first place, use patent correlation across multiple
5 computers to determine what's anticipated to be
6 effective and then, third, alerting the device
7 anticipated to be effective. That's the claim reduced
8 to its elemental steps. Well, that's very similar to
9 Parker v. Flook?
10    MR. LUPO: That's page 139?
11    MR. HOMRIG: That's correct. It's on slide
12 139 and there in Flook, measure the present value;
13 second, use an algorithm to calculate an updated
14 alarm-limit value; and then update the alarm limit.
15 And as the Supreme Court found, in Parker v. Flook that
16 wasn't enough to -- for the claim not to be directed at
17 an abstract idea and the similarity -- one of the
18 criticisms there is that, well, again, it's ultimately
19 a criticism with the Supreme Court's step, step by step
20 analysis set forth in Alice. The test isn't whether or
21 not there's a technological problem, technological

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 320

1 solution. The test is ultimately step one is directed
2 at an abstract idea. Step two, does the balance of the
3 claim mean free limit.
4     The argument was made by IV that, well,
5 they've just simplified Flook and Flook was actually --
6 sorry, they simplified the '084 patent and Flook was
7 this patent that really had no substance to it.
8     As we can see on slide 140, the Flook claim
9 was very specific. It wasn't patentable, but it was
10 very specific. It set forth exactly what steps had to
11 be done and, like the '084 patent, it used that
12 analysis and then it simply updated other devices or
13 updated a limit that was applied by other devices.
14 That wasn't enough to be patentable and it's not enough
15 to be patentable here.
16     That claim is ultimately directed at an
17 abstract idea and one of the interesting things too is
18 here the idea, the basic abstract idea actually
19 involves conventional aspects. So the first step is
20 detecting. What the spec tells us is that that can
21 be -- doesn't have to be necessarily, but it can be

Page 321

1 done using entirely conventional intrusion detection
2 systems and we see that here on slide 142 starting at
3 column 9, lines 1 through 8 of the '084 patent.
4     First, it tells us this point about
5 different algorithms being used to do the analysis
6 addressed in the claim. Then it tells us where the
7 algorithms are located in the back end date center.
8 And then -- this is the interest piece. It tells us
9 what can be done in this example is to use customer's
10 conventional intrusion detection systems and obtain the
11 data from there and then analyze it. So here that
12 corresponds ultimately to -- the conventional intrusion
13 detection system corresponds to that detection system.
14     Now, the balance of the claim is really
15 directed at, again, things that are not limiting. So
16 like the claim in Bancorp and like the Alice claim, we
17 have a plethora of generic computer limitations, a
18 network computer system, hosts, servers and computer
19 sites. None of these are specific devices. This is
20 basically simply saying apply this idea in a computer
21 system without further limitations.

Page 322

1     The balance of the limitations, the ones
2 that aren't just purely generic, are post solution
3 activity. We saw the same thing in Flook, that things
4 like an alerting device that may be affected or
5 updating a limit at firewall for just the setting of
6 the firewall. Those things like updating the alarm
7 limit in Flook aren't sufficient to limit the claim and
8 limit the idea in a way that is patentable.
9     For the same reasons, this claim and all
10 the claims that are asserted failed the machine or
11 transformation test. The idea that -- there's really
12 no argument that it's limited to a specific machine or
13 specific system and this analysis of data that was
14 anticipated to be effective, that doesn't perform a
15 transformation of anything in exactly the same -- in
16 the same way that the Ultramercial -- well, in exactly
17 the same way that analyzing data does.
18     Flook didn't -- updating the alarm limit or
19 figuring out the proper setting and updating that limit
20 didn't work any transformation either. The same is
21 true here.

Page 323

1     Now, the other claims are focused similarly
2 on the same set of issues. We have the basic abstract
3 ideas which are shown in slide 146. In claims 26 and
4 27, 27 depends from 26 and what we see is that 26
5 contains part of the idea that is conventional and both
6 collectively contain generic computer limitations just
7 like claims 15 and 18 and post solution activity,
8 again, alerting the devices. That's not going to be
9 enough to limit the idea.
10     Claims 31 and 23, ultimately, are in the
11 same place. So 32 depends from claim 31 which depends
12 from claim 26 and there's sort of a little more detail.
13 They talk about data packets. But, again, this is
14 simply providing conventional technology here and then
15 generic limitations in terms of the data collection and
16 processing center. There is nothing about analyzing
17 data packets as opposed to a larger set of data that
18 fundamentally applies the idea in a way that's
19 patentable.
20     The same arguments are made about a novelty
21 item addressed further here. The comments about

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 324

1 programming are, again, similar. We see the same sort
2 of argument we saw earlier today, that implementing
3 this on a system is actually going to result in a new
4 machine. That's an argument that's been rejected time
5 and again. What matters is do the claims require that
6 or is it left open to somebody to do and here it's left
7 open to somebody to do. Whether they use ways that are
8 known now or developed in the future is left open. And
9 so the claims fail for that reason.
10     The technological problem argument that has
11 been advanced, again, here is the quote from Bilski we
12 saw earlier in the Federal Circuit referring to it
13 before, but Flook also, as the Supreme Court
14 recognized, held at limiting the idea to a particular
15 technological environment, but that's not enough for
16 patentability.
17     So at the end of the day, applying the test
18 on this legal question, the test set forth by the
19 Supreme Court, what you find is that these claims are
20 directed at an abstract idea and that there's nothing
21 about the way either -- there's nothing about the

Page 325

1 limitations in the claim that either -- when you
2 consider them as pieces or as you integrate them
3 together with a full set of the claim, actually apply
4 the idea. So unless you have any questions...
5     MR. LUPO: Yeah, I do have one question.
6 Well, it might be two.
7     Are you familiar with Exhibit 27 to
8 Intellectual Ventures' reply, the one that relates to
9 the patent office giving examples under their -- what's
10 called interim eligibility guidance?
11     Have you seen that?
12     MR. HOMRIG: Yes, sir.
13     MR. LUPO: Okay. There's an example in
14 there, a hypothetical claim for isolating and removing
15 malicious code from electronic messages and it is given
16 as an example of one that is eligible for
17 patentability.
18     Do you see -- do you have a position with
19 regard to that example? And understand it's not
20 control, it's an example that the patent office is
21 pointing to for guidance to its examiners.

Page 326

1     Do you have a position with regard to that
2 example versus the '084 patent?
3     MR. HOMRIG: First, what I say is this
4 guidance from the PTO as opposed to tested claims. So
5 this is the PTO's point of view and we don't know how
6 it would turn out in a report.
7     The second thing -- and this is true of the
8 examples as we go through. The examples that are given
9 are quite specific in terms of, again, this point that
10 I raised before, whether you think of it in terms of
11 whether things are generic or whether the claims
12 actually claim how. So if we look at -- and this is
13 from record page 0738. This claim that's given its
14 guidance is much more specific. This tells -- this
15 limits the claim to how this method is actually carried
16 out.
17     So, for example, there is a piece about
18 flagging each scanned by -- if we start at this
19 beginning, it certainly has some aspects that are
20 generic computer functions like receiving an electronic
21 communication, storing communication, extracting, those

Page 327

1 sorts of limitations. But then it delves into detail
2 about how the malicious code is addressed.
3     So, first, it's received and it has -- so
4 it has storage in the quarantine sector of the memory
5 of the computer, wherein the quarantine sector is
6 isolated from the boot and the non-quarantined selector
7 in the computer memory. Where code in the quarantine
8 sector is prevented from performing right actions on
9 other memory sectors. There's nothing like that in the
10 '084 patent claim. There's nothing like that in any of
11 the claims we've looked at today.
12     When we talk about how, when we talk about
13 generic being not enough, the Supreme Court talks about
14 it, A, we don't know if that level of specificity is
15 going to be enough, but it is certainly far, far more
16 specific and, actually, not only tells but requires
17 that those very specific limitations are done. There's
18 nothing like that in the '084 patent.
19     The '084 patent is simply, at the end of
20 the day, states a generalized activity and looks -- and
21 kicks it to -- first, kicks it to one skilled in the

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 328

1 art to then go figure out what should be used in the
2 context of the claim, to go and invent something else
3 or be innovative himself or herself. But then also
4 then doesn't limit the claim to make sure that those
5 things aren't covered and that's terribly problematic.
6     Here, in the guidance given by the PTO,
7 it's certainly much less of a concern because there
8 those things are actually spelled out in the claim.
9     MR. LUPO: Thank you.
10    MR. HOMRIG: You're welcomed.
11    MR. BELLOLI: Well, it's not just that the
12 PTO thinks that that claim in Exhibit 27 would be
13 patentable. The courts agree as well. There's
14 actually one case that I think would be direct on that
15 point based on the kind of crux of Special Master's
16 question. It said in our reply brief it's the IV vs.
17 Motorola case that has a claim that's much less
18 specific than the one shown here or even the one shown
19 here. And there you were directing wireless network
20 traffic based on the contents of the data packets.
21    It's probably a third the length, a quarter

Page 329

1 to a third the length of the claim using the same kind
2 of concepts albeit in a different way because all
3 claims are different.
4     Then the example in Exhibit 27 and the '084
5 claim here, let me just give you that site so it's
6 handy for you in the record. It's very recent,
7 February of this year, 2015, Westlaw 846532.
8     We disagree that that record 738, Exhibit
9 7, is more specific than the claim here. But even if
10 it is, you can have claims that are more specific, less
11 specific and still be patentable. It's whether it's
12 directed to an abstract idea and I do think the Special
13 Master was right to point Capital One to that because
14 that is evidence. At least the PTO is sticking to the
15 claim, the claim that the '084 patent is eligible and
16 this other Intellectual Ventures patent that allocates
17 traffic based on the contents of data packets is
18 eligible as well.
19    So looping back to the beginning of this
20 for the '084 patent, this patent is so abstract in
21 Capital One's mind -- I mean, it is abstract. It takes

Page 330

1 them 29 words to tell you what the abstract idea is, 29
2 words. I mean, the definition of abstract is
3 disassociated from any specific instance. That's the
4 dictionary definition of abstract. Disassociated from
5 any specific instance.
6     The '084 is replete with specific instances
7 as are its claims and there's only one way to monitor
8 network traffic and to alert.
9     So let's go with Capital One's arguments
10 off of that again. It's conventional, generic --
11 conventional and generic. Again, that just doesn't cut
12 it. You gotta look to whether there is an abstract
13 idea or not, what the claim is directed to.
14    The machine or transformation test, there
15 are all kinds of parts to this patent that we'll see.
16 This certainly passes that. You have plurality of
17 devices, they're all being scanned for anomalies. Then
18 you're analyzing all that data using pattern
19 correlation, alerting, adjusting sensitivity levels of
20 the firewalls based on that analysis. If there's a
21 claim that passes the machine or transformation test,

Page 331

1 it's this one.
2     Then they said no technological
3 problem/solution. They said it's just limited to a
4 tech environment. We'll say that that's not true.
5 This certainly solved a technological problem that was
6 glossed over both in this presentation by Capital One
7 and its presentation, the tech tutorial this morning.
8 It's not just that you went from one device to multiple
9 devices and analyzed it. There is much more to this
10 claim and we'll talk about that in a minute right after
11 we discuss what Capital One again didn't argue,
12 preemption.
13    There's no way they could argue preemption
14 on these claims. As we'll see, there are a lot of
15 moving parts to this and all of them, obviously, must
16 be present.
17    And again, referring back to our slide 9
18 Special Master looked to a long time ago, the outlines,
19 what the abstract ideas that were discussed in Alice,
20 they don't fit into any of those boxes, nor can Capital
21 One claim they fit into any of those boxes. You can go

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

Page 332

1 to the beginning of the '081 again.
2     So what's the problem? What was the
3 problem? Prior art intrusion detection methods didn't
4 work well. Why? Because you were only getting them
5 from a single device. You weren't anticipating what
6 other parts of the system were going to be affected
7 based on the analysis of anomalies that were coming in
8 and then didn't do something about it, i.e., alert or
9 adjust sensitivity levels.
10     The independent claims here are actually
11 quite important, not just the independent claims.
12 They're patent eligible. The dependent claims show
13 further aspects to these claims that solve the problem
14 as well.
15     So the conventional systems just indicated
16 packer events and attacks, but you didn't have this way
17 to look at it across a whole system and adjust
18 accordingly based on your analysis of data coming in
19 and doing your own patent correlations across all of
20 those devices. So this is a big leap forward. This
21 isn't just, oh, I got -- my device got attacked, what

Page 333

1 do I do, I'll call IT. This is let's see what's coming
2 in across the network and adjust accordingly in near
3 real-time, alert the red parties, adjust sensitivity
4 levels and based on a complex analysis. Again, the
5 claims claim that, the specification teaches how to do
6 that. That's the function of the claims and the
7 specification.
8     So what the solution provided by doing a
9 round of pattern correlations, analyzing all of that
10 data coming in from the various sources and then
11 alerting -- anticipating and alerting what may be a
12 problem, it provided early warning and potential
13 misuses and intrusions that the prior art system didn't
14 have. That's -- again, this is the specifications
15 teachings telling you the problem, technological
16 problem and the technological solution.
17     Let's skip the figures here and we'll go
18 straight to what is going on here. So, like Capital
19 One, we agree that this patent can't be distilled down.
20 These claims cannot be distilled down into just a few
21 words, like the patient claims that are found

Page 334

1 illegible. You're using that work, intrusion detection
2 techniques across all these devices in a defined
3 system, you detect the anomalies, then you use pattern
4 correlation across all of those devices to anticipate
5 what those are going to infect or have problems with
6 and then you're going to alert and some of the pending
7 claims, you're going to adjust how the entire system is
8 working in terms of what comes in and what comes out of
9 a firewall and what anomalies are flagged based on that
10 analysis.
11     This is slide 83. This is our letter to
12 Special Master identifying both what the claim is
13 directed to and the inventive concept of the claim
14 which are coextensive. Again, with respect to
15 preemption, it wasn't brought up by Capital One, nor
16 could it given that they're saying it's a 29-word
17 abstract idea.
18     This is slide 84 pointing to paragraph 23
19 of our expert's declaration on this. That explains why
20 preemption is not a concern with respect to this
21 patent.

Page 335

1     So let's go to the claim. So slide 85, at
2 the bottom, we have what the claim is directed to and
3 what the concept is for IV and for the specification
4 and for the claims. And all of those aspects are there
5 in the claim. You have this plurality devices. You're
6 going to detect anomalies in them. You're going to use
7 pattern correlation and analyze all that data across
8 all the devices to determine whether any devices that
9 are going to be anticipated and be affected by the
10 anomaly. There's a lot going on. That's pretty
11 specific. You can't get much more specific than that.
12 And if they're going to make the "how" argument again,
13 again, the claim tells you how. If there's any gaps in
14 how, that's what the specification is for, what the
15 specification teaches and the claims claim what your
16 invention is.
17     Going to slide 86, this is what I was
18 talking about before. So claim 18 is one of the
19 asserted claims. After you do all of that analysis,
20 figure out what's going to be affected by these
21 anomalies coming in and alert those devices. Then

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

1 you're going to further adjust the anomaly detection
2 sensitivity. This is what my partner, Jake Zolotorev,
3 was talking about this morning was you're going to
4 adjust those things basically in near real-time so that
5 you know what to block and what not to block in
6 response to things like a ton more network traffic or
7 viruses or any other kinds of anomalies that may be
8 coming into the network that you want to get rid of.
9      We have claims 26 and 27, slide 87, again,
10 all the aspects of what the claims -- we say it comes
11 direct to, again, in the inventive concept or
12 embodiment in these claims. I think Capital One can
13 dispute otherwise. The same thing with claims 26, 31
14 and 32 on slide 88. And again, you have -- here with
15 claim 31, the data collection, the processing center
16 detects the anomalies by analyzing the data packet.
17 That's sounds a lot like -- in addition to all of the
18 other limitations, that sounds like that IV vs.
19 Motorola case that we directed the Special Master to in
20 addition to the example in Exhibit 27 from the PTO's
21 example of patent knowledgeable claims.

1      The last three slides here are, again,
2 comparing the inventive concept, slash, what the claims
3 are directed to, the '084 patent to claims that have
4 gone down under 101 on slide 89 and then claims that
5 have passed muster on slide 90.
6      So, in summary, at least for this patent,
7 the claims are not directly an abstract idea. No
8 29-word idea, I don't think, could be abstract. But,
9 regardless, we've shown it's not and there's an
10 inventive concept here regardless and we were shown
11 what that was.
12      Do you have any questions? I have one
13 final point after the questions.
14      MR. LUPO: There is one question.
15      Did I hear you correctly that you
16 distinguish the '084 patent from host-based intrusion
17 detection systems?
18      MR. BELLOLI: Host-based? I didn't talk
19 about host-based?
20      MR. LUPO: Okay. then I didn't hear you
21 correctly.

1      MR. BELLOLI: I didn't say anything
2 about --
3      MR. LUPO: It's not distinguishable?
4      MR. BELLOLI: I don't know if --
5      MR. ZOLOTOREV: If I may, Special Master, I
6 addressed that in the morning presentation. That's
7 probably where that comes from and, yes, the
8 specification and, actually, the prosecution history
9 very clearly distinguishes the network based intrusion
10 detection technology in the patent. And, of course,
11 the network based intrusion detection is a claim
12 limitation in the claim. So that's distinguished from
13 the host-based intrusion detection. That was a prior
14 art reference that was addressed during the prosecution
15 of the patent.
16      MR. BELLOLI: As I put up slide 85 here, I
17 believe what Mr. Zolotorev was referring to is that
18 first indented limitation where it's using a network
19 based intrusion detection reference.
20      Is that the only question?
21      MR. LUPO: Okay. You had one other point

1 you wanted to make, you said?
2      MR. BELLOLI: Yes. In addition to thanking
3 the three of you for taking the time and serving on
4 this, just to kind of put a bow on this whole thing,
5 we've shown that in all of these patents there were
6 technological problems that were overcome by
7 technological solutions.
8      We've shown that preemption wasn't a
9 problem and we've shown that these aren't conventional
10 or generic and, to the extent you want to say the
11 components are, that's not relevant and all the facts
12 on those points are in IV's favor. The specifications
13 support that. The claims themselves support that. The
14 expert declarations support that and, really, all
15 Capital One comes with are these inapt analogies that
16 have nothing to do with what's going on in the patent
17 and just saying their claims are conventional.
18      And sometimes they want to put two claims
19 next to each other without -- and taking snippets of
20 claims. That's not the proper analysis either. You
21 have to dig into what these are directed to. You do

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 340

1 that by first looking at the claim and then looking at
2 the specification to determine what was overcome, what
3 was the advancement in the art and that's -- what is so
4 important in Section 101 jurisprudence is not just
5 taking something that's admittedly known in the
6 specification and putting it on a computer, which is so
7 many of the claims that have gone down.
8     It's the ones that are advancing the art or
9 at least purporting to advance the art and you'll find
10 out under 102 and 103 later that that passed mustering.
11     All of these patents fall into that bucket
12 and all of the facts on that go in IV's favor and
13 certainly, for purposes of summary judgment, have to be
14 assumed in IV's favor at least with respect to Capital
15 One's motion because all facts have to be assumed in
16 our favor on a summary judgment motion.
17     So, again, the specs go in our favor, the
18 expert testimony goes in our favor and there's nothing
19 that thwarts this idea that these patents were
20 advancing the art as opposed to taking, you know, an
21 idea of risk hedging and throwing it on a computer and

Page 341

1 that is why we would ask you to recommend that Summary
2 Judgment be denied as to Capital One's motion and the
3 cross motion granted because, again, really, all of
4 those facts that we put forward haven't been thwarted
5 or contested or controverted and that, we think, is why
6 the cross motion should be granted as well.
7     MR. LUPO: Thank you.  Anything further
8 before we finish?
9     MR. HOMRIG: Yes.  Thank you very much.
10     So, first of all, focusing on the '084
11 patent, that patent is much more like Flook than any of
12 the other patents we looked at in terms of the claim
13 that was the issue there.  And just like calculating
14 the alarm limit, updating the alarm limit in that case
15 wasn't enough.  It's not enough here to simply throw
16 out the idea of gathering conventional data in a field
17 of use just like Flook did in a field of network based
18 instead of host-based.  But gathering conventional
19 data, analyzing it in some way that the claim doesn't
20 limit beyond general categories and then saying, well,
21 update the devices here and there to let them know what

Page 342

1 you've decided.
2     That's the level at which the claim is
3 claimed and that's specifically on a -- we heard from
4 counsel, I think another test that's being offered as
5 to how to resolve 101.  So I think it's useful to go
6 back to slide 20.  I apologize.  I wrote down the wrong
7 one.  We should go back to the basic test in Alice.
8     MR. LUPO: We're back on 409?
9     MR. HOMRIG: I apologize.  I gave the wrong
10 slide number.  I want to do is go back to what the test
11 actually is.  It's not technological environment.  It's
12 not anything other than what's set forth in Alice which
13 is first --
14     MR. LUPO: We're talking about Alice, not
15 the '002 patent?
16     MR. HOMRIG: Yes, sir.  This is to
17 address -- it certainly applies to every one of the
18 patents we have here.  But it addresses some of the
19 arguments we've heard today, all from cases that we
20 have to look at preemption, we have to look at
21 technological environment -- technological problem and

Page 343

1 solution as though that's the test.
2     This, on slide 4, is the test from the
3 Supreme Court.  This is how this issue was resolved and
4 with respect to the machine or transformation test
5 which is, I believe, what I meant to refer to on slide
6 20 -- actually, I'll just leave it.
7     With respect to the machine or
8 transformation test, the issue there is not whether
9 there's any device involved.  It's whether it's a
10 specific machine.  That's the question and that isn't
11 true in the '084 patent, that it's limited to a
12 specific machine.  All we have are generalized devices
13 and that's simply not enough.  And I apologize, I
14 messed up the lectern screen.
15     Let me just pull it off onto that and
16 direct your attention to me which is that the '084
17 patent by mining device is by referencing a firewall by
18 putting those in those terms.  That's not tying it to a
19 specific system.  That's what the machine or
20 transformation test requires.
21     So the suggestion that somehow it's just

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

Page 344

1 you look for any device, that's not right.  That's not
2 how Alice applied the -- excuse me, that's not how
3 Ultramercial applied the test.  That is not the test.
4     So for all of these reasons, we submit that
5 the motion -- Capital One's motion should be granted.
6 For the reasons they say, whatever factual issues they
7 argue, that standard applies to them on their cross
8 motion, of course, although, as we said, this is a
9 legal issue and one that should be resolved by the
10 court at this stage.
11     So unless you have any further questions,
12 we submit the motion.  Thank you very much for the long
13 day today.  We appreciate the attention of everyone
14 attention on both sides, I'm sure.
15     MR. LUPO: Very good.  Thank you.
16     MR. BELLOLI: 30 seconds?
17     (Laughter.)
18     MR. LUPO: 30 seconds.
19     MR. BELLOLI: Two points.  One, Flook was
20 patenting a mathematical algorithm.  That's not what's
21 being patented here.  Then the idea that this --

Page 345

1 looking whether there is a technological problem and
2 solution isn't part of the two-step test?  No, it is.
3 It's part of Alice.  This is what told you -- this is
4 the parts of Alice that told how you know if there is
5 an abstract idea.  It says at the bottom, inventive
6 concept.  That's the second prong.
7     All of this is part and parcel of the
8 two-prong test.  Thank you.
9     MR. LUPO: Thank you.  I'd just like to
10 note for the record that the advocacy here was, in my
11 opinion, I think the three us, excellent today.  The
12 briefs that we received have been excellent and I want
13 to thank everyone for really a very good presentation,
14 both the tutorial and the second half of the session.
15 So thank you.
16     (Trial concluded at 5:42 p.m.)
17
18
19
20
21

Page 346

1 State of Maryland
2 County of Baltimore, to wit:
3     I, R. DWAYNE HARRISON, a Notary Public of
4 the State of Maryland, Baltimore County, do hereby
5 certify that the within-named proceedings took place
6 before me at the time and place herein set out.
7     I further certify that the proceedings were
8 recorded stenographically by me and this transcript is
9 a true record of the proceedings.
10     I further certify that I am not of counsel
11 to any of the parties, nor an employee of counsel,
12 nor related to any of the parties, nor in any way
13 interested in the outcome of this action.
14     As witness my hand this 27th day of
15 April 2015.
16
17     _____
18     R. DWAYNE HARRISON
19     Notary Public
20 My Commission Expires:
21 September 15, 2017

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

# A

**able (5)**
241:8;258:12;278:18,19;
287:17
**absolute (1)**
242:8
**Absolutely (7)**
203:14;204:2;222:10;
224:6;242:12;244:1;314:19
**abstract (94)**
178:7,12;179:3,4;180:7;
181:6,21;182:11;183:20;
189:11,19;190:10,12,15,16,
17;192:10;193:17;194:8;
195:8,13;201:6;209:20;211:4;
212:7;214:1,19;220:8;224:21;
225:2,3,13;226:8,11,15;
227:1;233:13,14;235:17;
243:14;245:12;248:1;250:19;
251:3;255:11,21;256:11,18;
258:2;259:7;263:2,11;270:8,
13,15,18;273:16;274:10,13,
18,20;277:12;284:12;288:14;
291:7,19;299:20;302:17;
303:1,4,15;304:11,15;305:5;
317:7;318:7;319:17;320:2,17,
18;323:2;324:20;329:12,20,
21;330:1,2,4,12;331:19;
334:17;337:7,8;345:5
**abstracting (2)**
194:19;240:7
**abuse (2)**
292:16;295:11
**Accenture (3)**
217:5;269:11,11
**accepted (1)**
211:14
**access (56)**
193:19,21;194:3,3,7;
195:14;196:2,8,9;197:10;
198:18;199:4,9,10;205:18,20,
21;206:14,18;207:2,12,19;
208:12;209:4;210:7,9,10,12,
16,16;211:11,20;212:1,1,12,
14;226:1;239:13,16;241:12;
242:3,6;245:3,4,5,7,7;246:8,
18,19,20;264:17;268:16;
269:19;307:11;308:7
**accesses (1)**
211:7
**accessible (2)**
308:11;312:1
**accessing (8)**
197:5,8;199:12;211:5;
212:8;242:9;293:20;312:3
**accomplish (2)**
184:12,14
**accord (1)**
245:10
**accordance (6)**
194:7;195:16;196:12;
211:6;212:9;242:11

**according (12)**
208:4,5,13;211:21;212:2;
260:10;261:17;265:15;270:9;
294:10;298:8;314:11
**accordingly (2)**
332:18;333:2
**account (1)**
181:11
**accounts (2)**
181:8;293:12
**accurate (2)**
229:21;270:16
**achieve (4)**
265:2;266:14;270:3,3
**acknowledge (2)**
237:6;298:11
**acknowledged (2)**
292:21;314:17
**acknowledges (2)**
197:17;292:21
**across (8)**
318:13;319:4;332:17,19;
333:2;334:2,4;335:7
**act (1)**
277:17
**action (3)**
211:21;215:3;346:13
**actions (2)**
295:5;327:8
**activity (3)**
322:3;323:7;327:20
**actual (6)**
201:17;225:18;276:7;
316:10
**actually (54)**
177:17;183:18,21;184:7;
192:2;196:21;198:12;201:18;
204:11;206:4;208:18;213:3,
15;214:4;218:19;231:4;
238:8;244:15;251:16;253:5,
13;257:2,6;258:10,21;268:1,
18;269:2,6,16;275:3;286:18;
287:9,15;288:2,19;300:18;
301:10;306:1;307:7;314:8;
320:5,18;324:3;325:3;326:12,
15;327:16;328:8,14;332:10;
338:8;342:11;343:6
**ad (6)**
185:11;199:2,3,8,10,11
**Adam (2)**
183:21;286:17
**ADAMO (1)**
176:5
**adapted (1)**
316:2
**add (3)**
178:18;215:2;264:20
**added (1)**
246:10
**adding (1)**
250:20
**addition (3)**

336:17,20;339:2
**address (27)**
184:9,18;185:20;203:1,1;
220:5;222:13;244:4;254:21;
263:14;267:21;275:7,8,10;
277:21,21;285:14,14;286:17;
298:3,5;299:13;304:6,13,13;
314:6;342:17
**addressed (10)**
183:7;220:21;241:18;
268:10;291:4;321:6;323:21;
327:2;338:6,14
**addresses (2)**
216:6;342:18
**addressing (4)**
184:3;188:15;267:2,14
**adds (4)**
178:14;185:12;272:16;
295:7
**adjust (7)**
332:9,17;333:2,3;334:7;
336:1,4
**adjusting (5)**
181:10;182:7;330:19
**admittedly (2)**
245:1;340:5
**adopt (1)**
204:14
**adopted (1)**
311:20
**advance (3)**
225:21;288:10;340:9
**advanced (1)**
324:11
**advancement (1)**
340:3
**advancing (2)**
340:8,20
**advertisement (4)**
236:16;237:3;245:2;250:7
**advocacy (1)**
345:10
**advocating (1)**
272:1
**affected (5)**
317:11;322:4;332:6;335:9,
20
**afoul (1)**
291:6
**again (108)**
177:3,14;193:7;198:20;
206:20;209:19;212:1,7,12;
217:19;223:14;226:7,14;
230:11;231:9;232:9;233:19,
20;234:12;235:15;237:8,18;
241:14;242:7,16;245:20;
246:13;249:2,5;250:5,11;
260:6;262:5,13;263:7;264:1;
266:2,20;267:7;275:10,19,20;
277:9;278:1;280:1,8;281:21;
282:8,12;283:7;284:2,8,14,
17;285:3,7,10;286:21;291:13;
295:4,13;297:12;298:2,4;

303:7;304:7,11,15;305:7;
306:2,18;307:1,6,15,18,20;
308:14,21;309:7,12;310:11;
311:20;316:5,19;319:18;
321:15;323:8,13;324:1,5,11;
326:9;330:10,11;331:11,17;
332:1;333:4,14;334:14;
335:12,13;336:9,11,14;337:1;
340:17;341:3
**against (3)**
241:1;244:21;252:16
**age (5)**
187:8,8;189:5;205:16;
228:4
**agent (1)**
307:19
**ago (3)**
196:17;225:15;331:18
**agree (5)**
203:8,9;211:12;328:13;
333:19
**agreed (4)**
204:13;205:1,2,5
**agreement (1)**
212:14
**ahead (5)**
184:1;192:2;241:20;295:1;
297:11
**air (1)**
194:5
**akin (1)**
205:16
**Alappat (1)**
217:16
**alarm (5)**
319:14;322:6,18;341:14,14
**alarm-limit (1)**
319:14
**albeit (1)**
329:2
**Alberti (1)**
304:18
**alert (5)**
330:8;332:8;333:3;334:6;
335:21
**alerting (6)**
319:6;322:4;323:8;330:19;
333:11,11
**algorithm (2)**
319:13;344:20
**algorithms (3)**
317:16;321:5,7
**Alice (82)**
177:21;178:6;179:2,3,4;
182:14,15;184:13;187:14;
188:8;191:17;192:4;194:14,
14;195:1,2,10;200:11,14,15;
203:17;206:20;207:4,10,16;
208:5;209:2;212:6;213:9,9,
10;214:9;218:1;220:5;
223:19;225:13,14;226:5;
233:9,14;234:10;235:16;
237:1,13;243:7,11,11;249:3;

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

253:14;262:4;264:2,9;265:3;
270:9;273:15,15;274:16;
284:16;286:10;289:20;
290:14;293:12;295:19;
298:21;299:1,19;303:15;
304:4,9,14;305:2,5;306:4;
319:20;321:16;331:19;342:7,
12,14;344:2;345:3,4
**Alice's (2)**
207:17;208:17
**alleged (1)**
178:9
**allocates (1)**
329:16
**allow (1)**
264:15
**allowed (2)**
211:9;277:16
**allowing (5)**
196:8;198:17;199:8,10;
263:17
**allows (3)**
264:19;280:3,6
**almost (6)**
190:5;192:21;195:17,18;
203:20;277:2
**along (1)**
286:6
**Although (5)**
181:15;198:10;220:2;
257:11;344:8
**altogether (1)**
248:15
**always (9)**
180:16;185:4;196:14;
246:7;259:6;265:5;275:12;
282:15,16
**Amazon (1)**
185:3
**amount (1)**
222:16
**amounted (1)**
180:16
**analogies (9)**
239:21;240:1,3,7,9,14,16;
279:5;339:15
**analogize (1)**
240:5
**analogized (1)**
240:2
**analogous (6)**
184:16,17;213:12;214:4,4;
215:20
**analogue (11)**
187:11;188:12;205:19;
240:11,15;252:8;278:5;279:5;
280:8;285:1;306:12
**analogues (1)**
187:16
**analogy (6)**
225:18;235:2;240:18;
278:6,7;279:2
**analysis (22)**

202:10;208:17;209:1;
213:19;217:7;254:9;265:20;
284:15;290:14;318:18,19;
319:20;320:12;321:5;322:13;
330:20;332:7,18;333:4;
334:10;335:19;339:20
**analyze (2)**
321:11;335:7
**analyzed (1)**
331:9
**analyzing (9)**
317:8;318:11;319:2;
322:17;323:16;330:18;333:9;
336:16;341:19
**and/or (1)**
314:21
**anomalies (8)**
330:17;332:7;334:3,9;
335:6,21;336:7,16
**anomaly (5)**
317:9,11;319:3;335:10;
336:1
**answered (1)**
315:13
**ANTHONY (1)**
176:17
**anticipate (1)**
334:4
**anticipated (4)**
319:5,7;322:14;335:9
**anticipating (2)**
332:5;333:11
**apart (3)**
240:6;246:12;308:10
**apologize (6)**
210:3;297:1;314:8;342:6,9;
343:13
**apparatus (2)**
179:5;208:10
**appeal (1)**
183:17
**APPEARANCES (1)**
176:1
**appears (1)**
312:7
**applicable (1)**
274:18
**application (6)**
178:19;207:15;243:4;
265:15;290:17;295:9
**applications (1)**
274:14
**applied (7)**
179:1,2;299:1;318:8;
320:13;344:2,3
**applies (7)**
178:7,8;224:6;299:7;
323:18;342:17;344:7
**apply (12)**
180:17;182:19;221:4,12;
223:20,21;258:21;287:18;
288:19;297:4;321:20;325:3
**applying (13)**

177:19;193:8;200:14,15;
209:2,2;220:3;253:13;260:11,
12;287:18;289:4;324:17
**appointments (1)**
311:8
**appreciate (1)**
344:13
**approach (7)**
177:6;213:3,5;215:9;219:6;
223:7;284:16
**approaches (1)**
221:11
**appropriate (3)**
202:5;222:16;271:19
**April (1)**
346:15
**apt (6)**
224:18,19;228:7;240:4,9,21
**architectural (2)**
241:15;244:10
**argue (4)**
304:4;331:11,13;344:7
**argued (2)**
265:9,14
**arguing (6)**
228:9;232:11;268:5,6;
277:2;299:17
**argument (51)**
181:1;192:3;216:15,16;
217:6,9,10,11,19;218:1,20;
219:1,3,13;220:15;231:16;
232:10,20;260:8;261:12;
264:1,3,3;265:6,7,16,20;
268:4;269:16;274:5;275:7,19;
277:3,6;283:18;285:16,20;
289:2;293:17;295:14;297:11;
300:8,9,19;302:9;320:4;
322:12;324:2,4,10;335:12
**arguments (21)**
179:16,19,20;199:20;
202:12;212:16;213:2;216:7;
231:6;263:12,14;274:1;
275:17;285:15;297:19;
302:10;303:5;305:7;323:20;
330:9;342:19
**arise (1)**
306:8
**arises (3)**
188:16;275:15;306:15
**arose (2)**
187:7;282:9
**around (8)**
187:19;190:19;196:13;
201:19;209:7;233:11;262:6;
278:11
**arrange (1)**
280:12
**art (27)**
183:13;203:2,4,7;216:1;
219:9,9,16;224:2,11;225:21;
229:17;234:15;235:10;
239:13;243:16;245:4;250:21;
273:7;328:1;332:3;333:13;

338:14;340:3,8,9,20
**article (4)**
208:15;251:7;294:16;
301:14
**articles (2)**
228:14,15
**aside (2)**
276:5,20
**aspect (4)**
235:15;242:21;309:3;316:1
**aspects (6)**
307:21;320:19;326:19;
332:13;335:4;336:10
**aspiration (1)**
294:8
**aspirational (3)**
305:18,21;306:2
**asserted (7)**
208:10;216:3;222:2;
252:15;255:8;322:10;335:19
**assessed (1)**
190:7
**asset (1)**
280:16
**assorted (1)**
259:3
**assumed (3)**
287:3;340:14,15
**attacked (1)**
332:21
**attacks (1)**
332:16
**attempted (1)**
197:10
**attempting (1)**
189:16
**attempts (2)**
202:8;219:7
**attention (6)**
203:2;252:13;271:17;
343:16;344:13,14
**Authority (2)**
186:17;252:12
**authorized (4)**
197:15;241:18;247:1,2
**automated (1)**
181:12
**available (1)**
237:6
**averements (1)**
233:21
**aware (6)**
202:14,17,18;234:4,7;
294:17
**away (1)**
274:7

**B**

**BACHINSKI (1)**
176:19
**back (33)**
191:17;196:7;200:9,12,21;

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

230:3,9,20;231:15;234:16;
254:11;263:20;274:5;276:11;
278:4;279:12;280:21;281:18;
282:12;283:19;299:3;302:10;
305:8;306:11;308:17;316:7;
321:7;329:19;331:17;342:6,7,
8,10
**background (2)**
198:5;268:9
**balance (13)**
178:14,17;180:10,11;
195:19;211:10;214:18;220:9;
272:16;294:13;320:2;321:14;
322:1
**balances (1)**
181:11
**Baltimore (2)**
346:2,4
**Bancorp (2)**
261:5;321:16
**bank (1)**
279:11
**bare (1)**
233:3
**Bartons (1)**
196:16
**based (19)**
198:18;216:13;232:2;
258:7;282:6;283:14;318:9;
328:15,20;329:17;330:20;
332:7,18;333:4;334:9;338:9,
11,19;341:17
**basic (20)**
184:11;202:2;206:13;
209:20;211:4,18;212:7;260:4;
263:1,11;290:20;291:4;
292:10;294:21;295:2,11;
314:5;320:18;323:2;342:7
**basically (11)**
185:14;198:15;221:19;
236:17;243:7;284:20;293:13;
309:1;319:1;321:20;336:4
**basis (4)**
237:2;238:19;277:18;
279:21
**BASSETT (1)**
176:16
**bear (1)**
283:18
**bears (1)**
220:17
**Beauregard (1)**
218:9
**become (1)**
282:17
**bedrock (2)**
235:16;301:11
**beeps (1)**
301:2
**begin (1)**
223:16
**beginning (8)**
254:4;271:4,5;276:11;

302:10;326:19;329:19;332:1
**BEHALF (1)**
176:3
**behavior (1)**
240:3
**behind (4)**
200:1;236:10;238:5;307:21
**belabor (4)**
207:18;224:5;248:9;309:5
**BELLOLI (35)**
223:7,11,11,16;225:11;
227:15;228:6;231:20;234:7;
235:7;239:15;247:14;248:9;
253:18;254:1,15;273:3;
276:10;283:3;299:16;301:16;
310:1,7;311:17;312:15;315:9,
11;328:11;337:18;338:1,4,16;
339:2;344:16,19
**below (1)**
197:9
**beneficial (1)**
186:9
**benefit (1)**
223:15
**Benson (2)**
178:15;318:6
**best (3)**
234:1;263:9;289:15
**better (4)**
177:9;273:4,7;309:19
**beyond (4)**
188:21;191:12;202:2;
341:20
**big (4)**
274:13;275:11;313:16;
332:20
**Bilski (3)**
201:18;299:19;324:11
**binding (1)**
252:11
**bit (7)**
177:8;187:2;190:20;
199:19;262:4,7;289:11
**bits (2)**
208:8;215:7
**block (4)**
225:4;273:20;336:5,5
**blue (1)**
250:15
**body (2)**
311:15,18
**bolster (1)**
202:9
**booklet (1)**
270:6
**bookmark (1)**
293:10
**books (1)**
292:1
**boot (1)**
327:6
**both (24)**
206:19;212:2;243:10;

244:2;249:3;253:11;268:20;
280:2;298:16;299:19;300:13;
302:5;312:16,20;317:5,12;
318:4,5,10;323:5;331:6;
334:12;344:14;345:14
**bottom (10)**
218:16;246:16;247:12;
249:21;252:14;308:19;309:7;
317:15;335:2;345:5
**boundaries (1)**
190:19
**boundary (1)**
243:13
**bounds (1)**
286:11
**bow (1)**
339:4
**boxes (2)**
206:3;331:20,21
**break (6)**
182:17;185:19;223:14;
249:13;254:11;258:13
**breaking (3)**
257:7;266:21;298:3
**breaks (1)**
198:15
**breathes (1)**
315:20
**brevity (1)**
307:8
**brief (9)**
205:15;244:4;247:15;
250:1;265:9;271:13,14;298:6;
328:16
**briefing (24)**
177:15;196:16;202:13;
209:12,14;212:16,21;213:11;
216:19;221:1,3;224:5;229:2;
239:11;247:20;257:11;
261:13;272:5;279:2;283:9;
293:1;295:3;308:21;317:5
**briefly (3)**
184:9;255:7;272:19
**briefs (4)**
265:19;271:14;289:2;
345:12
**brilliant (1)**
220:14
**bring (2)**
199:18;281:12
**bringing (1)**
245:20
**broad (1)**
303:1
**broken (1)**
179:14
**brought (3)**
201:2;234:10;334:15
**bucket (1)**
340:11
**build (3)**
216:20;271:7;303:14
**building (2)**

225:4;273:20
**buildup (1)**
225:20
**built (1)**
226:1
**bunch (5)**
198:12;200:13;258:11;
277:7,16
**burden (4)**
223:17;230:12,17;231:4
**burn (1)**
206:3
**business (1)**
263:6
**button (2)**
206:5,7
**buy (1)**
297:16
**buying (1)**
277:5

**C**

**calculate (1)**
319:13
**calculating (1)**
341:13
**calculations (1)**
232:19
**California (1)**
213:8
**call (8)**
213:8,10,20;252:13;262:11;
289:21;316:1;333:1
**called (6)**
263:15;266:10;271:17;
317:6;318:6;325:10
**call-out (3)**
186:14;213:16;255:18
**came (7)**
185:9;207:10;229:6;
241:20;275:20;281:3;282:9
**camera (1)**
298:4
**Can (70)**
177:9;179:12;184:1,4;
186:20;187:17;188:4;190:6;
191:7;193:4;194:2,3,12;
195:17;198:1;203:12;206:7,
18;210:17;212:1;216:4;
222:13;223:4;230:19;237:20;
239:1;240:2,3,11;242:12,19;
247:11;248:15;253:10,10,10;
254:1;263:6,8;269:11,19;
273:20;274:21;280:17;282:7;
287:1;289:6,9;292:11;293:18;
296:4,18;300:15,21;301:4,18;
302:12;306:8;307:13;315:11;
316:20;317:16;320:8,20,21;
321:9;329:10;331:20,21;
336:12
**capable (4)**
293:20;300:15;301:5;312:2

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

**Capelli (1)**
283:4
**Capital (65)**
177:2,5;201:4,10;204:13;
214:15;224:6,21;226:12,13;
227:4;228:20;230:2;231:6,16;
232:11;236:2,12;239:9,21;
240:8;242:18;244:3;246:12;
247:5;248:3;249:8,17;250:6;
251:7;252:16;254:9;265:20;
273:19;274:19;275:17;277:2,
5,12;279:2,11;281:12,19,20;
299:16;301:7;303:6;305:1,10;
308:21;310:4;315:16;329:13,
21;330:9;331:6,11,20;333:18;
334:15;336:12;339:15;
340:14;341:2;344:5
**Capitol (1)**
309:10
**card (1)**
292:5
**carefully (2)**
180:3;253:2
**carried (3)**
232:16;294:2;326:15
**carry (3)**
218:14;261:11;267:7
**carrying (3)**
261:14,15;293:7
**case (87)**
179:21;182:13,14;184:13;
188:19;190:10;192:16;197:6;
198:9;199:15,20;200:2,10;
202:4,6,9,18;205:13;206:4,
20;213:1,7,13,14,18;214:3,16;
215:14;216:8;217:5,11,16;
218:2;220:19;221:21;224:4,5;
225:8;228:18,20;232:13;
233:19;237:16;238:21;
244:20;247:18;250:6;252:3,4,
5,5,12,18;254:6;255:18,19,20;
256:13,17;257:4,20;258:2;
259:13;261:5,6;262:4;264:3;
272:1;276:1,1;285:16;290:7,
15;291:8,11;294:17;296:19;
298:12,13;309:16;310:12;
314:13;316:9;328:14,17;
336:19;341:14
**cases (30)**
187:3;189:9;195:11;199:2;
202:14,19;223:19;226:5;
227:10,19;234:4;238:8,17,18;
249:16;250:3;252:1;254:2;
265:21;266:4;284:10;285:7;
295:13;297:20;299:7,20;
302:13;309:11;314:11;342:19
**cast (2)**
232:14;243:20
**catalog (2)**
292:5;306:3
**cataloging (4)**
284:11;305:15,16;306:13
**Catalogs (1)**

306:13
**catching (1)**
318:10
**categories (16)**
189:8,20;271:3;290:6;
300:12;302:18;303:15;304:4,
12;310:5,11;311:4;312:12,14,
20;341:20
**categorizing (1)**
261:16
**category (1)**
303:4
**cause (1)**
225:6
**causes (1)**
218:13
**center (3)**
321:7;323:16;336:15
**Central (1)**
213:7
**certain (2)**
280:18;285:11
**certainly (17)**
178:3;183:7;192:5;222:13;
257:11;271:2;273:10;291:21;
300:15;315:19;326:19;
327:15;328:7;330:16;331:5;
340:13;342:17
**certify (3)**
346:5,7,10
**challenge (3)**
302:19;310:4;315:3
**challenged (3)**
209:13,15;246:4
**challenging (2)**
314:18,20
**chance (1)**
281:14
**change (5)**
186:1;188:9;209:1;259:14;
266:21
**changed (7)**
183:1,3;215:7,11;262:8;
278:16;280:20
**changes (1)**
307:12
**changing (1)**
278:2
**characteristic (1)**
189:13
**characteristics (3)**
189:12;192:16;270:17
**characterization (1)**
212:20
**check-box (2)**
189:3,7
**Chicago (1)**
176:8
**chimed (1)**
220:12
**chorus (1)**
302:21
**chose (1)**

297:4
**cipher (1)**
196:19
**Circuit (35)**
183:17;198:7;199:16;
200:9,15;201:18;202:19;
208:3,5;215:15;217:5,8;
218:8,18;220:12;237:16;
252:3,5,5,20;253:1;255:19;
256:12,16;261:5,18;265:10,
16;267:5;287:8;290:3;291:1;
297:20;299:7;324:12
**circumstance (1)**
202:5
**citation (2)**
299:5;301:15
**citations (2)**
271:15;272:7
**cite (2)**
218:3;228:13
**cites (1)**
224:5
**citing (1)**
249:17
**claim (264)**
179:10,15,17;180:4,6,13,
21;181:2,9,21;187:15;191:2;
192:5,6,19;193:5;194:10,10,
11,11,15;195:12,18,19;196:8;
197:1;198:13,13,15,18;199:3;
200:20,21;202:8;204:9,15,16,
21;205:2,5,11;206:17;207:10,
13;208:8,9,10,14;209:5,10,10,
12,19;210:4,5,11,18,19,20;
211:5,10;212:6,7,11;213:17;
214:5,6,18,18;215:1,5,12,18,
21;216:2,2,14;218:7,19;
220:9,19;222:1;227:7;228:10;
229:14,15;231:2,7,17;232:1;
234:12;235:3,9,20;237:1,9,
11;242:9;243:12,15;245:12,
15;246:15,16,16,16,18;247:4,
17;248:7,15,16;253:6,9;
255:6,9,15;256:2,4;257:1,4;
258:5,18;259:1,2;261:3,4,9,
20,21;262:16,16,17;263:20,2,
3,4;264:8;267:6;269:3,3,6;
275:3,21;276:3,3,7,18,21;
277:6,10;283:6,6,11,12,15,17;
285:18;287:9,11;288:5,13,19;
289:1;290:4,5,8,18,21;291:1,
2,2,3,4;292:9;294:6;295:4,7,
10,16;296:6;301:20;307:20,
21;308:3,18,19,20,20;309:2,3;
310:19;311:6,14,15,18;
313:15,20;314:7,10;315:16,
21;316:9,14;317:5,21;318:1,
8,11,15,19,20,21;319:1,7,16;
320:3,8,16;321:6,14,16,16;
322:7,9;323:11,12;325:1,3,
14;326:12,13,15;327:10;
328:2,4,8,12,17;329:1,5,9,15,
15;330:13,21;331:10,21;

333:5;334:12,13;335:1,2,5,13,
15,18;336:15;338:11,12;
340:1;341:12,19;342:2
**claimants (1)**
258:2
**claimed (27)**
177:17;183:8;185:18;
193:1;198:11;206:15;216:1;
217:17;218:19;238:5,7;239:1;
245:13,15;250:2;251:5;
264:12;266:17;272:11;
287:19;293:6,15;294:9;302:1,
4;310:9;342:3
**claiming (4)**
232:6;235:13;310:13,14
**claims (162)**
177:17,20;178:10,11,13,14,
17;179:9,11;180:10,13;182:7,
9;183:14;192:4,11;194:19;
199:16,17;201:6;203:5;207:5;
208:11,16;209:13;213:21;
214:8,10;215:19,20;216:3;
217:4,6,8,11;218:3,8;219:8;
222:5;225:12;226:16,20,20;
227:21;230:16;231:1;235:4,8,
9,12,19;236:8,17;237:18;
238:5;239:6,6;242:20;244:18;
246:12;247:5,6,8,21;248:5,6,
10,13;249:4,20;250:12,18;
251:2,5;253:6;255:8,9;257:3;
259:2,3,21;262:15;265:10;
267:8,8,13;268:12,19;269:12,
15;276:3;277:4,4;283:7;
287:8;288:6;289:18;290:1,15,
18,20;291:15,18;293:14;
294:3;295:2;296:1;300:10;
302:19;308:5;309:4,8,10;
310:3,4;311:8;313:4;9;317:4,
4,12;322:10;323:1,3,7,10;
324:5,9,19;326:4,11;327:11;
329:3,10;330:7;331:14;
332:10,11,12,13;333:5,6,20,
21;334:7;335:4,15,19;336:9,
10,12,13,21;337:2,3,4,7;
339:13,17,18,20;340:7
**classic (1)**
204:8
**classification (1)**
269:12
**classified (1)**
205:17
**clear (25)**
177:21;188:20;204:13;
220:18;221:16,20;222:3,7;
223:17,20;225:1;230:12;
237:14,14,15;241:11;242:9;
243:9;251:4;268:5;269:9;
271:20;274:8;295:3;306:19
**clearance (1)**
205:18
**cleared (1)**
236:9
**clearly (2)**

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

208:11;338:9

**click (1)**
185:13
**clicked (1)**
185:11
**clicks (2)**
185:3;186:2
**close (1)**
237:17
**closely (1)**
205:18
**code (3)**
325:15;327:2,7
**coding (1)**
213:21
**coextensive (1)**
334:14
**coinciding (1)**
183:16
**colleagues (2)**
278:19;280:11
**collecting (3)**
257:21;258:19;262:9
**collection (2)**
323:15;336:15
**collectively (3)**
218:15;294:14;323:6
**colors (1)**
249:4
**column (5)**
197:18;300:17;307:1,9;
321:3
**columns (2)**
276:6;305:19
**combat (1)**
242:13
**combination (1)**
190:5
**combining (1)**
256:7
**coming (7)**
243:16;332:7,18;333:1,10;
335:21;336:8
**comment (1)**
252:6
**commented (1)**
181:7
**commenting (1)**
209:3
**comments (1)**
323:21
**commerce (4)**
225:6;228:14,15;286:9
**commercial (2)**
189:17;239:2
**Commission (1)**
346:20
**common (2)**
189:12;307:10
**communicating (1)**
193:3
**communication (2)**
326:21,21

**communications (3)**
192:14;195:6;207:2
**companies (3)**
187:21;229:7,7
**company (2)**
206:4;252:14
**compare (1)**
249:20;250:2
**comparing (1)**
337:2
**Comparison (2)**
207:9;250:3
**competing (1)**
316:16
**completely (11)**
219:20;231:7;236:1;245:3;
250:8;274:19;277:19;281:16;
304:8;305:1;313:11
**complex (3)**
206:11;259:6;333:4
**component (6)**
257:7;258:13;264:17;
284:4;287:20;288:3
**components (23)**
180:12;192:7,12,19;195:3,
4;207:16;211:19;226:10;
227:21;231:1,18;232:1;237:9;
261:13,14,15;264:16;269:21;
287:17,21;288:16;339:11
**composite (1)**
179:14
**comprise (1)**
263:6
**comprising (1)**
315:19
**computer (81)**
180:11,15;181:8,14,17;
182:1,1;183:2;187:8,8,21;
190:13;192:15,21;193:9,10,
16;207:3;211:13,18;212:13;
215:9;217:14,18;218:9,13;
227:12,14,16;228:2,4;230:2;
231:18;232:4,5,16,17,18;
233:5,6;234:6;238:9,10,13,13,
14,15;246:6;249:7;254:5;
258:9;261:3;264:5,9,12,15;
266:7;275:1;281:9;287:17;
288:16;293:20;297:15,17;
303:17;306:9;309:18,19;
310:14;318:12,14;321:17,18,
18,20;323:6;326:20;327:5,7;
340:6,21
**computerized (9)**
178:8;180:17;181:10;
192:8;209:6;218:5;236:19;
252:7;285:12
**computers (8)**
180:15;208:20,21,21;240:2;
275:2;306:15;319:5
**computing (4)**
214:21;237:9;255:5;312:2
**conceivable (1)**
259:11,16

**conceivably (1)**
204:16
**concept (46)**
198:5;201:7;205:17;215:2;
220:10;231:8;233:16;237:4,5;
245:16,17;246:17;247:5,8,17;
248:2,11,11;250:1;251:1,3;
257:21;258:17,21;262:20;
263:16;265:13;272:17;273:5;
282:2;283:12,16;297:14;
304:11;308:13,17,19;309:2,8,
9;334:13;335:3;336:11;337:2,
10;345:6
**conception (1)**
294:7
**concepts (8)**
227:1,2;250:16;256:21;
260:5;268:17;276:14;329:2
**conceptual (1)**
264:7
**concern (3)**
274:9;328:7;334:20
**concerning (1)**
193:19
**concerns (1)**
220:6
**concluded (1)**
345:16
**conclusion (2)**
250:18;272:15
**conclusions (4)**
272:14;300:4,6,7
**concrete (1)**
301:12
**conditions (1)**
204:15
**conference (1)**
197:2
**confirmed (1)**
178:6
**conflates (1)**
276:2
**conflating (1)**
288:21
**confused (1)**
190:3
**confusing (1)**
235:6
**connected (1)**
227:12
**connects (1)**
302:8
**consent (1)**
245:6
**consider (5)**
194:12;203:11,12;294:13;
325:2
**consideration (2)**
205:5;234:5
**considered (9)**
179:4;218:1,8,18;248:14;
261:6;271:21;277:9;314:3
**considering (1)**

202:15
**consistent (6)**
271:18;280:5;281:6;282:8;
283:1;288:8
**consistently (2)**
257:17;280:5
**consisting (1)**
301:13
**consists (1)**
211:11
**constant (1)**
266:12
**construction (21)**
204:10,16,21;205:2,3,6,11;
206:17;229:14;234:13;235:3;
269:3;293:17;295:6;296:10,
14,20;307:20;311:21;316:9,
14
**constructions (1)**
311:21
**consumer (1)**
199:9
**contain (5)**
201:6;227:2;248:1;250:16;
323:6
**containing (2)**
218:10;232:4
**contains (2)**
273:6;323:5
**contemplating (1)**
286:11
**content (12)**
208:20;237:4;250:8;
257:20;265:7;267:21;284:19,
20,21;285:4;287:9;291:12
**contents (2)**
328:20;329:17
**contested (1)**
341:5
**context (25)**
180:17;185:8;192:21;
193:9;200:20;201:15,15;
204:10,17;205:11;206:1;
214:2,21;215:10;224:1,10;
227:15,16;234:6;260:7;
269:20;282:5;313:12;316:15;
328:2
**contexts (1)**
295:15
**contingent (1)**
199:2
**CONTINUED (1)**
176:1
**continues (1)**
212:10
**contradict (2)**
251:8,9
**contradicting (1)**
237:17
**contrary (3)**
232:12,13;252:6
**control (5)**
193:4;239:19;245:7;

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

246:20;325:20
**controlled (1)**
239:18
**controller (5)**
192:14;195:6;207:3;
211:16,17
**controlling (1)**
205:18
**controverted (1)**
341:5
**conventional (29)**
189:15;214:21;224:9;
226:10;229:19;233:18;
234:20;235:18;243:2;246:14;
285:21;286:3;289:3;297:14;
304:16;317:18;320:19;321:1,
10,12;323:5,14;330:10,11;
332:15;339:9,17;341:16,18
**conventionality (6)**
200:5;234:19,19;275:19;
288:14,16
**convert (1)**
220:9
**convincing (6)**
221:16,20;222:7;223:18,20;
230:12
**copy (2)**
198:3;258:7
**copying (2)**
239:19;241:17
**copyrighted (2)**
199:1,4
**correction (1)**
214:1
**correctly (2)**
337:15,21
**correlation (5)**
317:21;319:4;330:19;
334:4;335:7
**correlations (7)**
256:2;291:9;318:2,3,13;
332:19;333:9
**correspond (1)**
258:16
**corresponds (3)**
311:8;321:12,13
**corroborated (1)**
251:5
**cotton (2)**
240:5,6
**Counsel (6)**
243:6;253:5;305:10;342:4;
346:10,11
**County (2)**
346:2,4
**couple (9)**
188:18;215:16;224:16;
229:11;237:20;238:18;260:6;
266:11;286:17
**course (13)**
177:19;199:14;256:13;
260:9,18;264:9,13;267:20;
268:8,9;298:19;338:10;344:8

**Court (93)**
178:1,5;179:2,4,12;180:1,9,
18,20;181:7;183:18,19;
186:13;189:2;190:18;192:11;
195:2,10;200:8,8,11,15,16;
201:1,14,20;204:2;208:4;
213:7,20;214:8,9,11,15,17,20;
215:14;216:9;217:3;218:1,6;
219:19;220:5;221:1,11,14;
223:2,14;224:3;225:2;230:20;
232:15;237:16;239:9;252:4,
12,18,21;253:2,13;254:2;
256:9;260:11;261:6;266:4,5,
19;267:17;270:14;273:4;
274:14;281:10;287:7,16;
288:7;289:5,8;290:11;294:10;
297:19;298:10,14,20;299:20;
314:12;316:9,18;319:15;
324:13,19;327:13;343:3;
344:10
**courts (5)**
178:4;202:15;203:15;
204:6;328:13
**Court's (3)**
213:19;299:2;319:19
**cover (1)**
236:14
**covered (4)**
297:8;313:17,18;328:5
**covers (2)**
313:15;318:4
**create (3)**
181:4;185:19;256:8
**created (1)**
283:14
**creates (1)**
312:8
**creating (1)**
182:7
**creation (3)**
279:6;282:5;312:6
**credible (2)**
201:11,12
**credit (1)**
181:3
**criticism (2)**
194:16;319:19
**criticisms (1)**
319:18
**criticizing (1)**
313:9
**cross (4)**
219:4;341:3,6;344:7
**crux (2)**
245:11;328:15
**culled (1)**
298:5
**customer (3)**
186:12;199:6;317:19
**customer's (1)**
321:9
**cut (1)**
330:11

**Cyberfone (8)**
256:16;257:4,18;267:20;
284:10,11,13;291:10
**CyberSource (5)**
218:7;262:2,4,9;297:20

**D**

**data (132)**
181:4,9,15,17;183:4,5;
192:13,14;193:19,20;194:1,3,
7;195:5,14,15,21;196:1,3,10,
11;197:13;198:16,17,18;
205:17;207:3;209:7,7,21;
210:1,6,6,7,10;211:5,7;212:9;
213:21;226:3;232:5;241:5,16;
242:9;243:18;245:7;246:8;
255:11,15;256:6,7,15,15;
257:5,8,13,21;258:6,7,8,11,
13,16,19;259:5,9,12,14,18;
260:2;261:2;262:2,6,6,7,10;
263:1;268:2;271:4,8;274:4,
21;275:12;276:8;277:14;
279:7,7,20;280:6;281:7,10,13,
21;282:8;284:6;285:6,6;
287:13,21,21;290:11,11,20;
291:19;293:21;296:20,21;
306:16;308:6,7;312:3;317:8;
318:11,18;319:2;321:11;
322:13,17;323:13,15,17,17;
328:20;329:17;330:18;
332:18;333:10;335:7;336:15,
16;341:16,19
**database (4)**
232:17;254:5;274:3;275:1
**dataset (1)**
256:8
**date (2)**
280:13;321:7
**Daubert (1)**
246:5
**daughter (1)**
188:1
**Dave (1)**
304:18
**DAVID (2)**
176:4,19
**davidhiger@kirklandcom (1)**
176:11
**dawn (1)**
234:2
**day (11)**
185:7;193:8;219:16;
223:12;292:7;295:20;299:1;
324:17;327:20;344:13;346:14
**days (1)**
238:10
**DDR (30)**
183:16;184:2,6,10,12,18;
185:9;187:9;188:15;228:5,7,
10;230:8;231:17;232:1,13,14;
233:9,15;237:14;238:16;
239:6;252:6,8;266:1,20,20;

267:10,12,17
**DDRs (1)**
229:2
**dead (1)**
300:8
**deal (6)**
178:4;179:6;191:8;275:11;
277:17;293:13
**dealing (2)**
189:15;291:13
**deals (5)**
191:6,14;197:5;257:13;
289:17
**dealt (12)**
187:4,20;188:1;195:1,2;
198:20;201:17;261:2;262:5;
264:2;290:8;311:17
**debating (1)**
279:1
**decade (2)**
286:6,7
**decide (1)**
227:9
**decided (8)**
200:14;237:2;266:5;314:9,
9,12,14;342:1
**decision (4)**
183:16;190:3;228:5;299:2
**decisions (3)**
190:4;230:9;253:3
**declaration (6)**
272:4,6,10;282:13;283:4;
334:19
**declarations (3)**
272:3,18;339:14
**declined (1)**
190:19
**decoding (2)**
213:21;215:8
**decontrol (1)**
239:17
**decrypt (2)**
239:17;240:20
**decrypted (1)**
240:19
**decryption (1)**
246:9
**DEFENDANT (1)**
176:3
**deference (2)**
316:15,17
**define (3)**
190:16,19,20
**defined (2)**
308:8;334:2
**defining (3)**
210:7;245:6;246:19
**definitely (3)**
227:18;276:5;301:7
**definition (3)**
270:20;330:2,4
**delineates (1)**
273:15

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

**delivering (2)**
  237:3;250:7
**delve (1)**
  229:11
**delves (1)**
  327:1
**denied (1)**
  341:2
**depend (1)**
  317:5
**dependent (8)**
  262:16;263:3,3;283:7;
  291:2;303:18;308:20;332:12
**depending (2)**
  196:11;280:18
**depends (4)**
  297:4;323:4,11,11
**depositions (3)**
  271:15;281:15,16
**describe (4)**
  238:5;244:17;301:21;
  310:19
**described (5)**
  177:16;269:14;280:11;
  304:20;312:19
**descriptions (1)**
  182:6
**desert (1)**
  206:6
**design (2)**
  241:15;244:10
**designed (1)**
  185:5
**detail (3)**
  179:13;323:12;327:1
**detailed (5)**
  198:14;214:5;261:8;
  268:13,14
**details (1)**
  276:18
**detect (3)**
  317:9;334:3;335:6
**detecting (2)**
  319:3;320:20
**detection (14)**
  317:4,18;321:1,10,13,13;
  332:3;334:1;336:1;337:17;
  338:10,11,13,19
**detects (1)**
  336:16
**determination (2)**
  230:12;316:10
**determinations (1)**
  231:12
**determine (10)**
  178:13;180:5;214:19;
  234:18;258:14;269:5;317:10;
  319:5;335:8;340:2
**determined (5)**
  180:6;181:13;193:20;
  224:8,10
**determining (4)**
  178:11;235:16;285:11;

  304:10
**developed (1)**
  324:8
**device (19)**
  290:8,10;294:1;301:21;
  303:18,21;308:12;310:20;
  311:11;312:4;316:3;319:6;
  322:4;331:8;332:5,21;343:9,
  17;344:1
**devices (22)**
  206:5;211:16;293:20;
  306:17;307:4;312:2;319:3;
  320:12,13;321:19;323:8;
  330:17;331:9;332:20;334:2,4;
  335:5,8,8,21;341:21;343:12
**dictionary (2)**
  235:5;330:4
**die (1)**
  216:13
**Diehr (10)**
  230:8;232:15;233:8;
  237:15;239:6;254:3;266:2,3,
  6,11
**difference (6)**
  184:11;209:18;270:11;
  276:2;313:16;314:4
**differences (1)**
  213:2
**different (56)**
  178:3,4;183:4,5;185:20,21;
  187:5,13;189:9;191:9,15;
  208:16;210:21;215:9,20;
  220:1;221:10;228:9,11,15;
  229:7,18;233:6,15;234:12,17;
  238:13,14,16;241:9,10,10;
  242:14,15;245:3;248:13;
  250:8;252:19;258:12;278:8;
  280:4;282:10;284:7;288:12;
  292:3,4,12;293:19;297:8,12;
  312:2;317:16,17;321:5;329:2,
  3
**differently (3)**
  187:2;228:12,16
**difficult (2)**
  190:20;279:18
**dig (1)**
  339:21
**digit (1)**
  232:17
**digital (2)**
  211:5;246:8
**Digitech (28)**
  255:18;256:5;267:21;
  290:4,7,14,18;291:8;301:8,9,
  9,17;302:7;310:8,8,11,13,14;
  311:3,3,15,17;312:17;313:5,6,
  8,9;314:3
**Digitech's (2)**
  301:20;310:18
**direct (5)**
  315:3;317:3;328:14;
  336:11;343:16
**directed (70)**

  179:5;183:12;184:14;
  185:3;191:1,2;195:13;197:20;
  226:21;227:1;231:8;243:14;
  245:12,16;246:15,17;247:4,
  17;248:1,7,10;249:20;250:12,
  18;251:2;253:7;255:3,10,21;
  256:14,17,18;257:16;258:19;
  259:5,9;275:3;277:10,11,12;
  282:2;283:11;290:1,8,19,19;
  292:8;300:10;308:6,13,18,19;
  309:2,8;313:20;315:1,4;
  317:7;319:16;320:1,16;
  321:15;324:20;329:12;
  330:13;334:13;335:2;336:19;
  337:3;339:21
**directing (1)**
  328:19
**direction (1)**
  182:11
**directly (7)**
  191:14;196:6;283:12;
  292:10;312:5,6;337:7
**disagree (2)**
  296:2;329:8
**disassociated (2)**
  330:3,4
**discuss (2)**
  272:8;331:11
**discussed (5)**
  268:2;279:17;299:12;
  314:5;331:19
**discusses (2)**
  197:19;217:1
**discussing (1)**
  260:7
**discussion (10)**
  197:4;203:16;207:17;
  268:13;269:2,18;271:12;
  272:7,10,12
**discussions (1)**
  257:3
**Dismiss (2)**
  199:18;200:18
**display (6)**
  199:7;265:10,11;295:12;
  296:8;307:11
**displayed (3)**
  265:13;296:21;312:10
**dispute (8)**
  178:2,2;204:21;206:16;
  235:20;239:10;283:13;336:13
**disputed (2)**
  249:8;316:11
**disputes (2)**
  177:12;251:6
**disregard (1)**
  304:8
**distilled (3)**
  237:20;333:19,20
**distinguish (1)**
  337:16
**distinguishable (1)**
  338:3

**distinguished (3)**
  201:9;303:17;338:12
**distinguishes (1)**
  338:9
**distinguishing (1)**
  310:12
**distribute (2)**
  198:1;247:2
**distributed (3)**
  194:2;196:1;209:21;210:6;
  242:12;245:9;246:21
**distributing (3)**
  195:14;198:17;241:16
**distribution (3)**
  205:17;210:15;226:3;
  239:5,19;241:3;242:14;
  243:18;244:8,11;245:14,19;
  246:11
**district (7)**
  213:7,7;215:14;252:12,18;
  259:15;316:18
**document (7)**
  204:7;278:16;280:17;
  282:18,21;284:8;298:4
**documents (44)**
  255:12,16;258:4,7,12,13;
  263:18;275:13,15;276:14;
  277:14;278:1,12,19,21;279:6,
  9,12,15;280:3,5,12,18;281:1,
  3,3,5;282:1,4,5,9,15,16,18,19,
  20;283:1,13;284:1,1,4;286:6;
  287:12;307:3
**done (15)**
  230:17;236:2;254:9;271:8;
  287:7,8,13,15;289:1,2;
  318:12;320:11;321:1,9;
  327:17
**doubt (1)**
  232:13
**down (18)**
  179:14;182:17;183:11;
  198:15;200:9,12;237:1,19,20;
  241:19;244:17;249:18;
  252:14;333:19,20;337:4;
  340:7;342:6
**drafted (1)**
  218:8
**draftsman's (1)**
  183:13
**drawn (1)**
  180:7
**drives (1)**
  274:9
**during (1)**
  338:14
**DWAYNE (2)**
  346:3,18
**dynamic (8)**
  276:14;278:16;280:17,18;
  282:4;283:13;284:8;307:12
**dynamically (2)**
  293:20;312:3

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

# E

**earlier (4)**
313:14;317:3;324:2,12
**early (3)**
200:2;291:18;333:12
**easy (2)**
239:1;297:3
**economic (1)**
191:11
**effect (1)**
259:10
**effective (4)**
251:17;319:6,7;322:14
**Effectively (2)**
202:11,11
**either (9)**
187:11;188:16;300:21;
311:11,16;322:20;324:21;
325:1;339:20
**electronic (2)**
325:15;326:20
**element (2)**
216:4;318:4
**elemental (1)**
319:8
**elements (8)**
214:18;226:20;241:15;
248:17,20;254:6,8;284:2
**eligibility (2)**
274:11;325:10
**eligible (11)**
213:13,19;236:9;248:5;
252:2;309:19;312:12;325:16;
329:15,18;332:12
**eliminate (1)**
280:8
**Ellis (1)**
176:6
**else (9)**
185:12;188:20;243:1;
247:3;258:20;267:1;285:9;
295:6;328:2
**else's (1)**
185:14
**Email (2)**
176:11,12
**embedded (1)**
229:1
**embodiment (7)**
300:17;302:2;307:15;
310:10,20;311:7;336:12
**embodiments (1)**
305:20
**emphasized (1)**
218:3
**employee (1)**
346:11
**enclosing (1)**
263:9
**encoding (1)**
215:8

**encrypt (1)**
245:8
**encrypted (4)**
241:5;242:3;245:8;246:21
**encryption (13)**
196:16,17;225:19,21,21;
226:2;234:3;243:16,17;244:7;
245:13;246:6,9
**encryptions (2)**
196:10;234:3
**end (11)**
185:6;193:7;219:16;
264:10;292:7;295:20;299:1;
316:20;321:7;324:17;327:19
**enforce (2)**
206:2;245:18
**enforced (1)**
194:8
**enforcing (1)**
207:1
**enough (27)**
180:18;182:2;188:9;192:9,
10;215:1,11;219:10;262:12;
264:7;269:5;270:4;292:17;
294:10;295:15;296:5;297:21;
319:16;320:14,14;323:9;
324:15;327:13,15;341:15,15;
343:13
**ensure (3)**
278:15;280:19;282:7
**entering (1)**
318:11;319:2
**entire (9)**
195:18,18;231:14;243:9,12;
277:4,8;283:20;334:7
**entirely (1)**
321:1
**entitled (1)**
316:15
**enumerates (1)**
225:13
**environment (14)**
188:6,8,10;227:12;260:13;
261:1;263:18;264:15;292:4,
16;324:15;331:4;342:11,21
**equation (1)**
266:8,8
**error (1)**
213:21
**eschew (3)**
224:7;226:14;247:6
**eschewed (1)**
224:21
**eschewing (2)**
231:7;305:2
**especially (3)**
250:5,15;269:21
**espouse (1)**
231:16
**ESQUIRE (2)**
176:4,5
**essential (1)**
198:15

**essentially (4)**
214:4;231:13;255:10;
303:11
**established (1)**
256:21
**estimate (1)**
254:13
**EULONDA (1)**
176:15
**evaluate (1)**
288:12
**evaluating (2)**
178:1;288:13
**even (39)**
183:19;192:4,15;194:4;
202:4;205:10;214:3,7;220:13;
221:13;223:21;225:12;
230:21;231:5;234:19;235:2;
237:6,14,16;240:21;250:16;
251:1;258:3;267:17;269:7;
274:8;276:4,20;282:15;284:1;
288:15;290:12,13,13;300:10;
304:5,7;328:18;329:9
**event (1)**
178:9
**events (2)**
179:7;332:16
**everybody (2)**
188:20;194:3
**everyday (1)**
277:18
**everyone (4)**
249:13;254:19;344:13;
345:13
**evidence (16)**
177:12;202:3;203:15;
204:3,6;221:16,19,20,21;
222:7,10;223:18;224:14;
225:14;314:12;329:14
**evidentiary (2)**
221:15,18
**eviscerate (2)**
281:8,9
**exact (1)**
238:19
**exactly (18)**
187:10;214:14,15;216:1;
223:16;228:6;235:7;245:14;
269:17;272:4;276:12,16;
278:9;288:7;308:13;320:10;
322:15,16
**examiner (1)**
224:4
**examiners (1)**
325:21
**example (30)**
190:4;192:13;194:2;
196:19;197:11,16;202:19;
203:21;205:19;216:18;218:6;
238:17;248:16;259:11,12;
287:9,20;290:7;293:8;307:8;
321:9;325:13,16,19,20;326:2,
17;329:4;336:20,21

**essentially** (continued) / **examples (5)**
196:21;270:12;325:9;
326:8,8
**Excel (1)**
282:19
**excellent (2)**
345:11,12
**except (2)**
194:1;250:11
**exception (3)**
274:11;302:18,21
**exceptions (1)**
302:16
**excess (1)**
268:18
**exclusionary (1)**
274:10
**excuse (2)**
219:3;344:2
**executed (2)**
302:12;312:7
**execution (1)**
218:12
**exercise (2)**
204:9;314:13
**exhaustive (1)**
270:18
**Exhibit (5)**
325:7;328:12;329:4,8;
336:20
**exist (4)**
183:2;185:20;216:10;
301:18
**existed (2)**
186:19;190:6
**existence (1)**
203:13
**existing (1)**
233:17
**exists (1)**
264:6
**experience (1)**
185:21
**expert (35)**
201:4,10,17,21;202:3,6,10,
15,19;203:3,7,11;216:19;
220:17;229:16;231:9;234:5,
14;235:6;239:8;245:21;246:2,
5;271:12;273:8,12;281:11,12;
282:13;286:2;298:1;299:12;
308:15;339:14;340:18
**experts (16)**
199:21;201:3,11;202:11;
205:13;224:14;226:14,18;
229:13;230:3;233:21;251:5,
10;271:15;299:11;303:12
**expert's (1)**
334:19
**Expires (1)**
346:20
**explain (5)**
264:21;265:1;268:18;
305:20,20

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

**explained (7)**
178:16;221:3;247:15;
266:14,16,17;267:4
**explains (1)**
334:19
**explicit (1)**
257:3
**exploded (1)**
257:5
**explore (1)**
255:14
**expressed (2)**
178:3;258:17
**extensible (1)**
255:3
**extent (3)**
203:16;229:21;268:14;
339:10
**extra (3)**
245:17;250:20;283:3
**extracting (2)**
285:6;326:21
**extraction (8)**
257:20;265:8;267:21;
284:19,20;285:4;287:9;
291:12
**extremely (3)**
206:11;224:18;234:11
**extremities (1)**
240:16
**eye (2)**
221:13,13

**F**

**face (1)**
308:8
**facilitated (1)**
199:8
**facing (1)**
203:1
**Facsimile (1)**
176:10
**fact (11)**
203:19;224:9;225:2;228:1;
234:10;240:13;264:5;279:4;
300:6,7;306:11
**factor (2)**
220:1,3
**facts (17)**
199:21,21;224:8;226:4,15;
227:8;230:7,14;237:12;246:1;
300:4;314:9,15;339:11;
340:12,15;341:4
**factual (24)**
200:4,5;202:6;204:15;
224:7,12;229:14;230:11;
231:12;234:9,11;251:6;298:9;
299:10,18;300:1;314:14;
316:8,10,11,12,16,21;344:6
**fail (5)**
191:8;208:16;287:2;
291:18;324:9

**failed (10)**
187:3;212:3,5;265:3;287:4;
290:15,16,20;294:19;322:10
**fails (6)**
208:13,14;210:18;288:5;
295:20,21
**failure (3)**
182:5;241:13,13
**fair (2)**
270:8;289:13
**fall (7)**
273:18;290:12;300:11,12;
302:20;303:4;340:11
**falling (1)**
248:14
**falls (9)**
270:20;271:2;273:19;
300:8;310:10;311:2,3;312:11,
19
**familiar (1)**
325:7
**far (5)**
195:7;256:3;274:2;327:15,
15
**fashion (2)**
212:10;302:14
**faster (1)**
254:16
**favor (8)**
230:7;231:13;339:12;
340:12,14,16,17,18
**favorite (1)**
250:6
**February (1)**
329:7
**Federal (35)**
183:17;198:7;199:16;
200:9,15;201:18;202:19;
208:2,5;215:15;217:5,8;
218:8,18;220:12;237:16;
252:3,5,5,19;253:1;255:18;
256:12,16;261:5,17;265:10,
15;267:5;287:7;290:3;291:1;
297:20;299:6;324:12
**feeds (1)**
306:11
**feel (4)**
223:3;224:21;228:15;270:8
**Feinberg (1)**
223:12
**few (4)**
247:9,18;303:2;333:20
**field (22)**
193:16;243:13,17,18;255:4,
4,12;260:2,11,15;271:9;
273:8,9;275:15;283:21,21;
292:16;295:11;306:21;317:3;
341:16,17
**fields (2)**
279:8;280:20
**fight (1)**
200:21
**fighting (1)**

**figure (5)**
218:4;244:11;276:6;328:1;
335:20
**figures (5)**
268:15;269:1;277:7;
305:18;333:17
**figuring (2)**
257:8;322:19
**file (3)**
245:8,14;246:21
**filed (1)**
197:3;286:7
**files (9)**
181:5;244:9;279:7;308:7
**filling (1)**
279:8
**final (2)**
220:2;337:13
**finally (4)**
194:6;306:6;308:4;316:6
**find (11)**
225:3;235:11,17;248:5;
252:20;263:9;281:7;299:20;
311:3;324:19;340:9
**finding (2)**
183:19;199:16
**findings (4)**
300:6,7;316:17,18
**fine (5)**
222:15;264:15;279:10;
299:15;315:8
**finish (2)**
289:9;341:8
**finished (1)**
223:14
**firewall (4)**
322:5,6;334:9;343:17
**firewalls (1)**
330:20
**first (40)**
178:6,10;189:4;195:20;
201:14,14;206:13;215:17;
219:14;224:16,19;226:7;
230:14;235:4,8;243:10;266:2;
268:16;270:7;271:2;273:4,19;
277:11;298:15;300:9;301:17;
302:21;303:5;311:7;313:5;
319:4;320:19;321:4;326:3;
327:3,21;338:18;340:1;
341:10;342:13
**fit (7)**
189:7,20;225:12;249:16;
304:12;331:20,21
**fits (2)**
208:5;305:4
**five (2)**
251:12;253:19
**flagged (1)**
334:9
**flagging (1)**
326:18
**flat (1)**

316:19
**Flook (14)**
319:9,12,15;320:5,5,6,8;
322:3,7,18;324:13;341:11,17;
344:19
**fluke (1)**
287:2
**flying (1)**
249:4
**focus (5)**
177:15,16,20;208:18;
281:19
**focused (12)**
191:4,5;195:4,5;229:2;
244:16;255:21;259:19;
266:20;287:16;318:19;323:1
**focuses (2)**
202:7;216:16
**focusing (1)**
341:10
**folders (1)**
258:15
**follow (1)**
195:9
**following (1)**
190:1
**foremost (1)**
219:14
**forever (1)**
286:4
**form (15)**
192:20;194:1;195:15;
196:3,9,11,17;210:9;211:7;
212:8;242:16;256:10;290:5,
11;301:14
**format (2)**
211:1;218:9
**formats (1)**
280:4
**forms (1)**
219:2
**formula (3)**
214:13;215:4,4
**forth (25)**
177:21;178:2,5;179:13;
180:6;182:6;192:6;194:9;
200:21;217:13;218:11,15;
220:5,6;229:4;233:6;249:15;
253:14;294:3;316:7;317:12;
319:20;320:10;324:18;342:12
**forward (6)**
230:15;244:8,9;254:12;
332:20;341:4
**found (28)**
179:11;180:9,10;181:20;
199:17;200:16;213:12;
214:20;215:5,11;216:8;219:8,
9;252:1,17;255:19;256:17;
257:17,18;258:1;259:1,15;
263:21;270:17;288:7;292:3;
319:15;333:21
**four (9)**
230:13;233:20;243:15;

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

249:7;285:20;300:12;310:5;
312:12,14
**fours (1)**
302:7
**framed (4)**
179:8;220:20;270:13;
297:13
**frames (1)**
298:9
**framework (5)**
177:18,20;193:12;195:9;
209:2
**frankly (5)**
194:16;212:21;253:1;
263:19;318:19
**free (3)**
237:3;250:7;320:3
**frequently (1)**
219:4
**Friday (1)**
247:16
**friend (1)**
240:19
**friends (2)**
198:3,4
**friends' (1)**
198:4
**front (1)**
302:9
**full (2)**
263:14;325:3
**fully (2)**
251:4;315:13
**function (13)**
181:10;193:5;207:1,13;
216:5;218:5;248:17;261:11;
270:3,4;294:2;309:19;333:6
**functional (6)**
192:20;206:16;207:15;
232:6;261:7;296:15
**functions (5)**
181:14;182:1;183:2;280:7;
326:20
**fundamental (9)**
177:11;189:3,5,19;190:21;
225:5;232:10;266:21;285:11
**fundamentally (8)**
186:1;187:5,6;215:8;228:9;
247:7;276:2;323:18
**further (15)**
193:11;245:9;246:21;
247:2;248:18;276:18;277:1;
321:21;323:21;332:13;336:1;
341:7;344:11;346:7,10
**future (2)**
179:7;324:8

## G

**gaps (1)**
335:13
**gathering (6)**
256:15;289:18;291:20;
315:2;341:16,18
**gave (1)**
342:9
**general (7)**
183:12;191:12;193:12,15;
214:10;296:15;341:20
**generalized (7)**
192:19;193:8;258:17;
261:10,15;327:20;343:12
**generally (6)**
203:18;255:4;256:15;
293:6;317:3;318:4
**generating (4)**
211:15;256:6,7,10
**generator (1)**
261:11
**generic (50)**
180:11;181:21;182:1;
192:17;206:15;207:15;
226:17;230:16,16,16,17;
231:15,15,16;232:2,3,9,9,9,
20;237:9;242:20,20,20;261:3;
264:16;268:17;274:2;287:16;
288:3,16;292:18;293:5,15;
294:6;295:12;297:14;305:7,
10;306:2;321:17;322:2;323:6,
15;326:11,20;327:13;330:10,
11;339:10
**gets (4)**
191:12,13;219:21;259:16
**Gin (1)**
240:5
**gist (1)**
180:4
**given (10)**
192:21;253:1;255:12;
309:5;316:18;325:15;326:8,
13;328:6;334:16
**giving (3)**
240:18;246:1;325:9
**glad (1)**
244:15
**gloss (2)**
228:7,8
**glossed (1)**
331:6
**goal (7)**
180:4,8;188:5,8;191:1;
288:3,5
**goes (7)**
196:4;237:1;240:9,21;
248:18;257:8;340:18
**good (7)**
179:13;247:14;298:13,14;
299:7;344:15;345:13
**gotta (1)**
330:12
**govern (1)**
197:8
**government (2)**
206:2,10
**government's (1)**
205:17

**grade (1)**
188:1
**granted (5)**
239:17;282:17;341:3,6;
344:5
**graphically (3)**
236:5,6;309:17
**graphics (1)**
184:2
**grayed (1)**
196:4
**great (2)**
238:16;243:13
**GRIM (1)**
210:2
**ground (1)**
297:8
**groundbreaking (1)**
220:13
**grounds (1)**
249:18
**guess (10)**
190:17;206:1;257:10;
273:17;296:10,13,15;306:10;
316:6,12
**guidance (6)**
200:16;325:10,21;326:4,14;
328:6
**guts (1)**
307:21

## H

**half (1)**
345:14
**hallmarks (2)**
291:19;318:7
**hand (4)**
243:21,21;289:12;346:14
**handle (1)**
282:17
**handouts (1)**
177:6
**hands (2)**
194:5;226:11
**handy (1)**
329:6
**happen (4)**
185:16;186:18;252:10;
264:9
**happened (6)**
189:6;199:8;200:7;202:11;
286:5;287:3
**happening (1)**
185:10
**happens (2)**
185:13;269:17
**hard (3)**
183:9;258:7;294:5
**hardware (20)**
192:7;206:18;212:2;218:4;
253:11;268:19;302:2,4,5;
310:10,13,16,21;311:2,20;

312:6,7,10,11,18
**harkens (1)**
263:20
**harp (2)**
248:20;249:2
**HARRISON (1)**
346:3,18
**hashmarks (1)**
305:12
**hate (2)**
209:16;262:13
**headed (1)**
191:7
**hear (10)**
177:9;206:3;226:12;235:6;
265:19;269:20;298:2;302:13;
337:15,20
**heard (9)**
193:16;255:3;266:3;
269:19;289:17;313:10;317:3;
342:3,19
**hearing (1)**
263:15
**heavily (2)**
224:7;230:11
**hedging (4)**
233:4;244:19;250:4;340:21
**held (11)**
201:20;223:19;238:18;
259:16;270:14;290:4,11,15;
291:21;315:2;324:14
**help (2)**
184:2;213:4
**helpful (3)**
184:8,9;235:6
**hereby (1)**
346:4
**herein (1)**
346:6
**herself (1)**
328:3
**HIGER (1)**
176:4
**high (1)**
269:7
**highlight (1)**
306:18
**highlighted (3)**
195:17;197:7;260:3
**himself (1)**
328:3
**hinge (1)**
222:6
**history (5)**
199:15,19;234:17;253:1;
338:8
**hit (2)**
230:19;301:2
**hold (2)**
232:11,20
**holding (1)**
243:17
**holds (2)**

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

301:10;302:11
**HOMRIG (46)**
177:4,5,9,11;182:13;
183:21;184:7;187:10;188:13;
190:18;192:1;201:8,13;
202:17;203:14;204:20;205:7,
10,21;207:8,11;210:3;213:10;
221:8;251:14,20;254:20;
255:2;259:8;270:10;271:1;
273:10;286:16;289:15;
292:14;296:5;298:16;313:2;
317:2;319:11;325:12;326:3;
328:10;341:9;342:9,16
**Honor (1)**
177:5
**Honor's (1)**
224:13
**hope (1)**
247:20
**hopeful (2)**
218:3;309:6
**host (3)**
184:21;219:13;318:14
**host-based (5)**
337:16,18,19;338:13;
341:18
**hosts (1)**
321:18
**hotspot (1)**
238:9
**hour (3)**
223:5,6;239:11
**hours (1)**
222:20
**hows (1)**
285:17
**HTL (2)**
263:17,18
**Hughes (7)**
213:6,6,13,18;215:19,21;
259:13
**human (5)**
240:2;252:8;273:20;279:3,
13
**Humvees (1)**
206:6
**hunt (1)**
237:12
**hypothetical (1)**
325:14

**I**

**I/O (2)**
211:16,17
**idea (134)**
178:12,18,20;179:8,13,16;
180:7,17;181:6,16;182:12,18;
186:21;188:18,21;189:5,5,14;
190:11,12,17;191:13;193:8;
195:8,13,19;196:6,13;197:1,
20;206:13;207:14;209:20;
210:14;211:4;212:4,6,8;

214:19;216:5;217:13,16,17;
218:11,16;220:8,14;226:8;
233:13;236:10;237:11;238:5,
6,12;239:2;243:4,13,14;
245:12,13;248:1;249:2;
250:19;251:3;253:11;255:11,
21;256:18;258:2;259:3,9;
260:4,11,12,12;263:2,11;
264:14,15,20;265:2;267:14;
270:9,15;271:9;274:10,13;
277:12;284:5,12;287:18;
288:19;291:3,4,6,21;292:10;
295:9,11;298:8;299:21;
302:17;303:4,15;314:21;
315:1,3;317:7;318:7;319:17;
320:2,17,18,18;321:20;322:8,
11;323:5,9,18;324:14,20;
325:4;329:12;330:1,13;
334:17;337:7,8;340:19,21;
341:16;344:21;345:5
**ideas (14)**
178:7;189:9;225:13;
226:16;227:1;250:2,16;
273:16;274:18;280:2;291:19;
305:5;323:3;331:19
**identified (3)**
209:12;248:2,17
**identifies (1)**
263:5
**Identify (3)**
177:3;223:9;292:9
**identifying (1)**
334:12
**ie (4)**
274:10;302:1;316:10;332:8
**ignore (2)**
203:3;227:4
**illegible (1)**
334:1
**Illinois (1)**
176:8
**illustrate (6)**
184:2;209:17;213:4;
247:19;261:8;262:14
**illustrates (1)**
262:3
**illustrative (2)**
213:2;299:4
**impact (1)**
204:21
**implement (4)**
179:16;188:20;192:8;
217:17
**implementation (5)**
179:18;180:12;188:19;
258:10;313:18
**implemented (2)**
277:1;288:2
**implementing (2)**
215:10;324:2
**implication (2)**
302:3;313:7
**import (2)**

269:6;277:3
**important (16)**
186:13;193:6;194:15,21;
197:9;199:19;200:6,19;
207:21;214:2;217:7;221:12;
234:11;270:11;332:11;340:4
**importing (1)**
309:1
**improve (1)**
203:7
**improvement (1)**
233:17
**inappropriate (1)**
268:21
**inapt (3)**
278:6;285:8;339:15
**Inaudible (2)**
207:9;316:3
**include (8)**
261:21;262:19,21;263:8,8;
265:11;296:11,11
**included (7)**
194:11;255:17;261:4;
262:3,16;271:13;296:12
**including (2)**
238:17;264:16
**inconsistently (1)**
289:4
**indented (1)**
338:18
**independent (7)**
194:11;283:6,6;303:20,21;
332:10,11
**index (1)**
292:6
**indexing (5)**
292:1;305:15,16;306:3,13
**indicate (1)**
211:8
**indicated (1)**
332:15
**indisputably (1)**
283:16
**individual (4)**
180:2;218:15;269:21;
279:21
**individually (1)**
294:14
**industry (3)**
233:18;235:18;304:16
**ineligible (3)**
179:12;256:11;310:9
**infect (1)**
334:5
**info (3)**
280:16;301:18,18
**inform (1)**
273:4
**information (40)**
188:2;189:16;199:13;
215:6;228:12;256:1,10,20;
258:15;261:16;263:5,6,10,18;
265:12;280:15,16;281:1;

285:2;289:18;290:9;291:5,8,
15,17;292:6;293:8,13;302:1;
303:19;307:2,11,14;310:8,15,
15;311:9,11;315:2;317:13
**informs (2)**
268:8,9
**ingenuity (3)**
273:21;304:1,1
**initiating (1)**
311:10
**innovative (1)**
220:13;328:3
**input (1)**
258:11
**inputting (2)**
211:16;308:2
**inquiries (1)**
200:4
**inquiry (8)**
178:20;213:4;217:7;221:9;
264:11;287:5;302:15;314:21
**inside (1)**
266:12
**insofar (1)**
245:19
**instance (3)**
240:17;330:3,5
**instances (1)**
330:6
**instead (5)**
186:2;210:15;228:13;
278:5;341:18
**institute (1)**
219:10
**instructing (1)**
182:8
**instruction (6)**
181:12;204:15;220:19;
229:15;314:7,10
**instructions (2)**
218:10,12
**insufficient (2)**
262:10;288:8
**integrate (1)**
325:2
**Intellectual (13)**
179:20;187:14;204:14;
222:19;223:12;251:20;267:9;
270:6;296:3;298:6;310:3;
325:8;329:16
**intended (1)**
260:19
**interact (2)**
302:13;316:4
**interacting (1)**
199:3
**interaction (1)**
265:12
**interactive (2)**
199:10;296:8
**interactivity (1)**
295:14
**interbase (1)**

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

281:8
**interest (1)**
321:8
**interested (1)**
346:13
**interesting (5)**
208:18;236:4;243:6;298:7;
320:17
**interface (40)**
263:16,17;284:5,7,8;290:3;
293:16,19;294:12;295:5;
296:3,7,9,19,19;300:16;301:2,
4;303:16;305:19;306:10;
307:10,18,19;308:1,7,11;
309:16,17;310:16;311:1;
312:1,1,9;313:11,21;315:14,
18,19;316:2
**interfaces (3)**
303:18;304:6,7
**interim (1)**
325:10
**intermediate (1)**
250:4
**intermediated (4)**
180:7;182:17;183:1;225:16
**Internet (11)**
184:20;185:2,13,21;187:2;
189:18;199:5,7;267:16,18,19
**interpret (2)**
311:14,14
**interrelate (2)**
194:13;279:9
**intertwined (1)**
263:13
**into (59)**
179:14;185:14;189:7,20;
198:15;204:3,6;208:6,15;
211:16;220:9;225:13;229:11;
230:7;236:6;247:10;248:4,6;
256:10;257:2,7;258:13,15;
262:1;267:4;269:6;273:18;
274:6;275:6,20;277:4;280:12;
281:9;283:10;285:3;300:11,
12;302:20;303:4,7,14;304:3,
12;306:11;310:10;311:2,3;
312:11;314:21;315:12,20;
319:2;327:1;331:20,21;
333:20;336:8;339:21;340:11
**intricate (1)**
261:14
**intrinsic (8)**
203:15;204:3,6;221:19,21;
222:9;273:13;314:12
**introduction (1)**
249:15
**intrusion (13)**
317:4,18;318:9;321:1,10,
12;332:3;334:1;337:16;338:9,
11,13,19
**intrusions (1)**
333:13
**invalid (10)**
199:17;200:17;216:8;

222:2,5,10;237:10;242:21;
252:17;257:14
**invalidate (1)**
219:7
**invent (1)**
328:2
**invention (28)**
180:5;187:13;190:5,7;
205:16;216:20;217:1;232:7,8;
241:20;245:11;252:7;259:17;
266:11,18;269:18;272:7,11,
11;276:19;279:16;304:2;
306:20,21,21;310:5;315:18;
335:16
**inventions (4)**
178:8,9;225:20;274:16
**inventive (36)**
178:14;183:19;201:6;
215:2;220:10;226:21;227:2;
231:8;233:16;245:16,17;
246:17;247:5,7,17;248:2,11;
250:1;251:1,3;272:17;273:5,
12;282:2;283:12,16;297:13;
304:11;308:13,17;309:9;
334:13;336:11;337:2,10;
345:5
**inventor (1)**
229:15
**inventors (3)**
183:10;188:21;229:5
**invoices (2)**
263:8,8
**involve (1)**
178:12
**involved (8)**
181:4;202:19;215:5;
259:17;266:6;267:15,18;
343:9
**involves (3)**
178:10;275:2;320:19
**IPR (1)**
219:10
**irrelevant (3)**
242:19;243:8;281:17
**isolated (1)**
327:6
**isolating (1)**
325:14
**issuance (1)**
181:11
**issue (34)**
188:15;191:11;196:14,15;
201:16;202:6,16;213:18;
215:9;219:20;221:17;224:12;
230:3,4;231:10;234:6;257:16,
16;262:5;269:4,10;274:6;
282:14;286:21;291:14;298:1;
308:15;314:9;315:17;318:17;
341:13;343:3,8;344:9
**issued (4)**
199:11,16;219:16;256:4
**issues (22)**
195:1;200:5;201:14,17;

204:15;212:18;227:9;259:20;
260:1;272:17;281:20;288:14,
15,17;289:19;298:9;299:10,
18;300:1;316:16;323:2;344:6
**ITC (1)**
300:5
**item (1)**
323:21
**ITRs (1)**
243:15
**IV (24)**
194:16;208:13;209:13;
211:21;212:2;213:11;216:7,
15,18;222:16,19;226:19;
238:18;252:13;265:14;
292:21;293:16;298:8,9;
308:21;320:4;328:16;335:3;
336:18
**IV's (16)**
199:20;206:17;212:21;
213:4;214:3;219:6;230:7;
231:13,21;238:11;270:6;
303:10;313:11;339:12;
340:12,14

**J**

**Jake (1)**
336:2
**JD (1)**
176:17
**Jeff (1)**
177:5
**John (1)**
283:4
**Judge (9)**
200:3,9,13;210:2;213:14;
214:7;215:13;252:16;259:15
**judges (1)**
252:18
**judgment (3)**
340:13,16;341:2
**judicial (1)**
203:20
**jumping (1)**
233:11
**juncture (1)**
227:5
**jurisprudence (1)**
340:4
**justices (1)**
243:9

**K**

**keep (7)**
188:2;196:15;200:6;
267:11;279:20;281:5;313:2
**keeps (1)**
274:7
**Kelly (2)**
272:3,9
**KENNETH (1)**

176:5
**key (2)**
184:16;216:4
**kicks (2)**
327:21,21
**kind (29)**
179:19;181:15;186:21;
187:13;188:7;189:1,16;190:9;
193:2;199:13;218:1;224:21;
228:6;240:18;250:13;258:9;
261:9;263:10;282:21;284:7,
15;291:14;292:19,19;294:4;
314:21;328:15;329:1;339:4
**kinds (9)**
194:17;206:9;237:18;
238:4;240:14;295:11;303:1;
330:15;336:7
**Kirkland (1)**
176:6
**knowledgeable (1)**
336:21
**known (18)**
181:14;228:2;231:1,3,3,3,4;
233:4;236:17;241:14,15;
245:1;254:6,7;286:3;318:5;
324:8;340:5
**kradamo@kirklandcom (1)**
176:12
**KSR (1)**
190:3

**L**

**laid (4)**
189:3;239:9;247:20;251:4
**language (7)**
178:15;179:15;183:13;
255:4;298:11;301:21;310:19
**largely (1)**
315:13
**larger (1)**
323:17
**LaSalle (1)**
176:7
**last (11)**
220:16;233:9;236:5;
239:11;267:10;273:3;284:4;
291:2;314:16;316:6;337:1
**late (1)**
222:21
**later (6)**
184:5,6;205:8,9;225:20;
340:10
**Laughter (2)**
253:21;344:17
**launch (1)**
275:6
**law (18)**
177:20;190:8,10;201:20,21;
216:9;269:10;276:1,1;285:16;
286:12;298:13,14,19;299:7;
300:4,6,7
**laws (2)**

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

178:8;274:17
**layer (4)**
  226:2;245:17;246:10;
  250:21
**leads (1)**
  274:5
**leap (2)**
  235:1;332:20
**learn (2)**
  235:10;315:17
**least (17)**
  198:8;203:12;209:10;
  210:21;211:2;239:10;245:19;
  248:10,15;259:15;260:17;
  305:11;312:11;329:14;337:6;
  340:9,14
**leave (2)**
  313:13;343:6
**lectern (1)**
  343:14
**leeway (1)**
  289:11
**left (13)**
  184:21;188:19;200:13;
  215:18;216:2;223:17;299:17;
  318:10,13,15;324:6,6,8
**left-hand (1)**
  265:8
**legal (15)**
  177:18;201:16;202:10,12;
  204:4,8;221:17;245:21;
  272:17;299:11;300:1;314:9,
  13;324:18;344:9
**length (2)**
  328:21;329:1
**less (4)**
  286:6;328:7,17;329:10
**lesson (1)**
  298:10
**letter (7)**
  244:14;247:15;250:1;
  277:13;281:18;308:4;334:11
**level (11)**
  183:9;190:21;240:1,7;
  274:15;293:15;296:9,15,18;
  327:14;342:2
**levels (3)**
  330:19;332:9;333:4
**library (4)**
  292:2,2;306:13,14
**life (4)**
  184:16;186:15;307:18;
  315:20
**light (7)**
  184:8;197:15;221:10;
  232:14;234:10;237:21;262:13
**liked (1)**
  236:13
**likely (2)**
  243:14;317:11
**likes (2)**
  231:16;239:21
**limit (25)**

207:4,14;210:18;212:4,6;
  215:1,11;258:3;270:15;271:9;
  318:15;319:14;320:3,13;
  322:5,7,7,8,18,19;323:9;
  328:4;341:14,14,20
**limitation (12)**
  181:9;195:20;210:8;261:3;
  262:1;272:8;291:3;292:15,16;
  297:6;338:12,18
**limitations (26)**
  194:12;195:20;211:2;
  212:3,5,5;214:13;255:14;
  258:18;260:21;261:3,6;
  262:17,21;267:14;294:13;
  295:12;321:17,21;322:1;
  323:6,15;325:1;327:1,17;
  336:18
**limited (14)**
  182:3;195:15;196:3;
  214:19;242:10,12;266:17,18;
  267:6;313:15,19;322:12;
  331:3;343:11
**limiting (9)**
  180:14;210:8;246:7;
  260:12;294:5;315:16,21;
  321:15;324:14
**limits (1)**
  326:15
**line (5)**
  190:4,10;236:2;253:3;
  278:3
**lines (6)**
  197:18;300:17;307:1,9;
  311:7;321:3
**link (6)**
  185:1,3,5,6,11;186:2
**links (1)**
  307:3
**list (2)**
  270:14,18
**listing (1)**
  252:1
**little (11)**
  177:8;186:5,6;187:2;192:2;
  210:21;233:12;262:4;289:11;
  305:12;323:12
**live (1)**
  216:13
**LLP (1)**
  176:6
**local (5)**
  294:1;303:20;311:11;
  312:4;316:3
**located (1)**
  321:7
**locating (2)**
  287:8;293:13
**location (1)**
  308:12
**log (1)**
  234:3
**long (16)**
  190:4,10;193:4;196:14;

206:21;216:4;225:5,15;
  261:11;272:6;277:5;291:21;
  292:2;315:2;331:18;344:12
**longer (1)**
  198:13
**longstanding (5)**
  189:13;197:16;203:10,21;
  286:9
**look (72)**
  179:1;180:1,3;186:7,20;
  187:17,18;188:4,6,7;189:9;
  193:13;195:7;197:12,14;
  198:14;202:5;203:15;213:14;
  214:9,10,12;215:17;217:6,8;
  226:5;228:15,18;232:21;
  234:16;235:4,21;236:5,14;
  237:8;252:21;254:11;256:2,4,
  13;258:12;259:2,21;262:5;
  267:8;268:21;269:5,11;270:1,
  7;275:3,5;276:21;287:6,11,
  13;289:18;291:16;292:14;
  301:18;305:8;311:5;313:13,
  14;317:14,17;326:12;330:12;
  332:17;342:20,20;344:1
**looked (28)**
  180:14,20;181:7,8,10,11;
  192:11;194:14;195:1,3,3;
  198:7;201:5,17;202:15;
  206:13;214:17;224:3;225:15;
  236:10;244:3;251:21;256:16;
  268:7;299:21;327:11;331:18;
  341:12
**looking (26)**
  178:10,13;180:10;185:15;
  186:6;194:20;195:12;204:2,6;
  225:4,12;235:19;236:1;
  237:18;239:14;255:20;
  261:19;273:7;288:13;289:1;
  292:9;300:19;311:6;340:1,1;
  345:1
**looks (7)**
  208:7;213:15;214:5;
  309:13;317:20,21;327:20
**looping (1)**
  329:19
**lose (1)**
  186:11
**lost (1)**
  305:11
**lot (19)**
  179:14;191:8;212:16;
  226:5;227:10,19,19;234:8;
  244:5;253:16;265:19;267:11;
  297:12;300:5;309:12,13;
  331:14;335:10;336:17
**lunar (1)**
  308:8
**LUPO (75)**
  177:2,7,10;182:4;183:15;
  184:4;187:7;188:11;189:21;
  191:20;201:2,9;202:14,21;
  204:18;205:4,8,14;207:6,9;
  213:9;221:5;222:15;223:9,13;

225:9;227:11;228:4;231:19;
  234:4;235:2;239:14;247:11;
  248:8;251:12,19;253:19;
  254:10,19;255:1;259:4;270:5,
  19;273:2;276:9;283:2;
  286:14;289:7;292:13;296:2;
  298:15;299:15;301:15;
  309:21;310:2;311:5;312:13,
  21;315:8,10;317:1;319:10;
  325:5,13;328:9;337:14,20;
  338:3,21;341:7;342:8,14;
  344:15,18;345:9

**M**

**M&T (1)**
  252:13
**machine (39)**
  192:18;208:9;217:18;
  240:4;248:19;249:2,5,9,10;
  261:19,21;262:1;284:6;290:2,
  6,12;294:11,15,15,16,19;
  295:17;300:13;301:11,12;
  306:6,7;312:15,16;322:10,12;
  324:4;330:14,21;343:4,7,10,
  12,19
**machine-or-transformation (2)**
  207:21;209:3
**machines (2)**
  240:2,13
**magically (1)**
  252:9
**makes (8)**
  187:12;190:10,16;193:12;
  206:5;216:7;223:21;263:19
**making (3)**
  203:8;231:6;300:7
**malicious (2)**
  325:15;327:2
**managed (1)**
  181:5
**management (5)**
  179:6;276:15;280:14;
  282:6;283:14
**manipulate (3)**
  259:12;276:12;280:6
**manipulated (1)**
  259:13
**manipulating (6)**
  274:4;275:12,12,13;276:13;
  284:6
**manipulation (9)**
  259:5,6,9;270:20;274:21;
  276:8;281:7,10,13
**manufacture (3)**
  300:13;301:13;312:15
**manufacturer (2)**
  290:7;301:12
**many (6)**
  213:2;218:17;221:18;
  249:16;299:10;340:7
**maps (1)**
  287:21

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

**Mark (1)**
223:11
**marketing (1)**
271:10
**markup (1)**
255:4
**Maryland (2)**
346:1,4
**massive (2)**
278:1,2
**Master (23)**
177:4;223:17;224:17;
226:8;228:8;230:19;231:20;
240:10;244:15,16;248:12;
251:15;277:13;281:19;
286:16;300:5;308:5;312:19;
329:13;331:18;334:12;
336:19;338:5
**Master's (2)**
224:13;328:15
**matched (1)**
192:7
**matches (1)**
204:8
**material (6)**
199:1,5;242:3;263:9;
290:11;299:5
**mathematical (4)**
256:1;266:8;291:9;344:20
**matter (14)**
193:10;201:20,21;207:16;
220:13,14;224:7;259:5;
290:19;300:11;302:7,20,20;
308:12
**matters (5)**
217:2;269:13;316:11,12;
324:5
**May (11)**
177:6;220:3;223:7;235:6;
253:18;298:2;313:18;322:4;
333:11;336:7;338:5
**maybe (2)**
187:1;259:18
**Mayo (1)**
178:6
**mean (25)**
182:15,20;210:2;225:14,19;
227:18;229:17;234:16;
235:19;262:8;267:15,19;
273:16,18;276:21;286:5;
289:9;296:13;300:14;301:1;
303:10;316:3;320:3;329:21;
330:2
**meaning (6)**
204:7;234:14;235:5;
262:12;308:9;315:20
**meaningful (5)**
178:19;209:18;260:15;
297:6;318:8
**meaningfully (5)**
180:14;182:3;207:4;215:1;
258:3
**means (11)**

191:1;211:12,15;212:12,12;
221:14,14;248:16,20;300:14;
313:7
**means-plus-function (2)**
211:1,11
**meant (4)**
186:9;193:7;222:18;343:5
**measure (2)**
259:10;319:12
**measurements (1)**
266:12
**mechanism (30)**
194:8;205:20,21;206:14,18;
207:2,12,19;208:12;209:4;
210:11,16,17;211:12,20;
212:1,1,12,14;226:1;238:15;
242:3;245:3,4,5;246:19;
264:17;268:16,18;269:19
**mechanisms (2)**
206:9;241:14
**media (5)**
197:19,21;199:5,6,9
**medium (1)**
218:10
**meet (3)**
231:4;262:10
**memory (3)**
327:4,7,9
**mention (1)**
220:18
**mentioned (6)**
211:10;221:1;291:17;
292:11;295:8;305:9
**mere (4)**
274:21;281:7,10,13
**merely (1)**
208:21
**message (2)**
215:7;240:19
**messages (1)**
325:15
**messed (1)**
343:14
**met (1)**
230:17
**method (3)**
192:4;232:16;326:15
**methodically (1)**
229:3
**methods (3)**
179:5;214:8;332:3
**MICHAEL (1)**
176:18
**microphone (2)**
177:8;315:12
**mid (1)**
194:5
**might (9)**
181:16;194:4;198:1;
206:21;224:2;289:21;296:12;
316:19;325:6
**mind (5)**
190:9;200:6;267:12;

301:19;329:21
**minds (1)**
183:10
**mining (1)**
343:17
**minute (4)**
180:3;275:10,16;331:10
**minutes (5)**
251:13;253:19;286:15;
289:10;312:21
**mirrored (1)**
306:3
**misapprehend (1)**
247:7
**missing (1)**
265:5
**misstated (1)**
268:6
**mistake (1)**
210:4
**misuses (1)**
333:13
**mixing (1)**
289:4
**mobile (30)**
290:3;293:16;294:12;
295:5;296:3,7,9,19;300:16;
301:1,4;303:16;304:7;305:19;
306:9;307:10,19;308:7,11;
309:16;310:16;311:1;312:1,9;
313:11,21;315:14,18,19;
316:2
**model (1)**
197:9
**modified (2)**
263:10;268:2
**modify (5)**
255:15;282:15,16,21;284:3
**modifying (12)**
255:11;256:14;257:13;
258:19;259:18;260:2;263:1;
271:4;277:14;281:21;283:21;
284:1
**mold (1)**
266:13
**moment (4)**
182:2;187:18;211:4;291:16
**monitor (2)**
296:11;330:7
**more (36)**
179:9;180:3;182:5,8,10;
188:17;189:12;196:20;
198:14;211:15;216:15;
218:12,14;223:21;234:8;
238:11;239:3;243:13,19;
249:12;263:1,11;272:19;
289:13;299:21;303:3;305:11;
323:12;326:14;327:15;329:9,
10;331:9;335:11;336:6;
341:11
**moreover (2)**
241:13;245:15
**morning (13)**

177:13;193:17;216:21;
240:17;242:2;278:6;280:11;
289:17;304:18;307:16;331:7;
336:3;338:6
**most (9)**
177:19;224:19;233:9;
251:17;261:1;293:17;301:9;
318:12,20
**Motion (17)**
199:18;200:17;204:14;
205:1,12;211:14;219:4;
220:20;340:15,16;341:2,3,6;
344:5,5,8,12
**motions (1)**
194:18
**motivating (1)**
220:1
**motivational (1)**
220:3
**motive (2)**
225:6;286:10
**Motorola (2)**
328:17;336:19
**mouth (1)**
305:11
**move (2)**
212:17;217:20
**moved (4)**
209:7;244:8,9;302:9
**moves (1)**
306:10
**moving (2)**
262:6;331:15
**MRTs (1)**
280:21
**much (20)**
196:20;198:13;216:14;
219:17;223:4;231:2;238:7;
239:3,6;249:13;293:11,14;
326:14;328:7,17;331:9;
335:11;341:9,11;344:12
**multiple (6)**
301:5;307:4,7;317:8;319:4;
331:8
**must (5)**
227:13;232:13;270:2;
298:11;331:15
**muster (1)**
337:5
**mustering (1)**
340:10
**myself (3)**
263:13;273:10;278:18

**N**

**narrowing (1)**
284:3
**natural (3)**
274:17;302:3;314:10
**nature (5)**
178:8;203:16;221:9;
274:17;290:10

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

**near (2)**
  333:2;336:4
**necessarily (11)**
  224:3;237:11;239:10;
  241:7;264:6;275:14;286:5;
  303:16;310:17;312:11;320:21
**necessary (1)**
  227:8
**need (22)**
  217:6;223:5,5;224:8;227:8;
  229:17,18;235:5;236:14;
  240:10;251:1;252:21;254:13;
  276:18;277:3;279:9;280:2;
  285:17;311:13;316:11,14,17
**needed (4)**
  202:1;224:11;244:11;
  278:14
**needs (5)**
  224:9;227:8;242:8;244:3;
  288:8
**negative (1)**
  232:14
**network (15)**
  293:21;311:11;312:4;
  318:9;319:3;321:18;328:19;
  330:8;333:2;336:6,8;338:9,
  11,18;341:17
**networks (2)**
  306:9;309:18
**nevertheless (2)**
  276:4;277:7
**new (19)**
  182:21;187:6;189:16;
  190:7;217:18;233:6;237:10;
  246:13,13;249:9;256:8,10;
  275:21;282:5,9;284:7;293:1,
  4;324:3
**next (11)**
  207:20;214:17;217:10;
  226:13;246:10;247:9,18;
  254:20;305:14;306:14;339:19
**non-abstract (1)**
  188:12
**non-business (1)**
  279:18
**none (2)**
  225:7;321:19
**non-quarantined (1)**
  327:6
**Nonsense (1)**
  282:4
**non-technical (1)**
  279:19
**non-usable (1)**
  194:1
**Nope (1)**
  265:15
**nor (6)**
  303:15;331:20;334:15;
  346:11,12,12
**normal (3)**
  181:19;184:20;185:2
**normally (2)**

  186:4;267:1
**North (1)**
  176:7
**notable (1)**
  244:5
**Notary (2)**
  346:3,19
**note (3)**
  220:16;222:18;345:10
**noted (5)**
  192:12;196:16;220:18;
  255:7;256:20
**notice (1)**
  203:20
**noting (1)**
  204:12
**notion (3)**
  298:4;299:9;315:3
**novel (3)**
  243:21;289:3;309:8
**novelty (10)**
  219:20;220:11;242:18,21;
  243:19,20;260:8;288:15;
  297:7;323:20
**number (4)**
  181:1;292:12;293:10;
  342:10
**numbers (1)**
  284:11

### O

**object (10)**
  180:4;182:15;197:10,13;
  210:12;214:14;255:15;
  287:21;292:4,7
**objects (3)**
  197:5,8;263:6
**obtain (2)**
  181:8;321:10
**obtaining (4)**
  182:7;209:21;210:5,15
**obviously (2)**
  189:1;331:15
**off (6)**
  223:17;281:4;297:17;
  299:17;330:10;343:15
**offer (1)**
  281:14
**offered (5)**
  199:7;251:8;272:13;315:4;
  342:4
**offering (2)**
  199:5,6
**office (5)**
  219:8;277:10;305:17;
  325:9,20
**often (3)**
  189:12,18;291:18
**old (6)**
  189:5;190:5,13;205:16;
  249:10;300:1
**omission (2)**

  241:16;244:10
**once (4)**
  199:8;239:16,17;245:8
**One (176)**
  177:2,5,11;179:11;184:15;
  187:17;188:4;189:4,8,13,20;
  190:4;192:16;194:16;196:5,
  13;200:2;202:7;204:13;
  205:11;207:10;210:20;
  211:15;213:17;214:15;216:1,
  6,18;218:12,13;222:1;224:4,
  6,19,21;225:13,18;226:12,13;
  227:4;228:20;229:10;230:2,
  10;231:6,16;236:2,5,12,12;
  239:9,21;240:8,13;242:18;
  244:3;246:12;247:5;248:3,14;
  249:8,17;251:7,21;252:3,4,11,
  16;253:20;254:9;255:1;
  256:6;259:10,11,17;260:5;
  263:15;265:21;266:4;267:10,
  12;270:7;271:6,13;272:19,20;
  273:19;274:11,19;275:13,17;
  276:12;277:2,12;278:12,16;
  279:2,11;281:12,19,20;
  282:20;283:6,18,18;288:1,6,
  11,12,17;289:19;290:2,6,17;
  291:19;292:14;294:2,18;
  295:20;298:1;299:16;300:11;
  301:7,7;302:16;303:6,19,20;
  304:3,12;305:1,5;306:15;
  307:8,13,20;309:10,21;
  310:10;312:13;315:16;316:1,
  20;317:14,15,20;318:6;
  319:17;320:1,17;325:5,8,16;
  327:21;328:14,18,18;329:13;
  330:7;331:1,6,8,11,21;
  333:19;334:15;335:18;
  336:12;337:12,14;338:21;
  339:15;342:7,17;344:9,19
**one-on-one (5)**
  213:4;219:12;234:5;
  302:15,16
**ones (7)**
  227:19;250:15;303:7;
  309:11;312:13;322:1;340:8
**One's (15)**
  201:4,10;232:11;250:6;
  265:20;277:5;301:19;305:10;
  308:21;310:4;329:21;330:9;
  340:15;341:2;344:5
**one-to-one (1)**
  200:4
**only (28)**
  194:7;196:11;211:5,8;
  212:9;235:11;242:4;247:10;
  252:3,4,11;254:4;256:13;
  257:16;259:9,19;266:17;
  274:14;276:18;306:8,15;
  310:14;312:6;315:5;327:16;
  330:7;332:4;338:20
**onto (2)**
  230:1;343:15
**oops (1)**

  256:2
**open (8)**
  318:1,10,13,15,18;324:6,7,8
**opening (1)**
  209:21
**openly (4)**
  194:2;195:21;196:1;210:5
**operate (1)**
  279:19
**operated (1)**
  183:3
**operating (1)**
  303:21
**opining (1)**
  245:21
**opinion (5)**
  199:16;200:3,10;201:19;
  345:11
**opinions (2)**
  200:2;272:13
**opposed (4)**
  295:9;323:17;326:4;340:20
**order (3)**
  248:5;264:19;285:18
**orders (2)**
  278:9;279:1
**ordinary (1)**
  273:6
**organization (6)**
  256:19;262:8;268:2;271:8;
  291:20;318:18
**organizational (1)**
  262:19
**organizations (1)**
  282:11
**organize (2)**
  255:15;291:14
**organized (2)**
  263:10;287:13
**organizing (15)**
  255:11;256:1,10,14;257:13,
  21;259:18;260:2;262:10,21;
  271:4;277:14;281:21;291:8;
  315:2
**original (2)**
  225:6;286:10
**originally (3)**
  186:8,11;219:8
**others (3)**
  217:21;273:17;294:9
**otherwise (3)**
  189:11;299:11;336:13
**ours (1)**
  232:8
**out (56)**
  189:3,10;194:19;196:4;
  197:21;200:7;206:6,8;208:3;
  213:11,20;215:4;217:20;
  219:19,20;232:16;235:11,17;
  239:9;244:12;247:20;251:4;
  252:2,20;257:8,12;261:11,14,
  15;266:10;267:7;271:17;
  275:19;276:1;284:21;293:7;

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

294:2;295:4;299:1,3;305:10;
306:4;310:7;316:1;317:6;
318:6;322:19;326:6,16;328:1,
8;334:8;335:20;340:10;
341:16;346:6
**outcome (1)**
346:13
**outlines (1)**
331:18
**output (1)**
258:6
**outputting (1)**
308:2
**Outside (1)**
250:10
**over (7)**
203:7;219:16;228:7,8;
278:9;279:12;331:6
**overall (3)**
183:3;191:1;318:5
**overcame (5)**
229:5,9;250:21;254:4;
304:21
**overcome (14)**
203:9;224:12;228:1;230:6;
233:1;235:11,19;238:2;
244:19;250:9;275:9;309:18;
339:6;340:2
**overcomes (2)**
243:15;278:21
**overcoming (1)**
239:4
**overlap (1)**
189:18
**overreaching (2)**
274:19;277:19
**overrule (1)**
265:20
**overrun (1)**
206:7
**overturn (1)**
216:9
**own (4)**
279:6;306:2;308:9;332:19

**P**

**pace (1)**
222:20
**packer (1)**
332:16
**packet (1)**
336:16
**packets (4)**
323:13,17;328:20;329:17
**page (17)**
186:4;191:21;205:15;
225:9,11;231:19;247:12;
270:7;274:15;276:9,10;283:2;
298:7;301:16;311:5;319:10;
326:13
**pages (1)**
277:5

**panel (5)**
227:8;248:2;249:14;273:5;
286:12
**paper (2)**
197:2,4
**paragraph (2)**
272:9;334:18
**parallels (1)**
250:14
**parcel (1)**
345:7
**Parker (2)**
319:9,15
**Parks (1)**
232:12
**part (20)**
178:16;182:5;194:17;
204:4;207:20;208:2,13;
212:17;218:11;244:2;296:16;
297:5;298:6;301:9;303:16;
312:19;323:5;345:2,3,7
**particular (9)**
183:14;188:7;202:5;208:9,
15;252:13;261:21;313:9;
324:14
**Particularly (1)**
205:4
**parties (7)**
177:12;211:12;213:3;
289:13;333:3;346:11,12
**partitioner (1)**
264:4
**partner (2)**
304:18;336:2
**parts (12)**
180:20;226:17;257:8;
258:13,14;277:17;280:18;
301:13;330:15;331:15;332:6;
345:4
**pass (3)**
249:10;285:18;306:6
**passed (3)**
249:4;337:5;340:10
**passes (5)**
251:10;295:18;312:17;
330:16,21
**patency (1)**
192:3
**patent (176)**
177:17,20;179:3,5,11;
184:11,12;185:9;187:17;
193:13,14,15;194:17;195:2;
197:3,17,18;198:6,8,11,14;
200:17;201:6;203:4,6,9,12;
205:15;206:12;208:11;
213:11,12,12,13,15,17,18;
214:5,6,8;215:18,19;216:3,3,
12,14;219:7,8,15;221:7;
222:21;225:18;226:12;229:4;
230:8;234:2;236:6,13,15;
237:5;239:4,7,8,12;241:2;
244:7,12,21;246:3;248:15;
249:20;250:6,12,17;251:10;

252:15;253:16;254:21;255:3,
7,10,19;256:6,14;257:4,12,14,
15,18;259:2,5,8,13,13,19;
264:19;265:3;267:4;268:1,14;
274:2,11;275:1,1,6;276:5;
277:9,15,17;278:10,11;280:2;
281:6;283:7,10;285:4;286:7;
289:10,16;292:8,21;294:8,18;
296:1;300:19;305:9,17,17;
306:19;307:1,7;308:9,10;
309:4;310:2,8;312:12;317:2,
14,15,21;318:1,11,13;319:4;
320:6,7,11;321:3;325:9,20;
326:2;327:10,18,19;329:15,
16,20,20;330:15;332:12,19;
333:19;334:21;336:21;337:3,
6,16;338:10,15;339:16;
341:11,11;342:15;343:11,17
**patentability (3)**
260:16;324:16;325:17
**patentable (28)**
178:19;183:11;189:10,11;
217:15;237:4;253:12;258:1,
21;261:17;264:20;265:18;
266:6,7,19;267:15,16,20;
269:13;285:12;302:7;320:9,
14,15;322:8;323:19;328:13;
329:11
**patented (3)**
219:9;301:18;344:21
**patentee (3)**
218:3;241:19;264:15
**patentees (1)**
249:10
**patenting (4)**
216:9,10;233:3;344:20
**patents (42)**
184:13;187:15;188:18;
213:18;216:8;222:1;227:16,
16;228:21;229:3,6;230:8,13;
233:20;236:9;237:21;238:4,
10,18,21;241:1;244:6;249:7,
19;250:13,14;253:5;254:7;
257:15;265:4;281:8;285:21;
291:7;303:2;309:12,13;
317:17;339:5;340:11,19;
341:12;342:18
**patient (1)**
333:21
**pattern (7)**
275:18;318:2,3;330:18;
333:9;334:3;335:7
**paying (1)**
203:2
**pending (1)**
334:6
**people (21)**
186:21;187:13;188:1,2;
196:18,21;197:6;198:1;
204:12;241:10;242:15;252:8;
271:3,5;278:7,18;279:1,12,
18;292:1,3
**perceive (2)**

300:15;301:4
**perceived (2)**
300:15;301:5
**perception (1)**
301:3
**perfect (1)**
254:1
**perform (6)**
182:21;193:4;218:4;280:6;
297:18;322:14
**performed (2)**
218:16;297:14
**performing (1)**
327:8
**performs (3)**
207:1,13;216:5
**perhaps (1)**
203:1
**Peribit (1)**
215:6
**permitted (3)**
211:8;229:16,16
**person (1)**
211:9
**personal (1)**
280:15
**pervade (1)**
285:20
**petitioner (1)**
218:2
**phenomenon (1)**
274:17
**phone (7)**
257:18;278:9;279:1,13;
284:11;293:10;307:17
**phonetic (1)**
252:17
**physical (4)**
231:17;232:1;264:6;290:5
**physically (2)**
186:17;296:6
**pick (1)**
306:14
**picks (1)**
196:7
**picture (3)**
284:21;285:2,6
**piece (11)**
196:5;208:17,19;220:2;
243:10;244:1;278:16;298:7;
299:4;321:8;326:17
**pieces (6)**
180:2;194:19;208:8;
285:11;317:13;325:2
**place (9)**
191:13;208:4;306:10,10;
307:13;319:4;323:11;346:5,6
**places (3)**
278:8;307:3,7
**plant (1)**
240:6
**platform (1)**
308:12

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

**play (1)**
278:19
**playbook (2)**
194:17;217:20
**please (7)**
177:3,7;223:10;251:14;
286:18;298:1;313:2
**plethora (1)**
321:17
**plug (1)**
297:17
**plurality (8)**
288:1;311:8;312:14;
318:11,14;319:3;330:16;
335:5
**plus (1)**
248:16
**pm (2)**
254:18;345:16
**point (33)**
184:17;191:16;204:11;
220:16,18;226:16;251:18;
260:7;262:3;267:10;268:8;
271:16;273:4,4,18;287:6;
292:18;295:4;297:10;299:13;
301:8;303:13;314:6,7,8;
316:6;321:4;326:5,9;328:15;
329:13;337:13;338:21
**pointed (6)**
186:5;208:3;219:19,19;
271:16;291:16
**pointer (4)**
185:6;291:5;308:6;311:10
**pointers (8)**
291:15;292:11;293:1,6;
294:4,4,12;308:1
**pointing (4)**
293:8;298:18;325:21;
334:18
**points (8)**
185:6,7;252:19;292:6,20;
304:10;339:12;344:19
**policy (1)**
261:11
**pop (1)**
285:17
**populate (2)**
279:8;280:21
**populated (1)**
280:5
**pop-up (1)**
185:12
**portion (2)**
197:7;201:19
**Portions (14)**
193:18,21;195:21;196:1,3,
10;198:16;210:1,6,8,10;
211:8;212:9;258:8
**position (15)**
201:4,10;206:17;212:20;
222:4;225:1;259:4;271:18;
272:1;301:20;310:18;313:11;
315:15;325:18;326:1

**positions (3)**
212:21;303:11,12
**possible (2)**
264:11;289:12
**possibly (4)**
183:6;224:20;237:16;
260:18
**post (3)**
223:19;322:2;323:7
**potential (1)**
333:12
**potentially (1)**
189:10
**PowerPoints (1)**
282:19
**practice (7)**
189:17;191:11;225:5;
233:19;235:18;304:17;306:1
**practices (1)**
300:5
**pre-Alice (1)**
284:14
**preamble (1)**
311:6;315:15,19
**preambles (1)**
311:18
**precise (2)**
190:19,20
**preempt (3)**
243:21;246:7;311:13
**preempted (1)**
272:15
**preempting (2)**
243:12;275:12
**preemption (39)**
219:3,11;220:3,4,6,10;
243:7,10,20,20;244:2,4;
246:3;260:7,9,10,17;274:6,
11;275:11,11;278:1;282:12,
14;283:19;285:14;304:6,7,13;
305:3;306:4,5;308:15;331:12,
13;334:15,20;339:8;342:20
**preempts (2)**
243:5;273:8;283:20;303:1
**PRESENT (5)**
176:15;185:21;222:20;
319:12;331:16
**presentation (11)**
223:13;231:21;238:11;
239:11;251:21;276:11;311:6;
331:6,7;338:6;345:13
**presentations (1)**
247:21
**presented (1)**
177:14
**presenting (2)**
228:12,16
**press (1)**
206:7
**pressed (1)**
272:20
**pressure (1)**
222:19

**presumably (1)**
316:17
**presumed (1)**
221:7
**presumption (5)**
219:2;221:2,3,11;222:6
**pretty (6)**
179:13;199:14;231:2;
238:7;253:2;335:10
**prevalent (1)**
225:5
**prevent (3)**
196:18;245:20;246:8
**prevented (3)**
194:1;210:13;327:8
**preventing (1)**
196:8
**prevents (1)**
226:3
**primary (6)**
262:18;276:14;280:13;
282:6;283:15;288:1
**principal (6)**
225:6;244:20;285:7,15,20;
286:9
**principally (1)**
309:11
**principle (1)**
274:10
**principles (2)**
233:3;246:1
**prior (13)**
203:2,3,7;215:6;219:9,9,16;
239:13;245:4;303:17;332:3;
333:13;338:13
**probably (8)**
178:2;191:18;204:11;
251:17;272:19;277:16;
328:21;338:7
**problem (108)**
184:15,19;186:18;187:5,7,
11,19,20,21;197:20;198:21;
203:10,10,13,21;219:12,15,
18;224:10;227:6,11,14,20;
228:1,19,21;229:5,8,20;
230:1;231:11;233:1,18;
234:21;235:10,18;236:21;
237:13;238:1;239:5,8;240:1;
241:1,3,11,13,17;242:14,17;
243:3;244:10,18;245:19;
246:3,11;250:9,21;254:4,7;
266:9,13;267:3,19;268:10;
275:8,14;277:20;278:10;
279:17;280:1;281:2;282:9;
284:9,13,17;285:5,13;291:10;
294:21;296:13,14;297:5;
298:18,19;303:8;304:5,16,19,
20;306:16;307:2,17;309:18;
314:18;315:5;316:13;319:21;
324:10;331:5;332:2,3,13;
333:12,15,16;339:9;342:21;
345:1
**problem/solution (2)**

**236:21;331:3**
**problematic (4)**
185:8;193:6;202:7;328:5
**problems (20)**
192:16;202:2,3,13;203:1,4,
7;219:13;227:17;229:6,8;
230:6;240:13;262:15;279:15;
295:2;306:5,19;334:5;339:6
**proceed (2)**
205:1,2
**PROCEEDINGS (4)**
177:1;346:5,7,9
**process (3)**
256:11;266:9;290:4
**processers (2)**
218:13,14
**processing (3)**
192:13;323:16;336:15
**processor (1)**
288:3
**products (2)**
186:7,10
**proffered (1)**
202:4
**profile (4)**
290:9,10;302:1;310:20
**program (8)**
217:14;218:10,12,20;
248:21;253:7;279:20,21
**programmed (4)**
218:5;238:14;269:21;270:2
**programmers (1)**
278:17
**programming (10)**
179:18;181:4;192:8;
217:12,17;249:9;261:9;280:7;
297:10;324:1
**programs (1)**
307:3
**progression (1)**
272:5
**proliferate (1)**
282:10
**prong (5)**
243:10,11;277:11;284:16;
345:6
**prongs (1)**
249:3
**proof (2)**
221:15;318:21
**proper (3)**
254:8;322:19;339:20
**properly (2)**
243:19;278:15
**property (1)**
197:9
**prosecution (3)**
234:16;338:8,14
**protect (1)**
206:10
**protected (19)**
193:19,21;195:15;196:1,3,
9;197:13;198:16,17;199:13;

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

210:1,6,7,10;211:7;212:9;
242:16;244:9;246:12
**protecting (3)**
187:19;195:13,20
**prove (1)**
203:19
**proves (1)**
219:17
**provided (3)**
194:6;333:8,12
**providing (1)**
323:14
**PTO (4)**
326:4;328:6,12;329:14
**PTO's (2)**
326:5;336:20
**public (3)**
199:4;346:3,19
**pull (2)**
177:7;343:15
**pulled (1)**
246:12
**pulling (3)**
194:19;240:6;306:4
**purchase (2)**
278:9;279:1
**pure (2)**
296:20;314:1
**purely (4)**
192:20;264:7;286:3;322:2
**purporting (1)**
340:9
**purpose (2)**
213:20;214:10
**purposes (3)**
204:14;211:14;340:13
**purview (1)**
202:10
**put (16)**
189:17;190:19;194:12;
206:6;230:15;233:5;238:12;
248:3;280:20;304:3;307:8;
309:7;338:16;339:4,18;341:4
**puts (2)**
293:17;302:6
**putting (9)**
207:12;236:2;238:12;
242:14;250:11;276:4;285:3;
340:6;343:18

## Q

**qualities (1)**
301:14
**quarantine (3)**
327:4,5,7
**quarter (1)**
328:21
**query (1)**
199:10
**quick (5)**
230:10;238:6;275:6;
306:19;308:14

**quickly (2)**
212:17;295:4
**quite (9)**
209:11;219:3;223:2;
241:11;242:9;244:5;262:6;
326:9;332:11
**quote (8)**
217:4,7,15;264:16;265:9;
301:8;313:7;324:11
**quoted (1)**
264:4
**quotes (1)**
247:13

## R

**Raider (3)**
200:3,9,13
**raise (1)**
222:3
**raised (4)**
286:20;288:15;314:7;
326:10
**rare (2)**
314:11,13
**rather (2)**
184:6;264:6
**raw (1)**
280:13
**reaching (1)**
274:3
**read (8)**
182:9;226:19;237:21;
272:5;273:15;283:10;301:15;
313:7
**readable (1)**
218:10
**reading (2)**
248:4,6
**ready (1)**
254:19
**real (21)**
184:16;186:15,19;187:11,
15;188:11;240:11,12,15;
275:6;278:4,7,18;279:5;
280:8;281:2;285:1;306:12,18;
307:18;308:14
**really (55)**
178:17,21;180:11;182:18;
183:6;192:20;208:7;229:20;
230:1,3,4;231:8;232:10;
233:2,20;235:11;236:13;
238:21;239:1,4;240:15;244:4,
17;248:13,21;249:8;250:3;
251:6;252:21;259:1;260:1;
264:20;270:11;277:10;
280:13;281:7,14,19;287:19;
288:17,18;291:3;292:20;
294:2;298:10;299:17;304:10;
314:2;318:19;320:7;321:14;
322:11;339:14;341:3;345:13
**realm (5)**
264:7;306:8;308:2;309:18;

311:20
**real-time (2)**
333:3;336:4
**reason (10)**
182:14;199:18;213:19;
224:6;247:10;261:7;268:7;
299:6;302:8;324:9
**reasons (6)**
252:2;291:7;314:5;322:9;
344:4,6
**rebutted (3)**
228:20;233:21;234:1
**rebutting (1)**
230:14
**received (4)**
199:11;258:6;327:3;345:12
**receiving (2)**
199:2;326:20
**recent (4)**
195:11;196:20;316:8;329:6
**recently (1)**
233:10
**recess (1)**
254:17
**recipient (2)**
245:10;247:2
**recitation (1)**
281:20
**recite (1)**
310:5
**recited (1)**
254:5
**recites (1)**
311:7
**recognizable (1)**
317:18
**recognized (2)**
258:8;324:14
**recognizing (1)**
230:21
**recommend (1)**
341:1
**reconcile (2)**
278:8,12;279:14
**reconciled (3)**
278:15;279:16,20
**reconciling (1)**
279:12
**record (24)**
177:3;181:3;207:6,12;
223:10;225:10;231:19;
262:14,18;273:13;276:14,14,
15;280:13,14;282:6;283:14,
15;288:1;326:13;329:6,8;
345:10;346:9
**recorded (1)**
346:8
**red (3)**
236:2;247:12;333:3
**reduce (1)**
319:1
**reduced (2)**
306:1;319:7

**refer (3)**
203:17;217:16;343:5
**reference (5)**
184:17;197:17;217:1;
338:14,19
**referenced (2)**
180:13;256:4
**references (1)**
313:17
**referencing (1)**
343:17
**referring (6)**
207:6;225:9;283:2;324:12;
331:17;338:17
**refers (2)**
197:6;211:5
**reflected (1)**
204:1
**regard (3)**
311:19;325:19;326:1
**regarding (3)**
205:15;224:14;231:11
**regardless (3)**
285:18;337:9,10
**regular (1)**
215:6
**regurgitate (1)**
202:12
**rejected (9)**
217:8,21;218:6,20;264:2;
265:16;297:19;298:20;324:4
**rejecting (1)**
263:20
**relate (1)**
268:16
**related (8)**
181:16;193:15;196:6;
261:15;277:14;282:3;283:15;
346:12
**relates (4)**
195:19;292:10;306:20;
325:8
**relating (3)**
179:6;255:11;282:1
**relations (1)**
317:10
**relative (1)**
196:20
**relativity (1)**
233:3
**relevant (6)**
204:17,19;207:19;274:12;
275:20;339:11
**relies (2)**
272:11;309:10
**rely (7)**
227:20;236:13;271:19,20;
284:10;302:10;309:12
**relying (2)**
214:3;285:8
**remaining (2)**
206:14;261:2
**remains (4)**

Intellectual Ventures 1 LLC, et al vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session - Vol. 2
April 16, 2015

204:9;208:3;249:5;282:8

**remember (1)**
194:21

**remote (1)**
303:20

**removing (1)**
325:14

**repeat (1)**
263:13

**repetition (1)**
215:6

**replete (1)**
330:6

**reply (6)**
205:15;271:14;298:6;
310:3;325:8;328:16

**report (2)**
266:11;326:6

**reporter (3)**
223:2,15;289:8

**reporting (1)**
230:1

**reports (2)**
216:19;299:12

**representative (5)**
209:13,16;255:8;258:7;
291:1

**require (2)**
235:3;324:5

**required (12)**
179:18;180:11;192:7;
199:3;217:11;258:10;261:9,
10;265:1,10;296:17;310:5

**requirement (2)**
189:19;292:20

**requirements (1)**
193:5

**requires (4)**
181:3;297:10;327:16;
343:20

**resolve (2)**
299:11;342:5

**resolved (5)**
231:12;316:12,14;343:3;
344:9

**resolving (1)**
227:17

**resounding (1)**
222:9

**resource (1)**
311:10

**resources (1)**
311:9

**respect (14)**
205:13;220:19;221:2;
274:2;289:16;291:10;297:7;
310:2;313:4;334:14,20;
340:14;343:4,7

**respects (2)**
198:8,9

**respond (3)**
212:19;222:13,17;223:5;
251:13

**response (8)**
199:11;209:14;217:5;
242:5,5;275:14;311:13;336:6

**rest (3)**
216:5;238:17;274:16

**restricting (1)**
199:4

**result (1)**
324:3

**resumed (1)**
254:18

**retrieve (1)**
293:9

**retrieved (1)**
311:12

**retrieving (2)**
291:5;294:3

**return (1)**
191:18

**returning (1)**
191:20

**revoke (1)**
281:15

**rid (2)**
233:2;336:8

**ridiculous (1)**
300:2

**rife (2)**
200:4;298:9

**right (39)**
177:2;183:21;184:5;
187:10;188:5;191:7;204:5;
205:10;207:7;215:13,19;
216:11;228:11,16;230:18;
235:7,8;239:12;247:8;248:7;
252:20;257:12;259:20;
278:17;280:10;282:20;
283:19;288:18;296:8,9;
298:16;301:7,12;312:20;
316:2;327:8;329:13;331:10;
344:1

**rights (4)**
193:19;210:7;245:7;246:20

**rising (1)**
248:14

**risk (7)**
179:6;219:11;220:6;233:4;
244:19;298:3;340:21

**ROBSON (1)**
176:16

**role (7)**
199:21;205:12;226:17,18;
227:3;229:13;264:12

**root (1)**
232:10

**rooted (1)**
249:7

**rough (1)**
254:13

**round (1)**
333:9

**route (1)**
228:11

**routine (1)**
181:14

**rubber (1)**
266:12

**rule (3)**
202:3;277:2;299:8

**rules (24)**
193:19;194:7;195:16;
196:12;197:7,15;198:18;
199:12;207:1;210:7;211:6,8;
212:10;235:3;241:9;242:6,10,
11,14;245:6,10,18,20;246:19

**rulings (1)**
267:21

**run (3)**
232:18;311:2;312:10

**running (2)**
248:21;253:7

**runs (2)**
264:8;291:6

**RUTLEDGE (1)**
176:18

## S

**safe (1)**
289:10

**sake (2)**
241:21;307:8

**sale (1)**
199:5

**salient (1)**
301:9

**same (64)**
178:13;179:19;197:1,20,20;
198:5,11,21;199:13;209:19;
210:10,11,14,16,18;211:3,4;
212:4,7,10;226:4;228:12;
232:15;236:18;238:19;
243:15;247:21;248:10,11;
250:11;252:15;259:3;262:5,
15,20;263:2,11;265:13;281:1;
284:19;291:7,10,14;292:4,7;
295:2,6,10,11;303:12,19;
318:17;322:3,9,15,16,17,20;
323:2,11,20;324:1;329:1;
336:13

**satisfied (2)**
287:4;290:16

**satisfy (5)**
193:5;257:17;287:1;290:6;
314:4

**save (1)**
233:12

**saved (1)**
183:14

**saw (25)**
177:12;194:14;195:8;
203:16;206:13,17;209:10;
210:11;216:20;217:2;240:12;
242:1;264:17;269:10;278:6;
291:9,10,11;292:16,17;
293:12;318:20;322:3;324:2,

12

**saying (20)**
180:17;190:14;201:9;
214:3;220:12;230:16;231:2;
232:3;242:20;248:6;278:8;
288:7;312:18;313:16;314:1;
317:20;321:20;334:16;
339:17;341:20

**scanned (2)**
326:18;330:17

**scanning (2)**
258:4,8

**scenario (2)**
189:1;221:4

**scenarios (2)**
188:4;209:6

**schoolyard (1)**
240:18

**scope (1)**
313:4

**screen (3)**
296:11,21;343:14

**scytale (1)**
196:19

**seamlessly (1)**
307:11

**Sears (1)**
252:9

**seat (5)**
222:12;253:15;273:1;
286:13;299:13

**second (19)**
181:9;208:19;224:13;
226:2;230:10;243:11;262:3;
270:5,7;271:3;272:2;283:19;
295:18,18;299:4;319:13;
326:7;345:6,14

**secondarily (1)**
242:13

**secondary (8)**
226:3;239:5,19;241:3;
242:13;244:11;245:19;246:11

**secondly (3)**
192:19;202:9;313:10

**seconds (5)**
253:18;313:1;315:9;
344:16,18

**secrets (5)**
187:19,20;196:15,18;
206:10

**section (19)**
190:8,8;205:4,13;219:21,
21;220:4;221:2,6;222:2,5,10;
224:1;229:13,18;257:18;
286:21;310:6;340:4

**sections (1)**
287:1

**sector (3)**
327:4,5,8

**sectors (1)**
327:9

**security (4)**
193:16;245:17;246:10;

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

250:21
**seeing (3)**
196:19;228:14;236:16
**seek (2)**
188:8;207:14
**seeking (3)**
184:12,13;187:15
**seeks (1)**
216:18
**seems (1)**
238:9
**selector (1)**
327:6
**send (2)**
241:6;299:2
**sense (6)**
191:16;193:13;204:5;
209:4;223:21;294:16
**sensitivity (4)**
330:19;332:9;333:3;336:2
**sent (3)**
200:8,12;247:16
**separate (6)**
219:21;287:1,4;288:11;
297:8;308:10
**September (1)**
346:21
**series (1)**
193:18
**server (5)**
185:7;232:5;293:21;
311:12;312:4
**servers (2)**
318:12;321:18
**service (1)**
318:14
**serving (1)**
339:3
**session (1)**
345:14
**set (30)**
177:21;178:1,5;179:13;
180:6;182:6;192:6;217:13;
218:15;220:5,6;229:4;233:6;
249:15;253:14;256:6,7;
263:14;280:19;294:3,12;
317:12;319:20;320:10;323:2,
17;324:18;325:3;342:12;
346:6
**sets (1)**
194:9
**setting (4)**
218:11;276:20;322:5,19
**settlement (5)**
180:8;182:17;183:1;
225:16;250:4
**seven (1)**
284:2
**several (5)**
204:12;252:2;271:13;
291:18;295:14
**shades (1)**
284:15

**shadow (3)**
181:3,8;293:12
**shared (1)**
188:3
**sharing (1)**
188:2
**shelf (1)**
297:17
**shop (2)**
186:9;303:19
**shopping (2)**
185:10;186:16
**short (2)**
238:6;313:3
**show (18)**
198:21;215:16;219:10;
226:1;236:16;239:2,2;245:2;
248:19,20;255:9;272:20;
275:9;283:1;286:18;303:3;
305:19;332:12
**showed (4)**
225:15;250:11;254:3;
304:19
**showing (7)**
229:3;236:16;237:3;250:7,
14;282:20;298:6
**shown (29)**
180:21;182:8;186:8,14;
192:13;209:20;212:11;
213:16;214:6;215:2;216:17;
218:2;257:3;262:17;263:4;
270:12;272:3;289:21;293:17;
303:2;307:16;323:3;328:18,
18;337:9,10;339:5,8,9
**shows (8)**
193:14;195:10;216:11;
222:1;240:7,14;279:5;307:17
**side (6)**
228:17;254:12;265:8;
268:6;289:10;315:4
**sides (1)**
344:14
**signals (1)**
211:16
**similar (11)**
198:8,8,9;209:11;249:18;
250:16;263:12;264:3;297:18;
319:8;324:1
**similarity (1)**
319:17
**similarly (2)**
318:21;323:1
**simplified (2)**
320:5,6
**simply (13)**
180:16;181:17;190:13;
236:3;263:5;270:3;318:3;
320:12;321:20;323:14;
327:19;341:15;343:13
**single (5)**
195:7;257:7;283:5;317:19;
332:5
**site (4)**

185:5;186:3;317:19;329:5
**sites (3)**
318:12,14;321:19
**situation (9)**
184:16,17,18;186:16;
267:13;268:1;269:4,7;314:10
**situations (1)**
188:16
**six (1)**
311:7
**skill (1)**
273:6
**skilled (2)**
216:1;327:21
**skills (1)**
280:7
**skip (5)**
184:1;241:20;295:3;
297:11;333:17
**skipping (1)**
295:1
**SKYLES (1)**
176:15
**slash (1)**
337:2
**slide (116)**
179:3,10;180:21;184:19;
186:15;191:19;192:1,13;
193:20;197:2,7,19;207:7,17;
208:17;209:20;210:20;
212:11;213:16;214:7;215:2,
17;216:11,17;217:4,15;218:2,
7;219:5;225:14;226:9;
230:19;231:21;232:12;
233:13,14;235:15;236:8;
237:2,19;238:3,10,20;239:15;
242:1;246:2,14;247:9;248:3,
12;249:12,17,18,21;250:10,
11;251:16,18,19,20;252:15;
254:2;255:6,17;257:4;258:5;
260:4;261:4;263:4;264:5;
265:8;266:10;270:12,13;
272:4,10;273:14;274:6,15;
280:1;281:20;283:5;286:19;
288:10;290:1;293:18;297:13;
303:14;304:12;306:21;307:6,
15;308:14,18,20;309:7,13;
317:12;319:11;320:8;321:2;
323:3;331:17;334:11,18;
335:1,17;336:9,14;337:4,5;
338:16;342:6,10;343:2,5
**slides (8)**
225:12;247:9,18,20;249:13;
275:6;309:4;337:1
**smell (1)**
301:3
**snippets (1)**
339:19
**society (1)**
271:7
**software (28)**
206:18;212:2;216:9,10;
253:10;264:8;265:18;268:19;

301:10;302:2,4,5,11,12;
310:10,13,16,21;311:1,19;
312:5,7,9,10,18;313:8,12;
314:1
**solely (1)**
260:1
**solution (35)**
184:15;187:5,12;191:5;
227:7;228:19;229:1;231:11;
237:1,13;242:17;266:14,15;
267:4,7,14;275:9;284:14,18;
285:13;288:4,5;303:9;304:5;
307:10,16;314:19;316:13;
320:1;322:2;323:7;333:8,16;
343:1;345:2
**solutions (4)**
305:4;306:5;307:6;339:7
**solve (6)**
241:2;245:18;246:11;
278:10;285:5;332:13
**solved (7)**
187:9;233:18;267:19;
281:6;285:5;306:17;331:5
**solves (2)**
243:3;304:15
**solving (2)**
227:13;266:9
**somebody (10)**
185:2;186:2,16;188:17;
197:13;268:8,9;292:5;324:6,7
**somehow (3)**
190:7;209:6;263:19;
314:17;343:21
**someone (13)**
185:10;194:2;197:12;
217:12;229:18;240:6;241:7;
246:4;247:3;273:6,12;293:8
**someone's (1)**
317:10
**sometimes (5)**
189:13,14;191:10,12;
339:18
**somewhere (1)**
198:2
**sophisticated (1)**
187:21
**sorry (6)**
204:18;231:20;251:16;
255:1;283:18;320:6
**sort (15)**
191:7,17;193:18;218:19;
252:7;262:20;264:7;265:13;
270:15;287:12;289:20;297:4,
12;323:12;324:1
**sorted (1)**
296:1
**sorts (2)**
209:8;327:1
**sounds (2)**
336:17,18
**source (3)**
204:3;298:8;299:9
**sources (2)**

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

317:8;333:10
**space (1)**
  284:9
**Spartan (2)**
  225:17,18
**Spartans (2)**
  250:20;251:8
**speak (2)**
  177:3;213:1
**spec (8)**
  216:21;235:4;276:20;
  281:11;304:20;309:1;318:1;
  320:20
**Special (25)**
  177:4;223:17;224:13,17;
  226:8;228:7;230:19;231:20;
  240:10;244:15,16;248:12;
  251:15;277:13;281:18;
  286:16;300:5;308:5;312:19;
  328:15;329:12;331:18;
  334:12;336:19;338:5
**specific (69)**
  179:9,17,17;181:2,6;182:5;
  191:2,5,8,14;192:6,10,17,18;
  193:1,3;195:3;203:19;207:15;
  211:17;214:6,8,13;215:9,21;
  216:15;218:4,4,19;258:18;
  262:1;275:14;282:16,21;
  287:18;288:5;290:12;291:5;
  292:19;293:5,7,18,21;294:15;
  311:9,10;312:3;318:15;320:9,
  10;321:19;322:12,13;326:9,
  14;327:16,17;328:18;329:9,
  10,11;330:3,5,6;335:11,11;
  343:10,12,19
**specifically (4)**
  182:8;217:13;236:7;342:3
**specification (54)**
  177:15;178:11;179:8;
  182:9,10;183:7;202:8;216:17;
  217:2;224:15;226:18,19;
  227:2,3,5;230:5;231:11;
  232:21;233:7;234:1,15;
  235:12,14;236:20;245:1;
  247:10;251:4,9;266:16;268:4,
  7;269:1,14;272:12;273:7,13;
  276:3,4,17,19;277:4,8;
  283:10;285:19;286:1;313:17;
  333:5,7;335:3,14,15;338:8;
  340:2,6
**specifications (6)**
  235:9,21;236:1;238:1;
  333:14;339:12
**specificity (2)**
  295:7;327:14
**specifics (1)**
  193:9
**specified (2)**
  179:7;317:10
**specify (1)**
  198:19
**specs (1)**
  340:17

**spelled (1)**
  328:8
**spend (1)**
  209:16
**spent (1)**
  253:16
**Sports (1)**
  186:16
**spot (2)**
  196:4;303:20
**squarely (1)**
  302:6
**stage (3)**
  191:13;200:18;344:10
**stand (2)**
  226:20;315:6
**standard (7)**
  221:21;222:8;223:20;
  253:3,13;269:7;344:7
**standpoint (2)**
  210:15,16
**start (9)**
  177:18;189:10;213:6;
  234:8;235:20;273:3,14;
  299:16;326:18
**started (2)**
  241:19;282:10
**starting (1)**
  321:2
**starts (1)**
  208:19
**state (4)**
  208:16;234:15;346:1,4
**statement (3)**
  212:20;243:6;300:3
**state-of-the-art (2)**
  229:4;234:21
**states (1)**
  327:20
**statute (1)**
  290:13
**statutory (4)**
  221:5;290:2;300:11;302:20
**stay (2)**
  186:10;315:11
**stays (1)**
  281:1
**steadfastly (2)**
  247:4;248:4
**stealing (1)**
  194:18
**stenographically (1)**
  346:8
**step (26)**
  189:4;195:9;206:12;208:2,
  6,14;258:15;264:11;288:11,
  11,12,17,18;289:21;290:15,
  16,17;295:19,20,21;319:19,
  19,19;320:1,2,19
**stepped (1)**
  178:5
**steps (23)**
  179:14,15;180:6;182:6;

183:19;192:8;193:18;198:10,
12,16;199:3,13;209:5;214:21;
218:14,15;257:6;261:14,15;
318:21;319:2,8;320:10
**sticking (1)**
  329:14
**still (7)**
  196:20;228:14;287:2,4;
  314:13;316:7;329:11
**stood (1)**
  252:2
**stop (3)**
  241:4;303:19;309:6
**storage (11)**
  192:14;193:2,2;195:5;
  206:5;207:3;211:13;212:14;
  256:19;261:10;327:4
**store (4)**
  185:14;231:18;232:4;
  258:15
**stored (4)**
  209:7;285:1;293:21;312:3
**storied (1)**
  199:15
**storing (12)**
  181:18;183:4;211:13;
  212:12,13;257:9;258:1,4,19;
  285:7;293:13;326:21
**straight (4)**
  217:20;310:7;311:2;333:18
**strong (1)**
  178:3
**struck (1)**
  318:20
**structure (6)**
  211:13,15,18;212:13;
  262:20;295:7
**structures (5)**
  181:4;182:1;248:18;262:6;
  279:7
**stuff (1)**
  285:21
**subject (7)**
  197:10;201:2;203:4;
  290:19;300:11;302:7,20
**subjects (3)**
  197:5,6,8
**submit (5)**
  221:10;231:9;314:3;344:4,
  12
**submitted (2)**
  222:3;308:5
**substance (2)**
  272:12;320:7
**substantial (2)**
  178:18;259:17
**substantive (2)**
  264:21;297:2
**substitute (4)**
  268:12;269:1,2,14
**substituting (1)**
  267:1
**subtle (1)**

270:11
**successful (1)**
  293:19
**suddenly (1)**
  186:17
**sufficient (5)**
  264:1;275:2;295:8,18;
  322:7
**suggestion (4)**
  257:10;261:12;314:17;
  343:21
**suit (1)**
  177:17
**summarize (1)**
  285:10
**summary (5)**
  270:8;337:6;340:13,16;
  341:1
**summed (1)**
  253:6
**superficial (1)**
  257:2
**support (6)**
  226:15;271:21;311:15;
  339:13,13,14
**supported (2)**
  301:20;310:19
**Supreme (65)**
  177:21;178:5;179:1,4,12;
  180:1;183:18;189:2;190:18;
  195:2,10;200:8,8,11,16;201:1,
  16,20;208:4;214:9,11,15,20;
  216:9;217:3,21;218:6;219:19;
  220:5;221:1,11,14;225:1;
  230:20;232:15;237:15;252:4,
  21;253:2,13;254:2;260:11;
  266:4,5,19;270:14;274:14;
  287:7,16;288:7;289:5;294:10;
  297:19;298:14,20;299:2,20;
  314:11;316:9;319:15,19;
  324:13,19;327:13;343:3
**sure (13)**
  183:17;189:21;197:12,14;
  223:2;252:8;253:2;263:14;
  268:5;278:20;279:10;328:4;
  344:14
**survives (1)**
  216:14
**synced (1)**
  307:13
**synch (1)**
  307:5
**system (38)**
  182:21;183:3;185:19;
  188:7;189:15;192:5,6,13;
  197:4;215:8;217:18;218:13;
  225:5;248:21;253:7,9;258:3;
  259:14;261:4;280:2;286:9;
  289:17;298:3;303:17,21;
  317:19;321:13,13,18,21;
  322:13;324:3;332:6,17;
  333:13;334:3,7;343:19
**systems (6)**

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

190:14;246:6;321:2,10;
332:15;337:17

## T

**table (1)**
300:19
**tactile (1)**
301:1;302:14
**tag (2)**
302:2;310:20
**talk (20)**
184:6;199:20;211:3;
230:13;262:18;266:2;289:19;
300:9;303:5,6;305:2,3,4,6;
315:12;323:13;327:12,12;
331:10;337:18
**talked (9)**
207:18;210:17;220:17;
236:15;262:3;266:1;287:17;
291:11;302:17
**talking (12)**
188:14;216:21;233:12;
249:15;263:7;286:8,11;289:8;
313:5;335:18;336:3;342:14
**talks (6)**
257:5;305:5;306:20;307:2,
9;327:13
**tangibility (1)**
265:7
**tangible (22)**
191:3,4;263:15,19;265:14;
290:5,19;300:14,14,21;301:6,
10,13;302:5,6,11;312:17,18;
313:8;314:2,3;316:5
**Target (4)**
186:18;252:9;289:9;290:5
**targets (1)**
317:10
**taste (1)**
301:4
**taught (2)**
266:18;267:6
**teach (1)**
235:9
**teaches (4)**
268:8;276:4;333:5;335:15
**teaching (1)**
235:14
**teachings (1)**
333:15
**tech (4)**
316:13,13;331:4,7
**technical (5)**
292:15,15;314:18,19;315:5
**technically (1)**
273:16
**techniques (2)**
318:10;334:2
**technological (51)**
184:14,15;188:6;191:11;
192:10;193:3;227:6,7;236:21,
21;237:13,13;260:13;261:1;

266:9,13,14;267:3,3;271:9;
275:8,9;284:13,13,17,17;
285:13,13;287:15;288:4;
303:8,8;304:4,5,16;305:3;
306:5;319:21,21;324:10,15;
331:2,5;333:15,16;339:6,7;
342:11,21,21;345:1
**technologies (1)**
309:15
**technology (17)**
191:6,8,15;224:11;227:14;
233:17;235:1;238:9;244:7;
249:8;281:4;285:12;309:16,
17;310:14;323:14;338:10
**Telephone (1)**
176:9
**telling (6)**
227:5,6;230:2;273:11;
284:2;333:15
**tells (20)**
188:8;193:17;216:1;
233:14;273:12;276:5,12,15,
20,21;277:8;285:18;317:15;
320:20;321:4,6,8;326:14;
327:16;335:13
**temperature (1)**
266:12
**tend (1)**
189:11
**ten-minute (1)**
254:10
**term (1)**
308:8
**terms (22)**
182:10,14;206:16,16;
211:11;230:5;234:14,15;
248:14;254:12;260:15;261:7;
262:19,21;294:9;302:16;
323:15;326:9,10;334:8;
341:12;343:18
**terribly (1)**
328:5
**test (64)**
178:6,7,10,16;179:2;189:3,
7;204:5;207:21;208:1,7;
209:3;217:3;220:4,7,10;
231:5,7;243:8,10;248:19;
249:3,5,11;251:10;254:8;
260:9,10,10,18,19;261:20;
262:12;263:20,21;274:9;
289:20;290:20;294:11,17,19;
295:18,19;297:18;306:7;
319:20;320:1;322:11;324:17,
18;330:14,21;342:4,7,10;
343:1,2,4,8,20;344:3,3;345:2,
8
**tested (1)**
326:4
**testifies (1)**
203:8
**testimony (28)**
201:5,11,12,17,21;202:3,6,
15,20,21;203:3,11;220:17;

229:15,16;230:4;231:10;
234:5,14;235:6;245:21;
271:12,16,20;281:14;298:1;
308:16;340:18
**tests (4)**
244:2;282:6;288:11;289:4
**Teva (4)**
204:9;314:12;316:8,8
**thanking (1)**
339:2
**Thanks (1)**
284:14
**theme (1)**
265:18
**therefore (6)**
192:9;207:4;217:14;
219:11,12;265:14
**Thereto (1)**
267:2
**thermal (1)**
266:11
**thinking (2)**
292:17;305:12
**third (4)**
188:1;319:6;328:21;329:1
**though (14)**
179:1;180:1;183:20;186:7;
189:6;194:4;214:7;221:5;
234:9;257:1;258:3;268:11;
293:7;343:1
**thought (2)**
190:9;236:4
**thousands (1)**
196:17
**three (12)**
198:15;244:18;249:12;
253:20,20;286:15;299:18;
317:6;319:2;337:1;339:3;
345:11
**throughout (4)**
274:12;278:20;283:1,9
**throw (2)**
226:11;341:15
**throwing (1)**
340:21
**thus (1)**
312:19
**thwarted (1)**
341:4
**thwarts (1)**
340:19
**tie (4)**
244:6;262:1;264:7,8
**tied (5)**
208:9;290:12;310:15;
312:5,6
**ties (4)**
261:20;283:21;294:14;
295:16
**timer (1)**
232:18
**times (3)**
203:17;260:6;305:11

**time's (1)**
241:21
**today (13)**
196:21;204:12,17;230:21;
265:4,19;267:9,11;324:2;
327:11;342:19;344:13;345:11
**together (5)**
194:12;256:8;258:14;
288:21;325:3
**told (6)**
233:15;246:2;274:15;
304:14;345:3,4
**ton (1)**
336:6
**tongue-in-cheek (1)**
232:7
**tons (1)**
305:19
**took (9)**
215:8,10;244:7,8;253:19;
281:15;284:20,21;346:5
**tool (1)**
249:6
**tools (1)**
206:2
**top (2)**
226:2;245:18
**total (3)**
180:16;181:7;254:14
**totally (2)**
185:20,21
**touch (4)**
266:1;271:11;296:4,6
**touched (1)**
212:18
**touchscreen (1)**
300:17
**track (1)**
305:11
**trading (1)**
309:15
**traffic (4)**
328:20;329:17;330:8;336:6
**transaction (1)**
257:7
**transactional (1)**
280:15
**transactions (2)**
257:5;279:14
**transcript (2)**
305:9;346:8
**transfer (1)**
208:20
**transform (1)**
208:15
**transformation (22)**
208:19;209:6;248:19;
249:3,5,11;261:19;262:11,11;
294:11,17,19;295:17;306:7;
322:11,15,20;330:14,21;
343:4,8,20
**transforming (2)**
262:2,7

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

**transforms (1)**
294:16
**transit (1)**
262:2
**translator (2)**
279:3,13
**transmission (1)**
256:19
**transmitting (3)**
181:18;183:5;257:9
**transported (4)**
185:14;186:3,17;252:9
**treated (1)**
208:2
**treatise (1)**
204:1
**treatises (1)**
203:18
**Trenka (1)**
252:16
**trial (2)**
254:18;345:16
**trotted (1)**
275:18
**true (22)**
219:14;229:21;233:7,8,8,9;
236:3,3;243:8;257:15;263:2;
272:18;273:13;291:21;
295:10,21;309:3;322:21;
326:7;331:4;343:11;346:9
**truly (1)**
233:4
**truncated (2)**
218:16;250:16
**Trust (1)**
252:13
**try (10)**
196:17;206:10;212:17,19;
216:20;263:13;288:19;298:4;
303:14;313:2
**trying (21)**
182:16;184:18;185:17;
189:17;196:21;204:7;233:2;
234:18;237:5,11;241:1,2;
242:13;247:6,19;269:5;
274:20;278:10;283:9;285:5;
297:2
**turn (6)**
191:16;289:6,7;290:21;
315:7;326:6
**turned (2)**
201:19;298:21
**turning (1)**
206:12
**turns (1)**
215:4
**tutorial (3)**
242:2;331:7;345:14
**tutorials (1)**
177:13
**tweak (1)**
187:1
**tweaking (1)**

183:13
**two (39)**
192:16,16;195:9;201:13;
202:13;211:2,11;222:20;
231:17;232:1;244:18;254:3;
273:19;275:5,17;278:7,21;
279:12;283:7;285:10,15;
286:14;288:11,18,21;290:17;
295:21;299:19;300:10;
302:19;303:3;304:9;310:4;
312:11,21;320:2;325:6;
339:18;344:19
**two-part (6)**
178:5,7,9;220:7;260:19;
289:20
**two-prong (1)**
345:8
**two-step (3)**
274:9;284:16;345:2
**tying (1)**
343:18
**type (2)**
218:18;261:1
**types (17)**
179:19;212:5;258:16;
262:18;263:5;272:17;276:15,
15;280:13,14;282:6;283:14,
15;288:1,17;317:16,17

**U**

**ubiquitous (1)**
282:17
**ultimate (1)**
263:16
**ultimately (27)**
181:13,20;182:15;185:18;
188:17;191:6;192:15;200:16;
210:12;214:14;216:12;217:2;
256:12;257:9;258:18;260:14;
264:21;271:21;289:1;290:17;
295:5;298:21;319:18;320:1,
16;321:12;323:10
**Ultramercial (27)**
187:4;198:9,11,13,20;
199:14;200:2,10,14,15,17;
208:2;209:1,9;236:12,15;
237:1;244:20;250:5;260:14;
298:12,12,13,15,21;322:16;
344:3
**unauthorized (3)**
196:7;210:12;245:10
**unbounded (1)**
243:4
**uncontested (3)**
303:10,12,13
**uncopyable (2)**
197:19;198:2
**under (20)**
199:17;205:3;208:5;219:2;
220:14;222:2,5,10;230:8;
235:2;236:14;246:4;252:17;
261:17;277:16;296:10,20;

**undergirding (1)**
282:14
**undergirds (3)**
243:9;244:2;274:12
**underlining (1)**
314:15
**underlying (1)**
315:1
**underpinnings (6)**
229:14;234:9,11;300:2;
316:8,21
**understood (2)**
190:13;267:17
**un-encrypt (1)**
241:8
**unencrypted (2)**
196:11;242:15
**unencrypts (1)**
242:4
**unencumbered (1)**
249:1
**unique (1)**
284:9
**unit (3)**
192:15;207:3;261:10
**units (1)**
206:5
**unknown (2)**
179:7;318:5
**unless (11)**
188:9;193:11;249:14;
272:21;286:12;290:4;299:13;
309:20;315:7;325:4;344:11
**unnecessarily (3)**
243:17;244:6;283:21
**unpatentable (2)**
192:5;259:1
**unprotected (6)**
195:15;196:2,9;210:9;
211:7;212:8
**unrebutted (2)**
231:13;233:20
**un-rebutted (2)**
303:11,13
**unspecified (2)**
195:16;317:9
**untied (1)**
284:6
**up (43)**
177:8;182:18,21;191:15;
196:7;199:18;200:11;201:2;
203:8,19;204:8,16;215:14;
216:20;226:11;227:18;231:1;
233:13;234:2;238:18;239:12;
241:20;243:17;245:20;
252:19;253:6;254:2,7;258:13;
259:16;260:5;274:13;278:6,
14;280:19;283:21;285:17;
298:2;306:12,14;334:15;
338:16;343:14
**update (2)**
280:3;319:14;341:21

325:9;337:4;340:10
**updated (3)**
319:13;320:12,13
**updating (5)**
322:5,6,18,19;341:14
**upheld (7)**
216:13;238:4;249:19;
250:13,15;294:20;309:14
**upon (3)**
274:16;309:10;311:9
**usable (1)**
194:4
**use (25)**
180:15;187:2;189:16;
196:21;198:1;206:2;208:20;
215:6;224:14;255:13;260:3,
12;271:7,9;294:4;308:6;
318:3,3;319:4,13;321:9;
324:7;334:3;335:6;341:17
**used (23)**
178:15;180:16;183:2;
187:1;196:10,16;203:19;
215:5;234:5;242:16;244:21;
266:7,8,11;267:11;268:11,12;
279:2,2;317:16;320:11;321:5;
328:1
**useful (7)**
179:1;208:3;213:14;249:6;
267:11;317:14;342:5
**user (17)**
196:9;211:6;241:18;
263:15,17;278:17;284:5,7,8;
293:19,21;296:19;309:17;
311:10;312:1,1,3
**users (6)**
194:6;279:19;280:3,17;
307:2;312:11
**user's (1)**
311:9
**uses (5)**
190:13;195:10,10;206:10;
318:5
**using (19)**
181:17,18;183:13;185:2;
190:14;226:19;238:7;240:7,9;
279:16;282:4;283:13;317:9;
318:13;321:1;329:1;330:18;
334:1;338:18
**usual (3)**
183:5,5;217:20
**usually (4)**
203:18;219:2;237:19;
241:14

**V**

**vacant (1)**
299:2
**vacated (4)**
200:8,12;298:14,16
**valid (4)**
199:17;221:7;230:8;233:7
**validated (2)**
197:11,14

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

**validity (3)**
221:2,12;222:6
**value (2)**
319:12,14
**variety (1)**
229:6
**various (3)**
206:1;219:2;333:10
**vein (1)**
183:12
**Ventures (9)**
179:20;187:14;222:19;
223:12;267:9;270:6;296:3;
298:6;329:16
**Ventures' (4)**
204:14;251:21;310:3;325:8
**versus (5)**
184:12;243:4;311:18;
313:15;326:2
**view (7)**
219:10;220:18;252:19;
280:3;292:11;298:20;326:5
**viewed (2)**
186:8;245:9
**viewer (1)**
199:12
**views (1)**
178:3
**Virginia (1)**
252:16
**viruses (1)**
336:7
**visiting (1)**
186:11
**visual (1)**
301:1
**visually (1)**
300:16
**vitality (1)**
315:20
**volunteer (1)**
222:21
**vs (3)**
252:13;328:16;336:18

**W**

**wait (1)**
184:4
**walk (1)**
193:13
**walked (3)**
191:17;192:12;257:2
**walks (2)**
193:17;257:6
**wants (5)**
224:6;226:13,16;227:4;
254:2
**warning (1)**
333:12
**watch (3)**
239:2,2;245:2
**water (3)**
232:12,21;302:11

**way (91)**
177:13;180:15;181:6,17,19;
183:1,1,3,4,5,6;184:19;185:2;
186:1,3,20;187:3;190:15,21;
191:8;193:3,3;194:4;201:1;
202:9;203:18;205:1,8;210:19,
21;212:4;213:3;215:7,7;
220:20;221:11;230:9,18;
238:6,14,14;239:20;240:9;
241:16;243:15;244:16;247:1;
251:17;254:8;257:14,15;
258:21;259:12,14;260:17;
262:7;263:19;266:21;270:13;
275:14;277:15;278:14;
282:16,21;284:3;287:15,18;
288:6;289:5;293:7;294:9;
295:19;298:9,21;305:1;
311:16;314:2;317:9;318:8,16;
322:8,16,17;323:18;324:21;
329:2;330:7;331:13;332:16;
341:19;346:12
**ways (14)**
191:9,15;192:20;216:18;
223:2;239:18;241:10;246:8;
292:12,14;293:11;297:12;
301:5;324:7
**website (9)**
184:21;185:1,10,15;186:5,
6,8,9,10
**welcomed (1)**
328:10
**weren't (5)**
182:2;233:21;260:1;
284:15;332:5
**Westlaw (1)**
329:7
**what's (33)**
177:16,17;189:6;227:21;
228:21;232:21;235:1,16;
236:14;238:5,20;239:1;
242:10;243:21;245:15;251:9;
265:1;269:2,14;273:12;
274:17;302:3;310:3,9;318:1;
319:5;325:9;332:2;333:1;
335:20;339:16;342:12;344:20
**whereby (2)**
196:2;211:6
**wherein (1)**
218:11;311:9;327:5
**WHITLEDGE (1)**
176:17
**whole (16)**
194:20;198:12;208:8,9,15;
219:20;227:17;254:13;
271:21;272:6;288:13;289:1;
314:20;318:2;332:17;339:4
**wholly (1)**
187:12
**who's (1)**
252:20
**widget (3)**
193:1;206:21;253:12

**wipes (1)**
206:8
**wireless (1)**
328:19
**wit (1)**
346:2
**within (8)**
245:6;270:20;271:2,2;
286:5;290:13;302:6;308:2
**within-named (1)**
346:5
**without (7)**
280:7;290:12;300:4,7;
310:15;321:21;339:19
**witness (1)**
346:14
**word (6)**
186:19;191:3;195:7;
234:20;282:18;305:10
**words (11)**
180:2;203:6,8;227:13;
237:20;244:18;280:4;297:16;
330:1,2;333:21
**work (14)**
188:14;207:14;216:15;
217:10;218:21;220:15;
242:16;245:6;288:2;290:14;
307:18;322:20;332:4;334:1
**worked (3)**
200:9;206:4;215:8
**working (5)**
181:16;209:5;229:7;
241:19;334:8
**works (9)**
184:20;185:4;186:1,4;
230:18;232:6;246:12;267:1;
290:2
**world (15)**
187:11,15;188:12;240:11,
12,15;277:15;278:4,7,18;
279:5;280:8;281:2;285:1;
306:12
**worth (1)**
204:12
**written (5)**
183:11;203:6;211:1,1;
261:7
**wrong (6)**
191:3;213:5;236:1;265:21;
342:6,9
**wrote (2)**
200:3;342:6
**wwwamazoncom (1)**
185:1

**X**

**XML (28)**
255:3,13;260:3,21;270:20;
275:15;278:1,11,20;279:6,12,
15;280:3,4,12,21;281:2,3;
282:5,9,16,17,20;283:1;284:1,
3,9;286:5

**Y**

**year (2)**
233:9;329:7
**years (2)**
196:17;299:21

**Z**

**zero (2)**
289:21;290:15
**Zolotorev (3)**
336:2;338:5,17

**0**

**002 (8)**
289:6,8,16;292:7,21;296:1;
305:9;342:15
**003 (1)**
310:2
**032 (3)**
213:17;214:6;215:19
**0738 (1)**
326:13
**081 (11)**
254:21;255:2,7,10;259:2;
265:4;268:1;274:2;275:5;
281:6;332:1
**084 (19)**
317:2,14,15;320:6,11;
321:3;326:2;327:10,18,19;
329:4,15,20;330:6;337:3,16;
341:10;343:11,16

**1**

**1 (10)**
194:11;205:15;213:17;
214:6;257:4;291:2,3;307:1;
308:20;321:3
**10 (3)**
193:20;233:14;235:15
**100 (1)**
299:21
**101 (43)**
178:1;201:15,16,20;202:16;
204:8;205:4,13;217:7;219:15,
21,21;220:4,15,20;221:2;
222:2,5,11;224:3;229:13,18;
230:8;233:2;234:18;238:9;
251:10;252:17;257:18;
261:17;264:12;269:4;277:9,
16;285:18;286:21;287:2;
297:8;298:20;316:16;337:4;
340:4;342:5
**102 (12)**
190:9;219:20;224:1,1;
277:16;286:21;287:1,1,3;
297:9;310:6;340:10
**103 (19)**
190:9;219:20;224:1,2;

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

277:16;286:21;287:1,2,3;
297:9;340:10
**104 (1)**
292:13
**109 (1)**
293:18
**11 (4)**
236:8;237:2,19;295:4
**112 (2)**
224:4;277:16
**12 (7)**
219:5;238:3,10;251:18,19,
20;254:2
**1257 (1)**
186:14
**126 (1)**
297:13
**13 (4)**
197:2,7,19;238:20
**1349 (2)**
301:16;310:12
**137 (1)**
317:12
**139 (2)**
319:10,12
**140 (1)**
320:8
**142 (1)**
321:2
**146 (1)**
323:3
**15 (5)**
232:12;305:11;317:4;
323:7;346:21
**16 (4)**
231:19,21;272:9;307:1
**17 (1)**
276:6
**18 (5)**
207:7;276:6;317:5;323:7;
335:18
**1800s (4)**
230:9,20;233:8;254:6
**19 (1)**
207:17
**1972 (1)**
197:3
**1981 (2)**
232:15;233:8

**2**

**2 (4)**
206:12;208:2,6,14
**20 (3)**
289:10;342:6;343:6
**2015 (2)**
329:7;346:15
**2017 (1)**
346:21
**21 (12)**
208:17;209:19;210:2;
255:6,9;259:2;261:3,20,21;

262:17;263:4;287:11
**22 (2)**
239:15;262:16
**2254 (1)**
274:16
**23 (4)**
209:20;263:3;323:10;
334:18
**24 (4)**
210:2,4,5;263:2
**25 (2)**
210:20;289:11
**26 (6)**
323:3,4,4,12;336:9,13
**27 (8)**
242:1;323:4,4;325:7;
328:12;329:4;336:9,20
**27th (1)**
346:14
**283 (2)**
221:6,6
**29 (3)**
212:11;330:1,1
**29-word (2)**
334:16;337:8

**3**

**3:34 (1)**
254:17
**3:48 (1)**
254:18
**30 (5)**
253:18;313:1;315:9;
344:16,18
**300 (1)**
176:7
**31 (4)**
323:10,11;336:13,15
**312-862-2200 (1)**
176:10
**312-862-7029 (1)**
176:9
**32 (3)**
246:2;323:11;336:14
**33 (12)**
179:10;180:6;181:9;
197:18;210:20;213:16;214:7;
246:14;247:12;248:16,16;
253:6
**34 (11)**
215:2;248:12;289:19;
290:1,18;295:10,16;302:8;
310:3;311:6;315:10
**36 (4)**
212:7;215:17;216:11;
300:17
**37 (7)**
249:12,21;289:19;290:1,18;
302:8;310:3
**38 (3)**
216:17;250:10,10
**39 (1)**

217:4

**4**

**4 (2)**
307:9;343:2
**409 (40)**
187:17;193:13;197:3,16,18;
198:6,14;205:15;206:12;
207:10;208:11;213:12;214:5;
215:18;216:2,3,14;217:11;
219:7;225:17;230:14;234:2;
236:6,13;239:4,7,8;241:2,11,
18;244:7,12;246:3;248:15;
249:20;250:12,17;253:5;
268:13;342:8
**41 (1)**
217:15
**415 (1)**
255:19
**42 (2)**
218:2;307:9
**43 (1)**
218:7
**44 (1)**
280:1
**45 (1)**
219:5
**46 (1)**
197:18
**479 (1)**
179:10
**48 (1)**
281:20
**49 (1)**
283:2

**5**

**5 (4)**
179:3;197:18;298:7;307:1
**5:30 (1)**
223:3
**5:42 (1)**
345:16
**50 (3)**
276:10;283:5;300:18
**56 (3)**
255:6,17;286:19
**57 (1)**
307:1
**58 (1)**
307:9
**59 (1)**
307:6

**6**

**6 (16)**
179:10;194:10,10;195:12;
196:8;197:1;208:10;209:12;
210:11,19;215:18;216:2,14;
246:16;274:6;300:17

**6:00 (3)**
223:3;289:9;309:5
**60 (2)**
257:4;307:15
**60654 (1)**
176:8
**61 (1)**
307:17
**62 (2)**
258:5;307:17
**64 (1)**
260:4
**66 (1)**
308:15
**67 (3)**
261:4;308:18;309:5
**68 (1)**
309:5
**69 (3)**
262:15;309:5;311:5

**7**

**7 (5)**
181:1;191:19;192:1;
274:15;329:9
**70 (2)**
263:4;309:7
**71 (1)**
309:13
**73 (1)**
264:5
**738 (1)**
329:8
**74 (1)**
265:8
**76 (1)**
184:1
**773 (1)**
186:14
**78 (1)**
266:10
**79 (1)**
184:19

**8**

**8 (2)**
192:13;321:3
**81 (1)**
186:15
**83 (1)**
334:11
**84 (1)**
334:18
**846532 (1)**
329:7
**85 (2)**
335:1;338:16
**86 (1)**
335:17
**87 (1)**
336:9

Intellectual Ventures 1 LLC, et al  vs.
Capital One Financial Corporation, et al

Trial Proceedings - Afternoon Session -  Vol. 2
April 16, 2015

**88 (3)**
    272:4,10;336:14
**89 (1)**
    337:4

**9**

**9 (21)**
    198:15;225:9,11,14;226:9;
    233:13;270:7,12;273:15;
    290:21;291:2,4;292:9;303:14;
    304:12;308:20;317:6,21;
    319:1;321:3;331:17
**90 (2)**
    288:10;337:5
**92 (1)**
    290:1