**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **INTELLECTUAL VENTURES I LLC,** *et al.*, | * | |
| **Plaintiffs/Counter-Defendants,** | * | **Case No.: PWG-14-111** |
| **v.** | * | |
| **CAPITAL ONE FINANCIAL CORP.,** *et al.*, | * | |
| | * | |
| **Defendants/Counterclaimants/** **Third-Party Plaintiffs,** | * | |
| **v.** | * | |
| **INTELLECTUAL VENTURES** **MANAGEMENT, LLC,** *et al.*, | * | |
| | * | |
| **Third-Party Defendants/** **Joined Counter-Defendants.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

The litigation history between the Intellectual Ventures companies (Plaintiffs, Counter-Defendants, Third-Party Defendants, and Joined Counter-Defendants to this action; collectively referred to as "IV") and the Capital One companies (Defendants, Counterclaimants, and Third-Party Plaintiffs in this action; collectively referred to as "Capital One") is protracted, beginning with a patent infringement action that Intellectual Ventures I, LLC and Intellectual Ventures II, LLC (together, "IV I and II") filed in the Eastern District of Virginia on June 19, 2013.  In that case, as well as in this patent infringement action that IV I and II filed on January 15, 2014, Capital One brought antitrust counterclaims.  The Virginia court dismissed Capital One's

antitrust claims for failure to state a claim, and IV now seeks summary judgment on very similar claims. ECF No. 656. Because *Noerr–Pennington* immunity and collateral estoppel both bar Capital One's antitrust claims, I will grant IV's motion.

## Procedural Background

IV I and II filed suit in this Court, alleging that Capital One infringed five of their patents. Compl., ECF No. 1. IV I and II ultimately voluntarily withdrew one patent infringement claim and proceeded with the others. ECF Nos. 80, 81. The parties engaged in extensive discovery and agreed to referral to a Special Master highly experienced in patent law, jointly selected by the parties and appointed pursuant to Fed. R. Civ. P. 53. ECF Nos. 134, 136, 143. He oversaw additional discovery, following which the parties extensively briefed the patent infringement claims. ECF Nos. 147, 147-1, 169, 169-1, 227, 246, 297, 300, 303. The Special Master issued two reports and recommendations, ECF Nos. 298 and 315, in which he ruled in favor of IV with respect to two of its patents, United States Patent Nos. 7,984,081 and 6,546,002 ("the '081 Patent" and "the '002 Patent"), and in favor of Capital One on the claims related to United States Patent Nos. 6,314,409 and 6,715,084 ("the '409 Patent" and "the '084 Patent"). Both parties challenged the Special Master's rulings adverse to them, and further briefing ensued. ECF Nos. 307, 311, 312, 313, 319, 324, 325, 330, 335, 336, 344.

After reviewing the Special Master's reports and recommendations and the parties' extensive briefs, I overruled the Special Master with respect to the '081 Patent and the '002 Patent, finding that they were unenforceable. ECF Nos. 377, 378. I also ruled that collateral estoppel applied regarding the '409 Patent and the '084 Patent, barring IV from bringing claims against Capital One for infringement of those patents. ECF No. 382. The net effect of my ruling was that each of the patents that IV claimed Capital One had infringed was unenforceable, two

patents because I concluded that they were invalid pursuant to 35 U.S.C. § 101, and two patents because the United States District Court for the Southern District of New York in *Intellectual Ventures v. JPMC*, Case No. 13-3777-AKH, 2015 WL 1941331 (S.D.N.Y. Apr. 29, 2015), concluded that they were invalid, and issue preclusion barred me from reaching a different conclusion.  On those grounds, I entered summary judgment in Capital One's favor on those four remaining patent infringement claims.  ECF Nos. 378, 382.  And, finding no just reason for delay, I entered a final judgment in favor of Capital One on the patent infringement claims, making that order immediately appealable.  ECF No. 387.  The Federal Circuit affirmed my rulings, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332 (Fed. Cir. 2017), thereby ending the patent infringement claims against Capital One.

Meanwhile, Capital One had sought leave to file three antitrust counterclaims, claiming monopolization and attempted monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and unlawful asset acquisition, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, as part of its Third Amended Answer, Defenses, and Counterclaims.  ECF No. 106.  IV I and II opposed the motion. ECF No. 118.   I granted Capital One leave to file its counterclaims, ECF Nos. 194, 195, which it did, ECF No. 196; *see also* Fourth Amended Answer, Defenses, and Counterclaims, ECF Nos. 438 (redacted), 439 (sealed).  It also filed a Third Party Complaint against additional Intellectual Ventures companies: Invention Investment Fund II, LLC; Intellectual Ventures Management, LLC; Invention Investment Fund I, L.P.  ECF Nos. 228 (sealed), 230 (redacted).  Capital One alleges that IV has tried, without success, to license to Capital One its extensive patent portfolio, which includes the patents that IV has sued Capital One, in this suit and the Virginia suit, for infringing.  Capital One believes that IV's repeated claims against it are actionable under antitrust law.

I denied IV's motions to dismiss the counterclaims and Third Party Complaint, ECF Nos. 225, 296, finding that Capital One had pled them sufficiently to proceed to discovery.  ECF No. 328.   After another round of extensive (and expensive) discovery regarding liability on the antitrust counterclaims, I attended a tutorial involving the economic experts that the parties had identified.  ECF No. 651.  Also in attendance was the court technical advisor, Professor John M. de Figueiredo of Duke University Law and Business Schools, whose appointment the parties had confirmed on a status conference call, and who assisted the court in evaluating the economic evidence.  ECF Nos. 606, 608.[1]   At the close of discovery, IV filed the pending Motion for Summary Judgment, which the parties fully briefed.[2]   In support of their positions, the parties jointly submitted a 13,344 page Joint Record, comprising 286 exhibits in sixteen, 3-inch binders. Having reviewed the parties' memoranda and exhibits, I now rule.

---

[1]  Unlike expert witnesses appointed under Rule 706, technical advisors are appointed under the court's inherent authority, and they do not testify at trial (and are not deposed or subject to cross examination).  Joe S. Cecil & Thomas E. Willging, *Court-Appointed Experts in* Reference Manual on Scientific Evidence 527, 531 (Fed. Judicial Ctr. 1994).  Accordingly, Professor de Figueiredo did not provide his independent opinion on the issues, but instead helped me understand the parties' experts' methodology, any assumptions underlying the experts' opinions, and how the methodology applies to the facts of this case. Thus, the purpose of the technical expert was to assist me in understanding the economic issues in this litigation and to enhance my ability to make an informed ruling on the pending motion. In this regard, Professor de Figueiredo's assistance was invaluable.

[2] The parties fully briefed the motion.  ECF Nos. 657 (sealed opening brief), 668 (redacted opening brief), 662 (redacted opposition), 664 (sealed opposition), 669 (sealed reply), 671 (redacted reply).  A hearing is not necessary.  *See* Loc. R. 105.6.

Also pending are motions to seal the opening brief and opposition.  ECF Nos. 658, 665.  I have considered the motions and other filings in this case, included redacted versions of the sealed documents, and in the interest of protecting confidential, proprietary, trade secret, and/or commercially sensitive information, I will grant the motions to seal.

Intellectual Ventures also has filed objections to the Joint Record Exhibits, ECF No. 674 (redacted), 675 (sealed), as well as a motion to seal its objections, ECF No. 676.  Its motion to seal is granted for the same reasons that the summary judgment briefings are sealed.  However, the objections are overruled.  And, although I relied on the sealed briefings for this Memorandum Opinion, its contents do not justify sealing it, because the public's interest in a public ruling outweighs the parties' interest in sealing information related to this case.

**Parties' Arguments**

The essence of Capital One's antitrust claim is that IV is a "patent troll,"[3] and not just any patent troll, but a veritable Dovregubben.[4]   Capital One asserts that IV's business practice is to acquire a vast portfolio of thousands of patents that purportedly deal with technology essential to the types of services offered by commercial banks (such as ATM transactions, mobile banking, on-line banking, and credit card transactions).   It then employs an aggressive marketing scheme whereby it makes an "offer" for banks to license (Capital One really would prefer to say "extorts" banks to license) its entire portfolio for a period of years at a jaw-droppingly high price.   But, Capital One insists, when the banks ask for details about the patents covered in the portfolio in order to determine whether their services infringe them, IV refuses to disclose sufficient information to enable them to make an intelligent decision about whether they should agree to the license.   And, if the bank balks at licensing the entire portfolio at IV's take-it-or-leave-it price, IV then threatens to file a patent infringement claim against the bank regarding only a few of the patents in the portfolio.   Adding insult to injury, IV then makes it clear that should it lose the patent infringement case, it will simply file another (and if needed, another, and so on) regarding a different set of its patents, until the prospect of endless high-cost litigation forces the bank to capitulate and license the entire portfolio.[5]

---

[3] A "patent troll" is an individual or company "who acquires by purchase or application to the Patent and Trademark Office a patent that he uses not to protect an invention but to obtain a license fee from, or legal judgment against, an alleged infringer." *Carhart v. Carhart-Halaska Int'l, LLC*, 788 F.3d 687, 691 (7th Cir. 2015).   "Patent trolls are also known [as] 'patent assertion entities' (PAEs), [and] 'non-practicing entities' (NPEs)." *In re Packard*, 751 F.3d 1307, 1325 (Fed. Cir. 2014).

[4] Dovregubben was the Troll King in Henrik Ibsen's 1867 play *Peer Gynt*.

[5] Capital One is not the first to make these claims about IV's business practices. *E.g.*, Robin Feldman & Tom Ewing, *The Giants Among Us*, 2012 Stan. Tech. L. Rev. 1, 2–15 (2012).

Capital One characterizes IV's business model as comprised of three components: *accumulate* a vast portfolio of patents purportedly relating to essential commercial banking services, *conceal* the details of those patents so that the banks cannot determine whether their products infringe any of IV's patents, and serially *litigate* to force the banks to capitulate and license the portfolio at exorbitant cost.   This conduct, Capital One insists, constitutes monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2, attempted monopolization under § 2 of the Sherman Act, and unlawful asset acquisition under § 7 of the Clayton Act, 15 U.S.C. § 18.

Nonsense, IV indignantly responds.   It counters Capital One's charges by arguing that it legitimately purchased or otherwise acquired its large portfolio of patents that relate to multiple technology markets.   It then offers to license its portfolio to banks (and other types of businesses), beginning its negotiation with an opening offer, and expecting the bank to counteroffer, thereby initiating a back-and-forth exchange that it hopes will result in a mutually-agreeable licensing fee.   IV vehemently denies that it conceals the details of its individual patents or that Capital One could not determine what they relate to by reviewing publicly available information.   As IV sees things, when Capital One declined to make a counter offer to its opening bid, it then selected a number of its patents and brought suit against Capital One, first in the Eastern District of Virginia, and then, when that suit was unsuccessful, in this Court, with respect to a different set of patents.   Moreover, IV claims that Capital One is, in essence, an "efficient infringer"—an entity that engages in its business without care for whether it infringes on patents held by others, with the knowledge that a patent infringement case is expensive to bring, and many patent holders lack the funds to do so to protect their rights.   As such, Capital

One can play the odds, infringing patents with near impunity until the rare patent holder with the resources to sue does so, and then negotiate a favorable license fee.

IV points out that each of its patents is presumptively valid, and that it has an absolute right to file litigation to enforce them.  And, in IV's view, if enforcing its patents through litigation has any monopoly effect (which IV denies it does), it has immunity under the *Noerr–Pennington* doctrine.[6]  Moreover, IV argues that Capital One is barred by both claim and issue preclusion from asserting its antitrust counterclaims because it brought virtually the exact claims in the Eastern District of Virginia suit, lost, and elected not to appeal.  Further, IV challenges Capital One's definition of the relevant market for purposes of antitrust analysis, insisting that its portfolio consists of numerous distinct technology markets, not some monolithic "financial services portfolio" as claimed by Capital One.

IV also asserts that Capital One's antitrust theory is fundamentally flawed, because no liability can attach unless Capital One can prove that IV exercises monopoly power within a relevant market. "Monopoly power is the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (quoting *E.I. du Pont*); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (same).  IV insists that it does neither, because the correct market definition would recognize that what IV owns is a series of patents that relate to multiple, distinct technology markets.  And IV could exercise monopoly power only if Capital One can show that its patents include those affecting alternative substitute technologies that

---

[6] Under the *Noerr–Pennington* doctrine, "[t]hose who petition government for redress," including by filing suit in court, "are generally immune from antitrust liability."  *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56, 57 (1993) (citing *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965)).

Capital One otherwise could turn to in order to avoid having to license IV's patents. Capital One has not made this showing, IV contends, entitling it to summary judgment.

## Antitrust Analysis and Economic Theory

Underlying the legal issues in this case are two important but competing policies. On one hand, we value innovation that leads to new inventions that advance science and technology, protecting that creative effort by issuing patents. A patent, by its very nature, vests its owner with a type of legal monopoly, which it can enforce against anyone who infringes the patent. Enforcing a patent through litigation protects this monopoly, even though in other circumstances we view monopolies as harmful.

The other important policy implicated by this case, of course, is the strong desire to ensure vigorous competition in the marketplace, so that consumers (whether businesses or individuals) can purchase at the lowest possible price. To promote the benefits of robust competition, antitrust law aims to prevent a company from having the ability to control the price of its product or exclude competitors to the extent that it can charge sustained supracompetitive prices (prices substantially above what a competitive price would be if consumers could simply buy a close substitute product from a competitor at lower cost).

The exercise of monopoly power with regard to a single patent (or even a few patents) usually does not offend antitrust law. But it is another matter to acquire a vast portfolio of patents that are essential to technology employed by an entire industry and then to compel its licensing at take-it-or-leave-it prices because it is not economically feasible to determine if alternative technologies, not covered by the accumulation of patents, are available. This

acquisition and compelled licensing could amount to the ability to exercise monopoly power on an entirely different scale.

In a very real sense, antitrust law is founded on economic theory about how efficient markets should operate.  In an ideally competitive market where there are no barriers to entry or exit by competing businesses, the availability of the same product (or a close substitute) from many sources will tend to drive the price downwards to a point slightly above the cost to make the product—the so-called "competitive price." Think of pizzerias.  There are lots of them, and entry and exit from this business is relatively free and unrestricted.  If one restaurant decides to charge too much for a slice of pizza, there are many others nearby where the consumer can buy at a lower cost.  The ready supply of close substitutes keeps costs competitive—slightly above the cost of making the pizza.

But, if circumstances are such that one pizzeria can exclude competition or control prices by charging more than a competitive price because consumers are unable to avoid paying it by turning to lower-priced alternatives, then it has the ability to exercise market power. And the power to control prices or exclude competitions is the essence of monopoly power. *See Grinnell Corp.*, 384 U.S. at 571.  Antitrust law is designed to prevent the acquisition and exercise of monopoly power.  *See id.*; 15 U.S.C. § 2.

Each of the above important competing policies is at play in this case.  Capital One argues, through its highly credentialed and impressive economic expert, Professor Fiona Scott Morton of Yale University, that IV possesses monopoly power in connection with its large financial services patent portfolio, which touches on essential technologies that commercial banks have heavily invested in and cannot realistically design around to avoid the reach of IV's

patents.  Because of the size of this portfolio (between 7,725 and 35,000 patents, depending on whether Capital One or IV's expert is correct),[7] IV is able to charge supracompetitive prices to license the portfolio. And IV's concealment of the details regarding the patents leaves Capital One unable (without incurring ruinous cost) to ferret out the particulars of each patent and assess whether it infringes any patents.  Also at play is IV's aggressive policy of threatening (and bringing) expensive serial patent infringement suits.  IV's aggregation of such a large portfolio, combined with its concealment and aggressive litigation strategies will, according to Capital One, eventually force it to capitulate and pay IV's supracompetitive price to license the entire portfolio.

As Professor Scott Morton sees it, antitrust analysis commonly used to determine whether a proposed merger will result in anticompetitive effects, simply does not work for the facts of this case.  That is because merger analysis is *ex ante*, focusing on whether, if the merger is approved, the new entity will be able to charge a small but significant non-transitory increase in price (referred to as "SSNIP")[8] that it could maintain over time without competition from others making that price increase unsustainable. Put differently, SSNIP analysis is best done *before* the entity of interest has acquired monopoly power.  Scott Morton reasons that this case requires *ex post* analysis because Capital One already had incurred significant costs to acquire the technology to compete with other commercial banks in essential services such as on-line

---

[7] According to Professor Scott Morton, IV has approximately 40,000 patents, 7,725 of which are financial services patents.  Scott Morton Report  ¶¶ 96 n.59, 170 n.136.  Professor Gilbert asserts that "the portfolio that Intellectual Ventures initially offered to license to Capital One includes a much larger number of patents. Capital One's complaint characterizes Intellectual Ventures' offer as covering 35,000 patents."  Gilbert Report ¶ 40 (citing Third-Party Compl. ¶ 40).

[8] *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.1 (Aug. 19, 2010), *available at* https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 (discussing SSNIP).

banking, remote banking, and ATM and credit card transactions when IV began licensing its massive financial services patent portfolio. In other words, IV already had acquired monopoly power when it approached Capital One to license its patents.  Because Capital One already had incurred substantial sunk costs in the technology in which it had invested, it was unable to design around IV's enormous portfolio to adopt non-infringing technologies the way it could have done if it knew of the breadth and scope of IV's patents before it incurred the cost of the technologies it adopted.

Under her proposed *ex post* analysis, it is IV's conduct after having acquired monopoly power that is critical to antitrust scrutiny. Through its trio of patent aggregation, concealment and litigation, IV has acquired insurmountable bargaining power enabling it to exercise "hold-up" power by demanding take-it-or-leave-it supracompetitive prices to license its financial services portfolio.  And even though it has resisted doing so to date, eventually Capital One will be forced to capitulate to the threat of exorbitantly expensive patent litigation to purchase a license that it does not want, despite the fact that IV's singular lack of success in prosecuting any of its patent suits against IV (or other banks) suggests that its massive portfolio is in truth composed of nothing more than an amalgamation of weak patents.  And, but for IV's practice of accumulation, concealment and litigation, it could never command a price to license its portfolio of weak patents at anything near the supracompetitive price it sought from Capital One.

Scott Morton analogizes IV's financial services patent portfolio to a "cluster market" that IV promotes as a single product (for which there are no close substitutes) at a supracompetitive price. And she asserts that IV exercises monopoly power, despite the fact that no bank (including Capital One) has agreed to purchase a license to the entire portfolio, and IV has yet to prevail in any of its patent suits against banks.

Pure humbug, counters IV, through its equally well-credentialed and impressive economic expert, Professor Richard Gilbert from the University of California, Berkley.  He challenges Professor Scott Morton's market definition, arguing that the proper definition is not a "cluster" of financial services patents constituting a single product, but rather a collection of patents that relate to multiple distinct technology markets.  Professor Gilbert relies on the Antitrust Guidelines for the Licensing of Intellectual Property issued jointly by the U.S. Department of Justice and the Federal Trade Commission ("Guidelines").  *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (Jan. 12, 2017), *available at* https://www.justice.gov/atr/guidelines-and-policy-statements-0/2017-update-antitrust-guidelines-licensing-intellectual-property.   The Guidelines state, relevantly, that "[a]lthough the intellectual property right confers the power to exclude with respect to the specific product, process, or work in question, there will often be sufficient actual or potential close substitutes for such product, process, or work to prevent the exercise of market power." *Id.* § 2.2, at 4.  The flaw in Capital One's antitrust analysis, according to Professor Gilbert, is its failure to analyze the distinct technology markets for which IV does have patents to determine whether there are alternative close substitutes that Capital One could turn to in order to avoid having to license from IV.

As Professor Gilbert sees it, IV's patents touch on a large number of distinct technology markets, each of which must be analyzed using SSNIP analysis, which Professor Scott Morton failed to do.  Thus, he strongly disagrees that IV's patent portfolio can be analyzed as a cluster market at all. And, even more fundamentally, he challenges Professor Scott Morton's conclusions, arguing that proper market definition and analysis requires looking at actual prices (competitive price, market price and monopoly price).  Here, he insists, there are no prices at all

because IV's licensing offer was only an opening bid in a negotiation, not a take-it-or-leave-it supracompetitive monopoly ultimatum.  The negotiation did not progress to a point where a final demand was reached because Capital One refused to engage by making a counter-offer. Indeed, at least as of the time that discovery closed in this case, IV had not succeeded in selling a single license to its banking-related patents to Capital One or any other bank.

As IV and Capital One agree, the essential first step in analyzing the antitrust claims in this case is to define the relevant market by product(s) and geography. *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974); *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962); *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1319–20 (10th Cir. 2017). "[M]arket definition is a deeply fact-intensive inquiry . . . ." *E.I. DuPont de Nemours & Co. v. Kolon Indus. Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001)).  In determining the relevant market, the Court must consider "the 'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992).  Where the facts are hotly disputed, as here, defining relevant market is "generally a question for the trier of fact." ABA Section of Antitrust Law, *Antitrust Law Developments* 627–30 (ABA 8th ed. 2017), Ex. 127, Jt. Rec. 9557; *see also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992) ("[T]he determination of a relevant product market or submarket . . . is a highly factual one best allocated to the trier of fact.").  The burden of proof lies with the antitrust plaintiff to prove relevant market. *Spectrum Sports, Inc. v. McQuillian* 506 U.S. 447, 455–56 (1993); *Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 582 (4th Cir. 2003); *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir. 1983). When the parties proffer competing economic experts on the proper definition of relevant market,

summary judgment is inappropriate as long as each expert's views could be found by the trier of fact to be reasonable. *Sprint Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 945 (6th Cir. 2006) ("'[I]ntellectual disagreement' among the parties' experts creates material factual disputes on the relevant market . . . so as to preclude an award of summary judgment." (quoting record)); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573–74 (11th Cir. 1991) ("The parameters of a given market are questions of fact, and therefore summary judgment is inappropriate if there are material differences of fact." (internal citations omitted)).

IV does not dispute this authority, but contends that it is entitled to summary judgment despite the substantial disagreement between Professor Scott Morton and Professor Gilbert on the definition of relevant market (as well as other antitrust elements) because the methodology used by Professor Scott Morton is so far removed from commonly employed antitrust analysis that it must be rejected as unreasonable as a matter of law.  It is true that Professor Gilbert's analysis of relevant market is firmly grounded in commonly used antitrust analysis, as evidenced by its reliance on the Department of Justice and Federal Trade Commission's Antitrust Guidelines for the Licensing of Intellectual Property.  But, in support of their alternative analysis, Capital One and Professor Scott Morton have cited authority for the application of cluster market analysis to the definition of a relevant antitrust market.  *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 355–56 (1963) (citing *Brown Shoe*); *United States v. Grinnell Corp.*, 384 U.S. 563, 572–73 (1966) (citing *Brown Shoe*); *Brown Shoe*, 370 U.S. at 324–25; and *Fed. Trade Comm'n v. Staples, Inc.*, 190 F. Supp. 3d 100, 116–17 (D.D.C. 2016) (citing *Brown Shoe*); *see also* Ian Ayres, *Rationalizing Antitrust Cluster Markets*, 95 Yale L. J. 109 (1985).  And, Professor Scott Morton has noted that the Department of Justice Horizontal Merger Guidelines that Professor Gilbert referenced do recognize that "[e]vidence of competitive effects can inform

market definition, just as market definition can be informative regarding competitive effects."

*Horizontal Merger Guidelines* § 4.

With respect to cluster markets, Professor Ayres, one of the early scholars to study such markets in antitrust law, was critical of the courts' failure to articulate "a sound justifying theory" of when cluster analysis is appropriate, opting instead for a series of "ad hoc" standards. He noted:

> The lack of a justifying theory apparent in *Philadelphia National Bank* and *Grinnell* has left lower courts virtually unconstrained to develop additional criteria for cluster definitions. Lower courts have based cluster definitions on the existence of trade associations; census classifications; functional complementarity; common technology, distribution or marketing; a unique product group; and other market characteristics. While courts have a plethora of standards from which to choose, they currently have no basis for distinguishing the good from the bad (and the ugly). In sum, while some cluster markets have been defined correctly, the lack of a sound justifying theory has led courts to adopt conflicting and ad hoc standards. In a world in which antitrust defendants are usually multiproduct firms, the problem of deciding when to cluster a group of products needs to be formally addressed.

Ayres, *supra*, at 112–14. He advocated using a standard he called "transactional complementarity," meaning:

> Goods are transactional complements if buying them from a single firm significantly reduces consumers' transaction costs. In other words, given equal prices, consumers prefer to buy transactional complements from a single firm. If consumers strongly prefer to purchase a group of goods from a single firm, firms selling only part of this group will not compete effectively with firms supplying the full line.

*Id.* at 114–15.

Applying Ayres's standard for using cluster markets to define a relevant antitrust market in this case would be problematic for Capital One, because Professor Scott Morton's analysis rests on the notion that Capital One (and other banks to which IV has pitched its portfolio) *does not want* the cluster of products that IV offers. In such circumstances, it would be difficult to argue that consumers (banks) "strongly prefer to purchase a group of goods" (IV's patent

portfolio) from a single firm (IV).  Nevertheless, the parties do not cite, nor have I located, any controlling legal authority that Professor Ayres's test for the use of cluster markets must be used instead of any others that courts that have employed cluster market analysis in antitrust cases have used. While factfinders ultimately might reject Scott Morton's reliance on cluster markets to justify her antitrust market analysis, I cannot conclude that as a matter of law it is unreasonable.

But, neither is Professor Gilbert's analysis immune from criticism. His contention that it would be economically feasible for Capital One to discern the particulars of each of IV's thousands of patents to determine whether there are close substitutes to which Capital One could turn in order to avoid IV's portfolio, even if all of the information needed to do so was readily available, stretches plausibility to the near breaking point.[9]  Capital One has produced evidence that IV does conceal a significant amount of information regarding its patent holdings, which has been confirmed by others.  *See, e.g.*, Robin Feldman & Tom Ewing, *The Giants Among Us*, 2012 Stan. Tech. L. Rev. 1 (2012).  Feldman and Ewing concluded:

> Much about Intellectual Ventures is shrouded in secrecy. Intellectual Ventures has acknowledged that it intentionally withholds the true scope and nature of its IP portfolio.  Its licensing transactions and interactions are protected by strict nondisclosure agreements, and the structure of its business activities makes it difficult to get a handle on the full extent of its activities.  For example, or research has identified more than a thousand shell companies that intellectual

---

[9] It is ironic that, to support its argument that it had a good faith basis to bring patent infringement claims against Capital One in this case, IV designated nine Ph.D.s who would support its infringement analysis.  *See* ECF Nos. 616 (paperless order acknowledging receipt of expert reports, on file in chambers), 619 (letter order addressing quantity of expert reports), 621 (correspondence from IV explaining purpose of multiple experts).  If, *a fortiori*, it takes an assortment of Ph.d.s just to support the bringing of a patent infringement suit with respect to only *four* patents, imagine the scope of the analysis Capital One would have to conduct (and cost it would have to incur) in order to determine whether the technologies it had acquired before IV approached it with its licensing demands infringed the thousands of patents in IV's portfolio (assuming the information needed to do so was fully available to it, and not concealed as Capital One contends).

Ventures has used to conduct its intellectual property acquisitions, and it has taken considerable effort to identify these.  The range and scope of its activities are so vast that it is difficult to conceptualize the reach of Intellectual Ventures.

*Id*. at 3.

The sheer scope of IV's patent holdings calls into question how it would be feasible to perform the analysis of available substitutes that Professor Gilbert calls for to determine whether there are close substitutes to which Capital One could turn to avoid the reach of IV's portfolio. And while the Antitrust Guidelines for the Licensing of Intellectual Property do apply the SSNIP analysis favored by Professor Gilbert, there is nothing in the Guidelines that seems to recognize the near impossibility of doing so with a collection of intellectual property as massive as IV's (despite the fact that it was revised and reissued on January 12, 2017).

After all, the phenomenon of applying antitrust doctrine to intellectual property rights on the scale presented by IV's holdings is a new challenge.  As noted by Feldman and Ewing:

> The patent world is quietly undergoing a change of seismic proportions. In a few short years, a handful of entities have amassed vast treasuries of patents on an unprecedented scale.  To give a sense of the magnitude of this change, our research shows that in little more than five years, the most massive of these has accumulated 30,000-60,000 patents worldwide, which would make it the 5th largest patent portfolio of any domestic US company and the 15th largest of any company in the world. . . .
>
> These entities, which we call mass aggregators, do not engage in the manufacturing of products nor do they conduct much research.  Rather, they pursue other goals of interest to their founders and investors.  Non-practicing entities have been around the paten world for some time, and in the past they have fallen into two broad categories.  The first category includes universities and research laboratories, which tend to have scholars engaged in basic research and license out inventions rather than manufacturing products on their own.  The second category includes individuals or small groups who purchase patents to assert them against existing, successful products.  Those in the second category have been described colloquially as 'trolls,' which appears to be a reference to the children's tale of the three billy goats who must pay a toll to the troll waiting under the bridge if they wish to pass.  Troll activity is generally reviled by operating companies as falling somewhere between extortion and drag on innovation.  In particular, many believe that patent trolls often extract a

disproportionate return, far beyond the value that their patented invention adds to the commercial product, if it adds at all.

The new mass aggregator, however, is an entirely different beast.  To begin with, funding sources for mass aggregators include some very successful and respectable organizations, including manufacturing companies such as Apple, eBay, Google, Intel, Microsoft, Nokia, and Sony, as well as some academic institutions such as the University of Pennsylvania and Notre Dame . . . .

*Id.* at 1.

And even if cluster market analysis ultimately is not considered the appropriate framework for analyzing the relevant antitrust market in cases such as this one (despite the fact that Capital One has cited abundant facts that a jury reasonably could conclude supports its contention that IV does, in fact, market its patents as a portfolio, rather than a collection of individual patents relating to a number of discrete technology markets), it is hard to deny that there is something concerning from an antitrust perspective about the way in which IV engages in its licensing business. *See, e.g.*, Michelle Miller & Janusz Ordover, *Intellectual Ventures v. Capital One: Can Antitrust Law and Economics Get Us Past the Trolls?*, Competition Policy Int'l: Antitrust Chronicle (Jan. 19, 2015), *available at* https://www.competitionpolicyinternational.com/intellectual-ventures-v-capital-one-can-antitrust-law-and-economics-get-us-past-the-trolls ("[M]any PAEs [Patent Assertion Entities] exploit the lack of transparency in patent ownership to amass huge portfolios of 'secret' patents that are then asserted against manufacturers.  Manufacturers faced with a royalty demand based on a large number of unidentified patents cannot determine an appropriate royalty, or even whether any royalty is owed at all.  That uncertainty may lead to manufactures paying supracompetitive royalties that can depress product innovation.").

If the only issue raised in IV's summary judgment motion was whether there are genuine disputes of material fact that would entitle it to judgment as a matter of law on the issues of

possession of monopoly power in a relevant market and the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident, *see Eastman Kodak*, 504 U.S. at 481, I would deny the motion and allow the case to proceed to trial.  This is because I have concluded from the record before me that Capital One has identified admissible evidence to establish a genuine dispute as to these issues, precluding summary judgment.  But as next will be seen, there are further legal issues which, when resolved, require the granting of IV's motion.

## **Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id.*

### *Noerr–Pennington* **Immunity**

Antitrust law proscribes the willful acquisition or maintenance of monopoly power within a market, as well as attempts to monopolize. *See* 15 U.S.C. § 2; *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993); *United States v. Grinnell Corp.,* 384 U.S. 563, 570–571 (1966). In contrast, a patent creates a legal monopoly. *Fed. Trade Comm'n v. Actavis, Inc.*, 133 S. Ct. 2223, 2231 (2013). Additionally, "[t]hose who petition government for redress are generally immune from antitrust liability" under what is known as *Noerr–Pennington* immunity. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.* ("*PREI*"), 508 U.S. 49, 56 (1993) (citing *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965)). This holds true for parties who file suit in court. *See id.* at 57 (noting that *California Motor Transport Co. v. Trucking Unlimited* ("*California Motor*"), 404 U.S. 508, 510 (1972), "extended *Noerr* to 'the approach of citizens . . . to courts'"). And, patent holders that believe that their patents have been infringed may seek to enforce their rights under the patent through patent litigation. 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent."). Thus, when a party challenges a patent holder's efforts to enforce its patents through litigation, the court must determine whether the patent holder is exercising "the lawful restraint on trade of the patent monopoly" or "the illegal restraint prohibited broadly by the Sherman Act." *United States v. Line Material Co.*, 333 U.S. 287, 310 (1948). To do so, courts must "balance the privileges of [a patent holder] under [its] patent grants with the prohibitions of the Sherman Act against combinations and attempts to monopolize." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 390–91 (1948).

IV contends that "[u]nder the First Amendment and the *Noerr–Pennington* doctrine, Intellectual Ventures I and Intellectual Ventures II, like other patent owners, . . . are entitled to petition a court for a redress of their grievances," that is, IV may sue corporations like Capital One for patent infringement without being sued under the antitrust laws for bringing suit.   IV Mem. 12.  On that basis, it argues that, for Capital One to proceed on its antitrust claims against IV based on IV's patent litigation activities, Capital One must establish that an exception to *Noerr–Pennington* exists such that IV was not entitled to exercise its right to sue.  *Id.* According to IV, Capital One has failed to prove that IV's claims were "objectively baseless," as it had to do to prove that IV was not exempt from antitrust liability.  *Id.* at 13.  IV asserts that Capital One instead tried to prove that IV's claims were "unsuccessful," which IV insists is not enough.  *Id.*

### *Applicability of Noerr–Pennington immunity*

Capital One counters that *Noerr–Pennington* immunity simply does not apply because the "litigation conduct is part of a broader monopolistic scheme," and "*Noerr* does not insulate the entire scheme."  Capital One Opp'n 19; *see also id.* at 21 ("IV's lawsuits against Capital One (and other banks) are part of its overall, multi-step scheme to force a portfolio license at a supracompetitive price.").  Insofar as Capital One argues that "IV's aggregation of patents to create market power would support substantial Section 2 and Section 7 claims on its own," and that "the concealment and misdirection at the heart of IV's extortive licensing strategy would be anticompetitive even if IV had never filed a lawsuit," *id.*, this contention is contrary to Capital One's pleadings.  Capital One alleges that "IV has eliminated banks' access to substitutes for IV's license, both in the form of other patent licenses and banking-product designs, through a carefully orchestrated campaign of patent aggregation, concealment, and sham litigation," Fourth Am. Countercl. (Redacted) ¶ 157, and that "IV's use of patent accumulations to cut off banks'

design and license choices, as weapons in negotiation, and to provide fuel for repeated sham litigation, violates Section 2 of the Sherman Act," *id.* ¶ 125.  *See also id.* ¶ 171 ("IV's actions in secretly aggregating 3,500 financial-services patents through shell companies, subjecting Capital One to sham litigation, demanding nine-figure sums for a limited and temporary patent respite, and refusing to disclose many of the patents that IV demanded Capital One pay more than $100 million for are all part of a carefully orchestrated plan to achieve monopoly power in the relevant technology-licensing market and wield it against the banking industry."); *id.* ¶ 177 ("Even though the patents in its portfolio are individually of little or no worth, IV can and does acquire monopoly power by amassing them as a source of serial sham litigation threats."); Third Party Compl. (Redacted) ¶¶ 17, 49, 63, 69 (same).

And, while patent acquisition and aggregation is the focus of the Clayton Act claim, acquisition is actionable under the Clayton Act only where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  To establish this effect, Capital One relies on IV's purported "campaign," which could not succeed absent the allegedly sham litigation.  *See* Third Am. Countercl. (Sealed) ¶ 218 ("IV combines [its patent acquisitions] in a way that 'gives [IV] market power,' because, now that IV has eliminated alternative licensing sources by acquiring the patents, banks 'can not avoid' paying a hold-up demand (which IV styles as a 'license') if they want to avoid repeated meritless litigation and uncertainty."); *see also* Third Party Compl. (Sealed) ¶ 110 (same).  Clearly, the allegation of sham litigation is an integral component of IV's alleged strategy underlying all of Capital One's claims.  *See* Third Am. Countercl. ¶¶ 125, 157, 171, 177, 218; Third Party Compl. ¶¶ 17, 49, 63, 69, 110.

Moreover, even if the sham litigation allegations could be excised from its pleadings, Capital One does not cite any controlling authority in support of its position that *Noerr–Pennington* immunity does not apply because sham litigation is only one component of a larger scheme, and I am not persuaded by the authority it cites from other circuits.  Capital One includes a quote from *California Motor* as indirect support for its argument: "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute. . . . If the end result is unlawful, it matters not that the means used in violation may be lawful." Capital One Opp'n 19 (quoting *California Motor*, 404 U.S. at 514–15).  These two sentences that Capital One pairs together (with the effect that it appears, from the quote, that *California Motor* provides that an exception exists to *Noerr–Pennington* immunity when the litigation is part of a broader scheme to violate the law) actually bookend a section of the opinion that has nothing to do with litigation as part of a broader scheme.  Rather, on pages 514 and 515 of its *California Motor* opinion, the Supreme Court explained the principles underpinning *Noerr–Pennington* immunity and the sham litigation exception (which I discuss further, below).  First, it observed that citizens are not always immune from legal consequences when exercising their First Amendment rights and that the First Amendment does not protect the press from antitrust laws.  *California Motor*, 404 U.S. at 514.  It then noted that "First Amendment rights may not be used as the means or the pretext for achieving 'substantial evils' which the legislature has the power to control."  *Id.* at 515 (internal citation omitted).  And it concluded that when businesses combine efforts to "harass and deter their competitors," even when their actions are in litigation that otherwise would be protected under *Noerr–Pennington*, their actions violate the antitrust laws.  *Id.*

Capital One also cites *Fed. Trade Comm'n v. Actavis, Inc.*, 133 S. Ct. 2223 (2013), as stating that "anticompetitive effects [that] fall within the scope of the exclusionary potential of the patent" do not "immunize [conduct] from antitrust attack."  Capital One Opp'n 19 (quoting *Actavis*, 133 S. Ct. at 2230).  But, a holding that, when the validity and preclusive scope of a patent are in question, the patent holder can be sued under antitrust laws for activities that may be permissible under the patent (such as charging supra-competitive prices) does not mean that a patent holder can be sued under antitrust laws for *filing suit* to enforce the patent, and Capital One has not identified any binding authority extending the Supreme Court holding in this manner.

### Exceptions to Noerr–Pennington immunity

Alternatively, Capital One argues that IV is not immune to suit under *Noerr–Pennington* because a party loses its immunity if it brings a series of "petitions . . . 'pursuant to a policy of starting legal proceedings without regard to the merits' and for the purpose of injuring competition," which is what, in Capital One's view, IV did when it "brought its ten patent claims against Capital One without regard to the merits and for the purpose of restraining trade." Capital One Opp'n 22–25 (quoting *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trade Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994)).

> A patentee who brings an infringement suit may [lose its *Noerr-Pennington* immunity and] be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965), or (2) that the infringement suit was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (quoting *Noerr*, 365 U.S. at 144); *see also Actavis*, 133 S. Ct. at 2239 (Roberts, C.J., dissenting) ("If its

actions are within the scope of the patent, they are not subject to antitrust scrutiny, with two exceptions concededly not applicable here: (1) when the parties settle sham litigation, cf. [*PREI*, 508 U.S. at 60–61]; and (2) when the litigation involves a patent obtained through fraud on the Patent and Trademark Office. *Walker Process Equipment, supra,* at 177, 86 S.Ct. 347.").

1. *Exception for litigation of patents procured by fraud*

*Walker Process* held narrowly that "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present." 382 U.S. at 174.  Thus, "'to strip [a patentee] of its exemption from the antitrust laws' because of its attempting to enforce its patent monopoly, an antitrust plaintiff is first required to prove that the patentee 'obtained the patent by knowingly and willfully misrepresenting facts to the [Patent and Trademark Office]'" and that the patent holder seeking to enforce its patent through litigation was "aware of the fraud when bringing suit." *Nobelpharma*, 141 F.3d at 1068–69 (citing *Walker*, 382 U.S. at 177 & n.6) (footnote omitted). For *Walker Process* purposes, "fraud is a more serious offense than inequitable conduct."  *Id.* at 1070.  Where, as here, there is no evidence that the Patent Office was tricked by fraud or that IV (which later acquired the patents) was aware of any such fraud, *Walker Process*'s holding has no application.

2. *Sham litigation exception*

Because *Walker Process* is inapplicable, to determine whether IV is immune from antitrust liability stemming from its patent litigation, I must determine whether the "sham litigation exception to *Noerr–Pennington* immunity" applies.  *See Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338, 1343 (Fed. Cir. 2014).  The Supreme Court first observed that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing

governmental action, is a mere sham to cover up what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified" in *Noerr*, 365 U.S. at 144. The sham litigation exception has been extended to patent litigation, in which a patentee's "conduct in the prosecution of a patent" may be "sufficient to strip [the] patentee of its immunity from the antitrust laws." *Nobelpharma*, 141 F.3d at 1067. But this exception to *Noerr–Pennington* immunity is narrow, "[g]iven the presumption of patent validity and the burden on the patent challenger to prove invalidity by clear and convincing evidence." *Tyco Healthcare*, 762 F.3d at 1343. Consequently, rarely will "a patentee's assertion of its patent in the face of a claim of invalidity . . . be so unreasonable as to support a claim that the patentee has engaged in sham litigation." *Id.*

As for what qualifies as sham litigation, *PREI*, 508 U.S. 49, and *California Motor*, 404 U.S. 508, provide guidance. In *California Motor*, a group of trucking companies brought antitrust claims against another group of trucking companies, alleging that the defendants "conspired to monopolize trade and commerce in the transportation of goods" through "a concerted action . . . to institute state and federal proceedings [including rehearings, reviews, and appeals from agency and court orders] to resist and defeat applications by [the plaintiffs] to acquire operating rights or to transfer or register those rights." 404 U.S. at 509. As noted, the *California Motor* Court extended *Noerr–Pennington* immunity, holding that an antitrust claim cannot be based upon "the approach of citizens or groups of them to administrative agencies . . . [or] to courts." *Id.* at 510. But, the Court concluded that the allegations in the case before it, that the defendants "sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process" and "'instituted the proceedings and actions . . .

with or without probable cause, and regardless of the merits of the cases,'" fell "within the 'sham' exception in the Noerr case, as adapted to the adjudicatory process." *Id.* at 512, 516.  It reasoned that, when a party's legal actions reflect "a pattern of baseless, repetitive claims" that "leads the factfinder to conclude that the administrative and judicial processes have been abused," that party "cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Id.* at 513.

In *PREI*, the operators of a resort hotel ("PRE") "sought to develop a market for the sale of videodisc players to other hotels wishing to offer in-room viewing of prerecorded material." Columbia Picture Industries, Inc. ("Columbia") "held copyrights to the motion pictures recorded on the videodiscs that PRE purchased" and, like PRE, "licensed the transmission of copyrighted motion pictures to hotel rooms." 508 U.S. at 51–52.  Columbia sued PRE for copyright infringement, and PRE counterclaimed in antitrust, claiming that "Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and conspiracy to restrain trade." *Id.* at 52.  Notably, Columbia only initiated one suit against PRE, *id.*, unlike the "pattern of baseless, repetitive claims" that defeated the antitrust defendants' immunity claim in *California Motor*, 404 U.S. at 513.  It is also significant that in *PREI*, the district court case was in the same posture as this case, with a summary judgment motion pending, and the court decided the case on summary judgment.  *PREI*, 508 U.S. at 53.

The *PREI* Court held that, to qualify as "sham litigation," a lawsuit "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and "the litigant's subjective motivation" must be "to interfere *directly* with the business relationships of a competitor."  *PREI*, 508 U.S. at 60–61; *see Tyco Healthcare*, 762 F.3d at 1343 (noting that a lawsuit qualifies as "sham litigation" under the *PREI* test when it "(1) is

'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits' (the objective element), and (2) is motivated by a desire 'to interfere *directly* with the business relationships of a competitor' (the subjective element)"  (quoting *PREI*, 508 U.S. at 60–61)).  Because "the antitrust defendant admittedly had probable cause to institute [its copyright suit]," the Court concluded that its suit against PREI was not objectively baseless and therefore could not qualify as sham litigation to defeat Noerr–Pennington immunity.  *PREI*, 508 U.S. at 51. Thus, although both factors must be present to establish that litigation is a sham, a finding of "an objectively reasonable effort to litigate" is sufficient to show that the litigation was not a sham, "regardless of subjective intent." *Id.* at 51.  Simply put, if the court concludes that the antitrust defendant had probable cause to file suit (which it can determine as a matter of law if, as here, "there is no dispute over the predicate facts of the underlying legal proceeding"), it cannot find that the defendant engaged in sham litigation, even if the litigant filed suit without any expectation of success. *See id.* at 62, 63.

The *PREI* Court analogized to the common law tort of wrongful civil proceedings (often erroneously referred to as malicious prosecution, a tort that involves wrongful *criminal* proceedings) to define probable cause for purposes of determining whether litigation is objectively baseless. *Id.* at 62.

> The notion of probable cause . . . requires the plaintiff to prove that the defendant lacked probable cause to institute an unsuccessful civil lawsuit and that the defendant pressed the action for an improper, malicious purpose. *Stewart v. Sonneborn*, 98 U.S. 187, 194 . . . (1879); *Wyatt v. Cole*, 504 U.S. 158, 176 . . . (1992) (REHNQUIST, C.J., dissenting); T. Cooley, Law of Torts.  *Cf. Wheeler v. Nesbitt*, 24 How. 544, 549–50, 16 L.Ed. 765 (1861)] Probable cause to institute civil proceedings requires no more than a "reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication" (internal quotation marks omitted). *Hubbard v. Beatty & Hyde, Inc.,* 343 Mass. 258, 262, 178 N.E.2d 485, 488 (1961); Restatement (Second) of Torts § 675, Comment *e*, pp. 454–455 (1977). Because the absence of probable cause is an essential element of the tort, the existence of probable cause is an absolute defense. *See Crescent City Live*

*Stock Co. v. Butchers' Union Slaughter–House Co.,* 120 U.S. 141, 149 . . . (1887); *Wheeler, supra,* 24 How. at 551; *Liberty Loan Corp. of Gadsden v. Mizell*, 410 So. 2d 45, 48 (Ala. 1982). . . . When a court has found that an antitrust defendant claiming *Noerr* immunity had probable cause to sue, that finding compels the conclusion that a reasonable litigant in the defendant's position could realistically expect success on the merits of the challenged lawsuit. . . . [T]herefore, a proper probable cause determination irrefutably demonstrates that an antitrust plaintiff has not proved the objective prong of the sham exception and that the defendant is accordingly entitled to *Noerr* immunity.

*Id.* at 62–63 (some internal citations omitted).

In his concurrence, Justice Stevens "agreed with the Court's disposition of [*PREI*] and with its holding that 'an objectively reasonable effort to litigate cannot be sham regardless of subjective intent,'" but he wrote separately because he believed that the majority's opinion included "unnecessarily broad dicta" that the Court "might regret when confronted with a more complicated case." *Id.* at 67–68. Justice Stevens distinguished cases like *PREI* in which a single lawsuit is alleged to be a sham, from cases like *California Motor* that involved "repetitive filings." *Id.* at 67–73. He noted that "[t]here might well be lawsuits" in which "'reasonable litigant[s] could realistically expect success on the merits,'" but the litigation could "be objectively *unreasonable*" nonetheless, "and thus shams." *Id.* at 68. Justice Stevens observed that "more complicated cases [previously before the Supreme Court], in which, for example, the alleged competitive injury has involved something more than the threat of an adverse outcome in a single lawsuit, have produced less definite rules." *Id.* at 72–73. Citing *California Motor*, he stated that "[r]epetitive filings, some of which are successful and some unsuccessful, may support an inference that the process is being misused." *Id.* at 73. Moreover, he said, "[i]n such a case, a rule that a single meritorious action can never constitute a sham cannot be dispositive," and "a simple rule may be hard to apply when there is evidence that the judicial process has been used as part of a larger program to control a market and to interfere with a potential competitor's

financing without any interest in the outcome of the lawsuit itself . . . ." *Id.* at 73.  But, notably, the majority did not modify its opinion to address the concerns Justice Stevens raised, and his views regarding how *Noerr–Pennington* immunity should apply do not limit the majority opinion.

Similarly, in *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, the Fourth Circuit, considering a series of proceedings in the labor context, observed that "[i]t is unclear whether *PREI* [and its two-step standard] distinguished or displaced the sham litigation test first propounded in *California Motor*" for analyzing the proceedings on the record before it.  728 F.3d 354, 363 (4th Cir. 2013).  The Fourth Circuit noted that, under the *California Motor* standard, "the focus is not on any single case. Rather a district court should conduct a holistic evaluation of whether 'the administrative and judicial processes have been abused.'" *Id.* (quoting *Cal. Motor*, 404 U.S. at 513).  It is "[t]he pattern of the legal proceedings, not their individual merits," that the court considers to determine "whether the [antitrust defendant] indiscriminately filed . . . a series of legal proceedings without regard for the merits and for the purpose of violating federal law." *Id.*  As with the *PREI* standard, "the subjective motive of the litigant and the objective merits of the suits are relevant," but the *California Motor* standard is different because "other signs of bad-faith litigation . . . may also be probative of an abuse of the adjudicatory process." *Id.*

The Fourth Circuit adopted the Second and Ninth Circuits' approach[10] in reading *PREI* and *California Motor* "as applying to different situations. *Professional Real Estate Investors*

---

[10] Other circuits do not take this approach.  *E.g.*, *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 148 (3d Cir. 2017) (applying two-part test from *PREI* without considering *California Motor*'s standard), *judgment entered sub nom. In re Wellbutrin XL Antitrust Litig.*, No. 15-2875, 2017 WL 3529114 (3d Cir. Aug. 9, 2017); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1350 (Fed. Cir. 2014)

provides a strict two-step analysis to assess whether a single action constitutes sham petitioning . . . . *California Motor Transport* deals with the case where the defendant is accused of bringing a whole series of legal proceedings." *Id.* (quoting *USS–POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council, AFL–CIO* ("*POSCO*"), 31 F.3d 800, 810–11 (9th Cir. 1994); citing *Primetime 24 Joint Vent. v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000)). The Fourth Circuit noted that the *PREI* standard "is ill-fitted to test whether a series of legal proceedings is sham litigation," especially when "the presiding tribunal [for earlier] cases had no occasion to measure the baselessness of the suit because (1) it had no inkling that the action comprised a possible campaign of sham litigation, and (2) the plaintiffs preempted an assessment of frivolity by prematurely withdrawing some of their suits." *Id.* at 364. Thus, under Fourth Circuit law, in the labor context, "when purported sham litigation encompasses a series of legal proceedings rather than a singular legal action, . . . the sham litigation standard of *California Motor* should govern." *Id.*

The parties disagree about which standard I should apply in this case. IV insists that Federal Circuit law governs, and therefore I should apply the *PREI* standard. *See* IV Mem. 13. Indeed, "an antitrust claim premised on stripping a patentee of its immunity from the antitrust laws is typically raised as a counterclaim by a defendant in a patent infringement suit," and, "[b]ecause most cases involving these issues will therefore be appealed to [the Federal Circuit]," immunity from antitrust laws "should [be] decide[d] … as a matter of Federal Circuit law, rather than [by] rely[ing] on various regional precedents." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1067–68 (Fed. Cir. 1998). On that basis, the Federal Circuit held that for

---

(same); *Bryant v. Military Dep't of Mississippi*, 597 F.3d 678, 690–91 (5th Cir. 2010) (considering *PREI* standard as well as test stated in *Bill Johnson's Rest. v. NLRB*, 461 U.S. 731, 733–35 (1983), in labor context).

"all antitrust claims premised on the bringing of a patent infringement suit," the issue of "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law," although "the law of the appropriate regional circuit [applies] to issues involving other elements of antitrust law such as relevant market, market power, damages, etc." *Id.* at 1068.  This language is unambiguous in its application to instances of patent litigation.

Nonetheless, Capital One argues that Federal Circuit law does not apply in this instance because it is not necessary to resolve any issues under patent law to determine antitrust liability, and this Court should, under Fourth Circuit law, apply the *California Motor* standard instead because the facts of this case involve what Capital One characterizes as a series of legal proceedings. Capital One Opp'n 23 n.7.  In its view, "Capital One's claims are based on IV's overall scheme, not solely on IV's 'conduct in . . . enforcing a patent." *Id.*  Capital One contends in the alternative that, even under Federal Circuit law, *California Motor*, not *PREI*, "is still the correct standard because the Federal Circuit has not reached the question of whether [*California Motor*] applies to a series of petitions," as Capital One asserts is present in this case, and "every circuit that has addressed the issue [including the Fourth Circuit] holds that the [*California Motor*] standard, not *PREI*, applies where, as here, more than one lawsuit (or petition) is at issue." *Id.* at 23.

Federal Circuit law, under which *PREI* provides the standard for deciding whether *Noerr-Pennington* immunity exists or whether the sham-litigation exception is present, clearly applies in this case.  Capital One's antitrust claims are counterclaims brought in the patent litigation that IV initiated.  These are the circumstances that *Nobelpharma* describes.

In any event, even if Fourth Circuit law applied or the Federal Circuit applied the *California Motor* standard to cases involving a series of claims, the result would not change: *PREI* still would provide the standard.  The facts before me are easily distinguished from the facts of *California Motor*, *Waugh Chapel*, and the cases on which the Fourth Circuit relied, *POSCO*, 31 F.3d 800, and *Primetime 24 Joint Vent.*, 219 F.3d 92.  In *California Motor*, 404 U.S. at 509, 513, there was a "pattern of baseless and repetitive claims" made in a number of administrative and court proceedings.  In *Primetime 24 Joint Venture*, 219 F.3d at 101, there were "voluminous challenges," and in *POSCO*, 31 F.3d at 804, there were "numerous grievances, arbitrations and enforcement proceedings."  *Waugh Chapel*, 728 F.3d 354, involved fourteen separate proceedings—a barrage of proceedings that was clearly a series.  Here, there have been only two cases that IV has brought against Capital One.  While it is true that IV has sued various other entities in other courts, that litigation does not make its two instances of litigation against Capital One a series.[11]  Further, IV's suits against other defendants, alleging infringement of various patents based on those other defendants' independent actions, have no bearing on the merits of the litigation before me or Judge Trenga.  *See Waugh Chapel*, 728 F.3d at 366–67 (considering only claims against one development even though two different developments had been subject to suit, one named as a defendant three times and one named fourteen times).  Accordingly, I only will consider the two suits against Capital One.  Additionally, multiple claims brought in one case do not constitute a series.  IV has not identified any controlling case law to the contrary.

Moreover, insofar as the *Waugh Chapel* Court identified *PREI* as the standard when there was only *one* lawsuit that could qualify as sham litigation and *California Motor* as the standard

---

[11] This is not to say that the lawsuits IV has filed against Capital One could not evolve into a series if IV continues to litigate its patents against Capital One.

for when there was a *series* of prior proceedings, it left open the question of the standard to apply when there were *two* lawsuits that could have been sham litigation (a situation closer to the facts in *PREI* than in *California Motor*).   After all, the sham litigation cases array along a continuum of instances of only one case filed to instances where many have been filed, and it seems overly rigid to limit the underlying analysis of *PREI* to situations involving only a single suit. Therefore, even if I applied Fourth Circuit law, I would have to consider the underlying rationale of *Waugh Chapel* to determine whether these allegations of two instances of sham litigation are analyzed best under *PREI* or *California Motor*.   As the *Waugh Chapel* Court observed, the *PREI* standard is "ill-fitted" when "the presiding tribunal [for earlier] cases had no occasion to measure the baselessness of the suit," while the *California Motor* standard enables a court to assess potentially sham litigation when it cannot determine whether each legal proceeding was objectively baseless. *Waugh Chapel*, 728 F.3d at 364.

In *Waugh Chapel*, there was no way of knowing what the merits were of the various earlier proceedings. At least two petitions were withdrawn such that the tribunals never had the chance to consider them.  Others were dismissed as moot or as conjecture without any decision on the merits with regard to whether the claims were objectively baseless.

Here, in contrast, in the sole earlier proceeding, Judge Trenga clearly had the opportunity to consider the bona fides because, as in this case, Capital One brought its antitrust counterclaims in response to IV's patent litigation.  Indeed, Judge Trenga reached a decision on the merits with regard to four of the five patents IV originally identified.  His conclusions are available to me in a published opinion that informed me of the court's rationale.   Further, the issue of sham

litigation arose in the Virginia court, and I have the benefit of Judge Trenga's cogent analysis.[12] And, the other instance of purportedly sham litigation is the patent litigation that IV brought before me—in which both a Special Master and I considered four claims on summary judgment. Thus, I need not resort to analyzing "[t]he pattern of the legal proceedings" in lieu of "their individual merits" to determine whether IV "indiscriminately filed . . . a series of legal proceedings without regard for the merits." *Waugh Chapel*, 728 F.3d at 363. Rather, it is quite feasible to apply the *PREI* standard to determine if these two instances of litigation were objectively baseless.

Under *PREI*, what I need to determine is whether a reasonable litigant in IV's position could realistically expect to succeed on the merits of its claims in this Court because, if it could, the litigation was not objectively baseless and therefore not sham litigation. *PREI*, 508 U.S. at 51, 62. As noted, this is an "absolute defense" that "requires no more than a 'reasonabl[e] belie[f] that there is *a chance* that [a] claim may be held valid upon adjudication.'" *Id.* at 62 (emphasis added) (citation omitted).

---

[12] The Eastern District of Virginia observed that "[c]entral to Capital One's theory of monopolization [was] that IV ha[d] engaged in or threaten[ed] to engage in 'sham litigation' to enforce a patent portfolio whose patents are, in fact, either unenforceable or so weak that, absent IV's 'hold-up,' they have limited commercial value." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13-740 AJT, 2013 WL 6682981, at *7 (E.D. Va. Dec. 18, 2013). But, it rejected that theory because Capital One failed to "allege any specific litigation history to support that claim or identify any particular patents IV ha[d] attempted or threatened to enforce that have expired, been cancelled or adjudicated to be invalid." *Id.* The court also found that "IV and Capital One do not compete in any relevant market, so it cannot be said that IV's object is to use th[at] or any other litigation to interfere with the business relationships of a competitor." *Id.* Thus, it concluded that "Capital One ha[d] not alleged facts or circumstances that would plausibly place th[at] litigation within any recognized exception to the *Noerr–Pennington* doctrine, which protects private parties from antitrust liability based on even unsuccessful litigation attempts to enforce laws with potential anti-competitive effects." *Id.*

Fatally, Capital One cannot establish that IV's litigation against it was objectively baseless because there were too many indicia of probable cause.  Most significantly, in this case, it is undisputed that the parties selected (ECF No. 134) and the Court appointed (ECF No. 143) an independent Special Master (with significant experience handling patent litigation), who wrote two comprehensive reports and recommendations (ECF Nos. 298, 315) regarding the merits of four of IV's patent claims after the parties submitted cross-motions for summary judgment on patent validity under 35 U.S.C. § 101.  Prior to issuing those reports and recommendations, the Special Master resolved multiple discovery disputes (ECF Nos. 170, 199, 203, 209, 223, 286, 290, 294); reviewed the parties' extensive formal briefing (ECF Nos. 147-1, 169-1, 227, 246), as well as supplemental letter briefing that the Special Master requested (ECF Nos. 298-1, 298-2) and twenty-seven exhibits; and heard argument (ECF No. 298-3).  Under the Special Master's detailed and insightful analysis, IV did succeed on two of its patent claims: the Special Master recommended a judgment of patent eligibility for the '084 and '002 Patents. ECF No. 298.  This fact alone is sufficient to show that a reasonable litigant could realistically expect to succeed on the merits, and it vitiates the notion that the loss before Judge Trenga meant that IV no longer could reasonably believe that it could prevail in this court.  And, next to this fact, any other disputes are scintillae.

Moreover, various other undisputed facts also support the finding that IV's litigation in this Court was not objectively baseless.  First, there is the presumptive validity of each of the nine patents that were the subjects of IV's claims against Capital One.  *See* 35 U.S.C. § 282(a) ("A patent shall be presumed valid.").  Second, IV filed both suits before the Supreme Court decided *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2351–52 (2014) (holding that claims "disclos[ing] a computer-implemented scheme for mitigating 'settlement risk' . . . by using a

third-party intermediary" were not patent eligible under 35 U.S.C. § 101 but rather were "drawn to the abstract idea of intermediated settlement, and that merely requiring generic computer implementation fails to transform that abstract idea into a patent-eligible invention").   I considered *Alice* and the parameters it set for eligibility in concluding that two of the patents before me were not actually patent-eligible.  *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 127 F. Supp. 3d 506, 511–31 (D. Md. 2015), *aff'd,* 850 F.3d 1332 (Fed. Cir. 2017).[13] The Special Master did not consider post-*Alice* cases and found that the same patents *were* patent eligible.  *See Intellectual Ventures*, 127 F. Supp. 3d at 509 ("[The Special Master did not] address in any depth the increasing number of cases that have been decided by the Federal Circuit and District Courts around the country that have been decided since the Supreme Court's recent decisions in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* ──U.S. ──, 134 S. Ct. 2347 (2014), and *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* ── U.S. ──, [132 S. Ct. 1289] (2012), that have found patents that are highly analogous to the '081 and '002 patents to be invalid for abstractness under 35 U.S.C. § 101."). This shows that when IV filed suit, before *Alice* was decided, it was realistic to expect success on the merits, at least with regard to these two patents.  *See also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1350 (Fed. Cir. 2014) ("CET's infringement suits, though unsuccessful, were not objectively baseless . . . . because the state of the law of § 101 was deeply uncertain at the time CET filed its complaints against Wells Fargo and PNC in 2012. Under these circumstances, we cannot conclude that as a matter of law, no reasonable litigant in 2012 could have expected success on at least one of CET's claims.").

---

[13] Judge Trenga granted summary judgment in Capital One's favor on April 16, 2014, before the Supreme Court decided *Alice* on June 19, 2014.  *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13-CV-740 AJT, 2014 WL 1513273, at *1 (E.D. Va. Apr. 16, 2014), *aff'd sub nom. Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015).

Third, IV has not filed any additional suits against Capital One post-*Alice*. Fourth, IV withdrew specific claims when it was persuaded that it would not prevail, suggesting that it reasonably believed it could prevail on the others.  Fifth, IV appealed my summary judgment rulings, an extra step that one who did not expect to succeed likely would not bother taking. Sixth, while Capital One incurred significant costs defending IV's patent claims, IV also incurred substantial litigation expenses.  The litigation before me has involved nineteen attorneys for IV, as well as a Special Master and an economic consultant, the costs of whom the parties have shared.   The docket includes almost 700 entries, and the documents in support of the parties' pending summary judgment briefing exceed 13,000 pages.  Seventh, IV did not file for these patents with the Patent and Trademark Office; it acquired them and was entitled to rely on their presumptive validity.  Eighth, Judge Trenga ruled that IV's patent infringement action was not an "exceptional case" marked by "unreasonable conduct" that would justify an award of attorneys' fees to Capital One pursuant to 35 U.S.C. § 285.  *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13CV0740 (AJT/TCB), 2015 WL 7283108, at *1, *4 (E.D. Va. Nov. 17, 2015).   Ninth, IV incurred the significant expense of designating nine experts on objective reasonableness—in comparison to Capital One's failure to designate any—something IV hardly would have done had it thought its underlying patent claims were objectively baseless. Under these circumstances, no reasonable factfinder could conclude that IV lacked probable cause.

Further, if I were to reach the subjective inquiry of whether IV initiated litigation to interfere directly with its *competitor's* business, it is questionable whether Capital One, a bank, could qualify as a competitor of IV, a patent assertion entity.  Indeed, Judge Trenga found that Capital One is not IV's competitor.  *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No.

13-740 AJT, 2013 WL 6682981, at *7 (E.D. Va. Dec. 18, 2013).  Thus, even if this litigation were objectively baseless—which it clearly is not—Capital One cannot establish that IV intended to interfere "with the business relationships of a competitor."  *See PREI*, 508 U.S. at 60–61 (emphasis added).

In sum, not only is Capital One not a competitor of IV, but more significantly, a reasonable litigant in IV's position realistically could have expected to succeed on the merits of its claims in this Court. Therefore, the litigation was not objectively baseless. Consequently, it was not sham litigation, and IV is entitled to *Noerr–Pennington* immunity, as its patent litigation is integral to Capital One's antitrust claims.  *PREI*, 508 U.S. at 51, 62.

### Collateral Estoppel

Collateral estoppel, also known as issue preclusion, "works to ensure that parties get 'one full and fair opportunity to litigate a particular issue, while preventing needless relitigation of that issue.'" *Barna Conshipping, S.L. v. 2,000 Metric Tons, More or Less, of Abandoned Steel*, 410 F. App'x 716, 720 (4th Cir. 2011) (quoting *In re Cygnus Telecomms. Tech., LLC, Patent Litig.*, 536 F.3d 1343, 1350 (Fed. Cir. 2008)). Collateral estoppel bars relitigation of an issue or fact if

> (1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

*In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (emphasis added).

Collateral estoppel may be offensive or defensive.  *Id.*  Offensive collateral estoppel is "[w]hen a *plaintiff* [or counter claimant or third party plaintiff] employs the doctrine of collateral

estoppel or issue preclusion 'to foreclose the defendant [or counter defendant or third party defendant] from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party.'" *Id.* (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4 (1979)).  Defensive collateral estoppel is "when a *defendant* [or counter defendant or third party defendant] employs the doctrine 'to prevent a plaintiff [or counter claimant or third party plaintiff] from asserting a claim the plaintiff [or counter claimant or third party plaintiff] has previously litigated and lost against another defendant.'" *Id.* (quoting *Parklane Hosiery*, 439 U.S. at 326 n.4).  A defendant (or defending party) also can employ defensive collateral estoppel to bar claims the plaintiff (or claimant) already unsuccessfully made against *it*, rather than another defendant.  *See Zeno v. United States*, No. DKC-09-544, 2009 WL 4910050, at *8 (D. Md. Dec. 11, 2009), *aff'd*, 451 F. App'x 268 (4th Cir. 2011).  Here, the Intellectual Ventures companies, which are Counter Defendants and Third Party Defendants, invoke the doctrine to prevent the Capital One companies, which are Counter Claimants and Third Party Plaintiffs, from asserting the claims they unsuccessfully alleged against IV in the Virginia litigation.  This is an instance of defensive collateral estoppel.  *See id.*; *Microsoft*, 355 F.3d at 326.

IV insists that collateral estoppel bars relitigation of whether the market that Capital One identifies is a "relevant market," because the Eastern District of Virginia already determined that the same market that Capital One describes here was not a relevant market for antitrust purposes, IV Mem. 7–8, and that issue was critical and necessary to Judge Trenga's judgment, which was a valid, final judgment, *id.* at 9, 12.  IV contends that, although Capital One pleaded different facts in this case, the changes were "immaterial," and "[a]ltering the facts alleged cannot avoid issue preclusion" because "[i]ssue preclusion prevents a second attempt to relitigate with additional pleaded facts, or any other way."  *Id.* at 8–9.  Capital One counters that the pleadings define a

different relevant market, Capital One Opp'n 15–17, that the changes are not immaterial, *id.* at 17, and that in any event, the market definition was not critical or necessary to the judgment, *id.* at 17–18, because "the Virginia court's decision rested on the independent grounds that Capital One's market definition and monopoly power allegations were both insufficient to state a claim." *Id.* at 18.

Notably, "relevant market" is a necessary element of all of Capital One's antitrust claims. *See Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 582 (4th Cir. 2003) (noting that, "to determine whether any antitrust violation [under the Sherman Act or the Clayton Act] has occurred, '[the court]must first define *the relevant market* because the concept of competition has no meaning outside its own arena, however broadly that arena is defined,'" and that the party bringing an antitrust claim "bears the burden of proof on the issue of the relevant product and geographic markets" (emphasis added) (citing *Satellite Television & Assoc. Res., Inc., v. Continental Cablevision of Va., Inc.,* 714 F.2d 351, 355 (4th Cir.1983))); *see also Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993) (stating that, for an attempted monopolization claim under § 2 of the Sherman Act, "to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider *the relevant market* and the defendant's ability to lessen or destroy competition in that market" (emphasis added)); *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71 (1966) (stating that, to prevail on a claim of monopolization under § 2 of the Sherman Act, a plaintiff must prove: "(1) the possession of monopoly power in *the relevant market* and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" (emphasis added)); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963) (holding that "a merger which produces a firm controlling an undue

percentage share of *the relevant market*, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it [is a violation of § 7 of the Clayton Act unless there is] evidence clearly showing that the merger is not likely to have such anticompetitive effects" (emphasis added)); *It's My Party, Inc. v. Live Nat., Inc.*, 88 F. Supp. 3d 475, 503 (D. Md. 2015) (stating that, to prevail on a claim of attempted monopolization, a plaintiff must prove "(1) a specific intent to monopolize *a relevant market*; (2) predatory or anticompetitive acts; and (3) a dangerous probability of successful monopolization") (emphasis added) (quoting *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.,* 748 F.3d 160, 177 (4th Cir. 2014)), *aff'd sub nom. It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016).  Therefore, if the relevant market that Capital One alleges has not changed in any material respect from the relevant market it defined in the Virginia litigation, then Judge Trenga's conclusion that Capital One's "relevant market" did not constitute a relevant market for antitrust purposes prevents relitigation of that issue, and IV is entitled to judgment as a matter of law on all counts.  *See Berlyn*, 73 F. App'x at 582.

Capital One does not challenge whether it had a full and fair opportunity to litigate the sufficiency of its market definition before the Eastern District of Virginia, whether the sufficiency of the relevant market it alleged was actually resolved in that court, or whether Judge Trenga issued a valid, final judgment.  *See* Capital One Opp'n 15–17.  Rather, as noted, Capital One challenges the applicability of issue preclusion in two regards: (1) whether the relevant market is materially different in this litigation, and (2) whether Judge Trenga's conclusion that the proposed relevant market was not a relevant market for antitrust purposes was critical and necessary to the judgment he issued.  *See id.*  I will consider each challenge in turn.

### *Is the relevant market materially different in this litigation?*

A relevant market is generally viewed as the field of "meaningful competition." *IGT v. Alliance Gaming Corp.,* 702 F.3d 1338, 1344 (Fed. Cir. 2012). It is determined by "commercial realities" and "consumer choice" and, while it typically includes substitutes for a particular product, it may also consist of a single product or brand where there is no "reasonable interchangeability" with other comparable products, that is, where there are essentially no substitutes for a given product. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481–82 (1992) (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. at 404).

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13-CV-00740 AJT, 2013 WL 6682981, at *4 (E.D. Va. Dec. 18, 2013).

In the Virginia litigation, Capital One alleged that the relevant market was the "market for technology enabling business processes common throughout the commercial banking industry in the United States." *Intellectual Ventures*, 2013 WL 6682981, at *5 (quoting pleadings). The Virginia court reworded the relevant market definition as "IV's 'portfolio of 3,500 or more patents that [IV] alleges cover widely used financial and retail banking services' in the United States." *Intellectual Ventures*, 2013 WL 6682981, at *5. Here, Capital One once again alleges that IV's 3,500 patents comprise the relevant market. Fourth Am. Countercl. ¶ 158; Third Party Compl. ¶ 50. Notably, the alleged market has not changed because IV has not acquired any new patents in the relevant investment funds since Capital One filed its antitrust counterclaim in the Virginia litigation. Detkin Decl. ¶ 4, Ex. 69, Jt. Rec. 3,415. And, Capital One acknowledges that, previously, I observed that the "[Virginia] court restated the relevant market as the Intellectual Ventures companies' 'portfolio of 3,500 or more patents,' the same market alleged here." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. PWG-14-111, 2016 WL 160263, at *3 (D. Md. Jan. 14, 2016) (quoting *Intellectual Ventures*, 2013 WL 6682981, at *5); *see* Capital One Opp'n 16. Yet, in Capital One's view, the Virginia court's

"restatement [of what the relevant market was] was dicta . . . based on comments made by Capital One's counsel during oral argument on IV's motion to dismiss," and the actual alleged market in the Virginia litigation was not the same as it is here.  Capital One Opp'n 16.  On the contrary, as IV asserts, IV Reply 5, the transcript from oral argument demonstrates that Judge Trenga paraphrased the relevant market to confirm his understanding of what Capital One alleged, and Capital One confirmed that his definition was accurate.  Hr'g Tr., Ex. 3, Jt. Rec. 147 ("THE COURT: You're saying the 3,500 patents that are owned by Intellectual Ventures constitutes 100 percent of the patents involved in the *ex post* market for technology enabling – for patents pertaining to technology enabling business processes.     [CAPITAL ONE'S COUNSEL]: And that's because of the antitrust law.  We're not saying they're the only patents that relate to commercial banking services. . . . We're saying they have effectively an inescapable threat [sic], which in antitrust law is what is controlling prices and eliminating competition. . . . The commercial reality faced by Capital One is you can't get around this market.").  Thus, the alleged relevant market is the same.

But, in this case, Capital One sets forth different facts to support a finding that these patents qualify as a relevant market for antitrust purposes. In the Virginia litigation, Capital One alleged that IV's patent portfolio qualified because Capital One had a business need to avoid litigation, which it only could do by licensing the patents in the portfolio.  Now, instead of relying solely on the need to avoid litigation, which Judge Trenga already found to be insufficient to define a relevant market, Capital One also contends that "continu[ing] to provide the online services they already offer without paying the cost-prohibitive licensing fees to the Intellectual Ventures companies—the only source of such licenses—," is a business necessity. *See Intellectual Ventures*, 2016 WL 160263, at *3 (quoting *Intellectual Ventures I LLC v.*

*Capital One Fin. Corp.*, 99 F. Supp. 3d 610, 622–23 (D. Md. 2015)).  Based on this change in the factual allegations, I denied IV's motion to dismiss on claim preclusion grounds.  *Intellectual Ventures*, 2016 WL 160263, at *3.  Thus, pre-discovery, I concluded that Capital One adequately alleged a plausible relevant market that was not identical to the one alleged in Virginia and therefore not barred by collateral estoppel.  *Id.*

Capital One relies on this preliminary finding to argue that the relevant markets are not identical. Capital One Opp'n 15, 17.  In its view, these changes are material because "the evidence confirms that, to compete, Capital One must provide the core banking services that IV's infringement claims targeted, including ATMs, payment cards, and online and mobile banking," and "the business necessity allegations (and evidence) raise different market definition issues than those present in Virginia."  *Id.* at 17.

IV counters that there "is no evidence to support the argument that a license was a 'business necessity' for Capital One or any other bank, none of which licensed any patents." IV Reply 23 n.17.  Indeed, discovery has concluded, and to date, IV's patent litigation has not led to Capital One (or any other company) licensing the portfolio of thousands of financial services patents that IV amassed, as none of IV's patent claims have resulted in a judgment in IV's favor. Nor is there any other evidence that Capital One has to license IV's patent portfolio or has been unable to do business because it has not licensed the patents.  Certainly, Capital One may feel compelled to license the patents to avoid litigation, but Judge Trenga already concluded that avoiding litigation is not a sufficient business necessity to define a relevant market.  Therefore, despite the new factual allegations before me, the alleged relevant market has not changed in a material way.

*Was Judge Trenga's conclusion that the proposed relevant market was not a*
*relevant market for antitrust purposes critical and necessary to the judgment he issued?*

The crux of Capital One's argument is that the Fourth Circuit has stated that "when issue preclusion is considered in the context of two separate litigations," as it is here, "if a judgment in the prior case is supported by either of two findings, neither finding can be found essential to the judgment." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 328 (4th Cir. 2004). The parties agree that separate findings supported Judge Trenga's judgment, IV Mem. 10; Capital One Opp'n 17–18, but they disagree about the effects of those independent grounds. Capital One relies on the *Microsoft* holding to argue that Judge Trenga's conclusion regarding the relevant market was not critical and necessary to his judgment. Capital One Opp'n 17–18. IV relies on *Ritter v. Mount St. Mary's Coll.*, 814 F.2d 986, 994 (4th Cir. 1987), and insists, to the contrary, that "'alternative determinations' should each be held material, and thus a basis for issue preclusion," IV Mem. 10 (quoting Restatement (First) of Judgments § 68 cmt. n). Notably, in *Ritter*, the Fourth Circuit considered circumstances in which (as here) the defendant had raised collateral estoppel *defensively* to preclude relitigation of issues previously determined by the court, 814 F.2d at 989–90, whereas in *Microsoft*, the Fourth Circuit considered whether *offensive* collateral estoppel should preclude relitigation of certain factual findings, 355 F.3d at 325.

Because, as noted, the motion before me involves defensive collateral estoppel, I look first to *Ritter*. There, the district court had dismissed the plaintiff's legal claims of discrimination against her employer under the Equal Pay Act ("EPA") and Age Discrimination in Employment Act ("ADEA") and held a bench trial on her equitable claims under Title VII. 814 F.2d at 988. At trial, the court found that Ritter "was not qualified for tenure" ("tenure issue") and that the only valid comparator she identified "was clearly more qualified" than she ("comparator issue"). *Id.* at 989–90. Ritter appealed the dismissal and the trial ruling. *Id.* at

989.  The Fourth Circuit affirmed the results of trial based on the trial court's finding on the

tenure issue, without reaching the comparator issue, but remanded for the trial court to hold a

second trial, this time by jury, on the EPA and ADEA claims.  *Id.* at 988.

On remand, the employer moved for summary judgment on the EPA and ADEA claims,

arguing that, "because the ADEA and EPA claims had common elements with the Title VII

claim, the issues determined by the court in the Title VII claim collaterally estopped the

relitigation of those issues before a jury," and the district court granted the motion.  *Id.* at 988–

90.  Ritter again appealed, and the Fourth Circuit considered "whether the findings of fact made

by the trial judge in the Title VII equitable suit should collaterally estop the relitigation of those

facts before the jury on the remanded EPA and ADEA legal actions."  *Id.* at 988.[14]

The Fourth Circuit decided that, even though "the doctrine of collateral estoppel was

designed to bar the relitigation of issues determined in a *prior* suit," it could apply to relitigation

within the same suit (as in the case before it), because where the relitigation "involves the same

parties, the same issues arising out of the same set of facts, and the same court," the "'sameness'

or mutuality of parties in interests which serves as the basis for the development of collateral

estoppel doctrines" is present.  *Id.* at 991–92.  Thus, the case before it was "the classic case in

which the court can utilize the doctrine of collateral estoppel without fear of denying a litigant a

right to argue his claims to the best of his ability before a competent court."  *Id.* at 992.

The court then considered whether collateral estoppel should apply, given that the district

court decided both the tenure issue and the comparator issue when resolving Ritter's Title VII

---

[14] As for the summary judgment ruling precluding trial *by jury*, because the issues had been
decided by the judge at a bench trial, the Fourth Circuit observed that "an equitable
determination can have collateral-estoppel effect in a subsequent legal action and . . . this
estoppel does not violate the Seventh Amendment."  *Ritter*, 814 F.2d at 990–91 (quoting
*Parklane Hosiery*, 439 U.S. at 335).

claim, and the Fourth Circuit had affirmed based on only the tenure issue.  *Id.* at 993.  It observed the general rule that, "where the court in the prior suit has determined two issues, either of which could independently support the result, then neither determination is considered essential to the judgment" and collateral estoppel does not bar relitigation of either issue, unless "one of the two determinations is upheld on appeal," in which case "collateral estoppel [bars relitigation] as to that issue.  *Id.*  The Fourth Circuit noted:

> The rationale underlying this corollary to the collateral estoppel doctrine is that it guards against the use of non-essential dicta and ancillary findings to estop later litigations.  . . . Non-essential findings should not serve as the basis for collateral estoppel because the litigants might not have concentrated their energies and resources upon the full development and presentation of these issues. Thus, . . . this requirement ensures the integrity and competence of any particular finding before it is allowed to estop collateral relitigation.

*Id.* at 993–94.

Despite this rule, the Fourth Circuit concluded that collateral estoppel barred relitigation of both issues in the case before it, reasoning that collateral estoppel is "limited by the overriding principle that the courts should protect a litigant's right to a full and fair opportunity to litigate his claims" but otherwise "capable of flexible determination to serve the interests of judicial economy by preventing needless relitigation."  *Id.* at 994.  It noted that Ritter "had a full and fair opportunity to litigate" the comparator issue as well as the tenure issue, given that she had "conducted extensive discovery" and "presented a vigorous argument to the trial court" on the comparator issue, and both rounds of litigation involved "the same parties, the same issues, the same facts, and even the same court."  *Id.*

*Zeno v. United States*, No. DKC-09-544, 2009 WL 4910050 (D. Md. Dec. 11, 2009), *aff'd*, 451 F. App'x 268 (4th Cir. 2011), in which this Court considered both *Ritter* and *Microsoft*, also provides guidance.  In *Zeno*, the plaintiff, an attorney who had been subject to

disciplinary proceedings in Puerto Rico, Massachusetts, and Texas, filed suit (with his wife) in this Court against several federal judges, the United States Attorney for the District of Puerto Rico, and several Assistant United States Attorneys, a Massachusetts state court judge, two clerks from the Massachusetts state court, and three Massachusetts attorneys. *Id.* at *1. The defendants moved to dismiss, and this Court granted the motion on the bases of lack of personal jurisdiction, improper venue, and, with regard to the defendant judges, prosecutors, and clerks, absolute and qualified immunity. *Id.* The plaintiffs appealed but then voluntarily dismissed their appeal. *Id.*

Thereafter, they filed suit again in this Court, against the same federal defendants as in their earlier lawsuit, as well as the United States. *Id.* at *2. They asserted that the Court had jurisdiction under the Federal Tort Claims Act. *Id.* The defendants moved to dismiss and the Court considered both claim and issue preclusion, concluding that claim preclusion barred the plaintiffs' claims in the second suit. *Id.* at *6. As for issue preclusion, the Court observed:

> In *In re Microsoft*, [355 F.3d 322,] the plaintiffs attempted to use *offensive* collateral estoppel to preclude the defendant from relitigating factual findings that were made in a case brought against the defendant by different plaintiffs in a different court. In deciding the meaning of "critical and necessary," the court expressed the following concern regarding the use of *offensive* collateral estoppel: "If a trial court were to make an unnecessary or collateral finding in a case and the defendant appealed the judgment, the appellate court, in affirming the judgment, would generally not reach the unnecessary findings. Thus, such findings would evade appellate review." *Id.* at 327.[15] The court noted that the United States

---

[15] The *Microsoft* Court stated that, if the judgment went up on appeal, the court in which issue preclusion is raised "must take care to limit is application to facts that were necessary to the judgment actually affirmed by the [appellate court]." *Microsoft*, 355 F.3d at 328. Here, Capital One appealed the dismissal of its claims in the Virginia litigation but then abandoned the appeal. *See* IV Mem. 1; Mot. to Dismiss Cross-Appeal, Ex. 11, Jt. Rec. 349–55 (stating that the question it posed for the Federal Circuit, "whether Capital One's antitrust counterclaims, as pleaded before discovery, alleged enough facts about the relevant market and Intellectual Venture's [sic] . . . conduct to state a claim," was "effectively irrelevant because the District of Maryland . . . allowed Capital One to file new antitrust counterclaims against IV based on a more developed pleading," and if the Federal Circuit ruled in Capital One's favor, it "would move to transfer and

Supreme Court granted courts "broad discretion to determine when [offensive collateral estoppel] should be applied" because of a "greater possibility of unfairness from the use of offensive collateral estoppel." *Id.* at 326. The court decided that parties would have a greater opportunity for full litigation of issues if the "critical and necessary" requirement were interpreted strictly to mean that the issue or fact must be "essential to," instead of merely "supportive of" the judgment in the prior proceeding in order to be barred by collateral estoppel in a future proceeding. In other words, in the Fourth Circuit, issues are generally not barred by collateral estoppel when more than one issue could independently support the result of the prior judgment.

*Zeno*, 2009 WL 4910050, at *7 (emphasis added; original emphasis removed).  Indeed, the

Fourth Circuit noted that, in *Ritter*, it "essentially appl[ied] a law-of-the-case principle" while

"call[ing] it collateral estoppel and appl[ying] it in the exceptional circumstances of that case,

where the parties were the same, the issues were the same, the facts were the same, and even the

court was the same."  355 F.3d at 328.  In *Microsoft*, the Fourth Circuit held, *in the context of*

*offensive collateral estoppel*, that "when issue preclusion is considered in the context of two

separate litigations, the restrictive principle recognized in *Ritter* remains viable—that if a

judgment in the prior case is supported by either of two findings, neither finding can be found

essential to the judgment." *Id.*

But, significantly, in *Zeno*, this Court then noted that, "[d]espite the Fourth Circuit's

general rule regarding alternative rulings and collateral estoppel, the Fourth Circuit [in *Ritter*]

applied *defensive* collateral estoppel to bar issues in a case where two issues were previously

decided and where both of the issues could have independently supported the result." *Zeno*,

2009 WL 4910050, at *8 (citing *Ritter*, 814 F.2d 986).  This Court concluded in *Zeno* that

"defensive collateral estoppel . . . bar[red] the court's consideration of issues that involve[d] 'the

same parties, the same issues, the same facts, and even the same court.'" *Id*.  It reasoned:

---

consolidate these claims with the ongoing litigation in Maryland, and that consolidation would not meaningfully expand the relief that Capital One seeks in that litigation").

Though this case has been assigned to a different judge, Plaintiffs' allegations regarding the individual Defendants are exactly the same as in Plaintiffs' complaint in the prior case. Because the complaints are nearly identical, this case presents the same issues of personal jurisdiction, venue, and immunity as to the individual Defendants that were resolved by the court's judgment in the prior proceeding. Furthermore, Plaintiffs had a full and fair opportunity to litigate those issues in the prior proceeding. Plaintiffs filed a notice of appeal in the Fourth Circuit after their case was dismissed, and then asked the Fourth Circuit to dismiss their appeal, citing a change in their own legal strategy. In doing so, Plaintiffs conceded the issues of personal jurisdiction, venue, and immunity as to the individual Defendants. The court's prior decision became final when Plaintiffs' appeal was dismissed by the Fourth Circuit. Finally, despite the fact that the court's previous decision rested on three alternative grounds for dismissal—personal jurisdiction, venue, and immunity—all of the grounds apply in this case.

*Id.*

As noted, what IV seeks to invoke is defensive collateral estoppel. Thus, the "greater possibility of unfairness from the use of offensive collateral estoppel" is not present. *See Microsoft*, 355 F.3d at 326. And, the prior litigation in the Eastern District of Virginia involved "the same parties, the same issues, [and] the same facts." *Ritter*, 814 F.2d at 994. Although the prior litigation was not in this Court, Judge Trenga's reasoning and analysis in his comprehensive written opinions in the Virginia case is available to me. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13CV0740 (AJT/TCB), 2015 WL 7283108, at *1, *4 (E.D. Va. Nov. 17, 2015); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13-CV-740 AJT, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013). Certainly, the conclusion that Capital One's alleged relevant market was "not a 'relevant market' under any recognized antitrust jurisprudence," *Intellectual Ventures*, 2013 WL 6682981, at *5, which provided a basis for dismissal of the monopolization and attempted monopolization claims, *see id.* at *5, *8, was only one of two alternative grounds for dismissal of these claims. *See id.* at *6–7 (concluding that capital One failed to alleged unlawful monopoly power sufficiently); *see also id.* at *8 ("Capital

One's attempted monopolization claim alleges the same injury, and in the same fashion, as its monopolization claim . . . and fails to state a claim for the same reasons.").

But, as noted, Capital One does not challenge whether it had a full and fair opportunity to litigate the sufficiency of its market definition before the Eastern District of Virginia.  *See* Capital One Opp'n 15–17.  Indeed, Capital One filed an opposition to IV's motion to dismiss in that court and argued its position at a hearing, advocating for its alleged relevant market in both instances.  Moreover, the court considered both the opposition brief and the oral argument in resolving the motion, *id.* at *5 (citing hearing transcript and opposition).  Also, as in *Zeno*, Capital One appealed the prior court's ruling to the Fourth Circuit and then withdrew its appeal.  Thus, the sufficiency of the market definition was fully and fairly litigated.  Under these circumstances, it is appropriate to apply defensive collateral estoppel in this case to estop Capital One from arguing that its relevant market, which has not changed materially from the relevant market alleged in the Virginia litigation, is not a relevant market for antitrust purposes.

## Conclusion

In sum, IV's Motion for Summary Judgment, ECF No. 656, IS GRANTED because *Noerr–Pennington* immunity and collateral estoppel both bar Capital One's antitrust claims.  The parties' Motions to Seal, ECF Nos. 658, 665, and 676, ARE GRANTED.  IV's objections to the Joint Record Exhibits, ECF No. 674, ARE OVERRULED.  A separate Order will issue.

Dated: November 30, 2017                              _____/S/_____
                                                     Paul W. Grimm
                                                     United States District Judge

lyb